# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RACER PROPERTIES LLC,
a foreign limited liability company,                    Civil Case No. _____

           Plaintiff,

                                       Honorable
vs.                                                    Mag. Judge

ECALP CORP., a foreign corporation,

           Defendant.
_____/

## NOTICE OF REMOVAL

Pursuant to 39 U.S.C. § 409(a) and 28 U.S.C. § 1442(a)(1), the United States

Postal Service ("USPS" or "Postal Service"), by its attorneys, Saima S. Mohsin,

Acting United States Attorney for the Eastern District of Michigan, and Anthony

C. Gentner, Assistant United States Attorney, hereby removes this action (Case

No. 2020-184360-CB), which is now pending in the Sixth Judicial Circuit Court

for the State of Michigan, from said state court to the United States District Court

for the Eastern District of Michigan, Southern Division.    In support thereof, the

USPS submits as follows:

1.      On October 30, 2020, Plaintiff RACER Properties, LLC ("RACER")

commenced civil proceedings in the Circuit Court for Oakland County, Michigan,

against Defendant ECALP Corp. ("ECALP") seeking, *inter alia*, a declaratory

judgment with respect to the ownership of certain real property located in the City of Pontiac, Michigan, and commonly known as 711 North Glenwood Avenue ("Property").   Copies of all process, pleadings, and orders in possession of the USPS are attached.

2.     The Property is the current site of the Michigan Metroplex Processing and Distribution Center, an approximately 900,000 square foot facility, the USPS uses to carry out its core mission of "maintain[ing] an efficient system of collection, sorting, and delivery of the mail nationwide."   39 U.S.C. § 403(b)(1). The Postal Service has leased the land upon which the Metroplex is built, first from General Motors Corporation, and later from RACER, since 2004.

3.     The USPS has authority to acquire, in any lawful manner, any interest in real property that the Postal Service deems necessary or convenient for its operations.   39 U.S.C. § 401(5).   Relevant here, the 2004 ground lease between the USPS and RACER contains an option for the Postal Service to purchase the fee simple title to the Property.

4.     Based on the parties' pleadings, it appears ECALP claims an interest in the fee simple title to the Property arising from a 2018 purchase agreement between ECALP and RACER, a claim that RACER apparently disputes.

5.     The USPS also asserts an interest in the fee simple title to the Property.   Prior to this litigation, on May 8, 2020, the USPS properly exercised in

2

writing the purchase option under its 2004 ground lease with RACER, at which

time the Postal Service became an equitable owner of the Property as a matter of

law.   *Rosenthal v. Shapiro*, 52 N.W.2d 859, 862 (Mich. 1952) (holding that the

exercise of an option vests in the purchaser an equitable ownership in the land).

6.     Thus, while not named as a defendant in this action, the USPS is a real

party in interest in the subject matter of this case by virtue of its equitable

ownership of the Property.   *See Riccobono v. Whitpain Twp.*, 497 F. Supp. 1364,

1370 (E.D. Pa. 1980) (holding that an equitable owner of real property qualifies as

a real party in interest who may sue to protect property rights).

7.     As a result, this action is removable under the Postal Reorganization

Act of 1970 ("PRA"), 39 U.S.C. § 101, *et seq*.   Under the PRA, federal district

courts "have original but not exclusive jurisdiction over all actions brought by or

against the Postal Service."   39 U.S.C. § 409(a).   "Any action brought in a State

court to which the Postal Service is a party may be removed to the appropriate

United States district court."   *Id.*; *Cont'l Cablevision of St. Paul, Inc. v. U.S.

Postal Serv.*, 945 F.2d 1434, 1437 (8th Cir. 1991) ("Section 409(a) does create for

the United States Postal Service an independent ground for removal from a state

court to a federal court. The general purpose of removal in such a case is to give

the Postal Service, an instrumentality of the United States, the protection of a

federal forum, if it should desire it.").   Here, the PRA provides the USPS, a real

3

party in interest in the state court litigation, a federal forum to protect its equitable

interest in the fee title to the Property against competing claims of ownership.

8.     Moreover, this action is removable under 28 U.S.C. § 1442(a)(1),

which provides in relevant part:

> (a) A civil action or criminal prosecution commenced in a State
> court and that is against or directed to any of the following may
> be removed by them to the district court of the United States
> for the district and division embracing the place wherein it is
> pending:
>
> > (1) The United States or any agency thereof or any
> > officer (or any person acting under that officer) of
> > the United States or of any agency thereof, sued in
> > an official or individual capacity for any act under
> > color of such office . . .

The Supreme Court has explicitly endorsed a broad reading of Section 1442(a)(1)

rather than "a narrow, grudging interpretation."  *Willingham v. Morgan,* 395 U.S.

402, 407 (1969).   Courts must therefore construe the removal statute considering

its basic purpose to protect the federal government from state interference with its

operations.  *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007).

9.     Further, naming the United States, or agency or officer thereof, as a

party defendant is not necessary in order to effectuate removal under Section

1442(a)(1).  *See Nationwide Investors v. Miller*, 793 F.2d 1044, 1046 (9th Cir.

1986); *Anderson v. Occidental Life Ins. Co. of California*, 727 F.2d 855, 856 (9th

Cir. 1984).   Indeed, in other cases involving an agency of the United States as a

real party in interest, the government has properly removed those actions from state to federal court, even when not named as a party.   *See Palmiter v. Action, Inc.*, 733 F.2d 1244, 1246 (7th Cir. 1984); *Goods v. Hous. Auth. of Baltimore City*, No. CIV. WDQ-10-2293, 2011 WL 809488 (D. Md. Mar. 2, 2011).

10.     Accordingly, removal under Section 1442(a)(1) is appropriate here, where the USPS is not a named defendant in this case, but nonetheless is a real party in interest, and the state court litigation could potentially interfere with the Postal Service's right to obtain fee title to the Property from RACER, or otherwise impair USPS operations at the site.

WHEREFORE, the USPS, as a real party in interest in this matter, hereby removes the action now pending in the Sixth Judicial Circuit Court for the State of Michigan to the United States District Court for the Eastern District of Michigan, Southern Division consistent with the provisions of 39 U.S.C. § 409(a) and 28 U.S.C. § 1442(a)(1).

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

*/s/ Anthony Gentner*
ANTHONY GENTNER (P79535)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9778
Dated: March 4, 2021                    anthony.gentner2@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2021, I electronically filed the foregoing

Notice of Removal with the Clerk of the Court using the ECF system.   I further

certify that I have caused the foregoing to be served via electronic mail to

following non-ECF participants:

Frances Belzer Wilson
DAWDA, MANN, MULCAHY & SADLER
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
*Counsel for RACER Properties, LLC*

Glenn L. Smith
WHEELER UPHAM, P.C.
250 Monroe Ave NW, Ste 100
Grand Rapids, MI 49503
(616) 459-7100
Smith@wuattorneys.com
*Counsel for ECALP CORP.*

*/s/ Anthony Gentner*
ANTHONY GENTNER
Assistant United States Attorney

# Court Explorer

✏️ Register of Actions                                    ← Go Back

**Case Number**
2020-184360-CB
**Entitlement**
RACER PROPERTIES vs. ECALP CORP
**Judge Name**
MARTHA D. ANDERSON
**Case E-Filed**
YES
**Case Filed**
10/30/2020
**Case Disposed**
00/00/0000

| Date | Code | Desc |
| --- | --- | --- |
| 03/01/2021 | MPS | MIFILE PROOF OF SERVICE FILED |
| 03/01/2021 | OTH | JNT CASE MGNT PLAN FILED |
| 01/28/2021 | MPS | MIFILE PROOF OF SERVICE FILED |
| 01/28/2021 | ANS | ANSWER FILED CTRCLM/POS/PLF |
| 01/28/2021 | AFM | AFFIRMATIVE DEFENSES FILED /TO CTRCLM/POS/PLF |
| 01/25/2021 | ORD | ORDER FILED TO APPEAR |
| 01/22/2021 | APR | DATE SET FOR E SCHED C ON 03082021 08 30 AM |
| 01/08/2021 | ATC | ANSWER TO COMPLAINT FILED /AFM/DFT |
| 01/08/2021 | AFM | AFFIRMATIVE DEFENSES FILED /DFT |
| 01/08/2021 | CMC | COUNTER FILED CLAIM/DFT |
| 01/08/2021 | MPS | MIFILE PROOF OF SERVICE FILED |
| 11/23/2020 | SUM | P/S ON SUMMONS FILED 11/02/20 |
| 11/23/2020 | MPS | MIFILE PROOF OF SERVICE FILED |
| 10/30/2020 | SI | SUMMONS ISSUED |
| 10/30/2020 | NTC | NOTICE FILED ASSIGN BUS CT |

| Date | Code | Desc |
|------|------|------|
| 10/30/2020 | C | COMPLAINT FILED |

Contact Us  |  FOIA  |  Privacy/Legal  |  Accessibility  |  HIPAA

Approved, SCAO

Original - Court
1st copy - Defendant
2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | **SUMMONS** | 2020-184360-CB |
| 6th   **JUDICIAL CIRCUIT** | | 2020-        -CB |
| **COUNTY PROBATE** | | JUDGE MARTHA D. ANDERSON |

| Court address | Court telephone no. |
|---|---|
| 1200 N. Telegraph Road, Pontiac, MI 48341 | 248-858-0345 |

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| RACER PROPERTIES LLC<br>c/o Frances Belzer Wilson<br>39533 Woodward Avenue, Suite 200<br>Bloomfield Hills, MI 48304<br>(248) 642-3700 | v | ECALP CORP, a foreign corporation<br>123 Grove Avenue, Suite 222<br>Cedarhurst, New York 11516 |

| Plaintiff's attorney, bar no., address, and telephone no. | |
|---|---|
| Frances Belzer Wilson (P68650)<br>Brian Considine (P53783)<br>Dawda, Mann, Mulcahy & Sadler, PLC<br>39533 Woodward Avenue, Suite 200<br>Bloomfield Hills, MI 48304; (248) 642-3700 | This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/efiling. |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.          **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 10/30/2020 | JAN 29 2021 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (6/19)   **SUMMONS**                                   MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED   Received for Filing   Oakland County Clerk   10/30/2020 2:35 PM

**SUMMONS**

Case No. 2020-          -CB

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ |

Signature _____

Name (type or print) _____

Title _____

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                                        Date

My commission expires: _____ Signature: _____
                                      Date                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                          Attachments

_____ on _____
                                              Day, date, time

_____ on behalf of _____ .

Signature

Original – Court

| **STATE OF MICHIGAN**<br>**6TH JUDICIAL CIRCUIT**<br>**COUNTY OF OAKLAND** | **NOTICE OF ASSIGNMENT TO THE**<br>**BUSINESS COURT** | **CASE NO.** 2020-184360-CB<br>2020-                -CB |

| Court address | Court telephone no. |
|---|---|
| 1200 N Telegraph Rd    Pontiac, MI  48341 | 248-858-0345 |

| Plaintiff's name(s), address(es), and telephone number(s)<br>RACER PROPERTIES LLC<br>c/o Frances Belzer Wilson<br>39533 Woodward Avenue, Suite 200<br>Bloomfield Hills, MI 48304;    (248) 642-3700 | v | Defendant's name(s), address(es), and telephone number(s)<br>ECALP CORP, a foreign corporation<br>123 Grove Avenue, Suite 222<br>Cedarhurst, New York 11516 |

| Plaintiff's attorney, bar no., address, telephone no., and email address<br>Frances Belzer Wilson (P68650)<br>Brian Considine (P53783)<br>Dawda, Mann, Mulcahy & Sadler, PLC<br>39533 Woodward Avenue, Suite 200<br>Bloomfield Hills, MI 48304;    (248) 642-3700 | Defendant's attorney, bar no., address, telephone no., and email address<br><br>This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/efiling. |

The ☑ Plaintiff ☐ Defendant  requests assignment of the above captioned matter to the Business Court.  The case qualifies for the Business Court and the matter should be identified as Business Court eligible pursuant to MCL 600.8031, MCL 600.8035, and LAO 2013-xx as indicated below. (Check all that apply.)

The case is a qualifying business or commercial dispute as defined by MCL 600.8031(1)(c) as:

☑ All of the parties are business enterprises;

☐ One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members of a limited liability company or similar business organization, directors, officers, agents, employees, suppliers, guarantors of a commercial loan, or competitors, and the claims arise out of those relationships;

☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances.

The business or commercial dispute involves:

☐ The sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a business enterprise.

☐ Information technology, software, or website development, maintenance or hosting;

☐ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;

☑ Contractual agreements or other business dealings, including licensing, trade secret, intellectual property, antitrust, securities, noncompete, nonsolicitation, and confidentiality agreements if all available administrative remedies are completely exhausted, including, but not limited to, alternative dispute resolution processes prescribed in the agreements;

☐ Commercial transactions, including commercial bank transactions;

☐ Business or commercial insurance policies; and/or

☑ Commercial real property.

☐ Other:(Please explain)

| October 29, 2020 | /s/ Frances Belzer Wilson |
|---|---|
| Date | Name |
| | Attorney for: Plaintiff |

**OCBC 01** (10/17) **NOTICE OF ASSIGNMENT TO THE BUSINESS COURT**

FILED   Received for Filing   Oakland County Clerk   10/30/2020 2:35 PM

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/efiling.

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

RACER PROPERTIES LLC,
a foreign limited liability company,

      Plaintiff,

v.

ECALP CORP., a foreign corporation,

      Defendant.

Case No. 20-      -CB

2020-184360-CB

Hon. JUDGE MARTHA D. ANDERSON

---

Frances Belzer Wilson (P68650)
Brian Considine (P53783)
Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
bconsidine@dmms.com
Attorneys for Plaintiff

---

There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the complaint.

DAWDA, MANN, MULCAHY & SADLER, PLC

      By: */s/ Frances Belzer Wilson*
          Frances Belzer Wilson (P68650)

**COMPLAINT**

    Plaintiff RACER Properties LLC, by its attorneys, Dawda, Mann, Mulcahy & Sadler, PLC,

for its Complaint against Defendant ECALP Corp. states as follow:

FILED    Received for Filing    Oakland County Clerk    10/30/2020 2:35 PM

## PARTIES

1.      Plaintiff RACER Properties LLC ("RACER") is a Delaware limited liability company wholly owned by RACER Trust (defined below).  RACER's principal place of business is in Michigan.

2.      Revitalizing Auto Communities Environmental Response Trust ("RACER Trust") is the sole member of RACER.

3.      The administrative trustee of RACER Trust is EPLET, LLC, a limited liability company formed under the laws of the State of Delaware.  The sole member of EPLET, LLC, is Elliott P. Laws, a resident of the Commonwealth of Virginia.

4.      RACER is the owner of the real property which is at issue in this matter, which is located in the City of Pontiac, County of Oakland, State of Michigan, and includes land and certain easements as more particularly described on **Exhibit 1**, and commonly known as 711 North Glenwood Avenue, Pontiac, Michigan (hereinafter the "Property").

5.      Defendant ECALP Corp. ("ECALP"), is upon information and belief, a New York corporation with its principal place of business at 123 Grove Avenue, Suite 222, Cedarhurst, New York 11516.

## JURISDICTION AND VENUE

6.      The amount in controversy, exclusive of costs and interest, is in excess of $25,000, and is otherwise in the jurisdiction of this Court.

7.      RACER also seeks declaratory relief relating to the parties' respective rights and obligations under a certain contract relating to the Property under MCR 2.605.

8.      Additional relief is requested by RACER against ECALP in connection with the Property.

9.      Venue is appropriate in this Court pursuant to MCL 600.1605 because the Property is located in Oakland County, and Defendant conducts business in Oakland County.

10.     This case involves a business or commercial dispute as defined in MCL 600.8031(2)(d), (e) and (g).

11.     This matter is properly before the business court pursuant to MCL 600.8035.

BACKGROUND

12.     RACER Trust is the largest environmental response trust in United States history and a successor for expressly limited purposes to Motors Liquidation Company f/k/a General Motors Corp. ("GM").  RACER Trust was formed pursuant to an Environmental Response Trust Consent Decree and Settlement Agreement ("Consent Decree") between and among, *inter alia*, the United States Government and certain State government environmental agencies and Attorneys General.  The Consent Decree was annexed and incorporated into the plan of reorganization in the GM Bankruptcy Case[1] ("Plan"), which was confirmed on March 29, 2011 by order of the bankruptcy court ("Confirmation Order").  [Bankr. Dkt. 9941].

13.     The Consent Decree was an agreement among GM and its affiliated Chapter 11 debtors, the United States on behalf of the Environmental Protection Agency ("USEPA"), various States or States' environmental agencies, and the Saint Regis Mohawk Tribe ("Tribe").  RACER Trust was expressly created to clean up and position for redevelopment certain industrial plants and other properties ("Trust Properties") formerly owned by GM.  Pursuant to the Plan and Confirmation Order, the Trust Properties were transferred to the RACER Trust on March 31, 2011.

---

[1] *In re General Motors Corp.*, 09-50026 ("GM Bankruptcy Case").  All references to filings in GM's Bankruptcy Case are public filings and extremely voluminous; they are referenced herein as "Bankr. Dkt."

3

14.     RACER Trust was funded by the United States Treasury with Troubled Assets Relief Program (or TARP) money.  Pursuant to the Plan and Consent Decree, GM "shall have no further liability, role, or residual interest with respect to the Environmental Response Trust or the Environmental Response Trust Properties" [Consent Decree, Bankr. Dkt. 9836, ¶ 30; Plan, Bankr. Dkt. 9836, pp. 48-49; GM Disclosure Statement, Bankr. Dkt. 8023, p. 84].  The Consent Decree designates the United States Government as the Trust's sole beneficiary.  As such, RACER has no responsibilities to GM or its creditors.  **In other words, GM is not RACER, and RACER is not GM.**

15.     RACER's general mission is to clean up legacy environmental impacts at former GM locations, such as the Property, and position them for redevelopment and beneficial reuse.  In so doing, RACER has an obligation to sell the former GM locations to which it assumed title, while taking into consideration the jobs and other economic benefits each prospective new purchaser may bring to the affected community.  The agreement establishing RACER Trust, and governing RACER, list six (6) criteria that must be taken into consideration when selling properties ("Sales Criteria"), including:

    a.      Whether the purchase price is sufficient;

    b.      The potential for job creation in the affected community and the state;

    c.      Increases in tax revenue or other benefits, like the reduction of blight, to the community, state or Tribe;

    d.      Avoiding an unanticipated increase in costs for the environmental cleanup;

    e.      The views of the local communities, the Tribe or the state; and,

    f.      The reputation and credibility of the prospective purchaser.

16.     RACER seeks declaratory relief relating to its obligation to sell the Property to Defendant USPS pursuant to the USPS Lease, as defined below, or to Defendant ECALP pursuant to the PSA, as defined below.

<u>GROUND LEASE BETWEEN RACER AND USPS</u>

17.     On or about November 29, 2004, GM, as landlord, and USPS, as tenant, entered a Ground Lease Agreement ("USPS Lease"). *See* USPS Lease, **Exhibit 2**.

18.     The USPS Lease was executed in connection with the Master Agreement, also dated November 29, 2004, between GM, USPS and Cunningham-Limp Development Company ("Master Agreement").  *See* USPS Lease, **Exhibit 2**; Master Agreement, **Exhibit 3**.

19.     Under the terms of the Plan and Consent Decree in the GM Bankruptcy Case, the Property was transferred to RACER and it is the successor and current landlord under the USPS Lease.

20.     The initial term of the USPS Lease is sixty (60) years, beginning on the "Commencement Date" (as provided for in the Master Agreement), which is believed to be October 3, 2006.

21.     Under Section 21 of the USPS Lease, so long as an Event of Default[2] has not occurred and is not continuing, USPS has the option to purchase the Property by giving written notice to RACER, at any time during the USPS Lease, that it is exercising its Option to Purchase. *See* USPS Lease, Section 21.1, **Exhibit 2**.

22.     Incorporated into the USPS Lease are the *General Conditions to USPS Ground Lease*, which are attached to the USPS Lease as Exhibit 5.  *See* USPS Lease, Section 1.2, Exhibit E to USPS Lease, **Exhibit 2**.

---

[2] As that term is defined in Section of 17.2 of the USPS Lease.  *See* **Exhibit 2**.

5

23.     Paragraph 4 of the *General Conditions to USPS Ground Lease* is applicable to assignments.  Specifically, paragraph 4(d) provides:

> Nothing contained herein shall be construed so as to prohibit transfer of ownership of the demised premises, provided that:
>
>   1.   such transfer is subject to this Lease agreement;
>
>   2.   both the original Landlord and the successor Landlord execute the standard *Certificate of Transfer of Title to the Leased Property and Lease Assignment and Assumption* form to be provided by the USPS Contracting Officer.

*See* Exhibit 5 to USPS Lease, **Exhibit 2**.

<u>RACER MARKETS THE PROPERTY FOR SALE
AND ENTERS INTO PSA</u>

24.     Prior to 2020, USPS had not expressed to RACER any immediate interest in exercising its option to purchase the Property under the USPS Lease.  In keeping with its mission to sell former GM locations, such as the Property, for redevelopment and beneficial reuse, RACER began marketing the Property for sale to third parties on or around April 1, 2011.

25.     Sometime in 2018, a prospective purchaser expressed interest in purchasing the Property from RACER and a Confidentiality Agreement was executed.

26.     Thereafter, on or about December 27, 2018, RACER, as the Seller, and the prospective purchaser and/or its assign, ECALP, as the "Buyer", entered into a Purchase and Sale Agreement for the Property, with an effective date of January 7, 2019 ("PSA").  *See* PSA, **Exhibit 4**.

27.     ECALP had full knowledge of and access to the terms of the USPS Lease prior to the execution of the PSA, which included USPS's right to exercise an option to purchase under Section 21 of the USPS Lease.

6

28.     Further, as set forth in the PSA, RACER represented and disclosed the existence of the USPS Lease to ECALP and the USPS Lease remained in full force and effect. *See* Section 23.10, PSA, **Exhibit 4**.

29.     Pursuant to the terms of the PSA, the obligations of RACER to consummate the sale to ECALP is conditioned upon certain Closing Conditions (as defined in the PSA), including but not limited to, the following:

    a.     the representations and warranties of ECALP made in the PSA, and any other Transaction Document delivered pursuant hereto are true, correct and complete when made and as of the Closing Date. *See* Section 6.2.1, PSA, **Exhibit 4**.

    b.     ECALP's representations and warranties expressly include an agreement that Seller relied on information provided by ECALP in determining that ECALP's proposed use of the Property will be a productive and beneficial use based on the Sales Criteria. To induce Seller to enter into the PSA, ECALP represented and warranted:

> "... that all information and documentation Buyer has provided, or caused to be provided, to or for the benefit of, Seller to assess whether or not Buyer's proposal for the Sale satisfies the Sales Criteria, is true, correct and complete in all material respects as of both the Effective Date and the Closing Date, and acknowledges and agrees that any misrepresentation with respect to, or material change in any such information or documentation will be deemed a Buyer Default, without further notice or act;…"

*See* Section 5.2.4, PSA, **Exhibit 4**.

    c.     the assignment by RACER to and the assumption by ECALP of the USPS Lease. *See* Section 6.2, PSA, **Exhibit 4**.

30.     Under the PSA, RACER is required to convey fee simple title to the Property, free and clear of all liens and encumbrances of any kind other than those "Permitted Exceptions" (as defined in the PSA), by virtue of a quit claim deed.  *See* Section 6.1.2, PSA, **Exhibit 4**.

31.     On or prior to a closing with ECALP, RACER is required to execute and deliver, or cause to be executed and delivered, certain "Seller's Closing Deliveries" (as defined in Section 7.1 of the PSA), including affidavits reasonably requested by the Title Company[3].  *See* Section 7.1.5, PSA, **Exhibit 4**.

32.     Upon belief, as part of the Seller's Closing Deliveries, the Title Company will require RACER to execute an owner's affidavit swearing under oath to at least the following:

     a.     RACER is the owner of the Property; and

     b.     That no tenant has an option to purchase or has exercised an option to purchase.

33.     Upon the occurrence of a "Buyer's Default", as defined in Section 11.1 of the PSA, RACER's sole and exclusive remedy is to terminate the PSA and RACER is permitted to retain the Extension Fees[4], if any, as liquidated damages.  *See* Section 11.2, PSA, **Exhibit 4**.

34.     In the event there is no Buyer's Default under the PSA and RACER does not convey the Property to ECALP following satisfaction of all Closing Conditions, the PSA provides that:

> "...**BUYER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH SELLER'S DEFAULT SHALL BE THE RETURN OF ANY EXTENSION FEES).**  Buyer will not have the right to sue Seller for specific performance to compel Seller to convey the Property to Buyer in accordance with this Agreement."  (Emphasis in original.)

*See* Section 11.3, PSA, **Exhibit 4**.

---

[3] "Title Company" has the meaning ascribed to it in the PSA.  *See* **Exhibit 4**.
[4] "Extension Fees" has the meaning ascribed to it in the PSA.  *See* **Exhibit 4**.

35.     Pursuant to the original terms of the PSA, ECALP had sixty (60) days from the "Effective Date"[5] to perform its Physical Inspection[6] of the Property and the Outside Closing Date[7] was set as ninety (90) days from the conclusion of the Physical Inspection Period.[8]

36.     Pursuant to the First Amendment to PSA dated May 10, 2019 ("First Amendment"), these deadlines were extended an additional sixty (60) days after ECALP deposited $1,000 with First American Title Insurance Company ("Title Company").  *See* First Amendment to PSA, **Exhibit 5**.

37.     After ECALP's Physical Inspection Period under the First Amendment expired, the parties executed a Second Amendment to PSA dated July 26, 2019 ("Second Amendment"), which, after ECALP deposited an additional $50,000 with the Title Company, established a New Diligence Completion Date[9] that was no later than 365 days from the July 26, 2019 date (i.e., July 26, 2020) and an Outside Closing Date of August 31, 2020.  *See* Second Amendment to PSA, **Exhibit 6**.

38.     After the execution of the Second Amendment, ECALP continued to engage in due diligence and formally requested a Prospective Purchaser Agreement ("PPA") with the United States Environmental Protection Agency ("USEPA") on or about November 19, 2019.

39.     At that time ECALP disclosed its identity to USEPA, and thus ECALP's and its principals' identities became publicly available.

---

[5] "Effective Date" has the meaning ascribed to it in the PSA.  *See* PSA, p. 2, **Exhibit 4**.

[6] "Physical Inspection" shall have the meaning ascribed to it in Section 2.2.1 of the PSA.  *See* **Exhibit 4**.

[7] "Outside Closing Date" shall have the meaning ascribed to it in the PSA.  *See* "Basic Terms", PSA, **Exhibit 4**.

[8] "Inspection Period" shall have the meaning ascribed to it in Section 2.2.1 of the PSA.  *See* PSA, **Exhibit 4**.

[9] "New Due Diligence Completion Date" shall have the meaning described to it in Section 3 of the Second Amendment.  *See* Second Amendment, **Exhibit 6**.

40.     Subsequent to November 19, 2019, ECALP commenced negotiating a PPA with USEPA.  It is RACER's understanding that as of August 31, 2020, ECALP has not reached an agreement with USEPA on the content of a PPA.

41.     Although it has not finalized a PPA with USEPA, ECALP has not sought an extension of the deadlines in the Second Amendment and, as of the filing of this Complaint, the PSA, as amended, expired on August 31, 2020.

### USPS EXERCISES OPTION TO PURCHASE

42.     On or about May 8, 2020, USPS issued a written notification to RACER electing to exercise its option to purchase the Property in accordance with Section 21 of the USPS Lease ("Option Notice").  *See* Option Notice, **Exhibit 7**.

43.     As of May 8, 2020, USPS and RACER were within the "Initial Term", as defined under the USPS Lease, and USPS was not in default under the terms of the USPS Lease.

44.     Upon exercising its option to purchase the Property, USPS requested to close on the transfer of the Property from RACER to USPS on or by September 9, 2020.  *See* Option Notice, **Exhibit 7**.

### RACER NOTIFIES PURCHASER OF EXERCISED OPTION, ECALP'S DEFAULT, AND TERMINATION AND EXPIRATION OF PSA

45.     On or about May 12, 2020, RACER advised ECALP that USPS had exercised its option to purchase the Property pursuant to the terms of the USPS Lease and a copy of the Option Notice was provided to ECALP.

46.     On or about June 25, 2020, RACER provided ECALP a proposed Termination Agreement memorializing the termination of the PSA.  Shortly thereafter, in communications with RACER, ECALP indicated it wanted to close on the sale of the Property under the PSA, despite USPS exercising its option to purchase the property.  ECALP stated that it believed it could

10

convince USPS that USPS was responsible for cleaning up historical contaminants on the Property and, therefore, USPS would withdraw its option to purchase.

47.     RACER disagreed with this assertion because the provisions of the Master Agreement, making GM (now RACER, as GM's successor via the Confirmation Order to such Agreement) responsible for the cleanup of the Property, are clear and are contrary to such a position.

48.     On August 21, 2020, RACER served ECALP's authorized agent with RACER's formal written termination of the PSA, based on the exercise by USPS of its option to purchase the Property.  In the same communication, RACER directed the Title Company to disburse to ECALP the escrowed funds it was holding under the First Amendment and Second Amendment, including the return of ECALP's "New Due Diligence Fee" of $50,000.  *See* PSA Termination Notice, **Exhibit 8**.

49.     On August 26, 2020, ECALP rejected RACER's termination of the PSA.

50.     Subsequently, ECALP, through its counsel, acknowledged that the PSA and the contemplated sale of the Property to ECALP is subject to the USPS Lease, but claimed that RACER is not permitted to terminate the PSA and close with USPS.  However, representatives of ECALP, when asked, stated that ECALP would not commit to honoring USPS's properly exercised option to purchase the Property.

51.     ECALP's position, as set forth herein, is not in keeping with the Sales Criteria because it potentially would result in interference and delay with RACER's obligations to clean up the Property and possibly increase costs for the cleanup work.  Moreover, it bears on the credibility of ECALP, which RACER is required to evaluate under the Sales Criteria when contracting with a buyer.

52.     Thus, ECALP's warranties, representations and covenants under the PSA were untrue, incorrect, and otherwise incomplete in material respects.

53.     ECALP never executed the proposed Termination Agreement.

54.     To date, ECALP has never sought to extend the July 26, 2020 New Diligence Completion Date or the Outside Closing Date of August 31, 2020, and therefore, the PSA has expired on its terms.

55.     USPS claims that upon exercising its option to purchase the Property, it is the equitable owner of the Property.

56.     Given USPS's position that it is the equitable owner of the Property, RACER is or will be unable to meet certain requirements in the PSA or of the Title Company, including at least the following:

a.      Execute the necessary Seller's affidavit representing that RACER is the owner of the Property (in light of USPS claiming it now holds equitable title);

b.      Execute the necessary Seller's affidavit representing that USPS, as tenant of the Property, has not exercised any right to purchase the Property; and

c.      Convey to Purchaser the necessary title to the Property free and clear of all liens and encumbrances of others.

57.     Despite the expiration of the PSA and the assertion by USPS of an equitable interest in the Property, RACER's attempts to proceed with a sale of the Property to USPS have been hindered because the Title Company refuses to proceed with a closing with USPS until ECALP has signed the Termination Agreement.

58.     The Title Company also advised that it would be unable to provide closing services if RACER were to proceed to a closing with ECALP because USPS has asserted an equitable ownership interest in the Property and because RACER would be unable to affirmatively state in its owner's affidavit that (a) it has clear title to the Property, and (b) no tenants of the Property exert any claims to the Property.

59.     ECALP has demanded that RACER close on the transfer of the Property under the PSA.

60.     RACER is unable to close the transaction for the sale of the Property to ECALP for the reasons set forth in this Complaint.

61.     Prior to filing this action, RACER renewed its request to ECALP that it execute the Termination Agreement.  To date, ECALP has refused and/or failed to execute the Termination Agreement.

## COUNT I
## DECLARATORY JUDGMENT

62.     Plaintiff RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

63.     Prior to May 8, 2020, RACER entered into a PSA, as amended, with ECALP for the sale and purchase of the Property.

64.     USPS is in its Initial Term (as defined under the USPS Lease) and USPS is not in default under the USPS Lease.

65.     On May 8, 2020, USPS exercised in writing its option to purchase the Property under the USPS Lease.

66.     The transaction contemplated under the PSA, as amended, is subject to RACER's assignment of and ECALP's assumption of the USPS Lease.

67.     The sale of the Property by RACER to ECALP cannot close for the following reasons: USPS's claim of an equitable ownership interest to the Property based on it exercising its option to purchase as set forth in this Complaint, statements by ECALP's representatives that it will not fully assume the Ground Lease terms to convey the Property to USPS, and the expiration of the PSA.

68.     Pursuant to Section 11.1 of the PSA, ECALP is in default as a result of its untruthful and/or inaccurate representation and warranties.

69.     Section 11.3 of the PSA permits RACER to terminate the PSA if a Buyer's Default occurs and allows RACER to retain any Extension Fees paid by ECALP.

70.     RACER is also unable to close on the transfer of the Property to USPS because the Title Company refuses to proceed with closing on a conveyance from RACER to USPS until both RACER and ECALP have signed the Termination Agreement directing the disbursement of the escrowed funds to ECALP.

71.     ECALP has demanded that RACER complete the sale pursuant to the properly exercised option to purchase and transfer its right, title and interest in the Property under the PSA, as amended.

72.     There is a genuine, bona fide dispute and an actual controversy and disagreement which exists between the parties as to their respective rights in and to the Property and their obligations under their respective contracts at issue, being the PSA, as amended, and the USPS Lease.

WHEREFORE, Plaintiff RACER respectfully requests that this Honorable Court enter a judgment declaring as follows:

a.     That USPS properly and validly exercised its option to purchase the Property under the USPS Lease;

b.     That upon exercising its option to purchase the Property under the USPS Lease on May 8, 2020, USPS became the equitable owner of the Property;

c.     That ECALP is in default under the PSA and RACER is permitted to terminate the PSA and retain all Extension Fees paid by ECALP currently being held by the Title Company;

d.     That the PSA, as amended, between RACER and ECALP has expired by its own terms and it otherwise is terminated as a result of USPS exercising its option to purchase the Property; and

e.     Such further relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

73.     Plaintiff RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

74.     RACER and ECALP entered into the PSA, as amended.

75.     ECALP breached the terms of the PSA, as amended, and pursuant to Section 11.1 of the PSA, there is a Buyer's Default as a result of ECALP's untruthful and/or inaccurate warranties and representations.

76.     Section 11.3 of the PSA permits RACER to terminate the PSA if a Buyer's Default occurs and allows RACER to retain any Extension Fees paid by ECALP as liquidated damages.

77.     RACER has been damaged as a result of the Buyer's Default by ECALP and is entitled to retain the $51,000 in extension fees paid by ECALP under Section 11.2 of the PSA, as amended, which fees are being held by the Title Company.

WHEREFORE, Plaintiff RACER respectfully requests that this Honorable Court enter a judgment in its favor and against ECALP in the amount of $51,000, together with interest from the date of the filing this Complaint, together with any other relief this Court deems appropriate under the circumstances.

Respectfully submitted,

DAWDA, MANN, MULCAHY & SADLER, PLC

By:  */s/ Frances Belzer Wilson*
Frances Belzer Wilson (P68650)
Brian Considine (P53783)
Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
bconsidine@dmms.com
Attorneys for Plaintiff

Dated:  October 29, 2020

02470234.DOCX

16

# EXHIBIT 1

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

All those tracts or parcels of land lying and being in the City of Pontiac, Oakland County, State of Michigan, and being more particularly described on as follows:

Part of lot 500, including vacated streets and alleys lying adjacent to said lots of the "Plat of Modem Housing Corporation Addition", as recorded in Liber 20 of Plats on Page 22, Oakland County Records, all or part of Lots 1 through 23, inclusive, Block 1, including vacated streets and alleys lying adjacent to said lots of "Modern Housing Corporation's Oakland Park", a subdivision of part of the North ½ of Section 21, Township 3 North, Range 10 East as recorded in Liber 46 of Plats on Page 21, Oakland County Records; including part of Sections 20 and 21, Township 3 North, Range 10 East, all being located in the City of Pontiac, Oakland County, State of Michigan and being more particularly described as follows:

Commencing at the East ¼ corner of Section 20, Township 3 North, Range 10 East, as recorded in Liber 20101, Page 712, Oakland County Records, said point also being the West ¼ of Section 21, Township 3 North, Range 10 East, thence along the East Section line of said Section 20, North 6 degrees 58 minutes 26 seconds West, 147.20 feet to the Point of Beginning and the North right-of-way line of East Montcalm Street (variable width), thence along said North right-of-way line, South 84 degrees 26 minutes 26 seconds West, 1,280.69 feet; thence North 07 degrees 33 minutes 31 seconds West, 614.02 feet; thence North 02 degrees 09 minutes 35 seconds West, 66.80 feet; thence North 84 degrees 05 minutes 48 seconds East, 244.44 feet; thence North 05 degrees 54 minutes 12 seconds West, 741.12 feet; thence North 84 degrees 05 minutes 48 seconds East, 1,788.80 feet; thence South 05 degrees 54 minutes 12 seconds East, 153.03 feet; thence North 84 degrees 05 minutes 48 seconds East, 91.20 feet; thence South 05 degrees 54 minutes 12 seconds East, 116.97 feet; thence North 84 degrees 05 minutes 48 seconds East, 385.00 feet to the Westerly right-of-way line of North Glenwood Avenue; thence along said right-of-way the following courses: South 05 degrees 54 minutes 12 seconds East, 300.00 feet to a curve to the right; thence along said curve an arc distance of 144.17 feet, radius 300.00 feet, central angle 27 degrees 32 minutes 04 seconds, and chord bearing of South 07 degrees 51 minutes 50 seconds West, 142.79 feet; thence South 21 degrees 37 minutes 52 seconds West, 489.35 feet to a curve to the left; thence along said curve an arc distance of 192.56 feet, radius 400.00 feet, central angle of 27 degrees 34 minutes 56 seconds, and chord bearing of South 07 degrees 50 minutes 24 seconds West, 190.71 feet; thence South 05 degrees 57 minutes 05 seconds East, 100.25 feet to the North right-of-way line of East Montcalm Street (variable width); thence along the said right-of-way line, South 83 degrees 49 minutes 03 seconds West, 606.04 feet to a deflection point; thence South 84 degrees 26 minutes 26 seconds West, 303.94 feet to the Point of Beginning. Containing 71.858 acres, more or less.

Subject to all recorded easements and rights-of-way.

**Tax Parcel ID Number**: 63-64-14-21-101-007

**Commonly known as:** 711 North Glenwood Avenue, Pontiac, Michigan 48340

EXHIBIT 2

# GROUND LEASE AGREEMENT

between

GENERAL MOTORS CORPORATION, a Delaware corporation,

as Landlord

and

UNITED STATES POSTAL SERVICE, an independent
establishment of the executive branch of the government of the United States,

as Tenant

November 27th, 2004

## GROUND LEASE AGREEMENT

This Ground Lease Agreement (this "Lease") is entered into as of November _19_, 2004 (the "Effective Date"), by and between GENERAL MOTORS CORPORATION, a Delaware corporation ("Landlord"), and UNITED STATES POSTAL SERVICE, an independent establishment of the executive branch of the government of the United States ("Tenant"). This Lease is being executed in connection with the Master Agreement of even date herewith among Landlord, Tenant, and Cunningham-Limp Development Company (the "Master Agreement").

## 1. DEFINITIONS AND EXHIBITS.

**1.1 Definitions.** The following defined terms have the meanings set forth in the Sections of this Lease indicated below:

| Term | | Term | |
|---|---|---|---|
| Additional Rent | Section 3.3 | Landlord's Holding Costs | Section 3.2(b)(ii) |
| Affiliate | Section 10.1 | Landlord's Notice | Section 17.4 |
| Alterations | Section 5.1 | Landlord's Remediation | Section 6.7 |
| Award | Section 12.4 | Laws | Section 6.2 |
| Buildings | Section 2.1 | Leasehold Mortgage | Section 14.6(a) |
| Casualty | Section 11.1 | Leasehold Mortgagee | Section 14.6(a) |
| Completion Date | Section 4.5 | Loan Documents | Section 17.1(c) |
| Concept Plans | Section 4.3 | Master Agreement | Opening |
| Construction | Section 4.4 | Net Proceeds | Section 13.1 |
| Construction Costs | Section 17.3(b) | Note | Section 17.1(c) |
| Construction Lender | Section 11.2 | Option Start | Section 21.1 |
| Construction Loan | Section 14.5(f) | PCBs | Section 6.3(b) |
| Construction Start Date | Section 4.3 | Percentage Reduction of Rent | Section 12.3 |
| Deed of Trust | Section 17.1(c) | Percentage Reduction in Fair Market Value | Section 13.3 |
| Demolition Period | Section 4.1 | Permitted Violations | Section 18 |
| Effective Date | Opening | Person | Section 3.2 |
| Environmental Laws | Section 6.3(a) | Plans | Section 4.3 |
| Event of Default | Section 17.2 | Premises | Section 2.1 |
| Fair Market Value | Section 13.3 | Purchase Date | Section 21.1 |
| GMAC | Section 3.2(a) | Qualified Mortgagee | Section 14.6(b) |
| Hazardous Substances | Section 6.3(b) | Renewal Term | Section 2.3 |
| Improvements | Section 2.1 | Rent | Section 3.3 |
| Initial Period | Section 17.4(a) | Reports | Section 4.3 |
| Initial Improvements | Section 4.1 | Restoration Fund | Section 13.1 |
| Initial Term | Section 2.2 | State | Section 3.2(c)(iv) |
| Inspection | Section 6.5 | Substantial Taking | Section 12.2 |
| Inspection Period | Section 6.6 | Taking | Section 12.1 |
| Intercreditor Agreement | Section 14.5(b) | Taking Date | Section 12.2 |
| Land | Section 2.1 | Takings Determinations | Section 13.3(a) |
| Landlord | Opening | Taxes | Section 8.1 |
| Landlord Affiliates | Section 10.2 | Tenant | Opening |
| Landlord Obligations | Section 4.1 | Tenant Affiliates | Section 10.2 |
| Landlord's Address | Section 3.2 | | |

| Term | | Term | |
|------|--|------|--|
| Tenant Equipment | Section 5.2 | Transfer | Section 14.2 |
| Tenant's Notice | Section 21.1 | | |
| Term | Section 2.3 | | |

**1.2 Exhibits.** The Exhibits listed below are attached to and incorporated in this Lease. In the event of any inconsistency between such Exhibits and the provisions of this Lease, this Lease shall control. The Exhibits to this Lease are:

| | | |
|--|--|--|
| Exhibit A | – | Legal Description of the Land |
| Exhibit B | – | Form of Intercreditor Agreement |
| Exhibit C | – | Form of Improvement Deed |
| Exhibit D | – | Form of Property Deed |
| Exhibit E | – | USPS General Conditions |

## 2.  DEMISE.

**2.1 Demise.** Subject to the provisions of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the real property consisting of approximately 72.5 acres located at 711 North Glenwood Avenue, Pontiac, Michigan 48340-9000, described in Exhibit A and all appurtenances thereto (the "Land"), together with all buildings ("Buildings"), structures, pavement, lighting fixtures and other improvements now or later installed or constructed upon the Land (the Buildings and all structures, pavement, lighting fixtures and other improvements being herein collectively referred to as the "Improvements"). The Land and the Improvements are together hereinafter referred to as the "Premises."

**2.2 Term.** The term of this Lease (the "Initial Term") shall be (unless terminated earlier as provided herein) the period commencing on the Commencement Date (as defined in the Master Agreement) and continuing for sixty (60) years following the Commencement Date; provided that if the Commencement Date is other than the first day of a month, this Lease shall continue until the date sixty (60) years following the last day of the month in which the Commencement Date occurs.

**2.3 Renewal Term.** Provided that Tenant is not in default under this Lease beyond any applicable cure period, Tenant shall have the option to extend the term of this Lease for two (2) periods of ten (10) years (each a "Renewal Term") on all of the terms and conditions set forth herein (except that there shall be no further renewal options after the second Renewal Term). Tenant may exercise its option to extend the term of this Lease for each Renewal Term by delivering written notice to Landlord not later than twelve (12) months prior to the expiration of the Initial Term or first Renewal Term, as applicable. The "Term" of this Lease shall mean the Initial Term and, if applicable, the Renewal Term.

**2.4  Condition.**  LANDLORD LEASES AND TENANT TAKES THE PREMISES AS IS.  TENANT ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4.1, NEITHER LANDLORD NOR ANY LANDLORD AFFILIATE (AS HEREINAFTER DEFINED) HAS MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) COMPLIANCE WITH LAWS (AS HEREINAFTER DEFINED), (v) LOCATION, (vi) USE, (vii) OPERATION, OR (viii) THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE (AS HEREINAFTER DEFINED); AND ALL RISKS INCIDENT

THERETO ARE TO BE BORNE BY TENANT EXCEPT AS SET FORTH IN THE MASTER AGREEMENT. TENANT ACKNOWLEDGES THAT THE PREMISES HAVE BEEN INVESTIGATED AND INSPECTED BY TENANT AND ARE SATISFACTORY TO TENANT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY OF THE PREMISES OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY (EXCEPT AS SET FORTH IN THE MASTER AGREEMENT) FOR ANY DAMAGES, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES. LANDLORD ACKNOWLEDGES THAT THE FOREGOING WAIVERS AND ACKNOWLEDGEMENTS BY TENANT SHALL NOT AFFECT LANDLORD'S OBLIGATIONS UNDER THE MASTER AGREEMENT.

**2.5 Quiet Enjoyment.** Landlord covenants that, during the Term, neither Landlord, nor anyone claiming by, through or under Landlord shall disturb Tenant's quiet and peaceful possession of the Premises, subject, however, to (a) the provisions of the Master Agreement and this Lease, (b) the Permitted Exceptions, and (c) any other matter created or consented to by Tenant. Tenant acknowledges that this Lease is subject and subordinate to the easements recorded or to be recorded against the Premises pursuant to the Master Agreement, including, without limitation, the access easement over the Premises in favor of Landlord relating to certain remediation requirements of Landlord described in the Master Agreement.

**2.6 Title to Improvements.** During the Term, Tenant shall be deemed to own, and shall hold title to, all Improvements. Upon expiration or earlier termination of the Term of this Lease, title to all Improvements shall automatically vest in, revert to, and become the property of Landlord without compensation to, or requirement of consent or other act of, Tenant and without the necessity of execution of a deed, bill of sale, conveyance, or other act or agreement of Tenant, and without any payment of any kind or nature by Landlord to Tenant or to any other person, including any Leasehold Mortgagee (as hereinafter defined). Tenant shall thereafter have no further rights to or interest in any of the Improvements. Upon or at any time after the expiration or earlier termination of the Term of this Lease, if requested by Landlord, unless such termination is due to Tenant's exercise of its option to purchase the Premises in accordance with Article 21 below, Tenant shall, without charge to Landlord, promptly execute, acknowledge and deliver to Landlord a deed and a bill of sale that (a) conveys to Landlord all of Tenant's right, title, and interest in and to the Improvements; (b) assigns to Landlord all contracts designated by Landlord relating to the operation, management or maintenance of the Premises or any part thereof; and (c) conveys or assigns, as the case may be, to Landlord all plans (including but not limited to the Plans (as hereinafter defined)), records, registers, permits, and other papers and documents which may be necessary for or useful in connection with the operation and management of the Premises.

## 3. RENT.

**3.1 Payment of Rent.** On or before the Effective Date, Tenant shall pay rent to Landlord, without setoff, counterclaim, or deduction of any kind, in the amount of $100.00 for the entire Term (the "Initial Rent"). The Initial Rent and all other covenants and promises of the parties hereto set forth herein and in the Master Agreement constitute good and adequate consideration for the agreements set forth herein.

**3.2 Place of Payment.** Tenant shall pay the Rent (as hereinafter defined) to Landlord in lawful money of the United States of America, at the following address ("Landlord's Address"):

By Mail:      General Motors Corporation
c/o Enterprise Activities Group
P.O. Box 77000
Department 771280
Detroit, MI 48277-1280

or to such other individual, partnership, limited liability company, association, corporation or other entity (each, a "Person") or at such other place as Landlord may from time to time designate by written notice to Tenant.

**3.3 Net Lease; Additional Rent.** It is the intent of the parties that Landlord shall not be required to pay any costs or provide any services in connection with the Premises, and Tenant shall bear all costs relating to the Premises. Accordingly, Tenant covenants and agrees to pay all costs relating to this Lease and the Premises which accrue during or are allocable to the Term (together, "Additional Rent"), including (a) Taxes; (b) insurance costs; (c) utility charges; (d) operating expenses; and (e) maintenance and repair expenses, all as provided in this Lease (collectively, the "Rent").

## 4.  INITIAL DEVELOPMENT.

**4.1 Improvements.** Landlord and Tenant acknowledge that Tenant intends to develop the Premises with Buildings and related Improvements (together, the "Initial Improvements") in accordance with the Concept Plans (as hereinafter defined). The intended use of the Initial Improvements is for use by the United States Postal Service for a Processing and Distribution Center, or other uses permitted herein. Tenant shall, at its sole cost and expense, within thirty (30) days after the Commencement Date, construct and maintain a eight (8) foot, chain link fence on the Premises and along the boundary line between the Premises and the Retained Property (as defined in the Master Agreement).

**4.2 Cooperation.** As requested in writing by Tenant, Landlord shall provide reasonable cooperation in obtaining any permits, licenses, or authorizations necessary and incidental to the construction or placement of Improvements on the Premises by Tenant, provided that Landlord shall not be required to expend any funds.

**4.3 Plans and Specifications.** Subject to the terms of the Master Agreement, Landlord and Tenant acknowledge that Tenant will by July 1, 2005, submit to Landlord the general concept design plans and elevations for all work to be performed in constructing the Initial Improvements (the "Concept Plans"). Landlord shall provide Tenant with Landlord's written comments on the Concept Plans within thirty (30) days after Landlord's receipt of the Concept Plans. In the event that Landlord fails to respond within such 30-day period, Landlord shall be deemed to have approved the Concept Plans. Upon Landlord's approval or deemed approval, Tenant shall, at its sole cost and expense, cause detailed architectural and engineering plans and specifications for all work to be performed in constructing the Initial Improvements (the "Plans") to be prepared and delivered to Landlord for its review. All such Plans shall be in general conformance with the Concept Plans  Tenant shall not cause or permit to occur any material alteration or modification of the Concept Plans without Landlord's prior written consent. Tenant agrees that the design of the Improvements shall be in general conformance with and consistent with the existing buildings and uses of Landlord's adjacent property. Landlord's approval of the Plans or any alteration or modification thereof shall not be deemed to certify that the Plans comply with applicable Laws or are free from defects. Notwithstanding anything herein to the contrary, Tenant acknowledges that, pursuant to the Master Agreement and the Confidentiality Agreement (as defined in the Master Agreement), Tenant has received and reviewed the environmental reports (the "Reports") that further discuss the environmental condition of the Premises. Tenant further acknowledges and agrees that Landlord shall

have the right to make comments to the Concept Plan in order to accommodate any remediation or monitoring activities that Landlord may need to perform in connection with the environmental condition of the Property, as further set forth in the Master Agreement.

**4.4 Construction.** Tenant shall commence construction of the Initial Improvements in accordance with the Plans (the "Construction"). Following commencement of Construction, Tenant shall, at its sole cost and expense, diligently and continuously cause the Initial Improvements to be constructed in accordance with the Plans.

**4.5 Completion.** Tenant shall substantially complete construction of the Initial Improvements in accordance with the Plans. Tenant shall provide Landlord copies of all mechanics' lien releases or other lien releases in connection with the construction of the Initial Improvements, notarized and unconditional, in such form as Landlord shall have approved in its sole discretion, copies of all building permits, if applicable, evidencing inspection and approval by the issuers of said permits, and an architect's certification that the Initial Improvements have been constructed in accordance with the Plans. The date upon which the Certificate of Occupancy is issued shall be referred to herein as the "Completion Date."

**4.6 Force Majeure.** If Landlord's Obligations or Tenant's commencement or completion of the Initial Improvements is delayed as a result of any cause or causes which Landlord or Tenant is, despite its commercially reasonable efforts, unable to prevent or overcome, including but not limited to acts of God, strikes, walkouts or other labor disputes, shortages of labor or materials, riots, civil strife, war, or acts of a public enemy, the dates for Landlord to complete Landlord's Obligations and Tenant to commence and substantially complete construction of the Initial Improvements shall be extended by the period of such delay.

**4.7 Restrictions.** In connection with the construction of the Initial Improvements, Tenant warrants and agrees that:

      (a)     Tenant shall, at all times, comply with any and all Environmental Laws in connection with or related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Premises. Except as set forth in the Master Agreement, Tenant shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to Tenant's use of or construction on the Premises.

      (b)     Tenant shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar Michigan law, on, at or below the Premises, and shall maintain generator-only status; provided, however, that Tenant may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal; and (ii) use and store commercial products on-site which may contain such substances.

      (c)     the Premises shall only be used for the following uses: those commercial uses specified in subcategories II, III, and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2) dated June 6, 1995 and any non-manufacturing industrial uses.

(d)     any site modifications required at, in, on, or below the Premises to accommodate the foregoing use are the sole obligation and liability of Tenant, and will be conducted at Tenant's sole expense; provided, however, that notwithstanding the foregoing, Tenant acknowledges and agrees that there are currently areas of the Premises which are undergoing corrective action (as described in the Master Agreement), and that development or use of these areas is, subject to the terms of the Master Agreement, at Tenant's sole risk and Landlord shall bear no direct, incidental, or consequential liability such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays, to Tenant in the event Landlord's activities during the Corrective Action Process (as defined in the Master Agreement) disrupt or interfere with Tenant's development, use of, or operations at, the Premises.

(e)     use of groundwater at, in, or under the Premises by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(g) Tenant acknowledges and agrees that any and all management of any utility lines or piping, including, without limitation, any sanitary or storm sewers (other than the storm sewer used by Landlord) and any gas, water, electrical, or any other similar utility lines or piping and any and all management of any septic systems which may be present at or below the Premises which management may be required or necessary to properly maintain the Premises or because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Premises, is (subject to the terms of the Master Agreement) the sole obligation and liability of Tenant or the owner of the Premises at the time of such activities.

Tenant acknowledges and agrees that Landlord shall be entitled to record all such restrictions against the Premises, either prior to the Commencement Date or at any time during the Term.

## 5.  ALTERATIONS AND TENANT EQUIPMENT.

**5.1 Alterations.**  Tenant shall have the right during the Term to make any changes, additions, alterations or improvements to the Premises (collectively, "Alterations"), subject to the terms of the Master Agreement.  Tenant shall not demolish or destroy any of the Premises without Landlord's consent.

**5.2 Tenant Equipment and Permitted Alterations.**  Tenant shall be permitted to make changes, additions, Alterations or improvements to the Premises and may install and remove trade fixtures, machinery, and equipment (collectively, "Tenant Equipment"), all without Landlord's consent, subject to the following:

(a)     the installation and removal of Tenant Equipment and Alterations shall be accomplished in a good and workmanlike manner (which means that the quality of workmanship and materials shall be at least equal to that of the then-existing Improvements), in material compliance with all applicable Laws;

(b)     Tenant shall pay the cost of installing and removing Tenant Equipment and Alterations so that the Premises at all times shall be free from any lien for labor, services, or materials supplied or claimed to have been supplied to the Premises as a result of the installation or removal of thereof;

(c)     title to all Alterations shall be deemed part of the Premises and subject to all provisions of this Lease as though included in the Premises as of the Effective Date;



(d)     all provisions of this Lease shall be in force and effect during the installation and removal of Tenant Equipment and Alterations;

(e)     Alterations made to the Premises by Tenant at any time during the Term shall not be construed as diminishing the value of the Premises;

(f)     Tenant shall not be required to demolish or remove any Alterations, but may do so at Tenant's option.  Should Tenant elect to remove such Alterations from the Premises, Tenant shall return the Premises to Landlord at the expiration or termination of the Term in a condition consistent with good engineering practices, damage by the elements or circumstances beyond the control of the Tenant, excepted.

(g)     All applicable provisions of the Master Agreement shall be in force and effect during the Alterations to the Premises.

**5.3 Easements.**  Tenant shall join with Landlord from time to time, at the request of Landlord, with respect to Tenant's interest in the Premises:  (a) to sell, assign, convey or otherwise transfer its interest in the Premises to any Person legally empowered to take such interest under the power of eminent domain; (b) to grant, in the ordinary course of business, easements, licenses, rights-of-way and other rights and privileges in the nature of easements; (c) to release, in the ordinary course of business, existing easements and appurtenances which benefit the Premises; (d) to dedicate or transfer unimproved portions of the Land for road, highway or other public purposes; (e) to execute petitions to have the Premises annexed to or incorporated in any municipal corporation, special district, special improvement district or utility district; (f) to execute covenants and restrictions affecting the Premises or any amendments thereto; and (g) to execute and deliver any instrument, in form and substance reasonably acceptable to Landlord, necessary or appropriate to make or confirm such grants or releases to any Person, with or without consideration, but in each case only if such grant, release or other action is either (i) in connection with the Master Agreement, or (ii) Tenant has received evidence satisfactory to it (in its sole discretion) that such grant, release or other action requested of Tenant is to be given in the ordinary course of business, does not interfere with and is not detrimental to the conduct of Tenant's business on the Premises, and does not materially impair the usefulness of, or Tenant's interest in, the Premises.

## 6.  USE AND OCCUPANCY.

**6.1 Use.**  Subject to the terms of the Master Agreement, Tenant may use and occupy the Premises for the operation of a United States Postal Service distribution warehouse, any commercial uses specified in subcategories II, III, and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2) dated June 6, 1995, and any non-manufacturing industrial uses.

**6.2 Compliance.**  Tenant shall comply with all Laws applicable to Tenant's use and occupancy of the Premises and shall keep and maintain the Premises in compliance with all applicable Laws, including, without limitation, all rules, regulations, ordinances and permits relating to noise control, soil erosion permits and utility permits.  "Laws" means any and all present or future federal, state or local laws (including common law), statutes, ordinances, rules, regulations, orders, decrees or requirements of any and all governmental or quasi-governmental authorities having jurisdiction.  The term "Laws" shall include all Environmental Laws (as hereinafter defined).

**6.3 Environmental Matters.**  Tenant agrees that it, its successors, assigns, and tenants shall comply with the terms of the Master Agreement and shall not treat, store, or dispose of any hazardous substance, hazardous waste, or toxic substance, as those terms are defined under CERCLA 42 U.S.C. §§ 9601 *et*

*seq.*, RCRA 42 U.S.C. §§ 6901 *et seq.*, or TSCA 15 U.S.C. §§ 2601 *et seq.*, at, on, or within the Premises and shall maintain generator-only status; provided, however, that Tenant, its successors, assigns, or tenants may accumulate such substances or wastes as allowed under applicable Laws for off-site treatment, storage, or disposal so long as such substances or wastes are generated on-site.  Tenant shall not cause or permit any Hazardous Substance to be brought upon, kept, used, or released in or about the Premises in violation of any Environmental Laws.  Without limiting the foregoing, if the presence of any Hazardous Substance on or about the Premises caused or permitted by Tenant results in any contamination of any portion thereof in violation of any Environmental Laws, Tenant shall promptly take all actions at its sole cost as are necessary to return the Premises to the condition existing prior to the introduction of any such Hazardous Substance, subject to obtaining Landlord's prior written consent to the actions to be taken by Tenant, which consent may be granted or withheld in Landlord's sole and absolute discretion.  Landlord shall require its prior written consent to the selection of the contractors and other experts involved in the inspection, testing and removal or abatement activities, the scope of activities to be performed, the manner and method for performance of such activities, and such other matters as may be reasonably required or requested by Landlord for the continued use of the Premises and the safety of the Premises and all occupants thereof.  Tenant shall provide Landlord with such documentation and information reasonably requested by Landlord with respect to any inspection, testing, remediation, removal, abatement, or other activities undertaken by or on behalf of Tenant under this Section 6.3.  The obligations and liabilities of Tenant in this Section 6.3 shall survive expiration or termination of the Term.  Furthermore, if any such activities extend beyond the Term, Tenant shall pay to Landlord, in addition to any other amounts under this Section 6.3, rent for the Premises during such period in an amount equal to the amount that could have been received by Landlord for the use of the Premises during such period in the absence of contamination by Hazardous Substances.

(a)      "Environmental Laws" means all federal, State and local laws, whether common laws, court or administrative decisions, statutes, rules, regulations, ordinances, court orders and decrees, and administrative orders and all administrative policies and guidelines concerning action levels of a governmental authority (federal, State or local) now or hereafter in effect relating to the environment, public health, occupational safety, industrial hygiene, any Hazardous Substance (including the disposal, generation, manufacture, presence, processing, production, release, storage, transportation, treatment or use thereof), or the environmental conditions on, under or about the Premises, as amended and as in effect from time to time (including the following statutes and all regulations thereunder as amended and in effect from time to time:  the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.*; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. §§ 11001 *et seq.*; the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f) *et seq.*; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901 *et seq.*; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §§ 1801 *et seq.*; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 *et seq.*; the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251 *et seq.*; the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601 *et seq.*; and the Occupational Safety and Health Act, 29 U.S.C. §§ 651 *et seq.*; and any successor statutes and regulations to the foregoing).

(b)      "Hazardous Substances" means (i) all chemicals, materials and substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (ii) all other chemicals, materials and substances, exposure to which is prohibited, limited or regulated by any governmental authority, including

asbestos and asbestos-containing materials in any form, lead-based paint, radioactive materials, polychlorinated biphenyls ("PCBs"), and substances and compounds containing PCBs.

**6.4 Inspection.** At any time and from time to time during the Term, Landlord may, at Landlord's sole cost and expense and on reasonable notice to Tenant (except in an emergency, which shall not require any notice), perform an inspection ("Inspection") of the Premises to evaluate Tenant's compliance with the terms of this Lease and applicable Laws.   Landlord may, at its sole option, hire any consultants, engineers or other professionals, reasonably necessary or desirable, in Landlord's sole opinion, to complete the Inspection. If any Inspection identifies a breach of Tenant's obligations herein, Tenant shall promptly, at its sole cost, take all necessary steps in accordance with this Lease to remedy such breach of any such violation.

## 7.  UTILITIES AND REPAIRS.

**7.1 Utilities.** From and after the earlier of the Commencement Date or the date of Tenant's possession of any portion of the Premises, Tenant shall pay, before delinquency, all water, sewer, electricity, gas, telephone and other communication, and all other utility charges related to the Premises, including (if applicable) costs and expenses incurred following the Commencement Date of providing utilities.

**7.2 Maintenance and Repair.** From and after the earlier of the Commencement Date or the date of Tenant's possession of any portion of the Premises, Tenant shall at all times maintain the Premises in as good repair and appearance as they were on such date and fit to be used for their intended use. Tenant shall take every other reasonable action necessary or appropriate for the preservation and safety of the Premises. Tenant shall promptly make all Alterations of every kind and nature, whether foreseen or unforeseen, which may be required to comply with the foregoing requirements of this Section 7.2 (for which Landlord's consent shall not be required).  In the event of an emergency, as determined in the reasonable discretion Landlord, Landlord may, but shall not be required to, immediately and without notice to Tenant, make any reasonably necessary emergency repairs or Alterations to the Premises, and Tenant shall, within 45 days upon demand, reimburse Landlord for the expenses incurred by Landlord (together with prompt payment act interest from the date paid by Landlord) in effecting such emergency repairs or Alterations.

**7.3 Encroachments.** If any Improvement hereafter constructed by Tenant shall (a) encroach upon any setback or any property, street or right-of-way adjoining the Premises, (b) violate the provisions of any restrictive covenant affecting the Premises, (c) hinder or obstruct any easement or right-of-way to which any of the Premises is subject or (d) impair the rights of others in, to or under any of the foregoing, Tenant shall, promptly after receiving notice or otherwise acquiring knowledge thereof and at its sole cost and expense, either (i) obtain from all necessary parties waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (ii) take such action as shall be necessary to remove all such encroachments, hindrances or obstructions and to end all such violations or impairments, including, if necessary, making Alterations.

## 8.  TAXES.

**8.1 Payment of Taxes.** Tenant shall, following the Commencement Date and during the Term, punctually pay and discharge or cause to be paid and discharged, as and when the same shall become due and payable, all applicable real and personal property taxes, assessments, special assessments and charges levied upon or with respect to the Premises, Tenant Equipment, or the personal property used in operating the Premises, all sales, use, rent or similar taxes assessed against Rent specified in this Lease,

and all taxes, levies and charges which may be assessed, levied or imposed in replacement of all or any part of real or personal property taxes, assessments, or special assessments as revenue sources, and which in whole or in part are measured or calculated by or based upon the Premises, the leasehold estate of Landlord or Tenant, the Rent payable by Tenant, or the Tenant Equipment or personal property used in operating the Premises (collectively, "Taxes"). In no event, however, shall Tenant be required to pay any estate, franchise or income taxes that are or may be imposed upon Landlord, or its successors or assigns. Tenant shall deliver to Landlord satisfactory evidence of payment within ten (10) business days after Landlord's written request therefor. Tenant shall pay any sales, use, rent or similar tax against Rent specified in this Lease at the times required under Article 3 hereof.

**8.2 Proration at Commencement and End of Term.** If the commencement or end of the term does not coincide with the commencement of end of a tax year, Taxes for the tax year in which the Term commences or ends shall be prorated between Landlord and Tenant, based on the most recent levy and most recent assessment. Such proration shall be subsequently adjusted when the bills for such Taxes become available. The provisions of this Section 8.2 shall survive the expiration or termination of the Term.

**8.3 Special Assessments.** Tenant shall pay all applicable special assessments and other like impositions levied or imposed for improvements installed and assessed either prior to or during the Term; provided, however, that Tenant may pay in installments any such special assessments or like impositions that may be so paid according to applicable Law and, in such event, Tenant shall only be required to pay those installments that become due and payable during the Term. If the commencement or end of the Term does not coincide with the commencement or end of a tax year, such special assessments or like impositions in which the Term commences or ends shall be prorated in the manner described in Section 8.2 for proration of Taxes. The provisions of this Section 8.3 shall survive termination of this Lease.

**8.4 Tax Bills.** Landlord shall make all arrangements necessary to have the collecting authority send all pertinent tax bills directly to Tenant or its designee. All pertinent tax bills received by Landlord shall be immediately forwarded directly to Tenant or its designee to permit timely remittance in the normal course of business. Landlord shall be fully liable for all interest and penalties reasonably chargeable due to its failure to perform as provided in this Section 8.4.

## 9. INSURANCE.

**9.1 Maintenance of Policies.** It is agreed that in recognition of Tenant's standing as an independent establishment of the executive branch of the government of the United States and in reliance upon the representation of Tenant that it will be self insured for purposes of meeting the requirements for insurance under this Lease, the following will not be applicable to the Tenant for so long as the United States Postal Service is the Tenant hereunder and is self insured. From and after the Commencement Date, Tenant shall maintain the following insurance on or in connection with the Premises:

       (a)    Insurance against physical loss or damage to the Improvements and Tenant Equipment as provided under a standard "All Risk" property policy including but not limited to flood (if the Premises are in a 100- or 500-year flood plain) and earthquake coverage (if the Premises are in an area of special earthquake hazard) in amounts not less than the actual replacement cost of the Improvements and Tenant Equipment. Such policies shall contain replacement cost and agreed amount endorsements and shall contain deductibles of not more than $10,000 per occurrence.

(b)    Commercial general liability insurance against claims for personal and bodily injury, death or property damage occurring on, in or as a result of the use of the Premises, in an amount not less than $2,000,000.00 per occurrence/annual aggregate including Garagekeepers Liability; provided, however, that the Landlord shall have the right to require such higher limits as may be reasonable and customary for properties of this size and type.

(c)    Worker's compensation insurance to the extent required by applicable Laws.

(d)    Comprehensive Automobile Liability covering all owned, non-owned and hired vehicles with limits of not less than $1,000,000 combined single limit.

(e)    Tenant shall maintain business income/interruption insurance on an actual loss sustained basis with a period of indemnity not less than one year from the time of loss.

(f)    During construction of Improvements and during any period in which substantial Alterations at the Premises are being undertaken, (i) builder's risk insurance (on a completed value, non-reporting basis) against "all risks of physical loss," including collapse and transit coverage, with deductibles not to exceed $10,000.00, in non-reporting form, covering the total replacement cost of work performed and equipment, supplies and materials furnished in connection with such construction or repair of Improvements or Tenant Equipment and (ii) general liability, worker's compensation and automobile liability insurance with respect to the Improvements being constructed, altered or repaired.

(g)    Such other insurance on or in connection with any of the Premises as Landlord may reasonably require, which at the time is commonly obtained in connection with properties similar to the Premises.

**9.2 Insurance Providers.**  The insurance required by Section 9.1 shall be written by companies that have a Best's rating of A-:VII or above and are authorized to conduct insurance business in the State. The insurance policies (a) shall be for such terms as Landlord may reasonably approve, (b) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, (c) shall name Landlord and Tenant as insured parties, as their respective interests may appear, and (d) shall name Tenant as the sole loss payee on all policies of casualty insurance.  If any such insurance shall expire, be withdrawn, become void, voidable or unreliable for any reason, including a breach of any condition thereof by Tenant or the failure or impairment of the capital of any insurer, or if for any other reason whatsoever such insurance shall become reasonably unsatisfactory to Landlord, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord.

**9.3 Premiums.**  Tenant shall pay as they become due all premiums for the insurance required by Section 9.1, shall renew or replace each policy and deliver to Landlord evidence of the payment of the full premium therefor or installment then due at least ten (10) days prior to the expiration date of such policy, and shall promptly deliver to Landlord certificates evidencing the existence of all policies.

**9.4 Blanket Policies.**  Any insurance that Tenant is required to obtain pursuant to Section 9.1 may not be carried under a "blanket" or umbrella policy or policies covering other properties or liabilities of Tenant.

**9.5 Insurable Value.**  Tenant shall have the replacement cost and insurable value of the Improvements and Tenant Equipment determined from time to time as required by the replacement cost and agreed amount endorsements and shall deliver to Landlord the new replacement cost and agreed amount endorsement or certificate evidencing such endorsement promptly upon Tenant's receipt thereof.

**9.6 Compliance with Policy Terms.**  Tenant shall promptly comply with and conform to (a) all provisions of each insurance policy required by this Article 9 and (b) all requirements of the insurers thereunder.

**9.7 No Additional Policies.**  Neither Landlord nor Tenant shall carry separate insurance concurrent in form or contributing, in the event of a Casualty or in the event of injury to or death of any person, with that required in this Article 9 unless (a) Landlord and Tenant, as the case may be, are included therein as named insureds, with loss payable as provided herein, and (b) such separate insurance complies with the other provisions of this Article 9.  Landlord and Tenant each shall immediately notify the other party of such separate insurance and shall deliver to the other party the original certificates and copies of the policies therefor.

**9.8 Waivers.**  All policies required hereunder shall contain full waivers of subrogation against the Landlord.

## 10. WAIVERS AND INDEMNITIES.

**10.1    Tenant's Waiver and Indemnification.**  Subject to those federal laws that specifically restrict the United States Postal Service's indemnity obligations, Tenant hereby waives all claims against Landlord for damages to any property or injury to or death of any person in, upon or about the Premises arising at any time and from any cause other than by reason of the willful misconduct or gross negligence of Landlord, its employees or agents, and Tenant shall indemnify and hold Landlord, its Affiliates and their respective partners, venturers, directors, officers, stockholders, employees, spouses, legal representatives, agents, successors and assigns (collectively, "Landlord Affiliates"), harmless from loss, damage, claim, liability, and cost (including reasonable attorneys' fees and disbursements) arising from (a) any default, breach or violation by Tenant under this Lease, or (b) any damage to any property or injury to or death of any person arising from or in connection with the use of the Premises by Tenant, except such as is caused by the willful misconduct or gross negligence of Landlord, its employees or contractors.  To the extent that Landlord recovers under the liability insurance carried pursuant to the requirements of this Lease, Tenant is hereby released from this indemnification to the extent of such proceeds.  "Affiliate" means, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

**10.2    Landlord's Waiver and Indemnification.**  Landlord hereby waives all claims against Tenant for damages to any property or injury to or death of any person in, upon or about the Premises arising at any time and from any cause other than solely by reason of the sole active willful misconduct of Tenant, its employees or agents, and Landlord shall indemnify, defend and hold Tenant, its Affiliates and their respective partners, venturers, directors, officers, stockholders, employees, spouses, legal representatives, agents, successors and assigns (collectively, "Tenant Affiliates"), harmless from loss, damage, claim, liability, and cost (including reasonable attorneys' fees and disbursements) arising from (a) any default, breach or violation by Landlord under this Lease, (b) Landlord's failure to maintain and repair the storm sewer line running under the Improvements pursuant to the Declaration of Storm Sewer Easement of even date herewith and filed in the real property records of Oakland County, Michigan, unless Tenant refuses to allow Landlord access to the Premises for the purpose of fulfilling Landlord's maintenance and repair obligations with respect to such storm sewer line, or (c) the gross negligence or willful misconduct of Landlord, its employees or contractors.  To the extent that Tenant recovers under the liability

insurance carried pursuant to the requirements of this Lease, Landlord is hereby released from this indemnification to the extent of such proceeds.

**10.3    Survival.**   The provisions of this Article 10 shall survive the termination of the Lease.

## 11. DAMAGE OR DESTRUCTION.

**11.1    Effect of Damage or Destruction.**   This Lease shall not be affected by any loss of or damage to any property included within or related to the Premises (a "Casualty"). In the event of a Casualty, Tenant may, at its sole discretion; (a) demolish the Improvements and remove all debris and return the Premises to Landlord in substantially the same condition as of the Commencement Date; (b) fully or partially demolish the Improvements and replace the Improvements upon the prior written approval of the Landlord and subject to the terms of the Master Agreement, or (c) shall promptly repair and restore the affected Improvements (subject to the terms of the Master Agreement) to a similar condition as existed immediately prior to the Casualty.

**11.2    Insurance Proceeds.**   If any Casualty occurs, Tenant shall give Landlord immediate notice thereof.

**11.3    Application of Insurance Proceeds.**   Landlord acknowledges that, so long as the United States Postal Service is the Tenant hereunder and self insures as described in Article 9 above, (i) no insurance proceeds shall be payable under any insurance policy and (ii) the United States Postal Service will pay all costs and expenses related to the repair and restoration of the Improvements. Any insurance proceeds shall be applied first to reimburse Landlord for all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in connection with the collection of such insurance proceeds. The balance of any insurance received by Landlord with respect to an insured Casualty shall be paid over, in whole or in part and subject to Article 13, to Tenant to pay for repairs or replacements necessitated by the Casualty provided that:  (a) no Event of Default shall exist hereunder; and in the event the Casualty occurs within the last twelve (12) months of the Term, Landlord shall have the right, in its sole discretion, to terminate the Term effective retroactively to the occurrence of the Casualty, in which event all insurance proceeds payable as a result of the Casualty shall be paid to, and become the sole property of, Landlord. Landlord shall have no obligation to see to the proper application of any insurance proceeds paid over to Tenant, nor shall any such proceeds received by Landlord bear interest or be subject to any other charge for the benefit of Tenant.  Landlord may, prior to the application of insurance proceeds, commingle them with Landlord's own funds and otherwise act with regard to such proceeds as Landlord may determine in its sole discretion.

## 12. CONDEMNATION.

**12.1    Notice.**   Landlord acknowledges that, so long as the United States Postal Service is the Tenant and not subject to condemnation or eminent domain rights, the provisions of this Article 12 shall not apply to Tenant.  If either Landlord or Tenant learns that any portion of the Premises has been or is proposed to be subjected to a Taking (as hereinafter defined), such party shall promptly notify the other of such Taking.  A "Taking" means the taking of any of the Premises as a result of the exercise of the power of eminent domain or condemnation for public or quasi-public use or the sale or conveyance of any of the Premises under the threat of condemnation.

**12.2    Termination Option on Substantial Taking.**   If a Taking occurs during the Term which shall materially reduce the fair market value of the Premises as a warehouse facility or materially interfere with any use of the Premises permitted under this Lease (a "Substantial Taking"), Tenant may, at its

option, terminate this Lease by giving written notice to Landlord on or before sixty (60) days after the Taking Date (as hereinafter defined). The "Taking Date" means, with respect to any Taking, the date on which possession of the portion of the Premises that is the subject of such Taking is transferred to the condemning authority. In such event, this Lease shall terminate effective as of the Taking Date, Tenant shall surrender the Premises according to Section 15.1 on or before thirty (30) days after the date of Tenant's notice of termination, and all Monthly Rent and other Rent shall be payable through the date Tenant so surrenders possession.

**12.3     Continuation of Lease.** If a Taking occurs during the Term that is not a Substantial Taking, or if a Substantial Taking occurs but Tenant does not exercise its termination option according to Section 12.2, then (a) Tenant shall promptly repair and restore any affected Improvements to at least their condition prior to the Taking, and (b) this Lease shall remain in full force and effect according to its terms, except that effective as of the Taking Date: (i) this Lease shall terminate automatically as to the portion of the Premises that is the subject of such Taking; and (ii) each payment of Monthly Rent due for (A) any remaining portion of the Term shall be reduced by subtracting from the amount that each such payment would otherwise have been required to be, a percentage thereof equal to the percentage obtained by dividing the ground area of the portion of the Land that is the subject of such Taking by the ground area of all of the Land prior to such Taking.

**12.4     Awards.** If a Substantial Taking occurs and Tenant exercises its termination option according to Section 12.2, Landlord shall be entitled to receive, and Tenant assigns to Landlord, the total award, compensation, damages or consideration paid or payable as a result of or in connection with any Taking (such total, an "Award"). If a Taking occurs that is not a Substantial Taking, or if a Substantial Taking occurs but Tenant does not exercise its termination option according to Section 12.2, the Award shall be paid over to Landlord and disbursed, subject to the provisions of Article 13, to Tenant to pay for repairs or replacements necessitated by the Taking, provided that: (a) no Event of Default shall exist hereunder; (b) the proceeds received by Landlord (together with any other funds delivered by Tenant to Landlord for such purpose) shall be sufficient in Landlord's judgment, to pay for any restoration necessitated by the Taking; and (c) such restoration can be completed, in Landlord's judgment, at least ninety (90) days prior to the end of the Term. Notwithstanding the foregoing, in the event the Taking occurs within the last twelve (12) months of the Term, Landlord shall have the right, in its sole discretion, to terminate this Lease effective retroactively to the Taking Date, in which event the Award shall be paid to, and become the sole property of, Landlord. Landlord shall have no obligation to see to the proper application of any portion of an Award paid over to Tenant, nor shall any such proceeds received by Landlord bear interest or be subject to any other charge for the benefit of Tenant. Landlord may, prior to the application of any such Award, commingle it with Landlord's own funds and otherwise act with regard to such funds as Landlord may determine in its sole discretion.

**12.5     Settlement.** Landlord is authorized to collect, settle and compromise, in its discretion, the amount of any Award. Provided that no Event of Default has occurred, Tenant shall be entitled to participate at its own expense with Landlord in any Taking proceeding or negotiations under threat thereof and to contest the Taking or the amount of the Award therefor to the extent of its interest therein. No agreement with any condemnor in settlement or under threat of any Taking shall be made by Tenant without the prior written consent of Landlord.

**13. RESTORATION OF PREMISES.**

**13.1     Restoration.** Landlord acknowledges that, so long as the United States Postal Service is the Tenant hereunder, and (x) self insures as described in Article 9 above with respect to insurance matters and (y) is not subject to condemnation or eminent domain rights, then (i) no insurance proceeds shall be

payable under any insurance policy or any Award available with respect to any Taking, and (ii) the United States Postal Service will pay all costs and expenses related to the repair and restoration of the Improvements. In all other cases, if the net proceeds of insurance resulting from any Casualty or the net Award resulting from any Taking other than a Substantial Taking (either, the "Net Proceeds") are less than Fifty Thousand Dollars ($50,000) and at the date of payment no Event of Default exists, the Net Proceeds shall be paid by Landlord to Tenant, to be used by Tenant to make repairs and restorations to the Premises required as a result of the Casualty or Taking, in which event Tenant shall comply with the provisions of Section 5.2 and Section 13.1(c) in connection with Alterations to the Improvements. If the Net Proceeds are Fifty Thousand Dollars ($50,000) or more, or if at the date of payment an Event of Default exists, or if the Net Proceeds have been paid in connection with a Substantial Taking, Landlord shall hold the Net Proceeds in a fund (the "Restoration Fund") and disburse amounts from the Restoration Fund only in accordance with the following conditions:

      (a)    prior to commencement of restoration, (a) the architects, contracts, contractors, plans and specifications for the restoration shall have been approved by Landlord in the exercise of Landlord's reasonable judgment, and (b) Landlord shall be provided with mechanics' lien insurance (if available) and performance and payment bonds reasonably acceptable to Landlord which insure satisfactory completion of and payment for the restoration, are in an amount and form and have a surety reasonably acceptable to Landlord and name Landlord as an additional dual obligee;

      (b)    at the time of any disbursement, no Event of Default shall have occurred and be continuing, any right to terminate this Lease (if applicable) under Section 12.2 shall have expired or been waived by Tenant, and no mechanics' or materialmen's liens shall have been filed against any of the Premises and remain undischarged or uncontested pursuant to and in accordance with Article 18;

      (c)    disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement, upon receipt of (a) satisfactory evidence, including architects' certificates, of the stage of completion, the estimated total cost of completion and performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (b) waivers of liens which shall be delivered in escrow from contractors and subcontractors who have performed work, (c) contractors' and subcontractors' sworn statements as to completed work and the cost thereof for which payment is required, (d) a satisfactory date-down endorsement to Landlord's policy of title insurance and (e) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed, in place and free and clear of mechanics' and materialmen's lien claims;

      (d)    each request for disbursement shall be accompanied by a certificate of Tenant, signed by the president or a vice president of the general partner of Tenant, describing the work for which payment is requested, stating the cost incurred in connection therewith, stating that Tenant has not previously received payment for such work and, upon completion of the work, also stating that the work has been fully completed and complies with the applicable requirements of this Lease including all Laws;

      (e)    Landlord may retain ten percent (10%) of the Restoration Fund until the restoration is fully completed;

(f)      the Restoration Fund may be commingled with Landlord's other funds and shall not bear interest; and

(g)      such other reasonable conditions as Landlord may impose.

**13.2      Excess Net Proceeds–Casualty.**  Any Net Proceeds of a Casualty remaining after restoration of the Premises shall be the sole property of, Landlord.  In no event shall Net Proceeds of any Casualty be retained by Landlord reduce the Total Project Cost hereunder.

**13.3      Excess Net Proceeds–Taking.**  Any Net Proceeds of a Taking remaining after restoration of the Premises shall be paid to, and be the sole property of, Landlord, except for that portion of the Award, if any, attributable to Tenant as described in Section 12.4 above.  In the event that Landlord retains any Net Proceeds of an Award as contemplated in the preceding sentence, the Total Project Cost shall (for the purpose of calculating the purchase price of the Premises under Section 21.2 only, and not for the purpose of calculating Monthly Rent) be reduced by a percentage equal to the lesser of the following: (a) the Percentage Reduction in Fair Market Value (as hereinafter defined) of the Premises occurring as a result of the Taking; or (b) the percentage represented by the total Net Proceeds of the Award divided by the Fair Market Value of the Premises immediately prior to the Taking.  The term "Fair Market Value" shall mean the fair market value of the Premises as a warehouse facility (and not necessarily for its highest and best use), and the term "Percentage Reduction in Fair Market Value" shall mean the percentage by which the Fair Market Value of the Premises is reduced as a result of the applicable Taking.  The Fair Market Value of the Premises immediately prior to the Taking and/or the Percentage Reduction in Fair Market Value of the Premises occurring as a result of the Taking, if finally determined in the Taking proceeding, shall be conclusive as to Landlord and Tenant, and, if not finally determined in the Taking proceeding, shall be determined as follows:

(a)      Tenant and Landlord shall attempt, in good faith, to agree on such Fair Market Value and/or Percentage Reduction in Fair Market Value (together, the "Takings Determinations").  If Tenant and Landlord fail, refuse, or are unable for any reason to agree on either Takings Determination within thirty (30) days following the applicable Taking, Tenant shall within fifteen (15) days thereafter select an appraiser and notify Landlord in writing of the name, address and qualifications of such appraiser.  Within fifteen (15) days following its receipt of such notice, Landlord shall select an appraiser and notify Tenant of the name, address and qualifications of such appraiser.  Such two appraisers shall endeavor to agree upon the applicable Takings Determinations.  If such two appraisers shall agree upon the applicable Takings Determinations, the Takings Determinations as so agreed shall be binding and conclusive upon Landlord and Tenant.

(b)      If such two appraisers shall be unable to agree upon the applicable Takings Determinations within thirty (30) days after the selection of an appraiser by Landlord, then such appraisers shall advise Landlord and Tenant of their respective Takings Determinations.  If the greater estimate of the applicable Takings Determination is less than or equal to one hundred five percent (105%) of the lesser estimate of the applicable Takings Determination, then such Takings Determination for purposes of this Section 13.3 shall equal the average of such two estimates, which amount shall be binding and conclusive upon Landlord and Tenant.  If the greater of the two estimates is more than one hundred five percent (105%) of the lesser of the two estimates, the two appraisers shall so advise Landlord and Tenant and shall select a third appraiser to make the applicable Takings Determination, which determination shall be binding and conclusive upon Landlord and Tenant.

(c)     If such two appraisers shall be unable to agree upon the designation of a third appraiser within ten (10) days after the expiration of the thirty (30) day period referred to in Section 13.2(b), or if such third appraiser does not make an applicable Takings Determination within thirty (30) days after his selection, then such third appraiser or a substituted third appraiser, as applicable, shall, at the request of either party hereto, be appointed by the office of the American Arbitration Association for the area in which the Land is located or, if this Lease is then the subject of litigation, by the court with jurisdiction thereof. The applicable Takings Determination made by the third appraiser appointed pursuant hereto shall be made within thirty (30) days after such appointment and shall be binding and conclusive upon Landlord and Tenant.

(d)     All appraisers selected or appointed pursuant to this Section 13.3 shall (a) be independent qualified MAI appraisers active in the market in which the Premises is located, with experience in appraising automobile sales and service facilities, (b) have no right, power or authority to alter or modify the provisions of this Lease, (c) utilize the definition of Fair Market Value and Percentage Reduction in Fair Market Value set forth above, and (d) be registered in the State if the State provides for or requires such registration. The costs and expenses of any appraiser selected by a party under this Section 13.3 shall be borne solely by such party, and the costs and expenses of a third appraiser, if any, shall be borne one-half by Landlord and one-half by Tenant.

**13.4    Tenant's Funds.** Prior to commencement of restoration and at any time during restoration, if the estimated cost of completing the restoration work free and clear of all liens, as reasonably determined by Landlord, exceeds the amount of the Net Proceeds available for such restoration, the amount of such excess shall, upon demand by Landlord, be paid by Tenant to Landlord to be added to the Restoration Fund. Any sum so added by Tenant which remains in the Restoration Fund upon completion of restoration shall be refunded to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of restoration, the Net Proceeds shall be deemed to be disbursed prior to any amount added by Tenant.

## 14. ASSIGNMENT, SUBLETTING AND FINANCING.

**14.1    Permitted Assignment and Subletting.** Landlord's consent shall not be required for an assignment of this Lease or a sublease of all or any portion of the Premises to a Tenant Affiliate (as such term is hereafter defined), provided (i) Tenant gives reasonable prior written notice to Landlord of the proposed assignment or sublease, and (ii) such assignee or sublessee executes such documents reasonably requested by Landlord to evidence such parties assumption of Tenant's obligations hereunder, and such parties acknowledgment to comply with the terms of the Master Agreement, as applicable. As used herein, the term Tenant Affiliate shall mean any entity which is another agency, department or establishment of the United States government, or, the successor in interest to the United States Postal Service as determined by applicable law.

**14.2    Assignment and Subletting.** Tenant shall not sell, assign or transfer this Lease or any interest herein, sublet or permit the occupancy or use by others of any of the Premises, or allow any transfer hereof by operation of law or otherwise (any of which is herein referred to as a "Transfer"), without the prior written consent of Landlord, which Landlord may withhold in the exercise of its sole discretion. Any Transfer not in compliance with the provisions of this Article 14 shall, at the option of Landlord, be void and of no force or effect. Tenant shall, by written notice in the form specified in the following sentence, advise Landlord of Tenant's intention on a stated date (which shall not be less than sixty (60) days after date of Tenant's notice) to sublet, assign or transfer any part or all of the Premises or its interest therein. Tenant's notice shall state the name and address of the proposed subtenant, assignee or

transferee, and a true and complete copy of the proposed sublease, assignment or other conveyance and all related documentation, executed by both parties, shall be delivered to Landlord with such notice. Tenant shall deliver to Landlord upon receipt from time to time throughout the Term or thereafter, any consideration received as a result of any Transfer, which shall include the difference, if any, between the amount of rent and similar payments received by Tenant as a result of such Transfer and the amount of Rent payable hereunder.

**14.3    Tenant Liability.**  If Tenant shall assign this Lease or sublet any of the Premises, Tenant shall be responsible for all actions and neglect of the assignee or subtenant and its officers, partners, employees, agents, guests and invitees as if such subtenant and such persons were employees of Tenant.  Nothing in this Section 14.3 shall be construed to relieve Tenant from the obligation to obtain Landlord's prior written consent

**14.4    No Release.**  The consent by Landlord to any Transfer shall not be construed as a waiver or release of Tenant from liability for the performance of all obligations to be performed by Tenant under this Lease, and Tenant shall remain liable therefor, nor shall the collection or acceptance of Rent from any assignee, subtenant or occupant constitute a waiver or release of Tenant from any of its obligations under this Lease.  Any consent given pursuant to this Article 14 shall not be construed as relieving Tenant from the obligation of obtaining Landlord's prior written consent to any subsequent Transfer.

**14.5    Equity Transfers.**  If Tenant is a partnership, limited liability company or unincorporated association, a withdrawal or change, whether voluntary, involuntary or by operation of law or in one or more transactions, of partners, members, or equity holders, owning a controlling interest in Tenant shall be deemed a voluntary assignment of this Lease and subject to the provisions of this Article 14.  If Tenant is a corporation, any dissolution, merger, consolidation or other reorganization of Tenant, or the sale, transfer or redemption of a controlling interest of the capital stock of Tenant in one or more transactions shall be deemed a voluntary assignment of this Lease and subject to the provisions of this Article 14.

**14.6    Financing.**

    (a)    Tenant's Right to Encumber.  Tenant shall not, without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole discretion, execute or deliver any mortgage, deed of trust, assignment of rents, assignment of leases, security agreement or other hypothecating instrument encumbering (a) Tenant's interest under this Lease or the leasehold estate in the Premises created hereby, (b) any agreements executed in connection with Tenant's operation of the Premises, or (c) Tenant's interest in any fixtures, machinery, equipment, Land, Improvements or other property constituting a part of the Premises securing any indebtedness or other obligation of Tenant or any other Person (a "Leasehold Mortgage"). "Leasehold Mortgagee" means the holder or beneficiary of any Leasehold Mortgage.

    (b)    Landlord's Consent.  Notwithstanding the provisions of Section 14.5(a) hereof, Landlord shall consent to one or more Leasehold Mortgages, provided that each Leasehold Mortgagee enters into an agreement with Landlord, in substantially the form attached hereto as Exhibit B (the "Intercreditor Agreement").  Tenant shall promptly upon demand reimburse Landlord for all costs incurred by Landlord in connection with (x) Landlord's review of any Leasehold Mortgages proposed by Tenant and with its execution of any Intercreditor Agreement, consents or other documents with or for the benefit of any Leasehold Mortgagee(s); (y) Landlord's payment or performance of any of Tenant's obligations under any Leasehold Mortgage; and (z) Landlord's purchase or payment of any Leasehold Mortgage or any obligation

secured by a Leasehold Mortgage. The holder of any Leasehold Mortgage consented to by Landlord shall be referred to herein as a "Qualified Mortgagee."

(c)     Qualified Mortgagees' Cure Rights.  Prior to terminating this Lease or exercising any other right or remedy hereunder for an Event of Default, Landlord shall give each Qualified Mortgagee notice in the manner and at the address specified in the Intercreditor Agreement with a Qualified Mortgagee of such Event of Default and afford it a period of 30 days after such notice is given in which to cure such Event of Default on behalf of Tenant; provided, however, that (a) if such Event of Default is not a failure to pay Rent and is susceptible of cure by a Qualified Mortgagee but cannot reasonably be cured within such 30-day period, then so long as any Qualified Mortgagee commences a cure within such 30-day period (and notifies Landlord that it has done so), its cure period shall be extended for as long as reasonably necessary for it diligently to pursue the cure to completion; (b) if such Event of Default is not a failure to pay Rent and is susceptible of cure by a Qualified Mortgagee but cannot reasonably be cured until the Qualified Mortgagee obtains possession of the Premises, then so long as any Qualified Mortgagee commences to obtain possession of the Premises within such 30-day period (and notifies Landlord that it has done so), its cure period shall be extended for as long as reasonably necessary for it to obtain possession of the Premises and then promptly commence and thereafter diligently pursue the cure to completion; and (c) if such Event of Default is not a failure to pay Rent and is not susceptible of cure by a Qualified Mortgagee, then so long as any Qualified Mortgagee commences to foreclose or otherwise enforce its Leasehold Mortgage within such 30-day period (and notifies Landlord that it has done so) and thereafter diligently pursues such foreclosure (or a conveyance in lieu thereof) to completion, upon such Qualified Mortgagee's acquisition of Tenant's interest under this Lease, and provided any other Events of Default have then been cured or are then being cured according to the foregoing provisions, Landlord shall waive such Event of Default that is not susceptible of cure by a Qualified Mortgagee.

(d)     Qualified Mortgagees' Right to Attorn.  If, by virtue of an Event of Default, Landlord reenters and repossesses the Premises without terminating this Lease or terminates this Lease, Landlord shall give notice thereof in the manner and at the address specified in the Intercreditor Agreement to each Qualified Mortgagee within 10 days after such reentry and repossession or termination, as the case may be.  If any Qualified Mortgagee notifies Landlord within 50 days after Landlord gives such notice that such Qualified Mortgagee would like to attorn to Landlord and either assume Tenant's obligations under this Lease (in the case of a reentry and repossession without termination of this Lease) or enter into a new lease with Landlord for the Premises (in the case of a termination of this Lease), and provided that such Qualified Mortgagee (a) pays Landlord all Monthly Rent and other Rent due Landlord under this Lease at the date of reentry and repossession or termination and which thereafter becomes due or would have become due if this Lease had not been terminated up to and including the date such Qualified Mortgagee's attornment to Landlord becomes effective, together with all of Landlord's expenses incident to the reentry and repossession or termination; and (b) covenants to promptly thereafter cure any Event of Default existing at the time of such reentry and repossession or termination that is not a failure to pay Rent and is susceptible of cure by a Qualified Mortgagee, then Landlord will accept such attornment and either (i) deliver possession of the Premises to such Qualified Mortgagee (or its approved designee) if Landlord has reentered and repossessed the same without terminating this Lease, whereupon such Qualified Mortgagee (or approved designee) shall assume in writing all obligations of Tenant arising under this Lease from and after the date possession is so delivered, whereupon any notice of Landlord advising of an Event of Default or other actions of Landlord to terminate this Lease by reason thereof shall be deemed rescinded and this Lease shall continue in full force and effect as a direct obligation between

Landlord and such Qualified Mortgagee (or its approved designee), or (ii) Landlord shall execute and deliver a new lease of the Premises to such Qualified Mortgagee (or its approved designee) for the balance of what would have been the Term had this Lease not been so terminated for the Rent and otherwise upon all of the same terms and conditions set forth in this Lease. Landlord shall have the same right to approve a designee of any such Qualified Mortgagee for purposes of assuming this Lease or entering into a new lease according to this Section 14.5(d); provided that any such designee who is an Affiliate of the designating Qualified Mortgagee shall be deemed automatically approved. The lessee under any such new lease shall have the same right, title and interest in and to the Improvements as Tenant had under this Lease. If more than one Qualified Mortgagee should properly notify Landlord that it would like to attorn to Landlord according to this Section 14.5(d), Landlord shall only be required to accept attornment by that Qualified Mortgagee whose Leasehold Mortgage was recorded first in the real property records of the county in which the Premises are located. Notwithstanding the foregoing provisions of this Section 14.5(d) to the contrary, no Leasehold Mortgagee shall be permitted to assume Tenant's obligations under this Lease, or enter into a new lease with Landlord, if Landlord elects to pay or prepay the indebtedness secured by the applicable Leasehold Mortgage in full.

(e)     Prohibition Against Mutual Rescission. No mutual termination, cancellation or rescission of this Lease by Landlord and Tenant shall be effective unless and until the same is approved in writing by each Qualified Mortgagee.

(f)     Construction Loan. Landlord hereby consents to the Construction Loan, and acknowledges and agrees that Construction Lender shall be deemed a Qualified Mortgagee upon the execution of this Lease.

(g)     Assumption of Obligations. No Qualified Mortgagee shall have any obligations under this Lease without the express assumption of any such obligations.

## 15. END OF TERM.

**15.1    Surrender.** Upon the termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition in which the Premises were at the commencement of this Lease, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear or damage by the elements. Within thirty (30) days following the termination of this Lease, Tenant shall (a) remove from the Premises all Tenant Equipment and personal property owned by Tenant or parties other than Landlord and (b) repair any damage caused by such removal. Property not so removed shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Premises. Tenant shall pay to Landlord on demand the cost of removing and disposing of such property and repairing any damage to any of the Premises caused by such removal. The covenants set forth in this Section 15.1 shall survive the expiration or termination of the Term.

**15.2    Holding Over.** If Tenant holds over after the end of the Term without a written agreement providing therefor, Tenant shall be deemed to be a tenant from month to month, at a monthly rent, payable in advance, equal to 125% of Monthly Rent payable during the last month of the Term, and Tenant shall be bound by all of the other provisions of this Lease as the same may apply to a month-to-month tenancy.

**15.3    Prorations.** Upon any termination of this Lease other than pursuant to Section 17.1, Landlord and Tenant shall prorate all Rent hereunder. The provisions of this Section 15.3 shall survive termination of this Lease.

## 16. LIENS AND ESTOPPEL CERTIFICATES.

**16.1    Liens.** Tenant shall not cause or permit to be recorded, filed, claimed or asserted against the Premises any mechanic's lien for supplies, machinery, tools, equipment, labor or material contracted for by, through or under Tenant and furnished or used in connection with any construction, development, alteration, improvement, addition to, demolition of, repair to or maintenance of any Building or other Improvement, or any tax lien, judgment lien or other involuntary lien of any nature, and if Tenant causes or permits any such lien to be so recorded, filed, claimed or asserted, Tenant shall cause the same to be released or discharged within thirty (30) days after tenant has knowledge, actual or constructive, of the recording or filing thereof. If Tenant defaults under the foregoing covenant, then Landlord may cause any such claimed lien to be released of record by bonding or payment or any other means available. All sums paid and costs and expenses, including reasonable attorneys' fees, incurred by Landlord in connection therewith, shall be due and owing from Tenant to Landlord upon demand therefor.

**16.2    Estoppel Certificates.** At any time and from time to time (but on not less than fifteen (15) business days' prior written request by the other party), each party shall execute, acknowledge and deliver to the other a certificate indicating any or all of the following: (a) the date on which the Term commenced and the date on which it is then scheduled to expire; (b) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification); (c) the date, if any, through which Monthly Rent has been paid; (d) that, to the knowledge of such party (actual or constructive) no Event of Default exists which has not been cured, except as to defaults stated in such certificate; (e) that the responding party has no existing defenses or set-offs to enforcement of this Lease, except as specifically stated in such certificate; and (f) such other matters as may be reasonably requested by the requesting party. Any such certificate may be relied upon by the requesting party and, if Landlord is the requesting party, by any prospective purchaser of Landlord's reversionary interest in the Premises, or if Tenant is the requesting party, by any present or prospective holder of a Leasehold Mortgage or assignee of Tenant's interest under this Lease.

## 17. DEFAULTS AND REMEDIES.

**17.1    Defaults by Tenant.** This Lease is subject to the provisions of the Contract Disputes Act of 1978 (41 U.S.C. §601-613). Landlord acknowledges that, so long as the United States Postal Service is the Tenant, the provisions of Section 17.2 (b), (c), (d) and (e) and Section 17.3 (b), (c) and (d) shall not apply to Tenant.

**17.2    Events of Default.** Each of the following events shall constitute an "Event of Default" under this Lease:

(a)    Failure to Perform Obligations. Tenant breaches or violates any provision of this Lease applicable to Tenant other than a covenant to pay Rent, and such breach or violation continues for a period of thirty (30) days after notice thereof from Landlord to Tenant; or, if such breach or violation cannot reasonably be cured within such 30-day period, Tenant does not commence to cure such breach or violation within such 30-day period or does not thereafter diligently pursue such cure in good faith to completion. Notwithstanding the foregoing to the contrary, the provisions of this Section 17.2(b) shall not apply with respect to any breach or

violation for which a cure period is specifically set forth in this Lease or for which an Event of Default is otherwise provided under this Article 17.

(b)     Execution and Attachment Against Tenant.  Any of Tenant's interest under this Lease or in the Premises is taken upon execution or by other process of law directed against Tenant, or is subject to any attachment by any creditor or claimant against Tenant, and such attachment is not discharged or disposed of within fifteen (15) days after levy.

(c)     Bankruptcy or Related Proceedings.  Tenant files a petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or insolvency Laws, or voluntarily takes advantage of any such Laws by answer or otherwise, or dissolves or makes a general assignment for the benefit of creditors, or involuntary proceedings under any such Laws or for the dissolution of Tenant are instituted against Tenant, or a receiver or trustee is appointed for the Premises or for all or substantially all of Tenant's property, and such involuntary proceedings are not dismissed or such receivership or trusteeship vacated within sixty (60) days after such institution or appointment.

(d)     Abandonment.  The Premises shall have been abandoned for a period of at least thirty (30) consecutive days.  For purposes of this provision, "abandoned" shall mean that Tenant has no operations on the Premises for thirty (30) consecutive days.

(e)     Dissolution.  Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution.

(f)     Leasehold Mortgages.  A failure by Tenant to perform or observe, or a violation or breach of, or a misrepresentation in, any provision of any Leasehold Mortgage or any other document between Tenant and the holder of the Leasehold Mortgage, if such failure, violation, breach or misrepresentation gives rise to a default beyond any applicable cure period.

(g)     Licenses and Permits.  A failure by Tenant to maintain in effect any applicable material license or permit necessary for the use, occupancy or operation of the Premises in accordance with this Lease.

(h)     Unpermitted Transfer.  The breach or violation by Tenant of any of the terms or conditions set forth in Article 14 of this Lease.

(i)     Use.  The breach or violation by Tenant of any of the terms or provisions of Section 6.1 of this Lease.

**17.3     Landlord's Remedies.**  If any Event of Default occurs, Landlord shall have the right, at its election, at any time, to exercise any one or more of the remedies described below.

(a)     Cure by Landlord.  Landlord may, at Landlord's option but without obligation to do so, and without releasing Tenant from any obligations under this Lease, make any payment or take any action as Landlord deems necessary or desirable to cure any Event of Default in such manner and to such extent as Landlord deems necessary or desirable, provided that, prior to making any such payment or taking any such action, Landlord notifies Tenant of Landlord's intention to do so and affords Tenant at least five (5) days (or such shorter period as is reasonable under the circumstances) in which to make such payment or take such action.  Tenant shall pay Landlord, upon demand, all advances and costs of Landlord in connection with making

any such payment or taking any such action, including reasonable attorneys' fees, together with interest at the Default Rate from the date of payment of any such advances and costs by Landlord.

(b)    <u>Termination of Lease and Damages</u>.    Landlord may terminate this Lease, effective at such time as may be specified by notice to Tenant, and demand (and, if such demand is refused, recover) possession of the Premises from Tenant.  In such event, Landlord shall be entitled to recover from Tenant, as damages for loss of bargain and not as a penalty, an aggregate sum equal to (a) all unpaid Monthly Rent and other Rent for any period prior to the termination date of this Lease (including interest from the due date to the date of the award at the Default Rate); plus (b) the present value at the time of termination (calculated by discounting on a monthly basis at a discount rate equal to the rate payable on U.S. Treasury securities offered at the time of such calculation having a maturity closest to the date on which the Term would have expired but for such termination) of the amount, if any, by which (i) the aggregate of the Monthly Rent and all other Rent payable by Tenant under this Lease that would have accrued for the balance of the Term after termination, exceeds (ii) the amount of such Monthly Rent and other Rent that could reasonably be recovered (less customary leasing commissions, reasonable tenant improvements, and other reasonable costs of leasing), if any, by reletting the Premises for the remainder of the Term at the then-current fair rental value; plus (c) interest on the amount described in (b) above from the termination date to the date of the award at the Default Rate.  If any Law shall validly limit the amount of any damages provided for herein to an amount that is less than the amount agreed to herein, Landlord shall be entitled to the maximum amount available under such Law.

(c)    <u>Repossession and Reletting</u>.    Landlord may reenter and take possession of all or any part of the Premises, without additional demand or notice, and repossess the same and expel Tenant and any party claiming by, through or under Tenant, and remove the effects of both using such force for such purposes as may be necessary to the extent permissible under any applicable laws, without being liable for prosecution for such action or being deemed guilty of any manner of trespass, and without prejudice to any remedies for arrears of Rent or right to bring any proceeding for breach of covenants or conditions.  No such reentry or taking possession of the Premises by Landlord, or notice thereof, shall be construed as an election by Landlord to terminate this Lease unless a notice of such intention is given to Tenant.  Landlord reserves the right, following any reentry or reletting, to exercise its right to terminate this Lease by giving Tenant such notice, in which event this Lease shall terminate as specified in such notice.  After recovering possession of the Premises, Landlord may, at its option, relet the Premises on commercially reasonable terms and conditions.  Landlord may make such repairs, alterations or improvements as Landlord considers appropriate to accomplish such reletting, and Tenant shall reimburse Landlord upon demand for all reasonable costs, including reasonable attorneys' fees, which Landlord may incur in connection with such reletting, together with interest at the Default Rate from the date paid by Landlord.  Landlord may collect and receive the rents for such reletting, but Landlord shall in no way be responsible or liable for any inability to relet the Premises or to collect any rent due upon such reletting.  Regardless of Landlord's recovery of possession of the Premises, so long as this Lease is not terminated, Tenant shall continue to pay, on the dates specified in this Lease, the Monthly Rent and other Rent that  would be payable if such repossession had not occurred, less a credit for the net amounts, if any, actually received by Landlord through any reletting of the Premises.

(d)    <u>Remedies Not Exclusive</u>. In lieu of or in addition to any of the foregoing remedies and damages, Landlord may exercise any remedies and collect any damages available

to it at law or in equity. All remedies are cumulative and concurrent and no remedy is exclusive of any other remedy. Each remedy may be exercised at any time an Event of Default has occurred and is continuing and may be exercised from time to time. No remedy shall be exhausted by any exercise thereof. Notwithstanding anything herein to the contrary, Tenant shall have no liability for payment of Rent accruing from and after the date upon which both of the following have occurred: (i) Landlord has recovered possession of the Premises; and (ii) Tenant has terminated the Dealer Agreement without payment or compensation from Landlord.

(e)    No Mitigation.  Landlord shall not be required to mitigate any of its damages hereunder unless required to by applicable Law.

(f)    No Waiver.  No failure of Landlord (a) to insist at any time upon the strict performance of any provision of this Lease or (b) to exercise any option, right, power or remedy contained in this Lease shall be construed as a waiver, modification or relinquishment thereof. A receipt by Landlord of any sum in satisfaction of any obligation with knowledge of the breach of any provision hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless expressed in a writing signed by Landlord.

(g)    Recovery of Enforcement Costs.  All costs, including reasonable attorneys' fees and disbursements, incurred by Landlord in connection with the exercise of any permitted remedy for an Event of Default, or the enforcement of the provisions of this Lease, together with interest thereon at the Default Rate from the date paid by Landlord, shall be paid by Tenant to Landlord upon demand.

**17.4    Grant of Option.**  Landlord acknowledges that, so long as the United States Postal Service is the Tenant hereunder, the terms of this Section 17.4 shall not apply to Tenant.  Tenant hereby grants to Landlord the option to purchase the Improvements at any time following the occurrence of an Event of Default upon and subject to the terms of this Section 17.4 (the "Default Option").  Landlord may exercise the option to purchase the Improvements by giving written notice to Tenant to such effect ("Landlord's Notice").  Landlord's purchase of the Improvements shall occur on a date selected by Landlord, set forth in the Landlord's Notice (the "Default Purchase Date"), but in no event shall the Default Purchase Date be earlier than the date ninety (90) days following delivery of Landlord's Notice.

(a)    Purchase Price.    The purchase price for Landlord's purchase of the Improvements shall be equal to (a) the Construction Costs (as hereinafter defined) of the Improvements if the Default Option is exercised at any time from and after the Effective Date through and including the tenth (10th) anniversary of the Effective Date (the "Initial Period") or (b) the net book value of such Improvements (including Alterations approved by Landlord in accordance with Section 5.5 of this Agreement) (as set forth on Tenant's books) after the Initial Period, less, in either case, any and all damages incurred by Landlord as a result of such Event of Default.

(b)    Construction Costs.  For purposes of this Section 17.4, "Construction Costs" means all hard and soft costs (*e.g.*, attorneys' fees and expenses; brokerage and escrow fees; surveying, engineering, architectural, and analytical testing fees and charges; recording fees and charges; property and other taxes; title and other insurance premiums; governmental fees and charges; and environmental auditing and testing fees and charges) incurred by or on behalf of Tenant, in constructing the Improvements (including any subsequent Alterations approved by Landlord in accordance with Section 5.5 of this Agreement).

(c)    <u>Assignment</u>. Following its exercise of the Default Option, Landlord may assign its right to purchase the Improvements to an Affiliate of Landlord. No such assignment shall relieve Tenant of any of its obligations hereunder.

(d)    <u>Procedures Upon Purchase</u>.

(i)    If the Improvements are purchased by Landlord pursuant to this Section 17.4, Tenant need not convey any better title thereto than that which was conveyed to Tenant, and Landlord shall accept such title, subject, however, to the Permitted Exceptions and to all other liens, exceptions and restrictions on, against or relating to any of the Improvements created by, consented to or resulting from the acts of Landlord after the Effective Date and to all applicable Laws, but free of any liens, exceptions and restrictions on, against or relating to the Improvements which have been created by, through or under Tenant or resulted solely from acts of Tenant after the date of this Lease, unless the same are Permitted Exceptions or customary utility easements benefiting the Improvements or were created with the concurrence of or at the request of Landlord.

(ii)    Upon the fixed dated for purchase of the Improvements pursuant to this Section 17.4, Landlord shall pay to Tenant the purchase price therefor specified herein, in immediately available funds, and Tenant shall deliver to Landlord a Warranty Deed substantially in the form attached hereto as <u>Exhibit C</u>, which describes the Improvements being conveyed and conveys the title thereto as provided in Section 17.4(a). If on the Purchase Date any Rent remains unpaid hereunder, then Tenant shall pay to Landlord on the Purchase Date the amount of such Rent.

(iii)    All costs and expenses incurred by Landlord or others in connection with the purchase of the Improvements under this Section 17.4 (including but not limited to recording fees, transfer taxes, documentary stamps, fees or taxes, title insurance premiums, brokerage fees, escrow fees, court costs, survey costs and expenses, escrow fees, and attorneys' fees) shall be the responsibility of Tenant, and shall be deducted from the purchase price of the Improvements or Tenant shall, at the closing of such purchase transaction or upon demand of Landlord thereafter, immediately reimburse Landlord for or pay such costs and expenses. The provisions of this Section 17.4 shall survive the expiration or termination of this Lease.

**17.5   Right to Perform.** Landlord shall have the right at any time, after five (5) days notice to Tenant or without notice in case of emergency (or in case any fine, penalty, interest, cost or expense may otherwise be imposed or incurred), to make any payment including but not limited to Taxes or perform any act required of Tenant under any provision of this Lease, and in exercising such right, to incur necessary or incidental costs and expenses, including reasonable counsel fees. Without limiting the generality of the foregoing provision, Landlord shall, following any default by Tenant under any Leasehold Mortgage, have the right at any time, without notice to Tenant, to cure such default or pay in full or purchase the Leasehold Mortgage or any obligation secured by the Leasehold Mortgage. Nothing herein shall imply any obligation on the part of Landlord to make any payment or perform any act required, and the exercise of the right so to do shall not constitute a release of any obligations or a waiver of any default. All payments made and all costs and expenses incurred in connection with any exercise of such right shall be reimbursed by Tenant to Landlord on demand, together with interest at the Default Rate from the respective dates of Landlord's making of such payments or paying such costs and expenses. In addition to any other rights and remedies available to Landlord, Landlord shall have, in

respect of Tenant's failure to make reimbursement of any amount as aforesaid, the same rights and remedies as in the case of default by Tenant in the payment of the Monthly Rent.

**18. PERMITTED CONTESTS.**   Notwithstanding any other provision of this Lease, Tenant shall not be required to (a) pay any Tax, (b) comply with any Law, (c) discharge or remove any lien referred to in Section 16.1 or (d) take any action described in Section 6.4 (such non-compliance being hereinafter referred to collectively as "Permitted Violations"), so long as (x) no Event of Default exists; (y) Tenant shall diligently contest, in good faith, the existence, amount or validity of the Permitted Violation by appropriate proceedings that operate during the pendency thereof to prevent or stay (i) the collection of, or other realization upon, the Permitted Violation, (ii) the sale or forfeiture of any of the Premises, (iii) any interference with the use or occupancy of any of the Premises, (iv) any loss or interference with the payment of any Rent, (v) the cancellation of any insurance policy, and (vi) the enforcement or execution of any injunction, order or Law with respect to the Permitted Violation; and (z) Tenant shall provide Landlord security  satisfactory in Landlord's reasonable judgment, to pay all losses, judgments, costs, interest, penalties and other sums that may be incurred or become due if Tenant's contest is successful. Tenant shall pay any and all losses, judgments, decrees and costs in connection with any such contest and shall perform all acts ordered or decreed as a result thereof.  No such contest shall subject Landlord to the risk of any civil or criminal liability.

**19. NO MERGER OF TITLE.**  There shall be no merger of the leasehold estate created by this Lease with the fee estate in any of the Premises by reason of the fact that the same Person may acquire or hold or own, directly or indirectly, (a) the leasehold estate created hereby or any part thereof or interest therein and (b) the fee estate in any of the Premises or any part thereof or interest therein, unless and until all Persons having the interests described in (a) and (b) above shall join in a written instrument effecting such merger and shall duly record the same.

**20. NON-RECOURSE AS TO LANDLORD.**   Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Premises and not against any other assets, properties or funds of (a) Landlord, (b) Landlord Affiliate, or (c) any predecessor or successor of Landlord or any Landlord Affiliate.

**21. OPTION TO PURCHASE.**

**21.1     Grant of Option.**  Landlord hereby grants to Tenant the option to purchase the Premises upon and subject to the terms of this Article 21.  Tenant may exercise the option to purchase the Premises by giving written notice to Landlord to such effect ("Tenant's Notice") at any time during the term of the Lease, commencing on the Commencement Date.  Tenant's purchase of the Premises shall occur on a date selected by Tenant, set forth in the Tenant's Notice, and reasonably acceptable to Landlord (the "Purchase Date"), but in no event shall the Purchase Date be earlier than the date ninety (90) days following delivery of Tenant's Notice nor later than the date three hundred and sixty five days (365) days following the delivery of Tenant's Notice.  Tenant shall not have the right to exercise the foregoing option to purchase if an Event of Default has occurred and is continuing.

**21.2     Purchase Price.**  The purchase price for Tenant's purchase of the Premises shall be equal to the sum of $10.00.

**21.3     Procedures Upon Purchase.**

(a)      If the Premises is purchased by Tenant pursuant to this Article 21, Landlord need not convey any better title thereto than that which was conveyed to Landlord, and Tenant shall

accept such title, subject, however, to matters of record and to all applicable Laws, but free of any liens, exceptions and restrictions on, against or relating to the Premises which have been created by, through or under Landlord or resulted solely from acts of Landlord, unless the same are customary utility easements benefiting the Premises or were created with the concurrence of or at the request of Tenant or as a result of a default by Tenant under this Lease.

(b) Upon the date fixed for purchase of the Premises pursuant to this Article 21, Tenant shall pay to Landlord the purchase price therefore specified herein, in immediately available funds, and Landlord shall deliver to Tenant a Deed substantially in the form attached hereto as Exhibit D, which describes the property being conveyed and conveys the title thereto as provided in Section 21.3(a). If on the Purchase Date any Rent remains unpaid hereunder with respect to the Premises, then Tenant shall pay to Landlord on the Purchase Date the amount of such Rent that is due as of, and through, such Purchase Date in connection with the property purchased. Upon the completion of the purchase of the Premises, this Lease and all obligations and liabilities of Tenant hereunder shall terminate, except for any liabilities or obligations arising hereunder which, by their terms, survive the expiration or termination of this Lease.

(c) The following warrants and covenants related to restrictions on uses of or at the Premises shall be included in the Deed to the Premises:

"(i) Grantee shall, at all times, comply with any and all Environmental Laws in connection with or related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Premises. Except as set forth in the Master Agreement dated November 19, 2004, among Grantor, Grantee and Cunningham-Limp Development Company (the "Master Agreement"), Grantee shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to Grantee's use of or construction on the Premises.

(ii) Grantee shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar Michigan law, on, at or below the Premises, and shall maintain generator-only status; provided, however, that Grantee may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal; and (ii) use and store commercial products on-site which may contain such substances.

(iii) the Premises shall only be used for the following uses: those commercial uses specified in subcategories II, III, and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2) dated June 6, 1995 and any non-manufacturing industrial uses.

(iv) any site modifications required at, in, on, or below the Premises to accommodate the foregoing used are the sole obligation and liability of Tenant, and will be conducted at Grantee's sole expense; provided, however, that notwithstanding the foregoing, Grantee acknowledges and agrees that there are currently areas of the Premises which are undergoing corrective action (as described in the Master Agreement) pursuant to the RCRA Corrective Action Performance Based Agreement between the U.S. Environmental Protection Agency and Grantor (the "Corrective Action Agreement"), and

that development or use of these areas is, subject to the terms of the Master Agreement, at Grantee's sole risk and Grantor shall bear no direct, incidental, or consequential liability such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays, to Grantee in the event Grantor's activities pursuant to the Corrective Action Process (as defined in the Master Agreement) disrupt or interfere with Grantee's development, use of, or operations at, the Premises.

(v)     use of groundwater at, in, or under the Premises by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(vi)     any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation, demolition, or soil disturbance related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Property is the sole obligation and liability of Tenant. Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and debris management options which are allowed or required under applicable Environmental Laws.

(vii)     Grantee acknowledges and agrees that any and all management of any utility lines or piping, including, without limitation, any sanitary or storm sewers and any gas, water, electrical, or any other similar utility lines or piping and any and all management of any septic systems which may be present at or below the Premises which management may be required or necessary to properly maintain the Premises or because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Premises, is (subject to the terms of the Master Agreement) the sole obligation and liability of Grantee or the owner of the Premises at the time of such activities."

(d)     The following warrants and covenants related to restrictions on uses of or at the Premises shall be included in (1) any agreement transferring complete or partial possession or ownership of the Premises by Tenant through sale, lease, or otherwise to any successor, assign, or tenant; and (2) any deed of conveyance transferring complete or partial ownership of the Premises, as restrictions which will run with the Premises, will be binding upon all subsequent owners, tenants, and users, and shall be enforceable against Tenant, its successors and assigns, and shall inure to the benefit of and be enforceable by Landlord, its successors, and assigns:

(i)     Tenant shall, at all times, comply with any and all Environmental Laws in connection with or related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Premises.   Tenant shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to Tenant's use of or construction on the Premises.

(ii)     Tenant shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar Michigan law, on, at or below the Premises, and shall maintain generator-only status; provided, however, that Tenant may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site

treatment, off-site storage, or off-site disposal; and (ii) use and store commercial products on-site which may contain such substances.

(iii)     the Premises shall only be used for the following uses:  those commercial uses specified in subcategories II, III, and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2) dated June 6, 1995 and any non-manufacturing industrial uses.

(iv)     any site modifications required at, in, on, or below the Premises to accommodate the foregoing use are the sole obligation and liability of Tenant, and will be conducted at Tenant's sole expense; provided, however, that notwithstanding the foregoing, Tenant acknowledges and agrees that there are currently areas of the Premises which are undergoing corrective action pursuant to the RCRA Corrective Action Performance Based Agreement between the U.S. Environmental Protection Agency and Grantor (the "Corrective Action Agreement"), and that development or use of these areas is at Tenant's sole risk and Landlord shall bear no direct, incidental, or consequential liability such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays, to Tenant in the event Landlord's activities pursuant to the Corrective Action Agreement disrupt or interfere with Tenant's development, use of, or operations at, the Premises.

(v)     use of groundwater at, in, or under the Premises by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(vi)     any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation, demolition, or soil disturbance related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Property is the sole obligation and liability of Tenant. Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and debris management options which are allowed or required under applicable Environmental Laws.

(vii)     Tenant acknowledges and agrees that any and all management of any utility lines or piping, including, without limitation, any sanitary or storm sewers and any gas, water, electrical, or any other similar utility lines or piping and any and all management of any septic systems which may be present at or below the Premises which management may be required or necessary to properly maintain the Premises or because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Premises, is the sole obligation and liability of Tenant or the owner of the Premises at the time of such activities.

(e)     Any prepaid obligations hereunder paid to Landlord shall be prorated as of the Purchase Date with respect to Premises, and the prorated unapplied balance shall be deducted from the amount due to Landlord; provided, that no apportionment of any Taxes or other Additional Rent shall be made upon any such purchase.

(f)     All costs and expenses incurred by Landlord or others in connection with the purchase of the Premises by Tenant under this Article 21 (including, but not limited to, recording

fees, transfer taxes, documentary stamps, fees or taxes, title insurance premiums (except for the portion of such premium relating to the Land underlying the Premises as described below), brokerage fees, escrow fees, court costs, survey costs and expenses, escrow fees, attorneys' fees, replatting fees and subdivision costs and expenses) shall be the responsibility of Tenant, and Tenant shall, at the closing of such purchase transaction or upon demand of Landlord thereafter, immediately reimburse Landlord for or pay such costs and expenses.  The provisions of this Section 21.3(e) shall survive the expiration or termination of this Lease.

(g)     Tenant represents to Landlord that, as of the Purchase Date, Tenant knows, has examined and has investigated to the full satisfaction of Tenant, the physical nature and condition, including the environmental condition, of the Premises and the improvements thereon. Tenant further represents and acknowledges that the Premises that may be subject to regulation under applicable law, including Environmental Laws.  Except as otherwise specifically provided in this Agreement or the Master Agreement, neither Landlord nor any agent, attorney, employee or representative of Landlord has made any representation whatsoever regarding the physical nature and condition, including the environmental condition, of the Premises, and, except as may be specifically provided in this Agreement or the Master Agreement, that Tenant, in executing, delivering or performing this Agreement, has not relied upon any statement or information made or given, directly or indirectly, orally or in writing, by any individual, firm or corporation.

(h)     Tenant represents that in proceeding to closing, subject to and excepting the environmental indemnities set forth in the Master Agreement, it is purchasing the Premises "AS IS, WHERE IS" AND WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, and without any right of action under contract, under any applicable Environmental Laws, or under common law or equity against Landlord regarding the physical nature or condition, including the environmental condition, of the Premises.  This representation shall survive the Purchase Date.

(i)     Tenant expressly waives any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise or agreement, if any, relating to the Premises.  From and after the Purchase Date, Tenant further releases and discharges Landlord from any and all claims or causes of action which Tenant may now have or hereafter have against Landlord relating to the Premises.

(j)     From and after the Purchase Date, subject to those federal laws that specifically restrict the United States Postal Service's indemnity obligations and except for the Environmental Conditions (as defined in the Master Agreement), Tenant shall indemnify, protect, and save harmless the Indemnified Parties from and against any and all claims, actions, suits, damages, liabilities, costs, penalties, and expenses, including reasonable attorneys' fees and disbursements arising or brought under any Environmental Laws, common law, or equity that: (A) are related to, or are in connection with the physical nature or condition of the Premises, (B) are related to or arise from any and all acts or omissions by Tenant or Tenant's agents, employees, contractors, subcontractors, licensees, invitees, or other third parties who are present on the Premises after the Purchase Date; (C) result from injury to person or property or loss of life sustained in or about the Premises after the Purchase Date; and (D) without limiting the generality of the foregoing, arise from the breach by Tenant of any of its representations, warranties, and covenants under the terms of this Agreement.  Tenant's obligations under this Section 21.3(i) shall survive the Purchase Date or any termination of this Agreement.

21.4    Like-Kind Exchange.  Tenant agrees to reasonably cooperate with Landlord, at Landlord's sole cost and expense, for purposes of effecting and structuring, in conjunction with the sale of the Premises or the Small Parcel, for the benefit of Landlord, a like-kind exchange of real property, whether simultaneous or a deferred exchange, pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.  Tenant specifically agrees to execute such documents and instruments as are reasonably necessary to implement such an exchange.  Landlord shall be solely responsible for assuring that the structure of any proposed exchange is effective for Landlord's tax purposes.  Furthermore, Tenant specifically agrees that Landlord may assign this Agreement and any of its rights or obligations hereunder, in whole or in part, as necessary or appropriate in furtherance of effectuating a Section 1031 like-kind exchange for the Premises, provided that such assignment shall not serve to relieve Landlord of any liability for Landlord's obligations hereunder.

## 22. RIGHT OF ENTRY.

22.1    **Exercise of Remedies.**  Landlord and its authorized representatives shall have the right, subject to the reasonable safety and security requirements of the Tenant, to enter the Premises at all reasonable times during Tenant's usual hours of operation, except in the event of an emergency, for the purpose of exercising any right, power or remedy reserved to Landlord in this Lease.

22.2    **Inspection.**  Landlord and its authorized representatives shall have the right, subject to the reasonable safety and security requirements of the Tenant,  to enter the Premises at all reasonable times during Tenant's normal business hours, after not less than two (2) days' prior telephonic notice to Tenant, for the purpose of (a) examining or inspecting the Premises or (b) showing the Premises to prospective purchasers, mortgagees or tenants.  Landlord agrees to use reasonable efforts not to disturb or disrupt Tenant's business operations, including not interfering with the safety and security of the US Mail or the employees of the Tenant.

22.3    **No Eviction.**  The exercise of any right reserved to Landlord or its authorized representatives in Sections 22.1 shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent or relieve Tenant from any of its obligations under this Lease or impose any liability on Landlord or its authorized representatives by reason of inconvenience or annoyance to Tenant or injury to or interruption of Tenant's business or otherwise.

22.4    **No Interference.**  In any case in which Landlord or its authorized representatives enter the Premises for any of the purposes set forth in this Article 22, Tenant shall not interfere, directly or in any manner or form with, the conduct of any work being performed by or for Landlord, except as may be required to provide for the reasonable safety and security of the US Mail or the employees of the Tenant.  Tenant hereby releases Landlord from any damages or claims of damages arising from any loss of business or from any increase in operating costs of Tenant's business resulting directly or indirectly from the conduct of any such work, except to the extent due to Landlord's gross negligence or willful misconduct.

## 23. MISCELLANEOUS.

23.1    **Construction.**  As used in this Lease, the singular shall include the plural and any gender shall include all genders as the context requires and the following words and phrases shall have the following meanings: (a) "include," "includes," and "including" shall mean "include," "includes" and "including" without limitation; (b) "provisions" shall mean "provisions, terms, agreements, warranties, representations, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, exception, restriction, title retention agreement, pledge, security interest, mortgage and/or deed of trust";

(d) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (e) "costs" shall mean "costs, expenses, fees, and other charges"; (f) "any of the Premises" shall mean "the Premises or any part thereof or interest therein"; (g) "any of the Land" shall mean "the Land or any part thereof or interest therein"; (h) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein"; and (i) "any Tenant Equipment" shall mean "the Tenant Equipment or any part thereof or interest therein."

**23.2     Performance by Landlord.**  Any act that Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any Person designated by Landlord.  Each appointment of Landlord as attorney-in-fact for Tenant hereunder is irrevocable and coupled with an interest.  Landlord shall have no obligation to perform any act required hereunder if an Event of Default has occurred and is then existing.

**23.3     Integration.**  This Lease and any documents executed by Tenant on or about the Effective Date at Landlord's request constitute the entire agreement between the parties and supersede all prior understandings and agreements, whether written or oral, between the parties relating to the Premises and the transactions provided for herein.  Landlord and Tenant are business entities having substantial experience with the subject matter of this Lease and have each fully participated in the negotiation and drafting of this Lease.  Accordingly, this Lease shall be construed without regard to the rule that any ambiguities in a document are to be construed against the drafter.

**Notices.**  All notices, demands, requests and other communications required or permitted under this Lease shall (except as expressly provided in Sections 22.1 and 22.2) be in writing and shall only be deemed properly given and received (a) when actually given and received, if delivered in person to a party; or (b) one business day after deposit with a private courier or overnight delivery service for next-business-day delivery; or (c) five (5) business days after deposit in the United States mails, certified or registered mail with return receipt requested and postage prepaid.  All such notices shall be transmitted by one of the methods described above to the party to receive the notice at, in the case of notices to Landlord, General Motors Corporation, c/o Worldwide Real Estate, Mail Code 482-B38-C96, 200 Renaissance Center, Detroit, MI 48265, with a copy to General Motors Corporation, GM Legal Staff, Mail Code 482-C23-D24, 300 Renaissance Center, Detroit, MI 48265, Attention: M. Gordon Ing, Esq.; with a copy to, Lowe, Fell & Skogg, LLC, 370 17th Street, #4900, Denver, CO 80202, Attention: David W. Fell, Esq., in the case of notices to Tenant, Manager, Great Lakes Facilities Service Office, United States Postal Service, FINSUB #258231-G05, 62 Stratford Drive, Bloomingdale, IL 60117-7000, and Manager, Real Estate, United States Postal Service, FINSUB #258231-G05, Facilities HQ Suite 300, 4301 Wilson Blvd., Arlington VA  22203-1861, or, in any case, at such other address(es) as Landlord or Tenant may notify the other of according to this Section 23.3.

**23.4     Survival.**  All of Tenant's obligations established by and arising under this Lease shall survive the termination of this Lease.

**23.5     Binding Effect.**  Each of the provisions of this Lease shall extend to, bind or inure to the benefit of, as the case may be, Landlord and Tenant, and their respective successors and assigns, provided that this clause shall not permit any Transfer by Tenant contrary to the provisions of Article 14.

**23.6     Modification.**  No modification, waiver or amendment of this Lease or of any of its conditions or provisions shall be binding upon a party unless in writing signed by such party.

**23.7     No Waiver.**  No waiver of any provision of this Lease shall be implied by any failure of either party to enforce any remedy upon the violation of such provision, even if such violation is continued or

repeated subsequently.  No express waiver shall affect any provision other than the one specified in such waiver, and that only for the time and in the manner specifically stated.

**23.8     Short Form Lease.**  Upon the request of either party, Landlord and Tenant shall cause to be prepared and shall execute, acknowledge and deliver a short form memorandum of this Lease in recordable form that either party may record in the appropriate real property records for the Premises to evidence and represent the provisions of this Lease, provided such short form lease shall not contain a reference to any amounts payable as rent.  Upon the termination of this Lease, Landlord and Tenant shall immediately cause to be prepared and shall execute, acknowledge and deliver a termination of such short form memorandum in recordable form which shall be recorded in such real property records.  The provisions set forth in this Section 23.8 shall survive the expiration or any termination of the Term.

**23.9     Captions.**  The captions of Sections and Articles are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning of such Sections or Articles.

**23.10    Severability.**  If any provision of this Lease is declared void or unenforceable by a final judicial or administrative order, this Lease shall continue in full force and effect, except that the void or unenforceable provision shall be deemed deleted and replaced with a provision as similar in terms to such void or unenforceable provision as may be possible and be valid and enforceable.

**23.11    Authority to Bind.**  The individuals signing this Lease on behalf of Landlord and Tenant represent and warrant that they are empowered and duly authorized to bind Landlord or Tenant, as the case may be, to this Lease according to its terms.

**23.12    Only Landlord/Tenant Relationship.**  Landlord and Tenant agree that neither any provision of this Lease nor any act of the parties shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**23.13    Time is of the Essence.**  Time is of the essence of each of the provisions of this Lease.

**23.14    Brokers.**  Landlord and Tenant each hereby represent and warrant to the other that their contact with the other or with the Premises has been made with the assistance of NAI Farbman of Southfield, MI.  Tenant shall be responsible for the payment of brokerage commissions to NAI Farbman in accordance with the provision of the Master Agreement.  Neither Tenant nor Landlord shall be responsible for any other broker or other third party.  Tenant shall indemnify, defend and hold harmless Landlord and all Landlord Affiliates, and Landlord shall indemnify, defend and hold harmless Tenant and all Tenant Affiliates, from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including reasonable attorneys' fees) resulting from the breach by the indemnifying party of the representation and warranty set forth in the preceding sentence.

**23.15    Counterparts.**  This Lease may be executed in counterparts, and executed counterparts bearing signatures of Landlord and Tenant shall constitute a fully executed original of this Lease.

**23.16    Attorneys' Fees.**  If either party commences an action to enforce the terms of, or resolve a dispute concerning, this Lease, the prevailing party in such action shall be entitled to recover all costs and expenses incurred by such party in connection therewith, including reasonable attorneys' fees, in accordance with the provisions of the Equal Access to Justice Act. .

**23.17    Governing Law.**  This Lease shall be governed by and construed according to Federal Law.

Having read and intending to be bound by the provisions of this Lease, Landlord and Tenant have signed it as of the date first set forth above.

LANDLORD:

GENERAL MOTORS CORPORATION, a Delaware corporation

Approved As To Form
Lowe, Fell & Skogg, LLC
By: _____

By: _____
Title: _____

JOHN K. BLANCHARD
DIRECTOR
WORLDWIDE REAL ESTATE

Tenant:

UNITED STATES POSTAL SERVICE, an independent establishment of the executive branch of the government of the United States

By: _____
Title: CONTRACTING OFFICER

Arthur Strange

**EXHIBIT A**

**LEGAL DESCRIPTION**

USPS — Montcalm Site Legal Description

Part of lot 500, including vacated streets and alleys lying adjacent to said lots of the "Plat of Modern Housing Corporation Addition" as recorded in Liber 20 of Plats on Page 22, Oakland County Records, all or part of lots 1 through 23, inclusive, block 1, including vacated streets and alleys lying adjacent to said lots of "Modern Housing Corporation's Oakland Park", a subdivision of part of the N. 1/2 of Sec. 21, T. 3 N., R.10 E. as recorded in Liber 46 of Plats on Page 21, Oakland County Records; including part of Sections 20 and 21, T. 3 N., R. 10 E., all being located in the City of Pontiac, Oakland County, Michigan and being more particularly described as follows:   Commencing at the East 1/4 corner of Section 20, T. 3 N., R. 10 E. as recorded in Liber 20101, Page 712, Oakland County Records, said point also being the West 1/4 of Section 21, T. 3 N., R. 10 E., thence along the East Section line of said Section 20, North 6 degrees 58 minutes 26 seconds West, 147.20 feet to the Point—of—Beginning and the north right—of—way line of Montcalm Street (variable width), thence along said north right—of—way line, South 84 degrees 26 minutes 26 seconds West, 1280.69 feet; thence North 07 degrees 33 minutes 31 seconds West, 614.02 feet; thence North 02 degrees 09 minutes 35 seconds West, 66.80 feet; thence North 84 degrees 05 minutes 48 seconds East, 244.44 feet; thence North 05 degrees 54 minutes 12 seconds West, 741.12 feet; thence North 84 degrees 05 minutes 48 seconds East, 1788.80 feet; thence South 05 degrees 54 minutes 12 seconds East, 153.03 feet; thence North 84 degees 05 minutes 48 seconds East, 91.20 feet; thence South 05 degrees 54 minutes 12 seconds East, 116.97 feet; thence North 84 degrees 05 minutes 48 seconds East, 385.00 feet to the westerly right—of—way line of Glenwood Avenue; thence along said right—of—way the following courses, South 05 degrees 54 minutes 12 seconds East, 300.00 feet to a curve to the right; and along said curve an arc distance of 144.17 feet, radius 300.00 feet, central angle 27 degrees 32 minutes 04 seconds, and chord bearing of South 07 degrees 51 minutes 50 seconds West, 142.79 feet; and South 21 degrees 37 minutes 52 seconds West, 489.35 feet to a curve to the left; and along said curve an arc distance of 192.56 feet, radius 400.00 feet, central angle of 27 degrees 34 minutes 56 seconds, and chord bearing of South 07 degrees 50 minutes 24 seconds West, 190.71 feet; and South 05 degrees 57 minutes 05 seconds East, 100.25 feet to the north right—of—way line of Montcalm Street (variable width); thence along the said right—of—way line, South 83 degrees 49 minutes 03 seconds West, 606.04 feet to a deflection point; and South 84 degrees 26 minutes 26 seconds West, 303.94 feet to the Point—of—Beginning. Containing 71.858 acres more or less, of land in area.

**EXHIBIT B**

**INTERCREDITOR AGREEMENT**

**Prepared by/Return to:**
Lowe, Fell & Skogg
370 17th Street, #4900
Denver, Colorado 80202
Attention: David Fell, Esq.

## INTERCREDITOR AND SUBORDINATION AGREEMENT

THIS INTERCREDITOR AND SUBORDINATION AGREEMENT ("Agreement"), entered into as of the _____ day of _____, 200_, and effective as of _____, 2003, is by and among _____ ("Lender"), and _____, a Delaware corporation ("Landlord").

### Recitals

A.    Landlord is the owner of certain real property located north on _____, a description of which is attached hereto as Exhibit A, and incorporated herein by this reference (the "Property").

B.    Landlord has leased the Property to _____("Tenant"), pursuant to a Ground Lease Agreement dated _____, 200_ (such agreement, as modified, amended or replaced being herein referred to as the "Lease"). All capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to them under the Lease.

C.    Lender has extended a loan in the principal amount of $_____ (the "Loan").

D.    The Loan is secured by, among other things, a Deed of Trust dated _____, 200_, made by Tenant, or its predecessor as owner of the Property, to Lender, and recorded in the _____ County, _____ real estate records in Book _____, Page _____ (such instrument, as amended, increased, renewed, modified, consolidated, replaced, combined, substituted, severed, split, spread or extended from time to time, being herein referred to as the "Deed of Trust"). The Deed of Trust, together with any other loan documents executed in conjunction with the Loan or the Deed of Trust are referred to herein collectively as the "Loan

Documents."

      E.     Lender desires to have Landlord consent to the Deed of Trust thereby enabling Lender to become a "Qualified Mortgagee" and to incorporate by reference into this Agreement certain terms and provisions relating to a Qualified Mortgagee contained in the Lease.

      F.     The parties have agreed to certain matters, all as hereinafter set forth.

### Agreement

      NOW, THEREFORE, in consideration of the premises and of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

      1.     <u>Incorporation of Recitals</u>.  The Recitals set forth above are by this reference hereby incorporated into this Agreement.

      2.     <u>Consent</u>.  Landlord hereby consents to Tenant's execution and delivery of the Deed of Trust to secure Tenant's obligations under the Loan Documents.  Lender hereby subordinates all of its liens, security interests, and other rights pursuant to the Deed of Trust and other Loan Documents encumbering the Property or any part thereof or interest therein, to the Lease and to the rights of Landlord thereunder.

      3.     <u>Property Encumbered</u>.  Lender agrees that the Deed of Trust and other Loan Documents executed by Tenant shall encumber only Tenant's right, title and interest in and to the leasehold interest created under the Lease and the Improvements situated thereon and shall secure a maximum principal amount of up to $_____$.

      4.     <u>No Subordination of Loan</u>.  Lender agrees that it will not subordinate the lien or security interests of the Deed of Trust or other Loan Documents to any other lien, security interest, or other encumbrance against the Property (or any part thereof or interest therein) without the prior written consent of Landlord, which may be granted or withheld in Landlord's sole discretion, and any such attempted subordination shall be void and of no effect.

      5.     <u>Lender's Rights under Lease</u>.  Under the terms and provision of Sections 14.5(c) through (g), inclusive, of the Lease, which Sections are incorporated herein by reference, Landlord extended to a Qualified Mortgagee certain rights in respect of the Lease.  By the execution of this Agreement, Landlord agrees that Lender is a "Qualified Mortgagee" and as such is entitled to all of the rights and benefits of a Qualified Mortgagee under such Sections.

      6.     <u>Notice of Default</u>.  Lender hereby covenants and agrees that, for any default or event of default specified as such in the Loan Documents (hereafter, a "<u>Default</u>"), Lender shall give notice of such Default to Landlord in the manner and at the addresses set forth in this Agreement, or at such other addresses of which Lender has been notified under the terms of this Agreement.  After delivery of such notice, Landlord shall have the right to cure any such Default on behalf of Tenant within thirty (30) days after receipt of such notice, or if such Default is not a monetary Default and is susceptible of cure by Landlord but cannot reasonably be cured within such thirty (30) day period, then so long as Landlord commences a cure of such Default within such thirty (30) day period (and notifies Lender that it has done so), its cure period shall be extended for as long as reasonably necessary for it to diligently pursue the cure to completion.  Lender shall not invoke any of its remedies, express or implied,

under the Deed of Trust unless such monetary Default remains uncured at the expiration of thirty (30) days after Landlord's receipt of such notice of Default, or if such Default is not a monetary Default and cannot reasonably be cured in such thirty (30) day period, unless the cure of such Default shall not be commenced within such thirty (30) day period and thereafter prosecuted diligently to completion.

       7.    <u>Payment by Landlord</u>.  Lender shall, at any time following a Default under the Deed of Trust, release the liens and security interests of the Deed of Trust encumbering the Property or any part thereof or interest therein upon payment to Lender by Landlord of the entire outstanding principal balance of the Loan (whether or not then due and payable), together with all interest accrued thereon at the non-default rate of interest set forth therein (the "<u>Payoff Amount</u>"), it being expressly understood that said release of collateral shall only apply to any lien or security interest applicable to the real property identified as the Property (including but not limited to fixtures), of which Landlord is the owner, and shall not apply to any other security interest maintained by Lender in any other assets of Tenant.  In no event shall the Payoff Amount include any prepayment premium or penalty, default interest, late charges imposed by the Deed of Trust, or attorneys' fees or other costs and expenses incurred by Lender pursuant to the Deed of Trust.  Landlord's right to pay the Loan pursuant to this <u>Section 7</u> shall be in addition to Landlord's right to cure a Default under <u>Section 6</u> hereof.

       8.    <u>Representations and Warranties</u>.  Lender hereby represents and warrants that  as of the date of this Agreement:

       (a)    Lender has provided Landlord with a true, correct and complete copy of the Deed of Trust;

       (b)    Lender is the sole holder of the Loan and the Deed of Trust and the same have not been assigned or pledged; and

       (c)    Lender has full power and authority to enter into this Agreement and no approval of any participant or other third party is required.

       9.    <u>Termination of Agreement</u>.  This Agreement shall automatically terminate and be of no further force and effect only at such time as all obligations under the Loan have been paid in full and the Deed of Trust has been released.

       10.    <u>Loan Modifications</u>.  Subject to this Section 10, Lender at any time, without the consent of, or notice to, Landlord, may do any one of the following:

       (a)    change the manner, place, or terms of payment or change or extend the time of payment of, or increase, renew, exchange, amend, or alter, the terms of any of the Loan or any lien in any of the collateral securing the Loan or any guaranty of Loan or any liability of Tenant or any guarantor or any liability incurred directly or indirectly in respect thereof (including, without limitation, any extension of the Loan), or otherwise amend, renew, exchange, increase, extend, modify, supplement in any manner the Loan, the Deed of Trust or any Loan Document; provided, however, that Lender shall not increase the amount of it's the Loan other than by the amount of protective advances and any other payments made pursuant to the terms of the Loan or Deed of Trust to protect the collateral position of Lender;

       (b)    settle or compromise the Loan or any security therefor or any liability directly or indirectly incurred in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including, without limitation, the Loan) in any manner or order; or

(c)    exercise or refrain from exercising any rights which Lender may have under the Loan, the Deed of Trust or the Loan Documents and discontinue credit to Tenant.

Notwithstanding anything contained in this Section 10, if any amendment or modification to the terms of the Loan or Deed of Trust would be disadvantageous or detrimental to Landlord's right, title or interest in the Lease or the Property, Lender and Tenant hereby covenant and agree not to amend or modify the terms of the Loan or the Deed of Trust without the prior written approval of Landlord, which approval may be given or withheld in the sole and absolute discretion of Landlord.

    11.    <u>Definition of Affiliate</u>.  The term "<u>Affiliate</u>" shall mean any individual, corporation, trust, partnership, or any other person or entity controlled by, controlling or under common control with a person or entity.   A person or entity of any  nature shall be indirectly, to direct, or cause the direction of, the management or policies of another person or entity, whether through ownership of voting securities, by contract, or otherwise.

    12.    <u>Notices</u>.  All notices, requests or demand hereunder must be given in writing and will be considered to be duly and properly given on person delivery or delivery by courier, or if mailed, upon the first to occur of actual receipt or the expiration of three (3) days after being sent by certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Lender:

    _____
    _____
    _____
    Attn:_____
    Telecopy:_____

with a copy to:

    _____
    _____
    _____
    Attn:_____
    Telecopy:_____

If to Landlord:

    _____
    _____
    _____
    _____
    Telecopy:_____

with a copy to:

    General Motors Corporation
    Legal Staff
    Mail Code 482-C23-D24
    300 Renaissance Center
    Detroit, MI 48265
    Attn: M. Gordon Ing, Esq.
    Telecopy: (313) 665-4960

with a copy to:   Lowe, Fell & Skogg, LLC
        370 17th Street, Suite 4900
        Denver, Colorado  80202
        Attn: David W. Fell, Esq.
        Telecopy:  (720) 359-8201

   13.  <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

   14.  <u>Governing Law</u>.  This Agreement is executed in and shall be construed under and governed by the laws of the State of _____.

   15.  <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement should be held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

   16.  <u>Amendments</u>.  No provision of this Agreement may be amended or modified unless the parties consent thereto in writing.

   17.  <u>Captions</u>.  The section titles or captions in this Agreement are for convenience only and shall not be deemed to be part of this Agreement.

   18.  <u>Waivers</u>.  No right under this Agreement may be waived except by written instrument executed by the party waiving such right.  No waiver of any breach of any provision contained in this Agreement shall be deemed a waiver of any preceding or succeeding breach of that provision or of any other provision contained in this Agreement.

   19.  <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same.

   20.  <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall constitute a duplicate original, but all of which together shall constitute one and the same instrument.

   21.  <u>Costs of Enforcement</u>.  In the event that any party to this Agreement commences any legal action to enforce its rights hereunder as a result of the breach of this Agreement by other party, the prevailing party in such action shall be entitled to recovery all of its costs and expenses in connection therewith, including all reasonable legal fees and costs.

   22.  <u>Insurance Proceeds</u>.  In the event of any loss or damage to the Property by fire or any other casualty or cause (each individually and collectively, a "<u>Loss</u>"), any insurance proceeds payable on account of said Loss which relate to or compensate for such portion of the Loss relating to improvements (which for purposes of this paragraph shall mean any and all (i) buildings, (ii) additions or modifications to existing buildings or other structures, (iii) furniture and fixtures, and (iv) equipment) hereinbefore, now or hereafter constructed, installed or otherwise placed on the Property by or on behalf of Tenant or any of its respective successors or permitted assigns, which are  not used to  repair, replace or restore said  improvements so damaged  or  destroyed in connection with the Loss, shall  be paid

to Lender. Lender may apply any such insurance proceeds so received to the Obligations (as that term is defined in the Deed of Trust), or otherwise in accordance with the Deed of Trust and applicable law, as Lender determines in its sole discretion. In connection with the foregoing, each insurance company concerned is hereby authorized and directed to make payment under its respective policy or policies, directly to Lender instead of to Landlord, or to Landlord and Lender jointly, and Landlord appoints Lender, irrevocably, as Landlord's attorney-in-fact to endorse any draft therefor.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Intercreditor and Subordination Agreement as of the date first above written.

**LENDER:**

_____, a

_____

By:_____

Name:_____

Title:_____

**LANDLORD:**

_____

By:_____

Name:_____

Title:_____

STATE OF               )
                              ) ss.
COUNTY OF           )

        This instrument was acknowledged before me on _____, 2003, by _____, _____ of _____.

_____
Notary Public


STATE OF               )
                              ) ss.
COUNTY OF           )

        This instrument was acknowledged before me on _____, 2003, by _____, _____ of Argonaut Holdings, Inc., a Delaware corporation.

_____
Notary Public

# EXHIBIT A

# PROPERTY

**EXHIBIT C**

**IMPROVEMENT DEED**

## WARRANTY DEED

      KNOW ALL PERSONS BY THESE PRESENTS:  That the_____,
whose address is _____,      Conveys    and    Warrants    to
_____,            whose            address            is
_____, the following described prem-
ises situated in the City of Pontiac, County of Oakland and State of Michigan, to wit:

ANY BUILDINGS OR BUILDING IMPROVEMENTS LOCATED ON THE LAND DESCRIBED IN

Exhibit A attached hereto, EXCLUDING THE LAND.

Commonly known as:

for the full consideration of

Subject to easements, building and use restrictions of record, if any, together with all improvements, ap-
purtenances, tenements and hereditaments thereto.

Grantor grants Grantee the right to make all permitted divisions under Section 108 of the Land Divisions
Act, Act No. 288 of the Public Acts of 1967 (the "Act").  This Property may be located within the vicinity
of farm and/or a farm operation.  Generally accepted agricultural and management practices which may
generate noise, odors, and other associated conditions may be used and are protected by the Michigan
Right to Farm Act.

Dated this _____ day of _____ 200__

 

By:_____
Print Name:_____
Its:_____

STATE OF _____)
                           ) SS.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____ 20____ by _____ of _____ a _____ corporation, on behalf of the corporation.

_____
Notary Public
_____ County, State of _____
My commission expires _____ 20_____

Prepared By:
Return To:

<u>County Treasurer's Certificate</u>
_____

<u>City Treasurer's Certificate</u>
_____

Recording Fee: _____
State Transfer Tax: _____
Tax Parcel No.: _____
When recorded return to: _____
Send subsequent tax bills to: _____

**EXHIBIT A**

**LEGAL DESCRIPTION**

**EXHIBIT D**

**PROPERTY DEED**

### COVENANT DEED

KNOW ALL PERSONS BY THESE PRESENTS: That, GENERAL MOTORS CORPORATION, a Michigan corporation ("Grantor"), whose address is c/o Wordwide Real Estate, 200 Renaissance Center, Mail Code: 482-B38-C96, P. O. Box 200, Detroit, Michigan 48265, Conveys and Warrants to UNITED STATES POSTAL SERVICE, an independent establishment of the executive branch of the government of the United States ("Grantee"), whose address is _____ , the following described premises situated in the City of Pontiac, County of Oakland and State of Michigan, to wit:

> See Exhibit A attached hereto and made a part hereof, together with all tenements, hereditaments, improvements and appurtenances, if any, belonging or in any way appertaining thereto

for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the said conveyance being dated and duly signed, sealed and acknowledged by the Grantor, shall be deemed and held to be a conveyance in fee simple to the Grantee, its successors and assigns. Grantor covenants and agrees that it has not heretofore done, committed, or wittingly or unwittingly suffered to be done or committed any act, matter or thing whatsoever, whereby the real property hereby granted or any part thereof is, or shall or may be, charged or encumbered in title, estate or otherwise howsoever, except as may be herein stated. Grantor covenants to and agrees with Grantee, that Grantor, its successors or assigns, will warrant and defend all or any part of the property conveyed unto the Grantee, its successors and assigns, forever, against the claims and demands of all persons claiming by, from, or under the Grantor, but against no other claims or persons.

This Deed is executed, delivered and accepted subject to all matters of record and to the following Deed Restriction (the "Deed Restriction"), relating to the use and occupancy of the Premises, which Deed Restriction shall run with the Premises, and shall be enforceable against Grantee, its successors and assigns, and shall inure to the benefit of and be enforceable by Grantor, its successors and assigns:

(a)     Grantee shall, at all times, comply with any and all Environmental Laws in connection with or related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Premises.  Except as set forth in the Master Agreement dated November __, 2004, among Grantor, Grantee and Cunningham-Limp Development Company (the "Master Agreement"), Grantee shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to Grantee's use of or construction on the Premises.

(b)     Grantee shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar Michigan law, on, at or below

{#00713613 2 07138-9999 11/16/2004 01:07 PM}

the Premises, and shall maintain generator-only status; provided, however, that Grantee may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal; and (ii) use and store commercial products on-site which may contain such substances.

(c)     the Premises shall only be used for the following uses:  those commercial uses specified in subcategories II, III, and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2) dated June 6, 1995 and any non-manufacturing industrial uses.

(d)     any site modifications required at, in, on, or below the Premises to accommodate the foregoing used are the sole obligation and liability of Tenant, and will be conducted at Grantee's sole expense; provided, however, that notwithstanding the foregoing, Grantee acknowledges and agrees that there are currently areas of the Premises which are undergoing corrective action (as described in the Master Agreement) pursuant to the RCRA Corrective Action Performance Based Agreement between the U.S. Environmental Protection Agency and Grantor (the "Corrective Action Agreement"), and that development or use of these areas is, subject to the terms of the Master Agreement, at Grantee's sole risk and Grantor shall bear no direct, incidental, or consequential liability such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays, to Grantee in the event Grantor's activities pursuant to the Corrective Action Process (as defined in the Master Agreement) disrupt or interfere with Grantee's development, use of, or operations at, the Premises.

(e)     use of groundwater at, in, or under the Premises by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(f)     any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation, demolition, or soil disturbance related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Property is the sole obligation and liability of Tenant.  Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and debris management options which are allowed or required under applicable Environmental Laws.

(g)     Grantee acknowledges and agrees that any and all management of any utility lines or piping, including, without limitation, any sanitary or storm sewers and any gas, water, electrical, or any other similar utility lines or piping and any and all management of any septic systems which may be present at or below the Premises which management may be required or necessary to properly maintain the Premises or because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Premises, is (subject to the terms of the Master Agreement) the sole obligation and liability of Grantee or the owner of the Premises at the time of such activities."

Grantee agrees that any contract, agreement, deed, lease or other instrument transferring title or possession of all or any part of the Property, by sale, lease, or otherwise, to any successor, assignee, or tenant shall incorporate the restrictions set forth in this paragraph.  The restrictions contained in the paragraph are deemed covenants running with the land and shall inure to the benefit of Grantor, its successors and assigns.

Grantor grants Grantee the right to make all permitted divisions under Section 108 of the Land Divisions Act, Act No. 288 of the Public Acts of 1967 (the "Act").  This Property may be located within the vicinity of farm and/or a farm operation.  Generally accepted agricultural and management practices which may generate noise, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Dated this _____ day of _____.

GENERAL MOTORS CORPORATION, a
Michigan corporation


By:_____
Print Name: _____
Its:_____

STATE OF MICHIGAN            )
                             ) SS.
COUNTY OF WAYNE              )

     The foregoing instrument was acknowledged before me, the undersigned, a Notary Public in and for the county and state aforesaid, personally appeared this _____ day of _____, 20 by_____ of _____ a _____ corporation,   on   behalf   of   the corporation.


_____
Notary Public
_____ County, State of _____
My commission expires _____ 20_____

Prepared by:  David W. Fell, Esq.
Address: Lowe, Fell & Skogg, LLC, 370 Seventeenth Street, Suite 4900, Denver, CO 80202

County Treasurer's Certificate
_____

City Treasurer's Certificate
_____

Recording Fee: _____
State Transfer Tax: _____
Tax Parcel No.: _____
When recorded return to:

EXHIBIT A
(TO DEED)

LEGAL DESCRIPTION

**EXHIBIT E**

**USPS GENERAL CONDITIONS**



# General Conditions to USPS Ground Lease

**1. DELETED**

**2. RECORDING**

This agreement or a memorandum thereof, with the commencement date and all other necessary dates inserted, may be recorded by the Landlord or Tenant at its sole expense.

**3. MORTGAGEE'S AGREEMENT**

If there is now or will be a mortgage on the property which is or will be recorded prior to the recording of the Lease, the Landlord must notify the contracting officer of the facts concerning such mortgage and, unless in his sole discretion the contracting officer waives the requirement, the Landlord must furnish a Mortgagee's Agreement, which will consent to this Lease and shall provide that, in the event of foreclosure, mortgagee, successors, and assigns shall cause such foreclosures to be subject to the Lease.

**4. ASSIGNMENTS**

a.   The terms and provisions of this Lease and the conditions herein are binding on the Landlord and the Postal Service, and all heirs, executors, administrators, successors, and assigns.

b.   If this contract provides for payments aggregating $10,000 or more, claims for moneys due or to become due from the Postal Service under it may be assigned to a bank, trust company, or other financing institution, including any federal lending agency, and may thereafter be further assigned and reassigned to any such institution.  Any assignment or reassignment must cover all amounts payable and must not be made to more than one party, except that assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in financing this contract.  No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed with:

1.   the contracting officer; and
2.   the surety or sureties upon any bond.

c.   Assignment of this contract or any interest in this contract other than in accordance with the provisions of this clause will be grounds for termination of the contract for default at the option of the Postal Service.

d.   Nothing contained herein shall be construed so as to prohibit transfer of ownership of the demised premises, provided that:

1. such transfer is subject to this Lease agreement;
2.   both the original Landlord and the successor Landlord execute the standard *Certificate of Transfer of Title to Leased Property and Lease Assignment and Assumption* form to be provided by the USPS Contracting Officer.

**5. DELETED**

**6. DELETED**

**7. DELETED**

**8. CLAIMS AND DISPUTES**

a.   This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) ("the Act").

b.   Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause.

c.   "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.  However, a written demand or written assertion by the Landlord seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph d below.  A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act.  The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

 **UNITED STATES POSTAL SERVICE.**

# General Conditions to USPS Ground Lease

d.  A claim by the Landlord must be made in writing and submitted to the contracting officer for a written decision. A claim by the Postal Service against the Landlord is subject to a written decision by the contracting officer. For Landlord claims exceeding $100,000, the Landlord must submit with the claim the following certification:

"I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the Landlord believes the Postal Service is liable, and that I am duly authorized to certify the claim on behalf of the Landlord."

The certification may be executed by any person duly authorized to bind the Landlord with respect to the claim.

e.  For Landlord claims of $100,000 or less, the contracting officer must, if requested in writing by the Landlord, render a decision within 60 days of the request. For Landlord-certified claims over $100,000, the contracting officer must, within 60 days, decide the claim or notify the Landlord of the date by which the decision will be made.

f.  The contracting officer's decision is final unless the Landlord appeals or files a suit as provided in the Act.

g.  When a claim is submitted by or against a Landlord, the parties by mutual consent may agree to use an alternative dispute resolution (ADR) process to assist in resolving the claim. A certification as described in subparagraph d of this clause must be provided for any claim, regardless of dollar amount, before ADR is used.

h.  The Postal Service will pay interest on the amount found due and unpaid from:

1. the date the contracting officer receives the claim (properly certified if required); or
    2.  the date payment otherwise would be due, if that date is later, until the date of payment.

i.  Simple interest on claims will be paid at a rate determined in accordance with the Act.

j.  The Landlord must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the contracting officer.

**9. DELETED.**

**10.  FACILITIES NONDISCRIMINATION**

a.  By executing this Lease, the Landlord certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform services at any location under its control where segregated facilities are maintained.

b.  The Landlord will insert this clause in all contracts or purchase orders under this Lease unless exempted by Secretary of Labor rules, regulations, or orders issued under Executive Order 11246.

**11.  CLAUSES REQUIRED TO IMPLEMENT POLICIES, STATUTES, OR EXECUTIVE ORDERS**

The following clauses are incorporated in this Lease by reference. The text of incorporated terms may be found in Appendix B of the Postal Service's *Purchasing Manual*, accessible at www.usps.com/business.

Clause 1–5, *Gratuities or Gifts* (January 1997)
Clause 1–6, *Contingent Fees* (January 1997)
Clause 9–7, *Equal Opportunity* (January 1997)[1]
Clause 9–13, Affirmative Action for Handicapped Workers (January 1997)[2]
Clause 9-14, Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (January 1997)[3]
Clause B-25, Advertising of Contract Awards (January 1997)
Note:  For purposes of applying the above standard clauses to this Lease, the terms "supplier," "contractor," and "lessor" are synonymous with "Landlord," and the term "contract" is synonymous with "Lease."

---

[1] For leases aggregating payments of $10,000 or more.
[2] For leases aggregating payments of $2,500 or more.
[3] For leases aggregating payments of $10,000 or more.

EXHIBIT 3

## MASTER AGREEMENT

This Master Agreement (this "Agreement") is executed this 17th day of November, 2004, by and among GENERAL MOTORS CORPORATION ("GM"), a Delaware corporation, the UNITED STATES POSTAL SERVICE ("USPS"), an independent establishment of the executive branch of the United States Government, and CUNNINGHAM-LIMP DEVELOPMENT COMPANY ("Cunningham"), a Michigan corporation.

## RECITALS:

A.   The addresses and telephone numbers of the parties to this Agreement are as follows:

| GM: | USPS: | CUNNINGHAM: |
|---|---|---|
| Sherry Ocelnik<br>General Motors Corporation<br>200 Renaissance Center<br>MC 482-B38-C96<br>Detroit, MI 48265-2000<br>Tel.: 313-665-6138<br>Fax: 313-6665-6745 | Facilities Headquarters<br>4301 Wilson Blvd., #300<br>Arlington, VA 22203-1861<br>Tel.: 703-526-2700<br>Fax: 703-526-2701 | Donald R. Kegley, Jr.<br>Cunningham-Limp<br>Development Company<br>39300 W. Twelve Mile<br>Road, Suite 200<br>Farmington Hills, MI<br>48331<br>Tel.: 248-893-2300<br>Fax: 248-893-2310 |
| Copies of any notice to GM should also be sent to: | Copies of any notice to USPS should also be sent to: | Copies of any notice to Cunningham should also be sent to: |
| David W. Fell, Esq.<br>Lowe, Fell & Skogg, LLC<br>370 17th Street, Suite 4900<br>Denver, CO 80202<br>Tel.: 720-932-2600<br>Fax: 720-359-8210 | Ruth L. Gottlieb, Esq.<br>United States Postal Service<br>8 Griffith Road North<br>Windsor, CT 06006-0170<br>Tel.: 860-285-7095<br>Fax: 860-285-7397 | Norm Thomas<br>Cunningham-Limp<br>Development Company<br>39300 W. Twelve Mile<br>Road, Suite 200<br>Farmington Hills, MI<br>48331<br>Tel.: 248-893-2303<br>Fax: 248-893-2310 |
| and | and | |
| John Coleman<br>Worldwide Facilities - ES<br>Remediation<br>Mail Code: 483-520-190 | Manager, Real Estate<br>Great Lakes Facilities<br>Service Office<br>62 Stratford Drive | |

Pontiac Centerpoint
Campus-Central
2000 Centerpoint Parkway
Pontiac, MI  48341-3147
Tel.: (248) 753-5772
Fax: (248) 753-5829

George Fritz
General Motors Corporation
Worldwide Facilities Group
Engine Engineering Building
MC: 483-730-112
823 Joslyn Ave.
Pontiac, MI  48340
Tel.: (810) 602-9868
Fax: (248) 857-5053

Laura Fitzpatrick, Esq.
General Motors Corporation
Legal Staff - Environmental
Law
Mail Code:  482-C24-D24
300 GM Renaissance Center
Detroit, MI   48265
Tel.: (313) 665-4881
Fax: (313) 665-4886

Bloomingdale,   IL   60117-
7000
Tel.: 630-295-6205
Fax: 630-295-6262

Charles C. Wolf (Curt), P.E.
ECT, Inc.
2250 Genoa Business Park
Dr.
Suite 130
Brighton, MI 48114
 Tel: (810) 494-5051 ext.
319
 Fax: (810) 494-5059
 Cell: (248) 613-6416

Paul Purcell
USPS  Facilities HQ
4301 Wilson Blvd. Suite 300
Arlington VA 22203-1861
Tel: (703) 526-2781
Fax: (703) 526-2701

B.     GM is the owner of approximately seventy acres of real property situated in the City of Pontiac, Oakland County, Michigan, at the northwest corner of East Montcalm Street and Glenwood Avenue, more particularly described on **Exhibit A** attached hereto and made a part hereof (the "Property").

C.     GM proposes to lease the Property to USPS pursuant to the Ground Lease attached hereto as **Exhibit B** and made a part hereof (the "Ground Lease").  This Agreement, the Ground Lease and the other documents described herein have been prepared in connection with the Solicitation Proposal HQRE2003.1 dated January 28, 2003, as amended.

D.     GM has selected Cunningham as the contractor to complete certain onsite and offsite work as described on **Exhibit C** attached hereto and made a part hereof (the

"<u>Work</u>"), in accordance with the General Terms and Conditions attached hereto as **Exhibit D** and made a part hereof (the "<u>General Terms and Conditions</u>") and USPS has approved the selection of Cunningham as contractor to complete the Work.

E.      Promptly after the completion of the Work, USPS intends to construct a commercial/industrial facility commonly referred to as a Processing and Distribution Center on the Property (the "<u>PDC</u>").  Title to the PDC improvements, appurtenances, and equipment and furnishing located therein shall belong to USPS without further action on the part of any party.

<b>AGREEMENT:</b>

1.      **Documents.**

a.      <u>Ground Lease</u>.  GM and USPS shall, simultaneously with the execution of this Agreement, execute and deliver the Ground Lease. The commencement date of the Ground Lease term (the "<u>Commencement Date</u>") shall be the date of Substantial Completion (as defined below) of the Work.   For purposes of this Agreement, "<u>Substantial Completion</u>" is defined in the General Terms and Conditions and shall be approved by GM in accordance with the General Terms and Conditions and by USPS (in the exercise of its reasonable discretion) in accordance with the General Terms and Conditions.  Upon Substantial Completion of the Work, GM and USPS shall execute and deliver a Commencement Date Certificate in a form reasonably acceptable to GM and USPS, setting forth the Commencement Date of the Ground Lease, which shall be an amendment to the Ground Lease.

b.      <u>Completion Date</u>.   Cunningham shall complete the Work within 365 calendar days after the date of execution of this Agreement by the parties hereto (the "<u>Completion Date</u>"), subject to Force Majeure (as defined below).  Each party shall, and

shall cause each of its agents, contractors and subcontractors to, provide all other parties hereto (and their agents, contractors and subcontractors) with full cooperation in connection with any matter under this Agreement, including, without limitation, providing information, consents and approvals on a timely basis and any reasonable assistance requested, in order to complete the Work by the Completion Date deadline. GM, USPS and Cunningham shall insure that any contracts for the Work or the PDC improvements shall include provisions for an extension of the Completion Date, without cost to GM or USPS, for Force Majeure events. For purposes of this Agreement, "Force Majeure" shall mean a delay as a result of any cause or causes that GM, Cunningham or USPS are, despite their commercially reasonable efforts, unable to prevent or overcome, including, without limitation, acts of God, strikes, walkouts or other labor disputes, shortages of labor or materials, new or additional requirements of any governmental agencies, any unusual and severe weather conditions, any Unknown Environmental Condition (as defined below), riots, civil strife, war, or acts of a public enemy.

c.     Access Agreement.   GM and USPS shall, simultaneously with the execution of this Agreement, execute and deliver an Access Easement in the form attached hereto as **Exhibit E** and made a part hereof, providing access for USPS over certain portions of the Retained Property (as defined below) to Saginaw Road and East Montcalm Avenue (the "Access Easement"). GM shall place an easement over a portion of the Property for the existing storm sewer line benefiting the Retained Property in the form attached hereto as **Exhibit F** and made a part hereof (the "Storm Sewer Easement"). The Access Easement and the Storm Sewer Easement are collectively referred to herein as the "Easements." GM shall record the Easements prior to the Commencement Date.

d.      Escrow Agreement.    GM, USPS and Land America Title Company ("Escrow Agent") shall, simultaneously with the execution of this Agreement, execute and deliver the Escrow Agreement in the form attached hereto as **Exhibit G** and made a part hereof (the "Escrow Agreement").

**2.      Remediation.**

a.      CAA.   USPS acknowledges that the Property and that certain parcel owned by GM immediately adjacent to the Property (the "Retained Property"), are subject to a Performance Based RCRA Corrective Action Agreement (the "CAA'") between the U.S. Environmental Protection Agency (the "USEPA") and GM.   USPS has agreed to lease, with an option to acquire, the Property with full knowledge of the CAA.

b.      Environmental Investigations.

(i)      Environmental Investigation by GM.

GM and its representatives have conducted environmental investigations of the Property and have provided USPS and its agents and representatives with the following final reports, in electronic form, which were prepared in connection with such environmental investigations of the Property, subject to the Confidentiality Agreement (the "Confidentiality Agreement"):

RCRA Current Conditions Report (the "CCR")

RCRA Facility Investigation Report (the "RFI Report")

RCRA Facility Investigation Supplement Number 1 (the "RFI Supp No. 1")

RCRA Corrective Measures Proposal (the "CM Proposal").

GM will also provide USPS with any additional, final written environmental reports (by electronic copy) prepared and submitted to the USEPA in connection with the CAA and pertaining to the Property, subject to the Confidentiality Agreement. All such reports are collectively referred to herein as the "Environmental Reports."

(ii)     Environmental Investigation by USPS

(1)     GM has permitted USPS to enter on the Property for the purpose of investigating the Property pursuant to the Right of Access Agreement dated February 4, 2001 between GM and USPS (the "Access Agreement"). USPS will have the results of any environmental investigation of the Property performed by or on behalf of USPS compiled in a written report which will be provided to GM promptly upon completion thereof (the "USPS Report").

(2)     It is anticipated that USPS will prepare a Baseline Environmental Assessment (hereinafter "BEA") in accordance with Michigan requirements within forty-five (45) days of the actual or anticipated Commencement Date of the Ground Lease and file such BEA with the Michigan Department of Environmental Quality (hereinafter referred to as the "MDEQ"). USPS may prepare and file a BEA in accordance with the following terms and conditions:

(A)     In conducting and preparing the BEA, as well as any petition for determination of the adequacy of the BEA (hereinafter referred to as "Petition"), USPS acknowledges and agrees that:     (a) the BEA will be representative of actual known site conditions at the Property; (b) USPS will utilize usual and customary practices, and sound and accepted engineering and scientific judgment in assessing the site and in evaluating relevant exposure

pathways and land-use based criteria; (c) USPS will properly evaluate all data collected at the site using generally accepted statistical analysis methods to determine which, if any, site locations constitute a "facility" as defined under Section 20101(1) of Michigan Public Act 451 (Part 201); and (d) USPS will utilize assessment and sampling methods which best evaluate the pathway being addressed.   In preparing its BEA, USPS may use the data from GM's Environmental Reports, but such use or reliance by USPS on such data is at USPS' sole risk and liability.

(B)   GM shall have a right to review USPS' proposed BEA prior to USPS submitting the same to the MDEQ.  USPS shall provide such documents in draft form to GM at least one (1) week prior to its planned submittal date.  USPS shall reasonably consider any reasonable comments by GM.

(C)   USPS shall provide GM with a copy of the MDEQ's response to USPS' submittal.

c.   Known Environmental Conditions.  Any contamination in, at, or of the soils, surface waters, or groundwater at the Property, including any abandoned underground storage tanks or other discrete containers which may contain or formerly contained chemicals or waste materials, which (x) is disclosed in the Environmental Reports, and (y) has been or is being addressed by GM under the Corrective Action Process (as defined below), shall be referred to herein as the "Known Environmental Conditions."

d.   Unknown Environmental Conditions.   Any contamination in, at, or of the soils, surface waters, or groundwater at the Property, including any abandoned

underground storage tanks or other discrete containers which may contain or formerly contained chemicals or waste materials, which (A) is not disclosed in the Environmental Reports or the USPS Report, (B) is discovered by GM, (or its agents) or USPS (or its agents) during the Indemnity Period (as defined below), and (C) USPS can demonstrate through sound and generally accepted engineering and scientific judgment and credible evidence: (i) was due to or caused by uses of or operations at the Property prior to the Commencement Date; (ii) exists at levels above the applicable Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels provided in the Administrative Rules of Part 201, Environmental Remediation, of the Natural Resources and Environmental Protection Act, 1994 PA 451 (Effective Date December 21, 2002) (herein, "MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels"); (iii) was not caused by, contributed to, or exacerbated (in any material or significant manner) by USPS or its tenants, licensees, agents, employees, contractors, or the acts of any other third party after the Commencement Date; and (iv) except as set forth in Section 2(j) herein, requires Response Activities under applicable Environmental Requirements to address such contamination, shall be referred to herein as the "Unknown Environmental Conditions." USPS shall promptly, but in no event later than seven (7) business days from the date USPS has actual knowledge (or, with respect to third parties that are not agents, employees or contactors of USPS, should have had actual knowledge and failed to have such actual knowledge as a result of the gross negligence of USPS) of any potential Unknown Environmental Condition that could significantly or materially affect the Work or construction of the PDC improvements, notify GM in writing of any potential Unknown Environmental Condition which is not being addressed by GM under the

Corrective Action Process.  This written notice shall provide the available facts and information regarding such potential Unknown Environmental Condition.  In the event GM (or its agents) discovers any potential Unknown Environmental Condition that could significantly or materially affect the Work or construction of the PDC improvements, GM shall notify USPS of such potential Unknown Environmental Condition within seven (7) business days after GM has actual knowledge (or, with respect to third parties that are not agents, employees or contactors of GM, should have had actual knowledge and failed to have such actual knowledge as a result of the gross negligence of GM) of any potential Unknown Environmental Condition, and provide USPS with copies of any reports (including Environmental Reports) prepared in connection with the investigation of such Unknown Environmental Condition, subject to the Confidentiality Agreement. USPS and GM shall use best efforts and sound and accepted engineering judgment to resolve promptly in good faith any disputes regarding any potential claim related to an Unknown Environmental Condition or any other matter hereunder. The Known Environmental Conditions and Unknown Environmental Conditions are collectively referred to herein as the "Environmental Conditions."

e.     Response Activities.     GM shall undertake cleanup, remediation, investigation, sampling, monitoring, inspection, evaluation, construction, installation, operation and maintenance of any remedial systems installed at, in, or on the Property, or other actions (herein, "Response Activities") required to be taken by GM relating to the Environmental Conditions pursuant to and in accordance with the CAA, and any subsequent agreements or orders entered into with or issued by USEPA or other governmental agencies related to the Property ("Subsequent Corrective Action Agreements"), at GM's sole cost and expense.  Notwithstanding the foregoing, in the

event that any acts or omissions of USPS, its agents, employees or contractors exacerbates the Environmental Condition of the Property or the Retained Property or significantly increases the costs and expenses of the Response Activities, USPS shall be responsible for the costs and expenses incurred by GM as a result of such acts or omissions of USPS, its agents, employees or contractors. GM shall provide USPS with final written documentation (by electronic copy) detailing any major planned and completed Response Activities taken to address any Environmental Condition. Such documentation may include Response Activities taken to address several Environmental Conditions and USPS acknowledges that GM is not obligated to create documentation to address each Environmental Condition separately. Such documentation may include, if prepared by GM related to GM's Response Activities at the Property, the following types of reports/plans: supplemental RFI submissions, due care plan revisions as of the Completion Date, soil management plans, interim measures work plans, pilot study plans, perimeter air monitoring work plans, soil erosion and sediment control plans, risk evaluations, final corrective measures plans, proposed deed restrictions, and final remedy construction completion reports. The foregoing list is not intended to be exhaustive or necessarily representative of the documents that will, in fact, be produced, but is merely illustrative of the types of documents that may be prepared by GM in connection with its Response Activities at the Property. Such documentation shall be part of the Environmental Reports.

f.   Access to Property.  At any time after the Commencement Date, upon reasonable notice to USPS (but in no event less than two (2) prior business days unless a shorter time is agreed to by the Parties or is required to address an emergency situation) during the term of the Ground Lease, GM and its representatives may come

upon the Property to undertake and complete:  (1) Response Activities under the CAA;

(2) Response Activities under any Subsequent Corrective Action Agreements; or (3) any

other Response Activities (collectively, the "Corrective Action Process") at the Property.

     g.    Response Activity Factors.  GM shall use the following factors in

developing and implementing the particular Response Activities which GM has

determined reasonably should or must be conducted under specifically applicable

Environmental Requirements (as defined below) in the Corrective Action Process: (i)

specific requirements, if any, under applicable environmental laws, regulations, or

ordinances (which environmental laws, regulations or ordinances do not include federal,

state, or local OSHA or other occupational health or safety requirements) as existing

and in effect as of the date of this Agreement, unless a less stringent standard applies

at the time the Response Activities are conducted in which case the less stringent

standard applies (the "Environmental Requirements"); provided, however, that in no

instance will the Response Activity be unreasonably delayed pending a proposed

change to an Environmental Requirement becoming effective, (ii) USPS' construction

plans, provided in writing by USPS to GM, for the PDC improvements and the continued

allowed commercial/industrial use of the Property as more specifically described in the

Ground Lease, (iii) configuration and condition of the Property, (iv) any contractual/deed

notifications/restrictions related to allowable future commercial/industrial use as

provided in the Ground Lease, (v) technical feasibility of the Response Activities, (vi)

economic reasonableness of the Response Activities, and (vii) an assessment of the

human health risks posed by the conditions of the Property, including but not limited to

the following human health and environmental risk-based factors: likely exposure

pathways consistent with the allowed commercial/industrial use of the Property under

the Ground Lease taking into consideration relevant federal or state OSHA worker exposure standards, typical simulated exposure distributions consistent with such exposures, fate and transport characteristics, local geology and hydrogeology, and toxicity of the material(s) in question. In conducting sampling and analysis of any data collected, USPS acknowledges that GM may utilize: (1) statistical evaluation of environmental data to determine actual contaminant concentrations in accordance with appropriate statistical methods, and (2) acceptable methods for determining and evaluating the reasonable and relevant exposure pathways including consideration of any land-use based criteria and relevant federal or state OSHA worker exposure standards. GM intends to record an easement for GM's continued access to the Property for all such activities to be conducted by GM that will be recorded prior to the Commencement Date, will run with the land and will state:

> Grantor hereby reserves unto itself, its representatives, contractors, and assigns, and the U.S. Environmental Protection Agency (the "USEPA") and its representatives, the right of access to, and an easement to and over, the Property to enter the Property with such persons and such equipment as determined necessary, in Grantor's sole discretion and judgment, to implement the cleanup, remediation, investigation, sampling, monitoring, inspection, evaluation, construction, installation, operation and maintenance of any remedial systems installed at, in, or on the Property, or other actions (hereinafter referred to as "Response Activities") required under the RCRA Corrective Action Performance Based Agreement entered into between the USEPA and Grantor, any subsequent corrective action orders or agreements issued by or entered into with USEPA or other governmental agencies related to the Property, or in connection with Grantor's obligations under the Master Agreement of even date herewith. In no event shall the development of, use of, or the operations at the Property by Grantee or Grantee's tenants, assigns, or successors interfere with, obstruct, or in any other manner impede Grantor's performance of its obligations under the RCRA Corrective Action Performance Based Agreement, any subsequent corrective action orders or agreements issued by or entered into with USEPA or other governmental agencies related to the Property, or in connection with Grantor's obligations under the Master Agreement of even date herewith, including, but not limited to, any Response Activities undertaken at, on, or within the Property.

USPS shall provide GM with such other easements as GM may reasonably require in form and substance reasonably satisfactory to GM with respect to ingress and egress to GM's sewer, storm water, and utility lines servicing the Retained Property.

  h. <u>Remediation Standards</u>.  GM shall implement and complete the Response Activities required hereunder including implementing the Final Corrective Measures as set forth in the CAA, providing a Final Remedy Construction Completion Report, and requesting a "No Further Action" determination or similar concurrence from the USEPA. GM shall provide USPS with a detailed bar chart schedule showing the intended start and end dates, duration of Response Activities, and a summary narrative description of the Response Activities to be performed.  GM intends that, at the time of completion of construction of the PDC Improvements, the Response Activities at the Property will meet  the applicable MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels for all actual or planned exposure pathways within the top two feet of any exposed soil surface. In the event contamination exists or remains at the Property in excess of the MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels, the Response Activity may include the use of appropriate engineered barriers or other exposure controls (such as restricted access), restrictive covenants, and operation and maintenance plan(s) necessary to meet the MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels for actual and planned exposure pathways in the relevant media, as appropriate to the circumstances. In no event will GM's obligation to conduct Response Activities include achieving levels of contamination more stringent than:  (1) applicable MDEQ Industrial and Commercial II, III, and IV Part 201 Generic

Cleanup Criteria and Screening Levels, (2) default background levels or site-specific background levels as determined using the published and publicly available MDEQ document entitled "Michigan Department of Environmental Quality Sampling Strategies and Statistical Training Materials for Part 201 Cleanup Criteria," or (3) method quantification limits.

     i.    <u>Agency Notification</u>. USPS acknowledges that GM has notified USPS that the RCRA Corrective Action and the CAA apply to the Property and, as required under Michigan law, that GM will provide written notification of the Ground Lease, with option to purchase, to the USEPA at least thirty (30) days prior to the scheduled Commencement Date. USPS shall provide written notification of the Ground Lease, with option to purchase, to the MDEQ at least ninety (90) days prior to the scheduled Commencement Date, unless a shorter time period is agreed to by the MDEQ.

     j.    <u>USPS Excavation Activities and Impacted Soils</u>. USPS acknowledges and agrees that GM and/or GM's representative shall have the right, at any time, to come upon the Property to observe all excavation, grading, or other activities relating to the PDC improvements and any other construction, demolition or excavation activities by USPS or its agents or contractors which could disturb or alter the condition of the soil at, of, or in the Property from the condition it was in immediately prior to such activities by USPS, its agents or contractors (herein "<u>Excavation Activities</u>"). With regard to the initial PDC improvements, USPS shall provide GM with the written plans showing the proposed excavations necessary for the PDC improvements, including a written schedule of such planned Excavation Activities, not less than ten (10) business days prior to the start of Excavation Activities for GM to review such plans. GM shall have five

(5) business days in which to review the proposed excavation plans and provide USPS with comments.  USPS shall reasonably consider GM's reasonable comments to such plans.  In the event such schedule changes after USPS provides such notice, USPS shall give GM as much prior notice as is possible but in no event less than two (2) business days.  If, during the Excavation Activities occurring within the Indemnity Period (as defined below), USPS encounters soils containing contamination which exceeds the applicable MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels and such soils could, under Environmental Laws (as defined in the Ground Lease), be left in place without further Response Activities (other than potential notification or Michigan Act 451, Part 201 due care requirements), but, due to the nature of the Excavation Activities,  such contaminated soils must be disturbed or altered (the "Impacted Soils"), USPS shall promptly notify GM and GM shall, during the Indemnity Period, be responsible for certain of the off-site disposal/management costs for such Impacted Soils, but only as set forth under the following terms and conditions:

(A)     GM shall reasonably determine whether such soils, in fact, exceed the applicable MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Criteria and, therefore could constitute Impacted Soils as defined herein.  Any sampling of such soils shall be conducted by GM, using generally accepted sampling methodology, including, but not limited to, ensuring that samples are statistically representative of the applicable exposure area. GM shall pay for the cost of such sampling.  If such determination cannot be made promptly, USPS shall, at USPS' cost, remove such soils and shall

stockpile them properly on-site to a location where such determination can be made.

(B) If such soils are determined, in fact, to exceed the applicable MDEQ Industrial and Commercial II, III, and IV Part 201 Generic Cleanup Criteria and Screening Levels, USPS shall, to the extent allowed under applicable Environmental Laws and so long as it would not significantly or unreasonably interfere with USPS' construction/development activities, allow such soils to remain in place or will otherwise utilize them in connection with USPS' construction/development activities. In the event such soils cannot: (1) be left in place either because it is not allowed under applicable Environmental Laws or it would significantly and unreasonably interfere with USPS' construction/development activities, or (2) be utilized by USPS in connection with its construction/development activities either because it is not allowed under applicable Environmental Laws or because USPS cannot reasonably use the volume of such soils in its construction/development activities, such soils shall be deemed Impacted Soils.

(C) GM shall be responsible and liable for properly disposing/managing such Impacted Soils off-site; provided, however, that USPS will be responsible for reimbursing GM for what the cost of disposing of the soils off-site would have been had they not been Impacted Soils.

k. <u>USPS Construction</u>. From and after the Commencement Date, and except as provided in this Agreement, USPS shall be solely responsible for all conditions of

the Property (except for the Environmental Condition as described herein), including, without limitation, the control of dust on the Property, air monitoring, storm water pollution prevention plan implementation, management of waste materials, erosion control, traffic requirements and all matters set forth in the Ground Lease. USPS shall comply will all applicable laws, rules regulations and orders in connection with the construction of the PDC improvements and any expansion to the PDC improvements. From and after the date of this Agreement, through the end of the term of the Ground Lease, USPS shall provide GM a copy of any proposed site construction or work plans and GM shall have the right to request modifications of such plans to avoid or reduce adverse environmental impacts to the Property or interference with any of GM's access to or Response Activities on the Property.

I.    Agency Submittals. GM may, in connection with its rights and obligations hereunder or with respect to the Retained Property, report, submit, or discuss environmental issues with appropriate governmental agencies. Prior to delivering any significant, material reports or submittals to such appropriate governmental agencies pertaining to the Property, GM shall provide copies of such reports and submittals to USPS. In the event a significant, material report or submittal pertaining to the Retained Property indicates that the Property could be materially or significantly affected by a disclosed condition at the Retained Property, GM shall also provide copies of such reports or submittals to USPS. USPS shall promptly review all such materials and provide to GM any comments or objections to any such reports, submittals or discussions. If USPS fails to respond, in writing, to GM with respect to such significant, material reports or submittals within ten (10) business days of delivery by GM of such reports or submittals to USPS (unless, due to the nature and scope of such report or

submittal as it pertains to the Property, a longer time period is reasonably required and will not interfere with GM's ability to timely respond to such governmental agencies), USPS shall be deemed to have no objections to such reports or submittals, and GM shall be entitled to deliver all such reports or submittals to the appropriate agencies, in substantially the same form as provided to USPS.  GM shall reasonably consider all reasonable objections by USPS to such reports or submittals that, in GM's reasonable discretion, do not materially and adversely change the nature, scope or cost of the Work or GM's obligations hereunder, under the Ground Lease, the CAA or any Response Activities.

m.      Agency and Third-Party Contacts.  GM shall invite USPS to GM's semi-annual project meetings (which are held either in person or by conference call) with USEPA, required pursuant to the Corrective Action Process and relating to the Property. USPS shall not independently participate or independently engage in any discussions or negotiations with such agency(ies) or any other third party (not including USPS' consultants, contractors, attorneys, employees, or other agents) regarding any Response Activities relating to the Property, the Retained Property, or GM's activities hereunder.  USPS will, as soon as reasonably practicable under the circumstances, notify GM of any contact, whether written, verbal, or in person, by or with any governmental agency, agency representative or any other third party, regarding Response Activities relating to the Property, the Retained Property, or GM's activities hereunder.  In the event the USEPA or any other agency is proposing that GM take actions that might significantly or materially interfere with USPS' ability to construct the PDC improvements or to conduct its proposed commercial/industrial operations thereon

in the ordinary course, GM will notify USPS and USPS shall participate with GM in such discussions with the USEPA or other such agency.

n. No Interference. USPS will avoid unreasonably interfering with GM's activities under this Agreement. USPS acknowledges and agrees that GM must comply with the Corrective Action Process and GM will not be required to take action or be precluded from taking actions that would put GM in violation of the Corrective Action Process. USPS further acknowledges and agrees that, except as otherwise set forth in this Agreement, GM will not be required by USPS to modify GM's intended work plans for the Corrective Action Process in a manner that would materially and significantly change the nature, scope, or cost of the Work or GM's obligations hereunder, under the Ground Lease, the CAA or any Response Activities. Neither GM nor USPS is aware of a condition on the Property that would preclude construction of the PDC improvements at the proposed location (based on the USPS site concept drawings A01.01 through A01.07 releases April 30, 2004 and revised June 4, 2004) of the Property or operation by the USPS of its proposed commercial/industrial facility thereon in the ordinary course. USPS acknowledges and agrees that the Property is subject to the Corrective Action Process and that, except as otherwise set forth herein, development or use of parts of the Property is at USPS' sole risk. Notwithstanding anything herein to the contrary, GM shall bear no direct, incidental, or consequential liability or responsibility to USPS such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays, in the event GM's activities during the Corrective Action Process disrupt or interfere with USPS' development, use of, or operations at the Property.

o.    Deed Restrictions and Easements.  In addition to those easements and deed restrictions set forth herein and in the Ground Lease, USPS shall cooperate with GM and its representatives, if such cooperation is reasonably required, in obtaining, signing and/or filing any requisite governmental approvals, consents, agreements, waivers, permits, or deed notifications/restrictions which may be required by GM, and which will be obtained at GM's sole expense, including, but not limited to, those related to: (i) notifications regarding cleanup levels achieved by GM's Response Activities; and (ii) operation and maintenance of any remedial system(s) or engineering control(s) which are installed or constructed by GM as part of its Response Activities in connection with the Corrective Action Process. Subject to Section 2(m) hereof, any additional deed notices/restrictions will not unreasonably interfere with USPS' commercial/industrial use of the Property as described in the Ground Lease.  USPS agrees that the Ground Lease shall be subject and subordinate to any such notifications/restrictions and such notifications/restrictions shall be included in any deed, lease, easement, license or other property right relating to the Property, as deed notifications/restrictions running with the land.

p.    Remedial Systems.  USPS acknowledges and agrees that it shall not disturb, impact, or interfere with any remedial system(s), including any engineering control(s) or barrier(s), which GM has implemented, installed, or constructed or will implement, install, or construct at, in, or on the Property as part of its Response Activities. USPS shall notify GM immediately, but in no event later than 24 hours after USPS has or obtains actual knowledge (or, with respect to third parties that are not agents, employees or contactors of USPS, should have had or obtained, actual knowledge and failed to have or obtain such actual knowledge as a result of the gross

negligence of USPS) of any such disturbance, impact, or interference with such remedial system(s) caused by USPS or its employees, agents, consultants, or contractors that occurs at, in, or on the Property. USPS shall notify GM immediately, but in no event later than 24 hours after USPS has or obtains actual knowledge (or, with respect to third parties that are not agents, employees or contactors of USPS, should have had or obtained actual knowledge and failed to have or obtain such actual knowledge as a result of the gross negligence of USPS) of any such disturbance, impact, or interference with such remedial system(s) by any other party that occurs at, in, or on the Property. USPS shall be solely liable and responsible for any costs incurred by GM to remedy such disturbance, impact, or interference with such remedial system(s). USPS further acknowledges and agrees that, in connection with USPS' commercial/industrial development, use of, or operations at the Property, USPS shall be solely liable and responsible for compliance with any requirements under Part 201 of Michigan Public Act 451, including, but not limited to, any due care requirements; provided that, this provision is not intended to, nor shall it, relieve GM from its remedial obligations under this Agreement. USPS shall comply with the Protocols for Identification and Management of Suspect Material attached hereto as **Exhibit H** and made a part hereof in connection with (i) any investigations or due diligence performed by USPS or any of its agents on the Property, and (ii) the construction or use of the PDC improvements on or at the Property.

q.     Except for Response Activities GM is required to undertake in accordance with its obligations under this Section 2 or under Section 3 below, GM shall have no other obligations to undertake Response Activities relating to any conditions that may exist at the Property.

3.    **GM's Indemnification.**

a.    <u>Indemnity</u>.  During the period commencing on the date of this Agreement and continuing through the later of (i) the date upon which GM receives any "no further action" letter or determination from the USEPA under the Corrective Action Process relating to the Property, or (ii) ten (10) years after the Commencement Date (the "<u>Indemnity Period</u>"), GM shall indemnify, defend (using the manners and methods selected by GM in its sole discretion) and hold USPS harmless from and against any and all losses, damages, claims, penalties, fines, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses), which are causes of action, demands or notices of any violation brought by any third party arising as a result of the Environmental Conditions, provided that (x) USPS gives written notice to GM of such demand within seven (7) business days of receipt of such third party demand or discovery by USPS  of any Environmental Condition as described in Section 2 above, and (y) in no event shall GM's indemnity obligation hereunder include punitive or consequential damages such as, by way of example and not limitation, loss of profits, loss of business opportunity, or construction/development delays.   Under no circumstances shall GM's indemnity include a claim for cost recovery under any current or future enacted applicable Environmental Law.  Subject to those federal laws that specifically restrict USPS's indemnity obligations, USPS shall indemnify and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, and legal representatives, harmless from and against any and all losses, damages, claims, penalties, fines, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses), arising directly or indirectly from any environmental condition (and the physical

condition of the Property that affects any environmental condition on the Property), except for the Environmental Conditions. The foregoing indemnification by USPS (excluding the Environmental Conditions) includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, State, or local governmental agency or political subdivision.

      b.    <u>Indemnity Response</u>.  USPS' written notice as set forth in Section 3(a) above shall specify in detail the particular facts and information available regarding such Environmental Condition.  GM shall undertake Response Activities required under applicable Environmental Requirements to address such Environmental Condition for which it is responsible under this Section 3, in accordance with Sections 2(e) – 2(h) above.   The provisions of this Section 3(b) shall not apply to any Environmental Conditions already being addressed by GM under the Corrective Action Process, and USPS is not obligated to and may not notify GM of such Environmental Condition under this Section 3(b).

      **4.**    **Modification or Termination of GM's Indemnification.**

      a.    <u>Limitations on Indemnity</u>.  GM's indemnity obligations hereunder will terminate (as to the specific matter discussed by USPS with any agency or third party only) if, without the prior written approval of GM, which may be granted or withheld in GM's sole and absolute discretion, USPS has engaged in any independent substantive discussions with any agency(ies) or other third parties (not including USPS' consultants, attorneys or other agents or employees) regarding Response Activities necessary to address such Environmental Condition in breach of Section 2(m) hereof.

Notwithstanding the foregoing, USPS may, if required under applicable Environmental Laws related to required notifications and reporting, including release reporting, properly notify the appropriate agency(ies) of such Environmental Condition without being in breach of this provision.  If such notice occurs, USPS shall promptly notify GM in writing of the agency(ies) so notified and the content of the notification.   USPS shall use reasonable best efforts to limit any such release notification to the chemical constituents and amount or volume of the release at issue.  In the event such notification would trigger GM's obligations hereunder, USPS shall, to the maximum extent possible under the circumstances, without interference with USPS' obligation to comply with notification or reporting requirements under applicable Environment Laws, provide GM with notice prior to such notification or reporting being submitted or made to the agency(ies).

b.   Restriction on Assignment.  The rights of USPS under this Agreement are personal to USPS and may not be assigned to any successor or assign without the prior written consent of GM, which consent may be granted or withheld in GM's sole and absolute discretion.

5.   **Work.**  Budget, Schedule, and Cost.  GM and USPS have established a budget for the costs of the Work of $13,386,018 (the "Construction Cost").  The budget for the Work is attached hereto as **Exhibit I** and made a part hereof (the "Budget").  The Budget includes a short narrative description of each portion of the Work, and provides a schedule of values for the enumerated construction activities set forth in the Work.

Exhibit J attached hereto and made a part hereof (the "Schedule") sets forth a detailed bar chart schedule illustrating the starting and ending dates, and duration of each portion of the Work. The Construction Cost shall be the guaranteed, maximum price for the Work pursuant to the General Terms and Conditions, subject to this Section 5(a) below. USPS shall, simultaneously with the execution of this Agreement, deliver the total amount of the Construction Cost to Escrow Agent to be deposited in an interest bearing account pursuant to the Escrow Agreement. Cunningham shall submit to GM and USPS, on a monthly basis, detailed, certified invoices for completed Work, and, subject to the approval of GM and USPS and the terms of the General Terms and Conditions, the Escrow Agent shall pay Cunningham the costs reflected in such invoices. The parties hereto acknowledge and agree that all of the costs and expenses of the Work shall be borne by USPS pursuant to the Budget and the Construction Cost, and that GM shall have no responsibility for the costs of the Work. The Construction Cost consists of firm fixed prices for certain itemized portions of the Work, and a contingency sum. Only the specific portions of the Work identified as allowance items in the Budget attached as **Exhibit I** will be treated as allowances. The contingency sum is not an allowance. Project allowances have been established within the Budget for the enumerated allowance items to cover those portions of the Work where insufficient information was available prior to commencement of the Work to establish a reasonably certain firm fixed price. Allowance funds will be managed on a line item basis by Cunningham with oversight by GM and oversight and verification by USPS. Detailed certified invoices for actual costs incurred for work performed for allowance items will be reported by Cunningham to GM and USPS on a monthly basis. USPS shall have sole final approval for all allowance item payments. Upon substantial completion of each

allowance item, any unused allowance funds for such item will be transferred to the Contingency Funds (as set forth in the Budget). The Contingency Funds may only be approved for items of work not included in the Budget. Contingency Funds may be approved by USPS (in the exercise of its sole discretion) for payment for material variation in estimated quantities, material conflicts between conceptual plans and construction plans, unforeseen site conditions, and modifications or changes initiated by USPS. No Work to be performed that Cunningham intends to charge to the Contingency Funds may be commenced prior to review and approval by USPS (in its sole discretion) of a detailed, certified description of the proposed Work to be performed and a detailed cost breakdown request. Contingency Funds will be managed on a line item basis by Cunningham with oversight by GM and oversight and verification by USPS. Detailed certified invoices for actual costs incurred for Work performed for contingency items will be reported by Cunningham to GM and USPS on a monthly basis. Upon substantial completion of the Work, any remaining contingency funds will be released to USPS. In the event USPS approves any increase to the Construction Cost for any Material Change (as defined below) or other reason set forth herein, USPS shall promptly deliver to Escrow Agent the amount required to cover the increase in the Construction Cost. Notwithstanding anything herein to the contrary, GM, USPS and Cunningham acknowledge that certain pre-development projects described in the Work are in process pursuant to the letter agreement between USPS and Cunningham dated June 14, 2004, as amended. All such amounts paid by USPS to Cunningham (or its subcontractors) pursuant to such letter constitute part of the Construction Cost.

b.    Plans and Permits. GM and USPS shall each provide to the other copies of all permits, approvals, sketches, plans and specifications, reports, test results, maps,

surveys, site assessments and other materials relating to the Work or the PDC improvements, prepared by or for or received by GM or USPS. GM and USPS shall meet on a regular basis to discuss the Work and the schedule of the Work. On or before the Commencement Date, GM shall assign, and USPS shall assume, all rights, duties and obligations relating to soil erosion permits and utility permits and USPS shall be responsible for fulfilling all requirements relating thereto from and after such date.

c.  <u>Substantial Completion</u>.  Cunningham shall (i) certify the Substantial Completion of the Work to both GM and USPS pursuant to the General Terms and Conditions and this Agreement, and GM and USPS shall approve the Substantial Completion of the Work; (ii) consent to the assignment by GM to USPS of rights and remedies herein and in the General Terms and Conditions relating to the Work, specifically including guaranties or warranties as to workmanship; and (iii) acknowledge the right of USPS to enforce such rights and remedies.  To the extent GM assigns to USPS any such rights or remedies relating to the Work, USPS waives any claims against and releases GM from any and all claims, expenses or liabilities of any kind or nature relating to the Work (except for those indemnities by GM to USPS set forth in Section 3 above) and USPS shall look solely to Cunningham with respect to such claims, expenses or liabilities.

d.  <u>Representatives</u>.  GM hereby appoints George Fritz (or his designee) as its designated representative for purposes of on-site supervision of the Work ("<u>GM's Supervisor</u>").  USPS hereby appoints Mathew Kalandranis (or his designee) as its designated representative for purposes of on-site observation of the Work ("<u>USPS' Observer</u>").  The expense of GM's Supervisor relating to the Work shall be included in the cost of the Work.  The expense of USPS' Observer shall be borne by USPS. USPS'

Observer and GM's Supervisor, or designated substitutes, shall have authority to make day-to-day routine decisions as to the Work and as to changes or substitutions other than a Material Change (as hereinafter defined). USPS' Observer shall make visits to the Property at intervals appropriate to various stages of progress as USPS deems reasonably necessary to observe the progress and quality of performance of the Work and to determine if the Work is proceeding in accordance with the terms of this Agreement and the General Terms and Conditions. USPS' Observer shall have no direct control of the Work and shall have no authority over, or direct contact with, contractors. USPS' Observer shall promptly notify GM's Supervisor of any conditions that USPS' Observer believes are defective or will negatively affect completion of the Work in accordance with this Agreement. In the event USPS' Observer does not approve or disapprove an action within five (5) operating days after a request for approval by GM, approval shall be deemed given. In the event of a disagreement between GM's Supervisor and USPS' Observer that concerns or affects GM's relationship with contractors or subcontractors or threatens to delay or impede performance under this Agreement, any subcontract or the General Terms and Conditions, GM's Supervisor shall have the final discretion to direct contractors and performance of the Work.

e.  <u>Changes to the Work</u>.  The Work shall be completed in accordance with the Scope of Work attached hereto as <u>Exhibit C</u> and the General Terms and Conditions. Any changes to the Work requested by Cunningham (i) relating to the substitution of materials which would reduce the level of environmental remediation (which shall be subject to GM's approval as set forth elsewhere in this Agreement) or affect the design of the PDC from that described in the Work, (ii) that would increase the cost of any

particular budget item beyond that set forth in the schedule of values set forth in the Budget, or (iii) that would, subject to Force Majeure events or changes to the Work requested by USPS, extend the schedule for completion of the Work (each a "Material Change"), shall be subject to the prior written approval of USPS, such approval not to be unreasonably withheld, conditioned or delayed.   If USPS does not approve or disapprove a Material Change within twenty (20) operating days of a request for such approval, approval shall be deemed given by USPS.

     f.    Plans.  Prior to the commencement of the Work and in accordance with all applicable local, state and federal laws and regulations, Cunningham shall establish and furnish to GM and USPS, pursuant to the Agreement and the General Terms and Conditions, a worker health and safety plan, a site development plan, a modified due care plan, a dust control and monitoring plan, and a soil erosion plan relating to the Work.  Cunningham shall be solely responsible for worker health and safety relating to the Work.  GM shall prepare a comprehensive soil management plan relating to the Corrective Action Process and deliver such plan to Cunningham and USPS.

     g.    Management of Work.   Within the limits provided herein (including Material Changes requiring USPS' written approval) and in the General Terms and Conditions, GM shall manage the Work and shall be the party, vis-à-vis contractors, responsible for approvals, rejections, consents, change orders and all other matters of judgment or discretion. GM shall make commercially reasonable efforts to ensure that the Work is performed in a good and workmanlike manner and in conformity, in all material respects, with the General Terms and Conditions.

h. <u>Inspections</u>. USPS shall cause any portion of the Work to be inspected within ten (10) operating days after written request by GM and, whether or not a request is made, at least monthly. USPS shall notify GM of any claimed unsatisfactory conditions disclosed by such inspection within five (5) operating days after USPS' inspection. USPS shall give GM at least two (2) operating days' notice of a scheduled inspection. If USPS does not conduct such inspections within ten (10) operating days of a written request from GM or does not give GM written notice of unsatisfactory conditions within five (5) operating days after USPS' inspection, the Work performed through the inspection or the date on which inspection should have been made shall be deemed acceptable to USPS, and GM shall be deemed as authorized to approve the disbursement of a portion of the Construction Costs to Cunningham and to proceed with the remainder of the Work. GM's Supervisor shall require such special inspections and tests of the Work as deemed reasonably necessary by GM, and shall receive and review all certificates of inspections, tests, and approvals required by laws and regulations or the General Terms and Conditions.

i. <u>Certificate of Substantial Completion</u>. On or before the Commencement Date, GM shall deliver to USPS the certificates of Substantial Completion from Cunningham and shall assign to USPS all applicable guaranties and warranties of Cunningham and any subcontractors performing the Work, provided to GM.

j. <u>USPS Consents</u>. USPS shall not unreasonably withhold, condition or delay any requested approvals or consents under this Agreement.

k. <u>Operating Days</u>. "Operating days" shall be defined as days when work is actually being performed on the Property, whether or not a state or municipal holiday, but not including federal holidays or weekends.

6.     **Condition to USPS' Obligation to Construct the PDC.**

As of the date of this Agreement, USPS intends to construct the PDC on the Property.  The construction of the PDC is contingent upon USPS' obtaining all required USPS internal approvals.

7.     **Subdivision Approval.**

The Ground Lease is subject to GM obtaining subdivision approval or the approval of the creation of a new parcel and tax identification for the Property and the Retained Property (the "Subdivision Approval") from the City of Pontiac, Michigan (the "City").  GM shall proceed with due diligence to obtain the Subdivision Approval from the City.  All of the costs and expenses incurred by GM for such subdivision shall be paid by GM and promptly reimbursed to GM by the Escrow Agent from the Construction Cost upon delivery by GM to the Escrow Agent of invoices for the costs of such Subdivision Approval.  In the event GM fails to obtain the necessary Subdivision Approval on or before the Option Purchase Date (as defined in the Ground Lease), or within such extended period of time as may be granted by the USPS in its reasonable discretion, USPS shall have the right to terminate this Agreement and both parties shall be relieved of all obligations and liabilities hereunder.

8.     **Self Help Rights of USPS.**

In the event that performance of the Work (i) is abandoned by Cunningham for

thirty (30) consecutive operating days, or (ii) is more than sixty (60) days behind the Schedule attached hereto as **Exhibit J**, USPS may take such action as deemed reasonably necessary by USPS to complete the Work in accordance with the terms of this Agreement and the General Terms and Conditions.  In the event that USPS elects to exercise its self help remedy, Cunningham shall not be entitled to any additional payments hereunder or under the General Terms and Conditions.  Notwithstanding the foregoing, cessation or delay in performance of the Work shall be excused when caused by Force Majeure events and during such events, USPS shall not have the self help remedy described herein.

      **9.**    **Notices.**

All notices pertaining to this Agreement shall be in writing delivered to the parties by facsimile transmission, reputable overnight courier, or by certified or registered mail, return receipt requested, postage prepaid, addressed to the parties at the addresses set forth in Recital A or such other address as the parties may designate by notice. All notices given by mail shall be deemed given when received. All notices by facsimile transmission shall be deemed given at the time of confirmation of transmission.

      **10.**    **Attorneys' Fees.**

If any legal action is brought by any party to enforce any provision of this Agreement, the entitlement of such party to recover attorneys' fees and court costs shall be determined by the federal Equal Access to Justice Act.

      **11.**    **Binding on Successors.**

This Agreement shall be binding upon the parties hereto and (except as otherwise set forth herein to the contrary) their respective successors and assigns. Neither GM nor USPS may assign this Agreement to any other party without the prior

written consent of the other, which consent may be withheld in such party's sole and absolute discretion. No such assignment shall relieve the assigning party of any of its liabilities or obligations hereunder.  Cunningham shall not be entitled to assign this Agreement, or any rights, duties or obligations herein or in the General Terms and Conditions.  Cunningham shall be entitled to subcontract portions of the Work in accordance with the General Terms and Conditions.

      **12.**   **Entire Agreement: Modification: Waiver.**

      This Agreement and the Exhibits attached hereto constitute the entire agreement between GM, USPS and Cunningham pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings with respect to the subject matter of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by the party against whom such supplement, modification, waiver or amendment is sought to be enforced. No delay, forbearance or neglect in the enforcement of any of the conditions of this Agreement or any rights or remedies hereunder shall constitute or be construed as a waiver thereof. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

      **13.**   **Severability.**

      Each provision of this Agreement is severable from any and all other provisions of this Agreement. Should any provision(s) of this Agreement be for any reason

unenforceable, the balance shall nonetheless be of full force and effect.

**14.    Additional Provisions.**

a.      USPS shall be responsible for the payment of the brokerage commission payable to USPS' broker, NAI Farbman.  In the event USPS exercises the option to purchase, no other brokerage commission shall be due NAI Farbman or any other broker from GM or USPS.

b..     GM shall not to rent or lease any portion of the Property subsequent to execution of this Agreement.

c.      No member or delegate to Congress may be admitted to any part or share of this Agreement, or to any benefit arising from it.

d.      This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. §601-613).

e.      This Agreement shall be governed by and construed in accordance with federal law.

**[*Signature page follows*]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

GENERAL MOTORS CORPORATION

Approved As To Form
Lowe, Fell & Skogg, LLC
By: _____

By: _____

Its: _____
JOHN K. BLANCHARD
~~DIRECTOR~~
WORLDWIDE REAL ESTATE

EXECUTION RECOMMENDED
WORLDWIDE REAL EST
BY: _____

UNITED STATES POSTAL SERVICE

By: _____
ARTHUR STRANGE

Its: _____
CONTRACTING OFFICER

CUNNINGHAM-LIMP  DEVELOPMENT COMPANY

By: _____
Donald R. Bagley, Jr.

Its: _President_

## <u>LIST OF EXHIBITS</u>

Exhibit A-Legal Description

Exhibit B-Ground Lease

Exhibit C-Scope of Work

Exhibit D-General Terms and Conditions

Exhibit E-Access Easement

Exhibit F-Storm Sewer Easement

Exhibit G-Escrow Agreement

Exhibit H- Protocol

Exhibit I- Budget

Exhibit J- Schedule

EXHIBIT 4

**PURCHASE AND SALE AGREEMENT**

**Between**

**SELLER**:

**RACER PROPERTIES LLC,**
**a Delaware limited liability company**

**And**

**BUYER**:

**ECALP CORP.,**
**a New York corporation**

**Property Address**:

**711 North Glenwood Avenue**

**City of Pontiac**
**County of Oakland**
**State of Michigan**

**Tax Parcel Identification Number:**
**63-64-14-21-101-007**

**RACER Reference #11970, portion of**

# BASIC TERMS

These Basic Terms are incorporated in the Purchase and Sale Agreement attached hereto, including all Exhibits (collectively, the "**Agreement**"), between Seller and Buyer (as such terms are defined below).  The Basic Terms do not include all of the relevant terms and provisions relating to each of the items below and Seller and Buyer should carefully review all of the terms and provisions of the Agreement.

| | | |
|---|---|---|
| 1. | Seller: | **RACER PROPERTIES LLC,** a Delaware limited liability company |
| 2. | Buyer: | **ECALP CORP.**, a New York corporation |
| 3. | Effective Date: | December ___, 2018 |
| 4. | Real Property: | Real property having an address at 711 North Glenwood Avenue in the City of Pontiac, County of Oakland, State of Michigan ("**State**"), consisting of approximately 71.858 acres of land, and more particularly described on **Exhibit A** attached hereto. |
| 5. | RACER Ref. No.: | 11970, portion of |
| 6. | Purchase Price: | $1.00 |
| 7. | Deposit: | N/A |
| 8. | Outside Closing Date: | On or about such date which is ninety (90) days following the expiration of the Inspection Period. |
| 9. | Escrow Agent/Title Company: | First American Title Insurance Company<br>Patricia A. Cadena, National Escrow Officer<br>National Commercial Services<br>900 Wilshire Drive, Suite 260<br>Troy, Michigan 48084<br>Tel: 248.458.7207<br>Fax: 866.714.8131<br>Email: pcadena@firstam.com |
| 10. | Inspection Period: | Sixty (60) Days |
| 11. | Broker (if any): | N/A |
| 12. | Settlement Agreement: | The Environmental Response Trust Consent Decree and Settlement Agreement among Motors Liquidation Company (f/k/a General Motors Corporation), Seller's predecessor-in-interest, and its affiliated debtors as debtors and debtors in possession, the States and EPLET, LLC, (not individually but solely in its representative capacity as |

2

Administrative Trustee of the "Environmental Response Trust" established thereby) that established the Trust, notice of which was published in the 75 Fed. Reg. 66390 (Oct. 28, 2010) and a copy of which is available on the Trust's website at http://racertrust.org/About_RACER/Settlement_Agreement.

13.   Trust:       Revitalizing Auto Communities Environmental Response Trust, a trust formed under the laws of the State of New York, the Sole Beneficiary of which is the United States of America.

3

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "**Agreement**") is made as of the above-referenced Effective Date between Seller and Buyer for the sale of the Property (defined below in Recital A), subject to the terms and conditions set forth herein.  Each party hereto may be referred to herein as a "**Party**" or collectively as the "**Parties**".  Initially capitalized terms used but not otherwise defined in this Agreement are defined in the Settlement Agreement.

### RECITALS:

A.      Seller is the owner of the Real Property, which Real Property, together with all of Seller's right, title, and interest in and to all appurtenances and improvements, if any, will be referred to collectively, as the "**Property**."

B.      Pursuant to the Settlement Agreement, effective as of March 31, 2011 (and accompanying "**Trust Agreement**" of the same date), and the Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(A) and (B) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan, entered by the U.S. Bankruptcy Court for the Southern District of New York on March 29, 2011 "**Confirmation Order**" (Trust Agreement and Confirmation Order are collectively referred to herein as "**Bankruptcy Documents**"), subject to funding and other limitations described therein, the Trust is obligated, with its successors and assigns, to conduct certain Environmental Action at, on, in,  under or about the Property, or otherwise to comply with Environmental Laws and the requirements of any other governmental agency or authority, in each case having jurisdiction over the Property (each, a "**Governmental Authority**"), including without limitation the United States Environmental Protection Agency ("**USEPA**") and the Michigan Department of Environmental Quality (or MDEQ).  As identified in Attachment A of the Settlement Agreement, as of the Effective Date the Governmental Authority with the lead oversight role for the Property's Environmental Action is USEPA.

C.      Notwithstanding any such existing obligations of the Trust for such Environmental Actions, Seller desires to sell, transfer and convey, and Buyer desires to purchase and acquire, the Property, subject to the terms and conditions thereof.

NOW, THEREFORE, for good and valuable consideration, including the mutual covenants, conditions and promises contained herein, Seller and Buyer hereby agree as follows:

### ARTICLE 1

### TERMS OF SALE

1.1      Purchase and Sale.  Buyer will purchase and acquire the Property from Seller, and Seller will sell and convey the Property to Buyer, on the terms and subject to the conditions set forth in this Agreement (the "**Sale**").  Buyer acknowledges that the Sale does not include any personal property.

1.2      Purchase Price.  Upon request from the Title Company, Purchaser will deliver to the Title Company an executed Form W-9 and any other documents required by all applicable laws

and other requirements of any Governmental Authority having jurisdiction over the Property (collectively, "**Laws**") in connection therewith.

1.3     Settlement Agreement.  This Agreement will be subject to the terms of the Settlement Agreement.  Where the terms of this Agreement and of the Settlement Agreement conflict, the terms of the Settlement Agreement will control.  Buyer acknowledges that it has been provided with a copy of or access to, and has had an opportunity to review, the Settlement Agreement.

1.4     Application of the Settlement Agreement to the Property.

1.4.1  Any Environmental Condition existing at, on, in, under or about the Property as of the Effective Date for which the Trust has actual knowledge and is obligated to perform Environmental Actions under this Agreement, the Settlement Agreement, or any other Bankruptcy Document is defined herein as a "**Pre-Existing Environmental Condition**."

1.4.2  Restrictions under the Settlement Agreement with respect to Seller's Funding Accounts may limit the liabilities and obligations of Seller under this Agreement.

1.4.3   Seller will not adjust the Purchase Price with respect to any Settlement Agreement requirements or restrictions.

## ARTICLE 2

## CONDITION; INSPECTION

2.1     Existing Conditions.

2.1.1  Buyer acknowledges and agrees that it is relying upon its own investigation of the physical, economic use, compliance and environmental condition of the Property.  Accordingly, except as may be specifically provided otherwise in this Agreement, the Property is being sold, and Buyer hereby agrees to accept the Property, in "AS IS, WHERE IS, WITH ALL FAULTS" condition as of the "**Closing Date**" (as defined in Section 6.1.1 below) without reliance upon any representation, warranty or covenant whatsoever with respect to the physical condition, fitness for a particular use or economic viability, including without limitation: (a) the compliance of the Property or its operation with any applicable Laws; (b) the availability, quality, nature, adequacy and physical condition of any utilities serving the Property; (c) the Intended Use as defined below or any other use; (d) the presence or existence of any Pre-Existing Environmental Condition, and any other Environmental Condition, whether or not disclosed in the Environmental Reports; or (e) any actual or threatened liability of any kind arising from, or related to, an Environmental Claim, any Environmental Condition, or any other violation of any Environmental Law.  For purposes hereof, "**Intended Use**" means any nonresidential cleanup criteria category referenced in Section 324.20120a(l)(b) of the Michigan Consolidated Laws ("**MCL**") and the nonresidential land uses described in the attached Declaration of Restrictive Covenant or Environmental Restrictive Covenant recorded or to be recorded in the chain of title for the Property, or other recorded document that sets forth the restrictions of the Property.

2.1.2  Buyer acknowledges and agrees that the Property will also be sold and conveyed subject to any and all work, actions and activities performed or taken by, or on behalf of, Buyer, its Affiliates or their respective agents, employees, contractors, representatives, and such other Persons over which Buyer exerts control thereof (the "**Buyer**

**Representatives**"), during any access granted to them to the Property prior to the Closing Date, and any liabilities arising in connection therewith.

2.1.3   Buyer acknowledges that Pre-Existing Environmental Conditions may exist at, on, in, under or about the Property, and Seller has provided Buyer with access to environmental reports in Seller's possession pertaining to the Property (the "**Environmental Reports**").   Buyer has been provided access to and/or has reviewed the Environmental Reports, and by its execution and delivery of this Agreement, agrees to purchase the Property subject to all matters and conditions described therein, without any adjustment to the Purchase Price of any kind whatsoever. Buyer will have full rights to use and rely upon the Environmental Reports, and data included in the Environmental Reports, at its sole discretion and risk to support compliance with the requirements of all applicable environmental, health and safety laws, regulations, and ordinances.   Buyer acknowledges and agrees that Seller makes no representations or warranties regarding the accuracy or completeness of any such reports.   Buyer understands that, for purposes of MCL 324.20116, the Property constitutes a "facility" as that term is defined by MCL 324.20101(1)(s) and Seller has disclosed the nature and extent of the release in the Environmental Reports and any land or resource use restrictions.

2.2   Physical Due Diligence.

2.2.1   Except as otherwise provided herein, during the period from the Effective Date through 5:00 pm Detroit time on the sixtieth (60th) day after the Effective Date (the "**Physical Inspection Period**"), Buyer may conduct, at Buyer's sole expense, any and all environmental, geotechnical and other physical due diligence regarding the Property reasonably required or desired by Buyer to satisfy itself in all material respects with the physical condition thereof, including any and all inspections and assessments (the "**Physical Inspection**") to determine the feasibility of any future development of the Property, if any, subject to the terms and conditions hereof and the Pre-Closing Access Agreement, in the form attached hereto as **Exhibit B**, dated as of the Effective Date. Buyer will provide copies to Seller of any and all reports, assessments, analysis, environmental site assessments, summaries and other materials provided by third party consultants in connection with, or otherwise pertaining to, such Physical Inspection (collectively, "**Buyer's Diligence**").

2.2.2   If Buyer is not satisfied with the results of the Physical Inspection for any reason (except for those matters already disclosed to Buyer in the Environmental Reports), then Buyer's sole right will be to terminate this Agreement by delivering written notice to Seller and Title Company prior to the expiration of the Physical Inspection Period, whereupon, effective as of the date Seller receives such written notice, this Agreement will be deemed terminated and of no further force and effect, Buyer will be entitled to receive a refund of any Extension Fees paid and the Parties will be relieved and released from any further liabilities or obligations under this Agreement, except to the extent otherwise expressly stated to survive the termination of this Agreement.  If Buyer does not timely deliver notice to Seller and Title Company, then Buyer will be deemed to have waived and relinquished all rights and claims to terminate this Agreement in connection with this provision, and this Agreement will continue in full force and effect in accordance with its terms.

2.2.3   If, prior to the expiration of the original Physical Inspection Period, Seller is unable to obtain a release of the United States Treasury Lien securing financing in the original maximum principal amount of $33,300,000,000, subject to which the Property may have been conveyed to Seller (the "**Treasury Lien**"), if such Treasury Lien exists on the Property, at Buyer's election: (a) the original Physical Inspection Period will be extended on

a day-to-day basis until such time as Seller obtains the release of the Treasury Lien; or (b) Buyer may terminate this Agreement as set forth above. If there is no Treasury Lien identified in the Title Commitment or other title records for the Property or otherwise not found to affect the Property, then this Section 2.2.3 shall not be deemed by the Parties to be a Closing Condition under Section 6.2.

2.2.4 Buyer will have the right to extend the Physical Inspection Period for two (2) consecutive periods of thirty (30) days (the "**Physical Inspection Extension Period**"), on the condition that:

(a) Buyer has notified Seller of its election to extend the Physical Inspection Period at least three (3) Business Days prior to the expiration of the original Physical Inspection Period, or the immediately preceding Physical Inspection Extension Period, as the case may be;

(b) No default by Buyer under this Agreement or any other Transaction Document has occurred; and

(c) In consideration of the Physical Inspection Extension Period, Buyer will deliver to Title Company in advance thereof, the sum of $500 for such Extension Period (the "**Physical Inspection Period Extension Fee**"), which will be held in escrow. The Inspection Period Extension Fee shall be credited towards the Purchase Price in Buyer's favor at Closing, but shall be nonrefundable and payable to Seller if a Closing does not occur for any reason other than due to Seller's Default or a termination due to any title objections as set forth in Section 3.1.2(b) below, Casualty (defined in Section 9.1 below) or Condemnation (defined in Section 9.2 below).

2.2.5 Seller has no duty at any time to inform Buyer of any approaching or missed deadlines under the inspection Period or any Extension Period relating thereto.

2.3 [Intentionally omitted]

2.3.1 [Intentionally omitted]

2.3.2 [Intentionally omitted]

2.3.3 [Intentionally omitted]

## ARTICLE 3

## <u>TITLE AND SURVEY</u>

3.1 Title.

3.1.1 Promptly after the Effective Date, Buyer may obtain at its own expense, and deliver, or cause to be delivered, to Seller, a title insurance commitment (the "**Title Commitment**") from the Title Company, underwritten by First American Title Insurance Company, including legible copies of all documents referenced therein. Within forty-five (45) days from the Effective Date (the "**Title Inspection Period**"), Buyer will deliver written notice to Seller ("**Objection Notice**") of its objection to any matter set forth in the Title Commitment ("**Objection Items**"). Within fifteen (15) days of Seller's receipt of the Objection Notice ("**Seller's Response Period**"), Seller will deliver written notice ("**Seller's Response Notice**") to Buyer setting forth which Objection Items, if any, Seller will cause to

be insured over or removed, in its sole and absolute discretion, without regard to reasonableness, on or before the Closing Date. Seller's failure to deliver a Seller's Response Notice will be treated as if Seller had elected to not take any action with respect to any Objection Items, thereby rendering them Permitted Exceptions (defined below), unless Buyer elects to terminate this Agreement in accordance with Section 3.1.2(b). "**Permitted Exceptions**" means all exceptions contained in the Title Commitment and all Restrictions affecting the Property relating to the Environmental Actions or otherwise limiting the use and/or development of the Property to the Intended Use or to implement the Settlement Agreement: (i) to which Buyer does not object as herein provided; or (ii) as to which Buyer has waived or is deemed to have waived its objection.

3.1.2   Within five (5) Business Days after delivery of Seller's Response Notice or the expiration of Seller's Response Period, Buyer will notify Seller of its election to either: (a) accept title as it then is, subject to all Objection Items, in which event all Items other than those which Seller specifically agreed in Seller's Response Notice to remove or insure over, will become Permitted Exceptions; or (b) terminate this Agreement, whereupon Title Company will return any Extension Fees to Buyer and, except as otherwise expressly provided in this Agreement, neither Party will have any further rights or obligations under this Agreement.

3.1.3   If any endorsement or update issued to the Title Commitment contains matters other than those in the Title Commitment, Buyer will be entitled to object to any such matters by a written notice of objections to Seller on or before the date five (5) Business Days following Buyer's receipt of such endorsement or update. If Buyer fails to deliver to Seller a notice of objections on or before such date, Buyer will be deemed to have waived any objection to any matters appearing on such endorsement or update, and thereafter all such matters will be deemed to be Permitted Exceptions. Seller will have the option, but not the obligation within twenty (20) days after Seller's receipt of Buyer's notice of objection, to obtain the issuance of an endorsement to the Title Commitment removing such new matters or to obtain affirmative title insurance protection for such new matters, or to otherwise cure such matters. If Seller fails either to provide for the removal of such new matters or to obtain affirmative title insurance protection for, or otherwise cure, such new matters within such 20-day period, then this Agreement, at Buyer's option, will be terminated by written notice delivered to Seller within three (3) days after the expiration of such 20-day period. Upon delivery of such termination notice, this Agreement will automatically terminate and the Parties will be released from all further obligations under this Agreement other than as specifically set forth herein. If Buyer fails to terminate this Agreement within the three-day period set forth above, all matters set forth in Buyer's notice of objections relating to such endorsement or update will be deemed to be Permitted Exceptions, and this Agreement will remain in full force and effect. If Buyer waives in writing its objection to any matters described in the notice of objections relating to such endorsement or update, such matters will be deemed to be Permitted Exceptions.

3.1.4   At Closing, Buyer may obtain, at Buyer's cost, a title insurance policy (the "**Title Policy**") from Title Company, insuring Buyer's fee interest in the Property, subject to the Permitted Exceptions; provided, however, the failure of Title Company to issue such Title Policy, shall not entitle Buyer to delay the Closing or terminate this Agreement, unless and to the extent Buyer has objected thereto during the Title Inspection Period, and Seller has agreed to the cure thereof as set forth in Section 3.1.1 above.

3.2   Survey. Buyer will have the right, in its sole discretion and at its sole expense, to cause a surveying company duly licensed in the State, to prepare and deliver to Buyer, Seller, and Title Company within forty-five (45) days after receipt by Buyer of the Title Commitment, an ALTA/NSPS survey of the Property sufficient for the issuance of Title Policy

(the "**Survey**"); provided, however, should a Survey be required for the Deed (as defined in Section 4.1.2 below) to be accepted for recording by the appropriate County recorder's office, then Buyer, at its sole cost, will obtain the Survey during the Inspection Period.  If Buyer elects, or is required, to obtain a Survey, the Survey will be specifically addressed and certified to each of Buyer, Seller and Title Company.

3.3     Extension. Buyer will have the right, upon prior reasonable request to Seller, to extend the Title Inspection Period for one additional thirty (30) day period (the "**Title Extension Period**"), on the condition that:

(a)     Buyer has notified Seller of its election to extend the Title Inspection Period at least three (3) Business Days prior to the expiration of the original Title Inspection Period;

(b)     no default by Buyer under this Agreement or any other Transaction Document has occurred; and

(c)     in consideration of such Title Extension Period, Buyer has delivered to Escrow Agent in advance thereof, the sum of $100 (the "**Title Extension Fee**"), which Title Extension Fee will be held in escrow.  The Title Extension Fee will be credited towards the Purchase Price in Buyer's favor at Closing, but shall be nonrefundable and payable to Seller if a Closing does not occur for any reason other than due to a Seller Default.

3.4     Seller has no duty to inform Buyer of any approaching or missed deadlines under the Title Inspection Period or any Extension Period relating thereto.

**ARTICLE 4**

**SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS**

4.1     Seller's Representations and Warranties.

4.1.1   Pursuant to the Confirmation Order, title to the Property was conveyed to Seller pursuant to quit claim deed.  Seller does not have a title insurance policy insuring its fee simple interest in the Property.

4.1.2   **Seller is wholly-owned by the Trust**.  Seller has full capacity, right, power and authority to execute, deliver, and perform this Agreement and the Transaction Documents.  This Agreement, the Transaction Documents and the transactions contemplated herein have been duly authorized by Seller, and are binding and enforceable against Seller in accordance with their respective terms (except as enforceability may be limited by Law).

4.1.3   Except as disclosed herein, no consents of any kind are required for Seller to execute, deliver and perform its obligations under this Agreement and consummate the Sale.

4.1.4   Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Internal Revenue Code of 1986, as amended (the "**Code**") for the purposes of the provisions of Section 1445(a) of the Code.

4.1.5   Seller acknowledges and agrees that it will cooperate with Buyer in obtaining any requisite approvals and/or in overcoming any objections of any Governmental Authorities, as such approvals may be required under this Agreement.

4.1.6   The Lease Agreement (as hereinafter defined) is still in full force and effect.  To Seller's knowledge, Seller in its capacity as landlord has performed all work to date under the Lease Agreement, and Seller has not received any written notice from the tenant thereunder of any default by landlord or any state of facts which could ripen into a default thereunder.

4.1.7   Seller has no knowledge of any pending or contemplated eminent domain actions, condemnations or other such takings affecting the Property or any portion thereof.  Seller has disclosed to Buyer that Seller and Trust were named as defendants in a lawsuit by certain employees of the United States Postal Service ("**USPS**") in which health effects allegedly caused by the inhalation of indoor air at the USPS facility on the Property are claimed (the "**Pending Action**").   A complaint was served upon Seller and Trust in the Pending Action on October 25, 2018, and Seller has provided Buyer with a copy of such complaint.  Seller is actively defending the Pending Action, which is captioned *Jill Powell-Murphy, et al. v. Revitalizing Auto Communities Environmental Response Trust, et al.*, Case No. 2018-168037-NO, Oakland County (Michigan) Circuit Court.

4.2     Additional Covenants.  From and after the Effective Date until the Closing Date, without Buyer's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed), Seller will refrain from:  (a) entering into any contract or agreement of any kind to sell or dispose of the entire Property, or otherwise solicit or accept from any individual(s) or entity or other Person any offers to purchase the entire Property, except as contemplated by this Agreement; (b) encumbering title to the Property with any liens or encumbrances (except to the extent that any required property taxes may continue to accrue with respect to the Property prior to the Closing, which items will be prorated as of the Closing Date in accordance with this Agreement), other than with Permitted Exceptions; and (c) entering into any other new contract affecting the Property, which will survive the Closing for more than sixty (60) days after the Closing or is otherwise terminable on not more than 60 days' notice.  Subject to Buyer's compliance with its obligations in Section 5.2.8, below, Seller and the Trust shall continue to diligently defend the Pending Action at their sole cost and expense, and agree to defend, indemnify and hold Buyer harmless with respect to any obligation, liability, cause of action, claim, damage harm, cost, expense (including reasonable attorneys' fees actually incurred) by Buyer as a result of the Pending Action or any related or ancillary action relating to actual or alleged claims which accrued (if at all) during Seller's period of ownership of the Property.  Seller's obligations pursuant to the preceding sentence shall survive the Closing.

## ARTICLE 5

## BUYER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1     Buyer's Representations and Warranties.

5.1.1   Buyer is a Michigan limited liability company in good standing under the laws of its jurisdiction of organization, and has all requisite power and authority to own and operate its real property and to carry on its business as now being conducted.

5.1.2   Buyer has authority to execute this Agreement and the Transaction Documents.  This Agreement and the consummation of the transactions contemplated herein have been authorized by all necessary company action on the part of Buyer and any required Affiliate, and are and will be, valid, binding and enforceable against Buyer in accordance with their respective terms (except as enforceability may be limited by Law).

5.1.3   Except as disclosed herein, no consents of any kind are required for Buyer to execute, deliver or perform its obligations under this Agreement or any Transaction Document.

5.1.4   There are no litigation, demands or claims of any kind pending, or to the knowledge of Buyer, threatened, which would reasonably be expected to have a Material Adverse Effect on Buyer's ability to consummate the Sale, including without limitation, disputes with any Governmental Authority.

5.2   Additional Covenants and Acknowledgements.

5.2.1   Buyer acknowledges and agrees that it is relying solely on Buyer's inspections of the Property in consummating the Sale, and that no representations or warranties whatsoever have been made by Seller, or by any Person, firm, or agent acting or purporting to act on behalf of Seller, including but not limited to, with respect to: (a) the value, expense of operation or income potential of the Property; (b) the accuracy or completeness of any title, survey, engineering, environmental, zoning, appraisal, or other confidential information provided to Buyer relative to the Property; or (c) any other fact or condition which has or might affect the Property or the use, operation, development, value, or expense of operation thereof.

5.2.2   Buyer acknowledges and agrees that Seller relied on the information and documentation Buyer provided, or caused to be provided, to Seller in selecting Buyer as the purchaser of the Property, and that any misrepresentation with respect to, or material change in, such information or documentation will be deemed an event of default by Buyer hereunder.  Buyer will promptly notify Seller in writing of any change in the information provided by Buyer to Seller in connection with this provision.

5.2.3   Buyer agrees that in the assignment of the Lease Agreement from Seller to Buyer (and in the assumption of such Agreement by Buyer), any sublease, any other lease with any other tenant, any license agreement, any operating agreement and any purchase agreement with any prospective purchaser, regarding the Property or any portion thereof, shall contain language requiring USPS (or any lessee, sublessee, or buyer as the case may be) to: (a) sign and comply with the terms of the Redevelopment and Remediation Coordination Plan (as that document is defined below), to the extent such Plan has been effectuated between Seller, Buyer, and Trust; and (b) comply with the applicable terms of the Environmental Easement Agreement and Restrictive Covenants (as those documents are defined below).

5.2.4   Buyer hereby acknowledges that, in connection with the sale of the Property and in reliance on information provided by Buyer, Seller has determined that Buyer's proposed use of the Property will be a productive and beneficial use based on the Sales Criteria.  Accordingly, to induce Seller to enter into this Agreement, Buyer hereby: (a) represents and warrants that all information and documentation Buyer has provided, or caused to be provided, to or for the benefit of, Seller to assess whether or not Buyer's proposal for the Sale satisfies the Sales Criteria, is true, correct and complete in all material respects as of both the Effective Date and the Closing Date, and acknowledges and agrees that any misrepresentation with respect to, or material change in any such information or documentation will be deemed a Buyer Default, without further notice or act; (b) acknowledges that Seller and all relevant Governmental Authorities have relied upon such information and documentation in entering into, or not objecting to, as appropriate, this Agreement; and (c) agrees to promptly notify Seller of any change in, to or affecting such information or documentation, or its truth, accuracy or completeness.

5.2.5   The issuance of the Title Policy will be in lieu of any express or implied warranty of Seller concerning title to the Property, whether made herein or in the Deed or in any other document delivered at or in connection with the Closing.  Purchaser acknowledges and agrees that, from and after the Closing Date, its only remedy for damages incurred by reason of any defect in title to the Property will be against the issuer of the Title Policy.

5.2.6   Buyer acknowledges and agrees that it will cooperate with Seller in obtaining any requisite approvals and/or in overcoming any objections of any Governmental Authorities, as such approvals may be required under this Agreement.

5.2.7   At Buyer's request prior to the Closing, Seller will promptly provide to Buyer information regarding the balances contained in the Minimum Estimated Property Funding Account, Reserve Property Funding Account and Cushion Funding Account (as such terms are defined in the Settlement Agreement), and/or detailed updates regarding the status of the environmental remediation efforts thereupon.

5.2.8   Buyer shall, prior to Closing and at all times during the pendency of the Pending Action, fully cooperate with Seller and the Trust and their legal counsel in the defense of the Pending Action, which cooperation shall include: (a) assisting with providing information and documents, in Buyer's possession, relevant to discovery requests; (b) providing access to the Property after Closing, upon reasonable advance notice and at dates and times convenient to Buyer, for litigation-related inspections and assessments; (c) notifying Seller and the Trust at least ten (10) Business Days prior to making any changes to the Property; (d) refraining from making any changes to the Property that Seller's and Trust's counsel determines could be construed as causing spoliation of evidence relevant to the Pending Action; and (e) refraining from making any statements or engaging in any conduct that adversely affects Seller's and Trust's defense of the Pending Action.

5.2.9   The provisions of this Article will survive the expiration or earlier termination of this Agreement and any Closing, and will not be merged into the Transaction Documents.

## ARTICLE 6

## CLOSING

6.1     Closing.

6.1.1   Except as otherwise provided herein or subsequently modified in writing by the Parties, the Sale shall close (the "**Closing**") at 11:00 am (Detroit time) on the date ninety (90) days after the expiration of the Physical Inspection Period, subject to the terms and conditions hereof (the "**Closing Date**"), and, at Seller's election, at the offices of Seller, its attorneys or Title Company, or by overnight delivery of all required documents, including escrow closing instructions, to Title Company.

6.1.2   At Closing, Seller shall convey fee simple title to the Property, free and clear of all liens and encumbrances of any kind other than Permitted Exceptions, by quit claim deed (the "**Deed**") substantially in the form attached hereto as **Exhibit C**, with such changes in form only as are required by the State.

6.1.3   On the Closing Date, Buyer will pay the balance of the Purchase Price by wire transfer to the account designated by Seller, unless otherwise directed by Seller at least three (3) Business Days prior to the Closing Date.

6.2    Closing Conditions.  The respective obligations of the Parties to consummate the Closing are subject to the satisfaction of the following conditions (the "**Closing Conditions**"):

6.2.1   The obligations of Seller to consummate the sale are conditioned upon the satisfaction of the following Closing Conditions:  (a) the representations and warranties of Buyer made in this Agreement, and any other Transaction Document delivered pursuant hereto, are true, correct and complete when made and as of the Closing Date; (b) the unconditional delivery of Buyer's Closing Deliveries, including without limitation the payment of the Purchase Price; and (c) receipt by Seller of the release of the Treasury Lien; (d) Seller issuance under Paragraph 64 of the Settlement Agreement of written notice to the United States, the State, and affected community(ies) where the Property is located, at least thirty (30) days prior to the Closing, of Seller's intent to sell the Property to Buyer, and (e) assignment by Seller to and assumption by Buyer of the Ground Lease Agreement ("**Lease Agreement**") dated November 29, 2004 between General Motors Corporation and USPS, as assumed by the Trust pursuant to the Settlement Agreement.

6.2.2  The obligations of Buyer are conditioned upon the satisfaction of following Closing Conditions:  (a) the unconditional delivery of Seller's Closing Deliveries; and (b) the delivery of fee simple title to the Property, subject to no liens other than the Permitted Exceptions, and those items which Seller has elected to cause to be omitted or insured over at or prior to Closing in accordance with this Agreement.

## ARTICLE 7

## CLOSING AND POSSESSION

7.1    Seller's Closing Deliveries.  On or prior to the Closing Date, Seller will execute and deliver, or cause to be executed and delivered, (collectively, "**Seller's Closing Deliveries**"):

7.1.1   the Deed;

7.1.2   all real property transfer tax returns and other forms required by Law to be completed or signed by Seller to transfer the Property as required under this Agreement and record the Deed;

7.1.3   the Environmental Easement Agreement between the Trust and Buyer in the form attached hereto as **Exhibit D** (the "**Environmental Easement Agreement**" or "**EEA**"), the Restrictive Covenant or other similar documents in the form attached thereto as **Exhibit E** (the "**Restrictive Covenant**" or "**RC**"), and all other Transaction Documents to which it is a party;

7.1.4   a Non-foreign Transferor Affidavit pursuant to Section 1445 of the Code;

7.1.5   a HUD-1 Settlement Statement or similar closing statement (the "**Closing Statement**") to Buyer and Title Company, and such other documents and affidavits as are reasonably requested by Title Company, to issue the Title Policy consistent with this Agreement.

13

7.2     Buyer's Closing Deliveries.  At Closing, Buyer will execute and/or deliver, as applicable (collectively, "**Buyer's Closing Deliveries**"):

7.2.1   the balance of the Purchase Price, subject to the credits and adjustments required by this Agreement (to be shown on the Closing Statement executed by Buyer, Seller and Title Company);

7.2.2   all real property transfer tax returns and other forms required by Law be completed or signed by Buyer to transfer the Property and record the Deed;

7.2.3   the Environmental Easement Agreement and all other Transaction Documents to which it is a party;

7.2.4   evidence of the valid existence and good standing of Buyer in the state in which Buyer is organized, along with the consent of its principals authorizing the Sale;

7.2.5   Intentionally omitted.

7.2.6    Intentionally omitted.

7.2.7   the Closing Statement to Seller and Title Company, and such other documents and affidavits as are reasonably requested by Title Company, to issue the Title Policy consistent with this Agreement.

7.3     Tax Prorations.  Except as otherwise provided herein, all real property taxes of any kind customarily adjusted upon the sale of a property similar to the Property will be prorated and adjusted on the due date basis, paid in advance, with Buyer being responsible for all such taxes allocable to the period commencing from and after 12:01 am (Detroit time) of the Closing Date, and Seller being responsible for all such taxes allocable to the period prior to and including 11:59 pm (Detroit time) of the day before the Closing Date, in each case regardless of when such taxes are actually due and payable without penalty or interest.

7.4     Other Prorations.

7.4.1   Any other expense items customarily adjusted upon the sale of property similar to the Property will be adjusted between Seller and Buyer as of the Closing Date in accordance with local custom; provided, however, Seller will have no responsibility for title insurance premiums or survey costs.

7.4.2   Buyer and Seller agree that the Title Company will be the "reporting person" relative to the transaction contemplated herein for purposes of Section 6045(e) of the Code.

7.5     Expenses.

7.5.1   Seller will be responsible for the cost of preparing the Deed.

7.5.2   Buyer will be responsible for the costs of the Title Commitment and Title Policy, Survey and conducting its due diligence investigation.  All transfer taxes associated with the recordation of the Deed, if any, including without limitation, transfer and recordation taxes and documentary stamps, will be paid by Buyer at Closing or, if assessed at any time thereafter, will be paid promptly by Buyer following such assessment.

7.5.3   Each Party will pay its own attorneys', brokers', and consultants' fees. Buyer and Seller agree to provide each other reasonable assistance in the preparation and filing of any and all required transfer tax returns for or with respect to such transfer taxes with any and all appropriate taxing authorities.

## ARTICLE 8

## SPECIAL PROVISIONS

8.1   Environmental.

8.1.1   Except as otherwise provided for in this Agreement or the Environmental Easement Agreement, Buyer hereby **forever waives, and releases, relinquishes, acquits, and forever discharges** Seller and the Trust (collectively, "**RACER**"), their Affiliates and each of their respective members, partners, venturers, stockholders, directors, managers, officers, employees, spouses, agents, legal representatives, successors and assigns (collectively, "**Seller's Representatives**") from and against any and all liabilities, duties and obligations of any kind for any Environmental Actions or other remediation or other work by the Trust, whether required or recommended for the Property by any Governmental Authority, to the extent it is not allowed for, or cannot be funded, under the Settlement Agreement. **Notwithstanding the foregoing, or anything to the contrary set forth elsewhere in this Agreement or any Transaction Document, RACER will have no responsibility or liability whatsoever with respect to any Pre-Existing Environmental Condition, or any other Environmental Condition which may hereafter exist, at, above, or below the surface of the Property, including without limitation, in any improvements and any and all discarded materials located on or at the surface of the Property, building materials from demolition activities; domestic and industrial trash; tires; automotive parts; used containers which held materials such as paint, antifreeze, gasoline, and other household substances; materials painted with lead-based paints or otherwise; wood, and other materials which may have been painted with lead-based paints; roof shingles and other building materials which may contain asbestos-containing materials, except to the extent otherwise provided in, and subject to, this Agreement or the Environmental Easement Agreement.**

8.1.2   Buyer and Seller will work cooperatively with the Trust to prepare a Remediation and Redevelopment Coordination Plan reasonably acceptable to Buyer and Seller ("**RRCP**").   The RRCP will establish the working dynamics between Buyer, Seller, and the Trust as well as the process for coordinating remediation work and redevelopment activities after the expiration of the Inspection Period and after Closing.

8.1.3   Buyer acknowledges that the Property is subject to a Resource Conservation and Recovery Act ("**RCRA**") Corrective Action and that it will comply with the applicable RCRA-related notice requirements of Mich. Admin. Code R. 299.9525, or, if the Property is not located in Michigan, then equivalent State law or regulation.

8.2   Restrictions.   Buyer hereby acknowledges that Seller may have previously recorded or will record, prior to Closing, a Restrictive Covenant, or may record, prior to Closing, an Amended Restrictive Covenant, as to the Property (as form of which is attached as **Exhibit E**) with the register of deeds or appropriate land records office of the County of Oakland.   Seller reserves the right to modify such Restrictive Covenant or Amended Restrictive Covenant prior to the expiration of the Inspection Period, or otherwise in accordance with the EEA.

8.3     Survival.  The provisions of this Article and the Parties' respective obligations hereunder will survive the expiration or sooner termination of this Agreement and any Closing, and will not be merged into the Transaction Documents.

## ARTICLE 9

## CASUALTY OR CONDEMNATION AFFECTING THE PROPERTY

9.1     Casualty.  If, between the Effective Date and the Closing Date, the Property is damaged by fire, flood, earthquake, hurricane, tornado, Act of God, or any other cause or means ("**Casualty**"), the following will apply:

9.1.1   Except as otherwise expressly provided in this Agreement, the risk of loss to the Property by such Casualty is assumed by Seller until the Closing Date, but without any obligation of Seller to repair or restore the Property, except to the extent such Casualty arises from the gross negligence or willful misconduct of Seller or any of Seller's Representatives.  Seller will notify Buyer of Seller's determination on whether or not it will repair or restore the Property within one hundred eighty (180) days from the date of such Casualty, subject to Force Majeure (as defined in Section 11.4 below) and delays caused by Buyer or Buyer's Representatives.  If Seller elects to repair or restore the Property, this Agreement will continue in full force and effect, and Buyer will not have the right to reject title or receive a credit against, or abatement in, the Purchase Price, so long as Seller completes the repair or restoration within a reasonable period of time.  Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss, will belong entirely to Seller, and if such proceeds are paid to Buyer, Buyer will promptly upon receipt thereof turn them over to Seller.

9.1.2   If Seller notifies Buyer that it does not elect to repair or restore the Property as set forth above, then this Agreement will automatically be deemed terminated and of no further force and effect, and Seller will return, or direct the Title Company to return, to Buyer all Extension Fees held in escrow (unless the Casualty was caused by or related to the gross negligence, willful misconduct or presence on the Property, of Buyer or any Buyer Representative, in which case this Agreement will remain in full force and effect, without any credit against, or abatement in, the Purchase Price) and neither Party hereto will have any further rights, obligations or liability to or against the other hereunder, except as otherwise provided herein to survive such termination.

9.2     Condemnation.  If, between the Effective Date and the Closing Date, the Property is affected by: (a) the exercise of any governmental power, whether by condemnation, eminent domain, other legal proceedings or otherwise by any Governmental Authority or private corporation or individual having the power of condemnation or eminent domain under applicable Law ("**Condemnor**"); and (b) a voluntary sale or transfer by Seller to any Condemnor, either under threat of condemnation or eminent domain or while legal proceedings for condemnation or eminent domain are pending ("**Condemnation**"), and such Condemnation is for:

9.2.1   All or substantially all of the Property, then this Agreement will terminate and be no further force or effect as of the date of such Condemnation.

9.2.2   A portion of the Property, and the removal of such portion from the Property would reasonably be considered to have a Material Adverse Effect on the Intended Use, then this Agreement will remain in full force and effect and: (a) Seller will be entitled to

the entirety of any compensation awarded for such Condemnation (an "**Award**"); and (b) the Purchase Price will be reduced by the amount of such Award, less Seller's costs incurred in connection therewith.

9.2.3   A portion of the Property, and the removal of such portion from the Property would not reasonably be considered to have a Material Adverse Effect on the Intended Use, then this Agreement will remain in full force and effect and: (a) Seller will be entitled to the full amount of the Purchase Price; and (b) Buyer will be entitled to receive all of the Award, and Seller agrees that it will not make any adjustment or settlement of any such Condemnation proceeding without Buyer's consent and will take at Closing all action necessary to assign its entire interest in the Award to Buyer.

9.3     Survival. The provisions of this Article and the Parties' respective obligations hereunder will survive the expiration or sooner termination of this Agreement and any Closing, and will not be merged into the Transaction Documents.

## ARTICLE 10

## INDEMNIFICATION

10.1    Buyer Indemnification.  Buyer shall defend, indemnify, pay, save, and, hold Seller, its Affiliates, and the Seller Representatives (the "**Seller Indemnified Parties**") harmless from and against any and all claims, liabilities, demands, fines, costs and expenses, including, without limitation, reasonable attorneys' fees and costs ("**Claims**") imposed upon, or incurred by or on behalf of such Seller Indemnified Parties, or the Property, arising from or related to:  (a) any breach or default by Buyer under this Agreement including all expenses incurred in connection with the exercise by Seller of any remedy to which it is entitled hereunder; (b) any Release, no matter how caused (other than as a result of Environmental Actions of Seller, the Trust, or Seller's Representatives), to the extent the Release occurred after the Closing Date; (c) any Pre-Existing Environmental Conditions exacerbated by Buyer; (d) anything necessary to protect Seller's interest under this Agreement in any proceeding (whether voluntary or involuntary) pursuant to Title 11 of the United States Code, as amended and/or supplemented from time to time, together with any similar Law relating to bankruptcy, insolvency, reorganization, restructuring, winding up or composition or adjustment of a Person's debts; or (e) the presence of Buyer or any Buyer Representative thereof on the Property prior to the Closing Date, or any other act or omission of Buyer, or any Buyer Representatives.  Notwithstanding anything set forth above in this Section, Buyer will not be liable for, or be obligated to defend, indemnify, pay, save and hold such Seller Indemnified Parties harmless from and against any Claims to the extent resulting from: (i) any Seller's Default or the gross negligence or willful misconduct of any of its Indemnified Parties; or (ii) any Environmental Action of Seller, the Trust or Seller's Representatives.  Except as otherwise provided in this Agreement, the Environmental Easement Agreement, or any of the other Transaction Documents, nothing herein will be construed as an agreement by Buyer to indemnify, defend or hold Seller harmless from liabilities related to Pre-existing Environmental Condition for which Buyer is otherwise not liable under Michigan law as a result of having conducted and filed a written report prepared in accordance with Parts 201 and/or 213 of Michigan's NREPA (as defined below), and the regulations promulgated thereunder, that confirms that the Property is a "facility" and/or a "site" as those terms are defined under Michigan law ("Baseline Environmental Assessment" or "BEA").

10.2    Costs and Fees.  If a Seller Indemnified Party shall, without fault, be made a party to any Claim commenced by or against Buyer, or if a Seller Indemnified Party shall, in its reasonable discretion, determine that it must intervene in such Claim to protect its interest

hereunder, Buyer shall defend such Seller Indemnified Party using attorneys reasonably satisfactory to such Seller Indemnified Party, and shall pay all liabilities, costs and expenses incurred by the Seller Indemnified Party in connection with such Claim.  A Seller Indemnified Party shall have the right to engage its own attorneys in connection with any of the provisions of this Section or any of the provisions of this Agreement, including, but not limited to, any defense of or intervention by Buyer, notwithstanding any contrary provisions of applicable Laws, and all attorneys' fees and costs shall be included in the amounts to be paid by Buyer.

10.3   Seller Indemnification.  Buyer acknowledges that Seller will not defend, indemnify, pay, save or hold Seller Indemnified Parties harmless, except for the limited indemnities set forth in Sections 14.7 and 14.12, below.

10.4   Survival.  The provisions of this Article and the Parties' respective obligation hereunder will survive the expiration or sooner termination of this Agreement and any Closing, and will not be merged into any Transaction Document.

## ARTICLE 11

## DEFAULT AND TERMINATION

11.1   Buyer's Events of Default.  The occurrence of any of the following events and breaches of its obligations (each a "**Buyer's Default**") will constitute a default by Buyer under this Agreement:

11.1.1 Failure by Buyer to consummate the Closing on the Closing Date, if Buyer's Closing Conditions have been satisfied or waived, if such failure is not cured within ten (10) days after delivery by or on behalf of Seller of written notice of such failure.

11.1.2 Failure of Buyer to comply with any other provision of this Agreement, if such failure is not cured within twenty (20) days after delivery by or on behalf of Seller of written notice of such failure, unless any provision of this Agreement provides for a shorter or no time period for cure, and except in cases of an emergency.

11.1.3 The breach by Buyer of any representation, warranty or covenant when made or on the Closing Date.

11.2   Seller's Remedies.  If a Buyer Default occurs, then Seller's sole and exclusive remedy for such Buyer's Default will be to terminate this Agreement, so that it is of no further force and effect and retain the Extension Fees, as liquidated damages, it being acknowledged and agreed that it is extremely difficult and impracticable to ascertain the extent of detriment to Seller caused by the breach by Buyer under this Agreement, and the failure of the consummation of the Sale contemplated by this Agreement, or the amount of compensation Seller should receive as a result of Buyer's breach or default.  Upon termination of this Agreement pursuant to this Section, Seller may sell the Property to any third party as though this Agreement had never been made (without any obligation to account to Buyer for any part of the proceeds of such sale).  No delay or omission by Seller to exercise any such right, power and remedy, will impair, limit or vitiate such right, power or remedy.

11.3   Seller's Default and Remedies of Buyer.  If Seller does not convey the Property to Buyer as, if and when required to do so by this Agreement, following satisfaction of all Closing Conditions ("**Seller's Default**"), then **BUYER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH SELLER'S DEFAULT SHALL BE THE RETURN OF ANY EXTENSION FEES)**.

Buyer will not have the right to sue Seller for specific performance to compel Seller to convey the Property to Buyer in accordance with this Agreement.

11.4    Force Majeure.    Anything to the contrary contained in this Agreement notwithstanding, neither Party will be deemed to be in default of any of its obligations hereunder if it will be prevented from or delayed in performing such obligation by reason of any: act of God; act of war; act of terrorism; civil commotion; governmental embargo or moratorium; Casualty; labor dispute not within the direct control of Buyer; unavailability or shortages of labor, materials or equipment which would not reasonably be foreseeable, enactment of any new Law after the Effective Date; or any other cause or event which would not be reasonably foreseeable or is beyond a Person's reasonable ability to control (except financial inability) ("**Force Majeure**") and such Party's time for such performance will be extended by the number of days during which any condition of Force Majeure prevails, so long as notice by the Party claiming such extension is given to the other Party within three (3) Business Days of notice thereof.

11.5    Waiver.  No waiver by either Seller or Buyer of any breach by the other of any one or more of the terms, covenants, conditions or agreements of this Agreement will be deemed to imply or constitute a waiver of any succeeding or other breach.  Failure of either Seller or Buyer to insist upon the strict performance of any of the terms, conditions, covenants and agreements of this Agreement will not constitute or be considered as a waiver or relinquishment of such Party's rights to subsequently enforce any default, term, condition, covenant or agreement, which will all continue in full force and effect.

11.6    General Effect of Termination.  Whenever in this Agreement provision is made that either Party will have the right to terminate this Agreement, then unless in such provision it is expressly provided otherwise (including, without limitation, as is provided in this Section), this Agreement will terminate on the date set forth in the operative termination notice delivered in accordance with the terms hereof, whereupon, the Parties will be released and relieved from, and neither Party hereto will thereafter have against the other, any further Claim or liability under this Agreement or on account of the termination hereof, except for those accruing prior to the effective date of such termination, and those expressly stated in this Agreement to survive the expiration or termination of this Agreement.

## ARTICLE 12

## NOTICES

All notices, requests, consents or demands herein provided to be given or made, or which may be given or made by either Party to the other hereunder (collectively, the "**Notices**"), will be given or made only in writing and will be deemed to have been duly given:  (a) when delivered personally at the address set forth below, or if delivery is rejected when delivery was attempted; (b) on the 1ˢᵗ Business Day after the date sent when sent *via* reputable overnight courier, properly addressed, prepaid and delivered to such courier's office during its business hours, otherwise, it will be effective the next Business Day; or (c) on the date sent via facsimile or electronic mail transmission, if sent prior to 5:30 pm (Detroit time) on a Business Day, and if a hard copy is deposited either with an overnight courier for next Business Day delivery, or in the United States mail within twenty-four (24) hours after the facsimile or electronic mail is transmitted.   The attorneys for either Party may, but will not be required to, deliver any notice pursuant to this Agreement on behalf of their respective clients.

      If to Seller:                **RACER Properties LLC**

500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226
Attn:  Bruce Rasher, Redevelopment Manager
Facsimile:  734.879.9537
Email:  brasher@racertrust.org

With a copy to:      **RACER Properties LLC**
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226
Attn:  Carl P. Garvey, General Counsel
Facsimile:  734.879.9537
Email:  cgarvey@racertrust.org

And a copy to:      **RACER Properties LLC**
P.O. Box 43859
Detroit, MI 48243

And a copy to:      **Dawda, Mann, Mulcahy & Sadler, PLC**
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
Attn:  Edward C. Dawda
Facsimile:  248.642.7791
Email:  edawda@dmms.com

If to Buyer:      **ECALP Corp.**
123 Grove Avenue, Suite 222
Cedarhurst, New York 11516
Attn:  Andrew Spodek
Facsimile:  516.295.2004
Email: aspodek@nationwidepostal.com

With a copy to:      **Goldberg Weprin Finkel Goldstein LLP**
1501 Broadway, 22nd Floor
New York, New York 10036
Attn: Andrew W. Albstein, Esq.
Facsimile:  212.730.4518
Email:  aalbstein@gwfglaw.com

# ARTICLE 13

## LEGAL PROCEEDINGS

EACH OF SELLER AND BUYER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAWS, THE RIGHT EITHER OF THEM OR THEIR AFFILIATES, SUCCESSORS OR ASSIGNS MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY CLAIM ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO SELLER ACCEPTING THIS AGREEMENT.

## ARTICLE 14

### GENERAL PROVISIONS

14.1    Interpretation.  The use of: (a) the neuter gender includes the masculine and feminine; and (b) the singular number includes the plural, whenever the context requires.

14.2    Captions and Headings.  Captions and headings in this Agreement are inserted for the convenience of reference only and do not define, describe or limit the scope or the intent of this Agreement or any of its terms.

14.3    Exhibits.   All attached Exhibits are a part of this Agreement and are incorporated in full by this reference.  Except as specifically provided herein, if any provision contained in any Exhibit hereto is inconsistent or in conflict with any provisions of this Agreement, the provisions of this Agreement will supersede and control the provisions of such Exhibit.

14.4    Entire Agreement.  This Agreement contains the entire agreement between the Parties relating to this Agreement and the transactions contemplated hereby and all prior or contemporaneous agreements, understandings, representations, warranties and statements, oral or written, are expressly superseded by this Agreement.  This Agreement may not be modified, waived, amended, discharged or changed, nor may any of its terms be waived, except by an instrument in writing signed by the Party to be bound thereby.  Any modification, waiver, amendment, discharge or change of this Agreement which is not in writing and signed by the Party against which the enforcement thereof is or may be sought will be deemed null and void and of no force and effect *ab initio*.

14.5    Drafting.  This Agreement will not be construed more strictly against one Party than the other because it may have been drafted by one of the Parties or its counsel, each having contributed substantially and materially to the negotiation and drafting hereof.

14.6    Governing Law, Jurisdiction and Venue.  The Laws of the State will govern the validity, construction, enforcement and interpretation of this Agreement; provided, however, that the United States Bankruptcy Court for the Southern District of New York will retain jurisdiction over any and all disputes arising under, or otherwise relating, to the construction and enforcement of the Settlement Agreement, and the transactions contemplated thereunder and governed thereby.  Each Party hereby consents to the jurisdiction and venue of any Federal District Court and State Courts located in the City or County in which the Property is located, and waives personal service of any and all process upon it, consents to service of process by registered mail directed to each Party at the address for notices herein, and acknowledges that service so made will be deemed to be completed upon actual delivery thereof (whether accepted or refused).

14.7    Attorneys' Fees.  With respect to any provision in this Agreement providing for payment or indemnification of attorneys' fees, such fees will be reasonable and will be deemed to include reasonable fees incurred through any applicable appeal process, and will include reasonable fees attributable to legal services provided by any general in-house counsel and staff to the prevailing or Indemnified Party.

14.8    Time of Essence.  Time is of the essence of every provision of this Agreement.

14.9    Severability.  This Agreement will be construed as though the covenants herein between Seller and Buyer are independent and not dependent, and Buyer hereby expressly

waives the benefit of any statute to the contrary.  Accordingly, if any term, covenant, condition or provision of this Agreement is held to be invalid, void or otherwise unenforceable by any court of competent jurisdiction, it will in no way affect the validity or enforceability of any other term, covenant, condition or provision of this Agreement.

14.10  Successors and Assigns.  This Agreement will inure to the benefit of and be binding upon, and enforceable by, the respective successors and assigns of the parties hereto.  Notwithstanding the foregoing, Buyer will not assign its rights or delegate its obligations hereunder, without Seller's prior written consent, which consent will be granted or withheld in Seller's sole and absolute discretion, without regard to reasonableness; provided, however, Buyer may assign this Agreement to Affiliate or an entity owned or controlled by Andrew Spodek, without Seller's consent on condition that: (a) Buyer provides Seller with notice thereof at least five (5) Business Days in advance thereof; (b) such Affiliate expressly assumes in writing the obligations and liabilities of "Buyer" under this Agreement, a copy of which assumption is provided to Seller; and (c) Buyer and such Affiliate will remain jointly and severally liable and responsible for the obligations of "Buyer" under this Agreement.  **The provisions of this Section and the Parties' respective obligations hereunder will survive the expiration or earlier termination of this Agreement and any Closing, and will not be merged into any Transaction Document.**

14.11  Specially Designated Nationals and Blocked Persons

14.11.1    Buyer represents and warrants to Seller that: (a) Buyer and each Person owning an interest in Buyer is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control of the Department of the Treasury ("**OFAC**") and/or on any other similar list maintained by OFAC pursuant to any authorizing Law, and (ii) not currently a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States Law; (b) none of the funds or assets of Buyer constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (c) no Embargoed Person has any interest of any nature whatsoever in Buyer (whether directly or indirectly); (d) none of the funds of Buyer have been derived from any unlawful activity with the result that the investment in Buyer is prohibited by Law or that this Agreement is in violation of Law; and (e) Buyer has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

14.11.2    Buyer will: (a) comply with all requirements of Law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect; (b) immediately notify Seller if any of the representations, warranties or covenants set forth in this Section are no longer true, have been breached or if Buyer has a reasonable basis to believe that they may no longer be true or have been breached; (c) not to use funds from any Prohibited Person to make any payment due to Seller under this Agreement; and (d) at the request of Seller, provide such information as may be requested by Seller to determine Buyer's compliance with the terms hereof.

14.12  Brokerage.  Each of Seller and Buyer represents and warrants to the other that it is not represented by any broker in this transaction.  Each Party will indemnify, defend, and hold the other Party harmless from and against any Claim by any broker, agent, or other Person claiming a commission or other form of compensation by virtue of having dealt with Buyer or Seller, respectively, with regard to this Agreement.  **The provisions of this Section and the respective obligations of the Parties hereunder shall survive the expiration**

**or sooner termination of this Agreement and any Closing, and will not be merged into the Transaction Documents.**

14.13 Relationship of the Parties.  This Agreement will not be deemed or construed by the parties, nor by any third party, as creating the relationship of: (a) principal and agent; (b) partnership or other associate relationship; or (c) joint venture between the parties, nor will this Agreement by construed to authorize either to act as agent for the other, except as expressly provided to the contrary in this Agreement.

14.14 No Third Party Beneficiaries.  Except as otherwise expressly provided in this Agreement, Seller and Buyer do not intend by any provision of this Agreement to confer any right, remedy, or benefit upon any third party (express or implied), and no third party will be entitled to enforce or otherwise will acquire any right, remedy, or benefit by reason of any provision of this Agreement.

14.15 No Recordation.  Except as otherwise provided therein, in no event will this Agreement or any document or other memorandum related to this Agreement or to the subject matter of this Agreement be recorded without the consent of Seller.  This provision will survive termination of this Agreement.

14.16 Survival.  Unless otherwise expressly provided for in this Agreement, the representations, warranties, covenants, and conditions of the Parties set forth in this Agreement will not survive the expiration or earlier termination of this Agreement, or the Closing and delivery of the Transaction Documents.

14.17 No Offer; Execution.  The submission of this Agreement for examination is not intended to nor will it constitute an offer to sell, or a reservation of or option or proposal of any kind for the purchase of the Property.  In no event will any draft of this Agreement create any obligation or liability, it being understood that this Agreement will be effective and binding only when a counterpart hereof has been executed and unconditionally delivered by each Party hereto.

14.18 Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same enforceable instrument.  All Parties to this Agreement need not sign the same counterpart of this Agreement provided that all Parties have signed at least one counterpart of this Agreement.  Any signature on a copy of this Agreement or any document necessary or convenient thereto sent by facsimile or electronic mail will be binding upon transmission by facsimile or electronic mail and the facsimile or electronic copy of the scanned signature page may be utilized for the purposes of this Agreement.

14.19 Time.  In computing any period of time prescribed by the terms of this Agreement, the day from which the designated period of time begins to run will not be included. The last day of the period so computed will be included unless it is a Saturday, Sunday, or legal holiday (i.e., not a Business Day), in which event the period will run until the next day which is a Business Day.  In the event any day on which any act is to be performed by Seller or Buyer under the terms of this Agreement is not a Business Day, the time for the performance by Seller or Buyer of any such act will be extended to the next day which is a Business Day.

## ARTICLE 15

## DEFINITIONS

The following terms, when used in this Agreement, will have the meaning set forth in this Article.

15.1  "**Affiliate**" means, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents and employees.  A Person will be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract or otherwise.

15.2  "**Business Day**" means any day other than: (a) a Saturday, Sunday, or federal holiday; or (b) a day on which commercial banks in Detroit, Michigan are authorized or required to be closed for all or any portion of the normal business hours of the day.

15.3  "**Embargoed Person**" means any Person or government subject to trade restrictions under United States Law, including without limitation, the International Emergency Economic Powers Act, 50 U.S.C. §1701 *et seq.*, and the Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, with the result that the investment in Buyer is prohibited by Law or Buyer is in violation of Law.

15.4  "**Environmental Action**" means, subject to the terms of the Settlement Agreement, any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, Restrictions, oversight costs, and Operation, Maintenance, and Monitoring activities authorized or required to be performed by or on behalf of the Trust under the Settlement Agreement or under any Law with respect to the Property.

15.5  "**Environmental Condition**" means any Release or other event, circumstance and/or condition regulated by Environmental Laws existing at, on, in, under, or about the Property, or the ambient air around the Land.

15.6  "**Environmental Laws**" means any and all Laws relating to pollution, noise, and/or odor control, wetlands pollution, the protection or restoration of health, safety, or the environment, natural resources, and/or the use, transportation, presence, storage, handling, disposal, discharge, recycling, treatment, generation, processing, labeling, production, release, contamination, or disposal of threatened Release of Hazardous Substance, including, without limitation, the following:  (a) the Clean Air Act, 42 U.S.C. Section 7401 *et seq.*; (b) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*; (c) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 *et seq.*; (d) the Federal Water Pollution Control Act, 33 U.S.C Section 1251 *et seq.*; (e) the Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; (f) the Safe Drinking Water Act, 42 U.S.C. Section 300f *et seq.*; (g) OSHA, 29 U.S.C. 651 *et seq.*; (h) the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001 *et seq.*; and (i) the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 *et* seq.; as any of the foregoing has been, and may be, amended, supplemented and/or replaced from time to time, as in effect on the Effective Date, and including the analogous Laws of the State and applicable tribal or local Law counterparts, as any of the foregoing has been, and may be, reauthorized, amended, supplemented and/or replaced from time to time.

15.7  "**Hazardous Substances**" means all materials, substances and wastes, defined, designated, regulated or classified as hazardous, toxic or radioactive under Environmental Laws, whether by type or by quantity, and shall include but not be limited to petroleum or any derivative or by-product thereof and asbestos-containing materials.

15.8   "**Material Adverse Effect**" means any matter, event or condition which would reasonably be expected to have a significant, negative effect on the Property, or which would otherwise reasonably be expected to have a material adverse effect on a Person's ability to perform its obligations hereunder or, with respect to Buyer, on Buyer's ability to develop the Property for Buyer's Intended Use.   By way of example, provided that Buyer promptly commences and diligently pursues the satisfaction of such conditions prior to the expiration of the Inspection Period, the following items will constitute a Material Adverse Effect: any lien not known to Buyer or that could not have been determined in the exercise of ordinary course due diligence that materially and adversely affects the Intended Use.

15.9   "**OMM**" means the operation, monitoring and maintenance activities required under the Settlement Agreement as Environmental Action.

15.10   "**Person**" refers to an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization or other entity.

15.11   "**Prohibited Person**" has the meaning set forth in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

15.12   "**Release**" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, transporting or dumping of Hazardous Substances, or as otherwise defined under Environmental Laws, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

15.13   "**Restrictions**" means those restrictions, covenants, conditions, reservations, controls (engineering, land use, institutional, and otherwise), easements or rights-of-way, affecting the future use of, access to or activities on the Property, relating to any ongoing Environmental Action at, on, under or about the Property, and otherwise limiting the use and/or development of the Property to the Intended Use or to implement the Settlement Agreement, whether agreed to by the Parties or required by any Governmental Authority.

15.14   "**States**" means collectively, the United States of America (on behalf of the EPA and the Saint Regis Mohawk Tribe), the States of Delaware, Illinois, Indiana, Kansas, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Virginia and Wisconsin, and the Louisiana Department of Environmental Protection and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

15.15   "**Transaction Documents**" means the Deed; all real property transfer tax returns and other forms required by Law to be completed or signed by Seller or Buyer to transfer the Property and record the Deed; the EEA; the RC; the Non-foreign Transferor Affidavit pursuant to Section 1445 of the Code; the HUD-1 Settlement Statement or similar closing statement; and any other documents and affidavits as are reasonably requested by Title Company to issue the Title Policy and record the Deed, EEA and RC, consistent with this Agreement.

**_[The remainder of this page is intentionally left blank; signature page follows.]_**

*Signature page to Purchase and Sale Agreement*

IN WITNESS WHEREOF, Seller and Buyer hereby execute this Agreement to be effective as of the Effective Date.

**BUYER:**

**ECALP CORP.**
a New York corporation

By: _____
Name: Andrew Spodek
Title:   Vice President

Date Signed: _____, 2018

**SELLER**:

**RACER PROPERTIES LLC,**
a Delaware limited liability company

By: Revitalizing Auto Communities Environmental Response Trust, Sole Member of RACER Properties LLC

By: EPLET, LLC, acting solely in its capacity as Administrative Trustee of Revitalizing Auto Communities Environmental Response Trust

By: _____
    ELLIOTT P. LAWS, not individually, but acting solely in his capacity as Managing Member

Date Signed: __December 27_____, 2018

## EXHIBIT A

### Legal Description of the Property

All those tracts or parcels of land lying and being in the City of Pontiac, Oakland County, State of Michigan, and being more particularly described on as follows:

Part of lot 500, including vacated streets and alleys lying adjacent to said lots of the "Plat of Modem Housing Corporation Addition", as recorded in Liber 20 of Plats on Page 22, Oakland County Records, all or part of Lots 1 through 23, inclusive, Block 1, including vacated streets and alleys lying adjacent to said lots of "Modern Housing Corporation's Oakland Park", a subdivision of part of the North ½ of Section 21, Township 3 North, Range 10 East as recorded in Liber 46 of Plats on Page 21, Oakland County Records; including part of Sections 20 and 21, Township 3 North, Range 10 East, all being located in the City of Pontiac, Oakland County, State of Michigan and being more particularly described as follows:

Commencing at the East ¼ corner of Section 20, Township 3 North, Range 10 East, as recorded in Liber 20101, Page 712, Oakland County Records, said point also being the West ¼ of Section 21, Township 3 North, Range 10 East, thence along the East Section line of said Section 20, North 6 degrees 58 minutes 26 seconds West, 147.20 feet to the Point of Beginning and the North right-of-way line of East Montcalm Street (variable width), thence along said North right-of-way line, South 84 degrees 26 minutes 26 seconds West, 1,280.69 feet; thence North 07 degrees 33 minutes 31 seconds West, 614.02 feet; thence North 02 degrees 09 minutes 35 seconds West, 66.80 feet; thence North 84 degrees 05 minutes 48 seconds East, 244.44 feet; thence North 05 degrees 54 minutes 12 seconds West, 741.12 feet; thence North 84 degrees 05 minutes 48 seconds East, 1,788.80 feet; thence South 05 degrees 54 minutes 12 seconds East, 153.03 feet; thence North 84 degrees 05 minutes 48 seconds East, 91.20 feet; thence South 05 degrees 54 minutes 12 seconds East, 116.97 feet; thence North 84 degrees 05 minutes 48 seconds East, 385.00 feet to the Westerly right-of-way line of North Glenwood Avenue; thence along said right-of-way the following courses: South 05 degrees 54 minutes 12 seconds East, 300.00 feet to a curve to the right; thence along said curve an arc distance of 144.17 feet, radius 300.00 feet, central angle 27 degrees 32 minutes 04 seconds, and chord bearing of South 07 degrees 51 minutes 50 seconds West, 142.79 feet; thence South 21 degrees 37 minutes 52 seconds West, 489.35 feet to a curve to the left; thence along said curve an arc distance of 192.56 feet, radius 400.00 feet, central angle of 27 degrees 34 minutes 56 seconds, and chord bearing of South 07 degrees 50 minutes 24 seconds West, 190.71 feet; thence South 05 degrees 57 minutes 05 seconds East, 100.25 feet to the North right-of-way line of East Montcalm Street (variable width); thence along the said right-of-way line, South 83 degrees 49 minutes 03 seconds West, 606.04 feet to a deflection point; thence South 84 degrees 26 minutes 26 seconds West, 303.94 feet to the Point of Beginning. Containing 71.858 acres, more or less.

Subject to all recorded easements and rights-of-way.

**Tax Parcel ID Number**: 63-64-14-21-101-007

**Commonly known as**: 711 North Glenwood Avenue, Pontiac, Michigan 48340

REF #11970, portion of

**EXHIBIT B**

**FORM OF PRE-CLOSING ACCESS AGREEMENT**

---

**PRE-CLOSING ACCESS AGREEMENT**

Between

**RACER PROPERTIES LLC**

**a Delaware limited liability company**

as Seller

and

**ECALP CORP.**

**a New York corporation**

as Buyer

*Affecting Property Located at:*

**711 North Glenwood Avenue**

**City of Pontiac**
**County of Oakland**
**State of Michigan ("State")**
**Tax Parcel Identification Number:**
**63-64-14-21-101-007**

**RACER Reference # 11970, portion of**

---

B-1

**PRE-CLOSING ACCESS AGREEMENT**

**THIS PRE-CLOSING ACCESS AGREEMENT** (this "**Agreement**") is made effective as of December ___, 2018 (the "**Effective Date**"), by and between **RACER PROPERTIES LLC**, a Delaware limited liability company (hereinafter "**Seller**"), and **MICHIGAN POSTAL HOLDINGS LLC**, a Michigan limited liability company (hereinafter "**Buyer**").  Seller and Buyer are collectively referred to herein as the "Parties."

**R E C I T A L S**

A.      Seller and Buyer entered into that certain Purchase and Sale Agreement dated as of even date herewith (the "**PSA**"), for the sale of certain real property having an address at 711 North Glenwood Avenue, Pontiac, Michigan and being more particularly described on Exhibit A to the PSA (the "**Property**").  All capitalized terms used herein but not otherwise defined shall have the meanings given to them in the PSA.

B.      Buyer desires to enter upon the Property prior to the Closing, for the limited purpose of conducting its Physical Inspection (as that term is defined in the PSA) of the Property and/or to permit a surveyor to prepare a new or updated survey of the Property (collectively, the "**Permitted Use**") and Seller is willing to permit Buyer and its Representatives (as hereinafter defined) to enter and use the Property for such Permitted Use on the terms and conditions set forth below.

NOW, THEREFORE, the Parties hereto agree as follows:

**ARTICLE 1**.   LICENSE; TERM.

1.1     For the period commencing on the Effective Date of the PSA to and including the expiration of the Physical Inspection Period (as that term is defined in the PSA) (the "**Term**"), Seller hereby grants to Buyer and its agents, contractors, invitees and employees (the "**Representatives**"), a non-exclusive revocable license and permission to enter upon the Property for the Permitted Use and for no other purpose whatsoever, including without limitation, no Invasive Work (as defined below) except as expressly permitted under this Agreement.  Buyer acknowledges that this is a temporary license and that neither Buyer nor any Representative has any rights as an owner or tenant by virtue hereof; and furthermore, that Seller reserves unto itself all rights to the use and occupancy of the Property throughout the Term, subject to this Agreement and the PSA.  This Agreement, and the license granted hereunder, shall automatically, and without further notice, expire on the expiration of the Physical Inspection Period (the "**Expiration Date**"), whereupon, this Agreement and the license granted hereunder, and the rights and privileges granted herein, shall be deemed terminated and revoked, and of no further force and effect, except for the obligations specifically stated herein to survive such expiration and revocation.

1.2     On or before the Expiration Date, Buyer shall surrender and vacate the Property in substantially the same condition as existed on the Effective Date.

**ARTICLE 2.**   ACCESS.

2.1     Subject to the terms of this Agreement, Buyer shall have the right to enter onto the Property during normal business hours ("**Access**"), for the Permitted Use as contemplated in this Agreement and in accordance with any Remediation and Redevelopment Coordination Plan approved in writing by Seller and Buyer ("**RRCP**").  The Access and the Permitted Use are

B-2

expressly conditioned upon and limited to the terms and scope of any such RRCP.  Buyer shall give Seller reasonable advanced notice, which may be telephonic, to Grant Trigger, RACER Trust Cleanup Manager, at 313-670-6226, of its proposed schedule for such Access and, upon Seller's request, allow Seller's Representative to accompany Buyer on such visits.  So long as no Event of Default (as defined below) has occurred, Buyer and Seller shall cooperate in all commercially reasonable respects with each other in facilitating the Permitted Use.  Buyer shall use reasonable efforts to avoid interfering with the activities of Seller on the Property, or otherwise interfering with any Environmental Actions.

2.2.    Buyer shall not grant or pledge any rights or interests to, or consent to, permit or suffer the access, use, or occupancy by, any Person (other than its Representatives) in or to the Property, or any interest therein.

2.3    Buyer and its Representatives may conduct the Permitted Use, provided however, that any such Representatives must be: (a) covered by Buyer's insurance policy, or otherwise maintain insurance coverage at least comparable to that required of Buyer below, and provide a certificate of insurance as provided below prior to its access to the Property; (b) duly licensed in the State, if required; and (c) comply with this Agreement, as if they are the Buyer.  Buyer shall be responsible and liable for all of its Representatives on, at, or about the Property.

2.4    Throughout the Term, Seller and any of its Representatives shall be entitled, at any time and from time to time, to inspect the activities of Buyer on the Property.

**ARTICLE 3.**    COMPLIANCE WITH LAWS AND INSURANCE REQUIREMENTS.

3.1    Prior to entering the Property, Buyer shall: (a) obtain, at its sole cost and expense, all permits and licenses of any kind ("**Permits**") required by all applicable Governmental Authorities for its Physical Inspection, including all tests and assessments of the Property (to the extent required by applicable Law); provided that Seller shall promptly provide any documents (that it knows to have in its possession) or cooperation reasonably required by Buyer or its Representatives to obtain any Permits, if any; and (b) furnish to Seller copies of all such Permits.

3.2    Throughout the Term, Buyer shall comply, and cause all of its Representatives to comply, with any and all Laws applicable to the Property and its Permitted Use thereof, and the requirements of any insurance carriers insuring the Property.

**ARTICLE 4.**    SPECIAL NOTICE.

4.1    All persons who enter upon the Property do so at their own risk, and shall comply with the terms hereof, and any and all instructions and directions of Seller.

4.2    Seller shall have no duty to inspect the Property, or warn any person of any latent or patent defect, condition or risk that may exist in, on, at, about or under the Property or that might be incurred in the exercise of the rights granted herein; provided that (i) Seller shall make available to Purchaser (a) any and all documents and information in Seller's possession relating to the Property and its current or former physical and environmental condition, and (b) all pleadings, motion practice, discovery, statuses or other information regarding the Pending Action (as such term is defined in the PSA), and (ii) Seller shall respond as fully and accurately as it can based on its actual knowledge to any inquiry from Buyer or its

agents relating to the Property, the Lease Agreement (as such term is defined in the PSA) and the Pending Action.

**ARTICLE 5.** <u>CONDITION OF PROPERTY.</u>

5.1    Seller makes no representations, warranties, promises, covenants, agreements or guarantees of any kind, nature, or character whatsoever, whether express or implied; oral or written; past, present or future, with respect to the Property or any portion thereof or interest therein, except to the extent expressly set forth in the PSA or in this Agreement. Seller has no obligation to perform any work at or to the Property to prepare it for Buyer's Permitted Use.

5.2    Buyer acknowledges and agrees that Seller has no obligation whatsoever to provide any utilities to or at the Property, or for or on behalf of Buyer, during the Term.

**ARTICLE 6.** <u>USE OF THE PROPERTY.</u>

Throughout the Term, Buyer shall:

6.1    Repair and restore any damage to the Property arising from, related to or caused by the presence on, at or about the Property of Buyer or any Responsible Party thereof, to a condition comparable to that existing as of the date hereof; provided that Buyer shall have no obligation to repair or restore any damage to the Property arising from, related to, or caused by Seller, the tenant under the Lease Agreement, any of either of their respective agents, employees, representatives, sublessees or invitees, or any other third parties on the Property.

6.2    Not exacerbate, disturb, disrupt, impair or unreasonably interfere with, any Environmental Actions.

6.3    Observe, and cause to be observed, strict fire and smoking precautions, including prohibiting the lighting of fires on the Property; and prohibit the use of all firearms and intoxicating liquor on the Property.

**ARTICLE 7.** <u>PERMITTED INVASIVE ACTIVITIES.</u>

7.1    Buyer and its Representatives shall be permitted to conduct any physically intrusive work, installations or alterations, or otherwise penetrating the ground surface of the Property, including without limitation, excavation, scraping, digging, trenching, tunneling, boring, drilling, sampling, moving, disturbing or removing any portion of the Property or otherwise affecting the Property ("**Invasive Work**") at the Property, pursuant to any approved RRCP, to the extent that:

(a)    Buyer has completed an ASTM Phase I environmental site assessment of the Property in a manner and by a consultant that is approved by Seller (the "**Phase I Assessment**"), such Phase I Assessment satisfies all requirements of Law and the ASTM standards for a Phase I environmental assessment, and the Phase I Assessment identifies any conditions indicative of an actual or threatened Release that are used as the basis to focus the Invasive Work, or

(b)    such Invasive Work is required by Environmental Laws (e.g., preparing a Baseline Environmental Assessment or similar document or to take advantage of a statutory defense to liability), including but not limited to an enforceable order, directive, or demand or specific request of any State or any other governmental agency or authority having jurisdiction over the Real Property, or

REF #11970, portion of

(c)      the Invasive Work is necessary to allow Buyer to secure environmental insurance for the Property.

Such Invasive Work shall comply with all applicable Environmental Laws, and shall not disturb or exacerbate any Pre-existing Environmental Condition or interfere with any Environmental Action.  Seller shall have the right to review and approve Buyer's proposed Invasive Work.  Seller's approval of any such Invasive Work shall not be unreasonably conditioned, delayed or denied. Buyer and its Representatives further shall notify Seller in writing and provide its proposed work plan a reasonable period in advance of any proposed Invasive Work regardless of the purpose thereof, and permit Seller to observe such Invasive Work and to take "split samples" if Buyer collects any samples.

**ARTICLE 8.**   <u>LIENS AND CLAIMS.</u>

8.1      Buyer shall not create, suffer or permit to be filed or enforced against the Property, or any part thereof or interest therein, any liens or claims of any kind; and Buyer shall pay or cause to be paid or discharged all of such liens and claims within ten (10) Business Days filling written notice to Buyer from Seller of the filing thereof.

8.2      In addition to, and not in limitation of, Seller's other rights and remedies under this Agreement, if Buyer fails either to pay or discharge any such lien or claim in accordance with Section 8.1, above, then Seller may, at its option, pay any such lien or claim or settle or discharge any action therefor or satisfy any judgment thereon, and all liabilities incurred by Seller in connection therewith, together with an administrative fee equivalent to five percent (5%) thereof, shall be paid to Seller by Buyer immediately upon written demand, from the date incurred or paid until repaid.

**ARTICLE 9.**   <u>INSURANCE.</u>

9.1      <u>Buyer's Liability Coverage</u>.  Throughout the Term, Buyer shall, at its sole expense, maintain with a reputable company or companies reasonably acceptable to Seller; (a) a policy or policies of commercial general liability insurance with respect to the Property, including but not limited to owned and non-owned automobile (vehicle) liability, personal injury, blanket contractual, broad form property damage and product/completed operations liability coverage for not less than Three Million Dollars ($3,000,000) combined single limit bodily injury, death and property damage liability per occurrence, or the current limit of liability carried by Buyer, whichever is greater; and (b) workers' compensation insurance in an amount required by Law.  Buyer shall also provide Seller with a waiver of subrogation endorsement from Buyer's insurance carrier with respect to Seller.  Buyer's consultant shall maintain in force and effect for the term of this agreement insurance (Pollution Liability Insurance) covering losses caused by pollution conditions that result from the performance of the consultant's work on the Property.  The Pollution Liability Insurance shall cover client costs and liabilities attributable to bodily injury; property damage, including loss of use of damaged property or of property that has not been physically injured; cleanup cost; and defense, including costs and expenses incurred in the investigation, defense, or settlement of claims, in an amount of at least Three Million Dollars ($3,000,000) per loss with an annual aggregate of at least Three Million Dollars ($3,000,000).

9.2      <u>Seller As Additional Named Insured</u>.  Buyer shall provide that the policy or policies of insurance required above shall be primary to any other insurance coverage that may be available, and shall name Seller as additional named insured, as indicated below, and shall apply severally to Seller and Buyer, with the provision that any other insurance carried by Seller shall be noncontributing.  Each such policy shall contain a provision that the naming of an additional insured shall not negate any right the additional insured would have had as claimant under the policy if not so named.  For purposes of naming Seller as additional named

insured, the following provision shall be included within each applicable policy:  "It is understood and agreed that coverage afforded by this Policy shall also apply to Racer Properties LLC and the Revitalizing Auto Communities Environmental Response Trust and its Administrative Trustee, and their respective officers, agents, employees and affiliates, as additional insured, but only with respect to legal liability or claims caused by, arising out of or resulting from the acts or omissions of the named insured or of others performing acts on behalf of the named insured."

9.3    Form and Procedures.  Any policies or certificates of insurance required under the provisions of this Section must contain an endorsement or provision that not less than thirty (30) days' prior written notice be given to Seller prior to cancellation or reduction of coverage or amount of such policy.  A certificate issued by the insurance carrier of each policy of insurance required to be maintained by Buyer, stating the limits and other provisions required hereunder and in a form reasonably acceptable to Seller, shall be delivered to Seller prior to Buyer entering upon the Property for any purpose, and thereafter not later than thirty (30) days prior to the expiration of the term of each such policy.  Any policies required hereunder may be made a part of a blanket policy of insurance, so long as such blanket policy contains all of the provisions required herein and does not in any way reduce the coverage, impair the rights of Seller hereunder or negate the requirements of this Agreement.

9.4    Representatives.  Buyer shall cause all of its Representatives entering the Property which are not covered by its insurance policy, to obtain and maintain at least comparable insurance coverage to that required of Buyer above, and to provide to Seller the certificates evidencing such coverage as are required of Buyer above, prior to entering the Property.

## ARTICLE 10.   CONFIDENTIAL INFORMATION.

10.1    Reports.  Buyer shall furnish Seller with copies of any and all of the following, which are prepared, obtained, issued and/or provided to or for the benefit of, Buyer during its Physical Inspection or while otherwise on, at or about the Property, within a reasonably amount of time after obtaining same (collectively, the "**Property Information**"): any and all studies, reports, assessments, appraisals, recommendations, conclusions, results, findings, analysis, summaries, surveys, maps and other documentation created or delivered, or information obtained, in connection with such Physical Inspection, or derived therefrom; provided that Buyer shall have no obligation to furnish to Seller (i) any confidential or privileged documents or communications, (ii) any Property Information prepared by a third-party which such third-party vendor expressly prevents Buyer from providing to Seller; provided that Buyer shall advise each vendor at the outset of the engagement that Seller requests that a copy such vendor's reports be delivered to Seller, but that Seller need not be required to rely thereupon, and (iii) Seller shall pay any costs and expenses assessed or charged by any third-party vendor to deliver additional copies of any Property Information to Seller in accordance with this Agreement.

10.2    Confidential.  Except to the extent otherwise provided in the Confidentiality Agreement, Buyer shall treat all Property Information, including the results of any Invasive Work or permitted sampling, absolutely strictly confidential consistent with the Confidentiality Agreement and PSA.  Neither Buyer nor any Responsible Party thereof shall communicate with any Governmental Authority or any other Person, or their respective Representatives, regarding this Agreement (or anything disclosed herein) or the Property, or otherwise disclose, disseminate, discuss or reveal to any such Governmental Authority or other Person, any Property Information (or summary, analysis, or report based thereupon), without the prior written consent of Seller, which may be given or withheld in Seller's absolute discretion, except: as required by Law;  to the extent required under Parts 201 and 213 of NREPA, MCL

324.20101 *et seq.* and MCL 324.21301a *et seq.*; to the extent such Property Information is in the public domain; or is otherwise permitted under the Confidentiality Agreement.

(a)     In granting Buyer and its Representatives access to the Property, Seller has not waived any privilege or claim of confidentiality with respect the Property Information, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created.  In any case, Buyer shall promptly notify Seller in writing of any request for Property Information received by Buyer or any Responsible Party thereof from any Governmental Authority or any other Person.

(b)     Notwithstanding the foregoing, no Property Information may be disclosed or disseminated to Buyer's Representatives, unless Buyer has notified such Representatives of the confidentiality thereof, and required them in writing to keep such Property Information confidential consistent with the terms hereof and the Confidentiality Agreement.

10.3   <u>Environmental Reports</u>.   Notwithstanding the foregoing, with respect to all reports or documents prepared by or for Buyer describing, pertaining, or otherwise relating, to any Environmental Condition, Environmental Action or any other environmental matter affecting all or any part of the Property, such reports or documents  shall: (a) be delivered to Seller, in draft form prior to being finalized; (b) not be finalized without providing Seller an opportunity to provide and submit comments or corrections to Buyer and the preparer, which comments or corrections may (but do not have to) be incorporated into the final report; (c) be subject to the limitations of Section 10.1 above; and (d) be Property Information and subject to the terms of this Agreement and the Confidentiality Agreement.

**ARTICLE 11.**   <u>EVENT OF DEFAULT AND REMEDIES.</u>

11.1   If Buyer breaches any obligation under this Agreement, which is not cured within ten (10) Business Days after written notice thereof, or if such breach may not be cured within ten (10) Business Days, Buyer shall have failed to commence curing such breach within ten (10) Business Days following written notice thereof and diligently pursue such cure (each, an "**Event of Default**"), then this Agreement shall automatically terminate and the license revoked as if it were the Expiration Date.  A Buyer Default under the PSA shall automatically be deemed to be an Event of Default under this Agreement, and at Seller's election, an Event of Default hereunder shall be deemed a Buyer Default under the PSA, upon notice to Buyer but without further action.

11.2   Upon termination of this Agreement by reason of an Event of Default, Buyer shall promptly vacate and surrender the Property, as required hereunder, and Seller may remove all persons or things therefrom, without legal process to the maximum extent permitted by Law, or by such legal process as Seller may deem appropriate.  In addition to terminating this Agreement, if an Event of Default has occurred, Seller shall be entitled to seek any other remedy available hereunder, under the PSA, at Law, or in equity, all such remedies being cumulative and not exclusive.  No termination or expiration of this Agreement shall relieve Buyer of its obligations to perform those acts required to be performed prior to the Expiration Date, or those expressly stated to survive the Expiration Date.

**ARTICLE 12.**   <u>INDEMNIFICATION; EXCULPATION AND RELEASE.</u>

12.1   Buyer shall indemnify, defend and hold Seller, its Affiliates and their respective members, partners, venturers, stockholders, directors, managers, officers, spouses, legal representatives, agents, successors and assigns (collectively, the "**Indemnitees**") harmless from and against any and all claims, demands, fines, penalties, liabilities and obligations of any kind (a "**Claim**") arising from, relating to, or caused by, with or without fault:  (a) the presence  on, or use of, the Property by Buyer or its Representatives during the Term; (b) any act or omission of Buyer or any of its Responsible Representatives; (c) any bodily injury,

property damage, accident, fire or other casualty to Buyer or its Representatives or their respective property on, or, about the Property; (d) any violation or alleged violation by Buyer or its Representatives of any applicable law; (e) any loss or theft whatsoever of any property or anything placed or stored by Buyer or its Representatives on or about the Property; (f) any breach by Buyer of its obligations under this Agreement; and (g) any reasonable costs actually incurred by Seller as a result of successfully enforcing any provision of this Agreement and any cost of removing Buyer or any Responsible Party thereof from the Property or restoring the same as provided herein; provided, however, that no Indemnitee shall be entitled to indemnification hereunder to the extent any such Claim is ultimately established by a court of competent jurisdiction to have been caused solely by the gross negligence or willful misconduct of any Indemnitee.  Except as otherwise provided in this Agreement, the Environmental Easement Agreement or any of the other Transaction Documents, nothing herein shall be construed as an agreement by Buyer to indemnify, defend, or hold Seller harmless from liabilities related to Pre-existing Environmental Condition for which Buyer is otherwise not liable under any State, Federal or other law as a result of having conducted and filed a Baseline Environmental Assessment, or for any other reason.

12.2    The foregoing indemnity and obligation to defend and hold harmless shall apply to any Claim brought by a private party or by a Governmental Authority under any applicable law.  If any Claim shall be brought against an Indemnitee alleging any facts or circumstances for which Buyer is to provide indemnification and/or defense, Buyer shall, upon notice from the Indemnitee, defend the same at its expense by counsel approved in writing by such Indemnitee.  The indemnity provided by Buyer in favor of the Indemnitees in this Agreement shall not require payment as a condition precedent, and a finding of liability or an obligation to indemnify shall not be a condition precedent to the duty to defend.

12.3    As a material inducement to Seller to enter into this Agreement, Buyer, for itself and its Representatives, forever **waives, releases, acquits, and forever discharges**, each RACER entity, and their respective Indemnitees (collectively, in such role, all of the foregoing are the "**Releasees**"), from any and all Claims or liabilities whatsoever arising from, related to, and/or otherwise in connection with, the use, access, and presence by and of Buyer and its Representatives on or about the Property pursuant to the terms hereof, that Buyer and any such Responsible Party may now have, ever had, or will ever have against the Releasees in connection with this Agreement.

12.4    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT OR ITS AFFILIATES, SUCCESSORS, OR ASSIGNS MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY CLAIM ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT.

**ARTICLE 13**.    <u>ASSIGNABILITY</u>.  This Agreement may not be assigned, whether voluntarily or by operation of Law, and Buyer shall not permit the use of the Property, or any part thereof, except in strict compliance with the provisions hereof, and any attempt to do so shall be null and void.

**ARTICLE 14.**    <u>COST OF ENFORCEMENT</u>.  In the event any declaratory or other legal or equitable action is instituted between Seller and Buyer in connection with this Agreement or the subject matter hereof, then the prevailing party shall be entitled to receive from the losing party all of its costs and expenses, including court costs and reasonable attorneys' fees and costs.

**ARTICLE 15.**    <u>MISCELLANEOUS.</u>

15.1    The laws of the State shall govern the validity, construction, enforcement, and interpretation of this Agreement; provided, however, that the Bankruptcy Court shall retain

jurisdiction over any and all disputes arising under, or otherwise relating, to the construction and enforcement of the Bankruptcy Documents, and the transactions contemplated thereunder and governed thereby. Each Party hereby consents to the jurisdiction and venue of any Federal District Court and State Courts located in the county in which the Property is located, and waives personal service of any and all process upon it, consents to service of process by registered mail directed to each Party at the address for notices herein, and acknowledges that service so made shall be deemed to be completed upon actual delivery thereof (whether accepted or refused).

15.2    Neither this Agreement, nor a short form memorandum or assignment hereof, shall be filed or recorded in any public office and any attorneys' fees or other costs incurred in clearing such cloud on title to the Real Property shall be Buyer's responsibility.

15.3    This Agreement constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations and understandings of the Parties hereto, oral or written, are hereby superseded and merged herein, except with respect to any matters set forth in the PSA.  No supplement, modification, or amendment of this Agreement shall be binding unless in writing and executed by the Parties hereto.  This Agreement is delivered pursuant to the PSA, and to the extent there are any inconsistencies or conflicts between the PSA and this Agreement, the terms of the PSA shall govern and control.  To the extent any ambiguities are created when reading both the PSA and this Agreement together, such ambiguities shall be resolved in favor of Seller.

15.4    If any paragraph, subparagraph, sentence, clause, phrase or portion of this Agreement is, for any reason, held invalid, or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct, and independent provision, and such holding shall not affect the validity of the remaining portions of this Agreement.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

15.5    The headings of this Agreement are for purposes of reference only and shall not limit or define the meaning of the provisions hereof.

15.6    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a fully executed agreement, with the same effect and validity as a single, original agreement signed by the Parties.  Signatures transmitted via facsimile or electronic mail transmission shall have the same validity and effect as original signatures.

[Signature page follows]

REF #11970, portion of

*Signature page to*
*Pre-Closing Access Agreement*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER**:

**RACER PROPERTIES LLC,**
a Delaware limited liability company

By: Revitalizing Auto Communities Environmental Response Trust, Sole Member of RACER Properties LLC

By: EPLET, LLC, acting solely in its capacity as Administrative Trustee of Revitalizing Auto Communities Environmental Response Trust

By: _____

ELLIOTT P. LAWS, not individually, but acting solely in his capacity as Managing Member

Date Signed: ___December 27____, 2018

**BUYER:**

**ECALP CORP.**,
a New York corporation

By: _____
Name: Andrew Spodek
Title:   Vice President

Date Signed: _____, 2018

REF #11970, portion of

**EXHIBIT C**

**FORM OF DEED**

**QUIT CLAIM DEED**

      **RACER PROPERTIES LLC**, a Delaware limited liability company ("Grantor"), whose address is 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226, for and in consideration of the sum of TEN DOLLARS and No/100 and other good and valuable consideration as described on the Real Estate Transfer Tax Valuation Affidavit filed simultaneously with this Deed, paid by **ECALP CORP**, a New York corporation, ("Grantee"), having an address of 123 Grove Avenue, Suite 222, Cedarhurst, New York 11516, the receipt of which is hereby acknowledged, and pursuant to the Order of the United States Bankruptcy Court for the Southern District of New York entered on March 29, 2011, in Case No. 09-50026 (REG) styled *In re:  Motors Liquidation Company, f/k/a General Motors Corporation, et al.,* by these presents does QUIT CLAIM unto Grantee, all of Grantor's rights, title and interests in and to (a) that certain tract of land, as more particularly described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference for all purposes, (b) strips and gores between such tract of land and any abutting properties whether owned or claimed by deed, limitations or otherwise, and whether or not held under fence by Grantor, (c) any land lying in or under  the bed of any creek, stream or waterway or any highway, avenue, street, road, alley, easement or right-of-way, open or proposed, in, on, across, abutting or adjacent to such tract of land, (d) improvements, buildings or fixtures located on such tract of land, and (e) mineral, water, oil, gas, solar and wind rights relating to all or any part of such tract of land, together with all of Grantor's rights, claims, titles and interests in and to any and all appurtenances, rights, easements, and rights-of-way, filings or other interests, including without limitation rents and profits accruing after the effective date hereof, related to or benefiting such tract of land (collectively, the "Property").

      The Grantor further grants to the Grantee the right to make all divisions available to the Property under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967, as amended.

      The Property may be located within the vicinity of farm land or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

      Exempt from real estate transfer tax pursuant to Michigan Compiled Laws §§ 207.505(c) and 207.526(c).

Dated this _____ day of _____, 201__.

*(Signature and notary appear on following pages)*

REF #11970, portion of

*Signature Page to Quit Claim Deed*

**RACER PROPERTIES LLC**,
a Delaware limited liability company

By:  Revitalizing Auto Communities Environmental
     Response Trust, Sole Member of RACER
     Properties LLC

By:  EPLET, LLC, acting solely in its capacity as
     Administrative Trustee of Revitalizing Auto
     Communities Environmental Response Trust


By:  _____
     ELLIOTT P. LAWS, not individually, but acting
     solely in his capacity as Managing Member

DISTRICT/STATE OF _____)
                                     ) SS:
CITY/COUNTY OF _____)

      On the _____ day of _____, 201_ before me a Notary Public for the District/State and City/County aforesaid, personally appeared ELLIOTT P. LAWS, who acknowledged himself to be the Managing Member of EPLET, LLC, the Administrative Trustee of the REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST (the "Trust"), Sole Member of RACER PROPERTIES LLC, a Delaware limited liability company, and that he, being authorized to do so, executed the foregoing Quit Claim Deed, on behalf of RACER PROPERTIES LLC, not individually, but solely in his capacity as Managing Member of EPLET, LLC, Administrative Trustee of the Trust, its Sole Member, for the purposes therein contained by signing his name.

      WITNESS my hand and seal the day and year aforesaid.

Notary's Signature:_____
Notary's Name:_____
Notary Public, District/State of _____
City/County of_____
My Commission Expires:_____
Acting in the County of:_____

Drafted by:

Carl P. Garvey
General Counsel
Revitalizing Auto Communities Environmental Response Trust
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226

When recorded return to and send subsequent tax bills to:

TBD

REF #11970, portion of

**EXHIBIT D**

**FORM OF ENVIRONMENTAL EASEMENT AGREEMENT**

**ENVIRONMENTAL EASEMENT AGREEMENT**

Dated as of _____, 201_

Between

**GRANTOR**:

**MICHIGAN POSTAL HOLDINGS LLC**

And

**GRANTEE:**

**REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST**

Affecting Property Located at:
711 North Glenwood Avenue

Tax Parcel Identification Number:
63-64-14-21-101-007
City of Pontiac, Wayne County, State of Michigan

## ENVIRONMENTAL EASEMENT AGREEMENT

THIS ENVIRONMENTAL EASEMENT AGREEMENT (this "**Agreement**") is made as of _____, 201__ (the "**Effective Date**"), between ~~ECALP CORP.~~~~MICHIGAN POSTAL HOLDINGS LLC~~, a ~~Michigan limited liability company~~New York corporation, the address of which is 123 Grove Avenue, Suite 222, Cedarhurst, New York 11516 ("**Grantor**"), and **REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST**, a trust formed under the laws of the State of New York, the address of which is 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226 ("**Trust**" or "**Grantee**"). Grantor and Grantee (or Trust) are collectively referred to herein as the "**Parties.**" Certain defined terms used herein and not otherwise defined in the body of this Agreement are included in Section 5 below.

## R E C I T A L S

A. Grantor and the Trust's wholly-owned affiliate RACER Properties LLC, ("**RACER Properties,**" a Delaware limited liability company), entered into that certain Purchase and Sale Agreement dated as of _____, 201__ (as modified, amended, restated, supplemented and/or assigned, the "**PSA**"), pursuant to which Grantor has agreed to purchase from RACER Properties certain real property and improvements (if any) located at 711 North Glenwood Avenue, Tax Parcel Identification Number 63-64-14-21-101-007, City of Pontiac, State of Michigan ("**State**"), as more particularly described on **Exhibit A** attached hereto (the "**Property**").

B. Pursuant to that certain Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan, dated March 29, 2011, and all documents issued relating thereto, including the Settlement Agreement ("**Settlement Agreement**") issued by United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Documents**"), subject to funding and other limitations described therein, Grantee is obligated with its successors and assigns to conduct certain Environmental Actions at, on, in, under or about the Property, or otherwise to comply with Environmental Laws and the requirements of any other governmental agency or authority, in each case having jurisdiction over the Property (each, a "**Governmental Authority**"), including without limitation, the United States Environmental Protection Agency ("**USEPA**"), and the Michigan Department of Environmental Quality ("**MDEQ**"). As identified in Attachment A of the Settlement Agreement, as of the Effective Date, the Governmental Authority with the lead oversight role for the Property's Environmental Action is USEPA.

C. This Agreement is a condition to the closing of the transfer of the Property pursuant to the PSA and is made in furtherance of the Settlement Agreement to protect the public health, safety, and welfare, and the environment, and is intended to be contemporaneously recorded with the title to the Property in the appropriate real estate records in the county in which the Property is located.

NOW THEREFORE, for the purposes set forth above and in consideration of the recitals and mutual promises herein contained, Grantee and Grantor, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, hereby agree as follows:

# SECTION 1.   EASEMENT.

1.1   <u>Grant of Easement</u>.   Grantor, for itself and all Persons who shall succeed to any interest, directly or indirectly, in any portion of the Property and/or any improvements thereon and appurtenances thereto, by sale, assignment, conveyance, pledge, condemnation, succession upon default or foreclosure or by operation of law or by lease, sublease, license or any other transfer (collectively, "**Grantor's Successors**"), hereby grants, conveys and transfers to Grantee and its respective agents, employees, contractors, representatives, servants, tenants, subtenants, licensees, sublicensees, invitees, officers, directors, stakeholders, owners, divisions, subsidiaries, affiliates, heirs, successors and assigns, and such other Persons over which Grantee exerts control ("**Grantee's Representatives**") and any applicable Governmental Authority (including any representative thereof), a non-exclusive, rent-free easement (the "**Easement**") over the Property, including all improvements, structures, and facilities located thereon as are required or desired for the following limited purposes, and those purposes incidental thereto (collectively, the "**Easement Rights**"): (a) conducting and completing any Environmental Actions; (b) ensuring and enforcing compliance with any work plans, remedial action plans, or other plans approved by a Governmental Authority with respect to Environmental Actions, including the right to inspect the operation of the Environmental Actions, including without limitation any Remediation and Redevelopment Coordination Plan approved by the Grantor pursuant to the PSA (the "**RRCP**"), conducted at, on, in, under, or about the Property, including the right to inspect the operation of the Environmental Actions, and to perform any actions necessary to oversee compliance with the applicable plan; (c) access, ingress and egress to, from and over such portions of the Property as is required to perform and monitor the Environmental Actions and otherwise utilize the Easement; (d) recording any easements, subject to Grantor's approval, needed for any Remediation Systems; and (e) such access as is lawfully required by the Governmental Authorities to supervise and oversee the Environmental Actions.   Grantor and Grantor's Successors are collectively referred to herein as "**Owner.**"

1.2   Any access rights granted under this Agreement shall not (nor are they intended to) expand, diminish, or modify any rights of any Governmental Authority under existing Environmental Laws to take any action of any kind with respect to Grantor, Owner (or any of Owner's agents, employees, contractors, representatives, servants, tenants, subtenants, licensees, sublicensees, invitees, officers, directors, stakeholders, divisions, subsidiaries, affiliates, heirs, successors and assigns, and such other Persons over which Owner exerts control ("**Owner's Representatives**")), or Grantee.

# SECTION 2.   EASEMENT DURATION AND TERMINATION.

2.1   <u>Nature of Easement</u>.  The Easement, and all rights, obligations, covenants, and conditions set forth in this Agreement, shall be construed as both covenants and conditions running with the land, and continue to be easements, servitudes, charges and encumbrances appertaining to and upon, and covenants benefiting, binding and running with, the land, buildings and improvements now or later existing upon or within the Property.   Grantee's interests herein shall be enforceable as an irrevocable easement running with Property, coupled with an interest, and enforceable against Grantor and Owner (and their respective Representatives) and all third parties claiming an interest in the Property through any of them.  Grantor and any future Owner of all or a portion of the Property, or any interest therein, shall automatically be deemed by acceptance of title thereto to have assumed all rights and obligations created under this Agreement pertaining to such lands.  The conveyance by Grantor or any future Owner of fee simple title to any of the Property, whether voluntarily or by

REF. #11970, portion of

operation of law, shall relieve only such Owner, of all obligations and Liabilities thereafter accruing hereunder.

2.2     Termination Event.  The Easement and Easement Rights, and Grantee's rights and obligations hereunder with respect thereto, shall remain in full force and effect until USEPA and/or Michigan Department of Environmental Quality otherwise unconditionally waives or releases, in writing (a "**Governmental Authority Determination**"), Grantee from any and all further obligations and Liabilities with respect to Environmental Actions in, on, or at the Property (a "**Termination Event**").  Owner shall also have the right to seek, after notice and consultation with Grantee, a Governmental Authority Determination that the Easement is no longer required at any time.  In the event a Governmental Authority re-opens any investigation of the Environmental Conditions on the Property after a Termination Event, and notice of such re-opening is provided to Owner, Grantee shall have the right to access the Property in accordance with this Agreement.

2.3     Easement Termination and Release. Within thirty (30) days following such Termination Event, the Trust shall deliver to Owner an executed and acknowledged agreement (the "**Termination Amendment**") providing for the amendment and modification of this Agreement to terminate the Easement Rights, and release and relinquish the Easement.

## SECTION 3.  USE, OPERATION, AND COOPERATION.

3.1     Grantee Access and Activities.

3.1.1   Grantee and/or Grantee Representatives may access and use the Property, at all reasonable times and in accordance with the terms of this Agreement, for purposes of exercising the Easement Rights, so long as Owner is provided with at least seventy-two (72) hours prior notice, except in the event of an Emergency, or when otherwise required by any and all laws, statutes, ordinances, rules, or orders of any Governmental Authority having jurisdiction over the Property ("**Laws**"), in which case, the Grantee shall provide Owner with such advance notice as is reasonable under the circumstances.   A Governmental Authority (or its representatives) and/or Owner (and/or Owner's Representatives) shall be permitted, should either so choose, to accompany Grantee during the exercise of the Easement Rights; provided that Grantee's exercise of its Easement Rights shall not be restricted in the event Owner or Governmental Authority is unable to be present.

3.1.2   With respect to any Pre-Existing Environmental Conditions,  Grantee shall, solely in accordance with the Settlement Agreement, this Agreement, and budgets and plans approved by the appropriate Governmental Authorities: (a) exclusively conduct, or have conducted, all Environmental Actions at the Property, and design, install, operate, and maintain all Remediation Systems, without unreasonably interfering with Owner's operations thereon or the use and development thereof (provided Owner has previously provided Grantee with a description of Owner's use, development, and operations; and (b) provide Owner with all reports on the progress and resolution of such Environmental Actions that are provided to appropriate Governmental Authorities, and related communications from such Governmental Authorities concerning same.

3.1.3   Notwithstanding the foregoing or anything to the contrary set forth elsewhere herein, Owner shall be responsible for all costs caused by, arising from, or related to: (a) any reconfiguration or relocation of any Remediation Systems requested by Owner; and (b) any damage to or by any Remediation Systems to the extent resulting from the negligence or willful misconduct of Owner or any Owner Representative, except to the extent caused by Grantee or any of Grantee's Representatives.

D-4

REF. #11970, portion of

3.2    Owner's Activities and Restrictions on Use.

3.2.1  Owner may use the Property only for nonresidential uses that are compatible the nonresidential cleanup criteria category referenced in MCL §324.20120a(1)(b) and/or Restrictions set forth in any Restrictive Covenant, or similar document, recorded against the Property (the "**Intended Use**") and for no other purpose.  Any modifications required at, in, on, or below the Property by Owner to accommodate such Intended Use (the "**Development Activities**") shall be the sole obligation of Owner and conducted at such Owner's sole expense and shall be performed in accordance with any RRCP, so as to not: (a) exacerbate any Environmental Condition; (b) violate any Restrictions in any Restrictive Covenant; or (c) unreasonably or materially interfere with, disrupt, impair, inhibit, impede, prevent, restrict, or otherwise impact (collectively, "**Impact**") any Environmental Action, to the extent performed pursuant to or in accordance with this Agreement, the Settlement Agreement, or as directed by a Governmental Authority.

3.2.2  No permanent markers may be placed on the Property without Owner's prior written consent, which consent shall not be unreasonably withheld, delayed, or conditioned; provided, however, any markers required by Law or any applicable Governmental Authority shall be placed in accordance with the specific requirements thereof.  Upon granting such consent, Owner shall not remove, cover, obscure, or otherwise alter or interfere with the permanent markers placed on the Property, if required by USEPA, MDEQ or any other Governmental Authority, or otherwise in connection with the performance of any other Environmental Actions.  To the extent required by any Governmental Authority, Owner shall keep vegetation and other materials clear of the permanent markers to assure that the markers are readily visible.

3.3.    Owner's Environmental Responsibilities.

3.3.1. Except as otherwise provided in this Agreement, Owner shall be responsible for any and all Environmental Compliance Liabilities to the extent caused by and arising from, or relating to: (a) any Pre-Existing Environmental Conditions exacerbated by Owner or any Owner's Representatives; (b) violations of Owner's due care or continuing obligations (if any); or (c) any Environmental Condition caused by Owner or any Owner's Representatives.  Without limiting the generality of the foregoing, to the extent any Release or Environmental Condition on, at or affecting the Property is caused by, arises from, or relates to any act or omission of Owner, or any of Owner's Representatives, in violation of any Environmental Laws, any Restrictive Covenant, due care plan (or similar document), or this Agreement, then Owner, at its sole expense, shall conduct appropriate environmental response actions to remove, or mitigate exposure to, the Release and/or Environmental Condition, in compliance with any applicable Environmental Laws and any Governmental Authority directive.

3.3.2. In the event an Environmental Condition is discovered on the Property that: (a) is not a Pre-Existing Environmental Condition; and (b) was not caused by Owner or any Owner's Representative; (i) as between Owner, RACER Properties, and Grantee, Owner shall have no liability or responsibility with respect to such Environmental Condition (except as specifically set forth above); and (ii) subject to the terms (including the funding limitations therein) of the Settlement Agreement and approval of any remediation action by the applicable Governmental Authorities, such Environmental Condition may, as determined solely by Grantee and the applicable Governmental Authorities, be deemed a Pre-Existing Environmental Condition, in which case it is subject to Section 3.1.2.  Owner specifically

REF. #11970, portion of

waives any Claims (as defined below) against RACER (as defined below) or the Property with respect to any matters relating to clause (ii) above.

3.3.3.   From and after the recording of this Agreement, Owner hereby assumes, at its sole expense and liability, the obligation to do all of the following in accordance with Environmental Law and this Agreement and any RRCP:  (a) to properly operate, maintain, manage, remediate and dispose of any Surface Materials; (b) exercise its due care and/or comply with its continuing obligations (if any) relating to the Environmental Conditions; and (c) to perform and complete any and all: (i) demolition or renovations of improvements at the Property which are required by Law, or otherwise deemed necessary or desirable by Owner; and (ii) obligations with respect to the redevelopment, improvement and operation of the Property, and any Environmental Condition there at, on, in, under, or about, including but not limited to any obligations under any Environmental Law.

3.3.4.   Notwithstanding anything to the contrary set forth in this Agreement, with respect to any Pre-Existing Environmental Condition, neither Owner, nor any Owner Representative, shall:     (a) voluntarily report or otherwise communicate with any Governmental Authorities, except to the extent such report or communication is: (i) required by Environmental Law, including, but not limited, in connection with Owner's performance of a Baseline Environmental Assessment or similar document, and preparation and implementation of any Due Care Plan or similar document, and efforts to obtain a prospective purchaser agreement or similar agreement from a Governmental Authority; (ii) in response to an order, directive, demand, or specific request of such Governmental Authorities; (iii) reasonably related to Owner's obligations under a brownfield plan, work plan or similar plans or documents associated with the funding of Owner's activities on the Property that are required to be disclosed to any third party in connection with such funding; or (iv) reasonably necessary to defend against or otherwise respond to a third party claim against Owner; or (b) except in connection with any of the foregoing, take any other action which is intended to result in any Governmental Authority or third party requesting or requiring Grantee to take, perform or cease any activity on or with respect to the Property, or increasing the cost or scope of any Environmental Actions.  Without prejudice to the foregoing, Owner and Owner's Representatives shall further notify Grantee in writing in advance of any permitted contact with any Governmental Authority concerning any Pre-Existing Environmental Condition of the Property, including any Environmental Action with respect thereto, and shall permit the Grantee to attend and participate in any communications with the Governmental Authorities. Owner and Owner's Representatives shall also deliver any and all Notices received from any Governmental Authority in any way related to the Property to the Grantee promptly after receipt thereof, and shall coordinate and cooperate with the Grantee, in responding to the same.

3.4.   Future Restrictions on Owner's Use.  Owner hereby acknowledges that, from and after the date of this Agreement, certain additional Restrictions, relating to the Environmental Actions and/or the use of the Property, may need to be recorded against the Property as follows:

(a) With respect to such Restrictions that are required by Environmental Law, or approved by any Governmental Authority, Owner shall, promptly, upon being notified of the need for such Restrictions by Grantee or any Governmental Authority, agree to and take every action required to properly record such Restrictions, and/or

(b) With respect to any other Restrictions reasonably requested by Grantee to implement any Environmental Law or Governmental Authority requirement: (i) such Restrictions shall not have a material adverse effect, proven by the Owner, on Owner's

REF. #11970, portion of

operation, use, or development of the Property or the value thereof; and (ii) Owner shall have the right to consent to such Restrictions, which consent shall not be unreasonably withheld, delayed, or conditioned.

In all cases, Grantee shall provide Grantor with: (A) prior notice of any meeting or other procedure established by any Governmental Authority in connection with determining whether or not such Restrictions are necessary or appropriate, and the opportunity to consult in good faith with Grantee in connection therewith; (B) information and reasonable updates with respect to such procedures and determination; and (C) and the opportunity, individually, and together with any or all appropriate Governmental Authorities in connection therewith, to participate in such procedures and determinations, to the extent permitted by such Governmental Authorities.

3.4.1. In furtherance of this Section 3.4, Owner shall within thirty (30) days execute, deliver, and record, any and all documentation prepared by Grantee and approved by any applicable Governmental Authority, and required in order to effectuate and/or impose such additional Restrictions or modifications. If Owner fails to execute and deliver the required documentation within such thirty (30) day or other applicable period, then Owner irrevocably appoints Grantee as attorney-in-fact for Owner with full power and authority to execute, deliver and record, in the name of Owner, any such documentation, which appointment is coupled with an interest, and is irrevocable.

3.4.2. Any and all Restrictions set forth herein or added to the Property pursuant to this provision shall be deemed to be covenants, conditions and Restrictions running with the land, affirmatively enforceable against and binding upon Grantor and any future Owner, and shall continue to be easements, servitudes, charges and encumbrances appertaining to and upon, and covenants benefiting, binding and running with, the land, buildings and improvements now or later existing upon or within the Property.

3.5    Cooperation. Grantee and Owner (and their respective Representatives) shall cooperate with each other in all commercially reasonable respects, and as required by Environmental Law and the Settlement Agreement, in connection with: (a) Grantee's performance and completion of any Environmental Actions and assisting Grantee in obtaining a Governmental Authority Determination; (b) Grantee's exercise of its Easement Rights herein; and (c) the integration and coordination of Owner's use, development, and operation of the Property with any Environmental Actions as set forth in any RRCP.

3.6    Utilities. At Grantee's sole cost and expense, Grantee shall have access to all available Utilities at the Property, to the extent reasonably necessary for Grantee to conduct, or cause to be conducted, Environmental Actions in a cost-effective manner and as required under this Agreement. Grantee shall pay its appropriate allocated share of such utility fees based on mutual agreement of the Parties or pursuant to metered utilities and Grantee shall be responsible for any damage to Utilities resulting from the exercise of the Easement Rights. Except to the extent required by a Governmental Authority as part of Environmental Actions, any and all management of Utilities which may be present at or below the Property, is the sole obligation and liability of Owner.

3.7.    Liens.

3.7.1. Grantee shall keep the Property free and clear of any liens or encumbrances of any kind ("**Liens**"), to the extent resulting from the exercise of the Easement Rights, except that Grantee may, in good faith, contest such Liens so long as it pays, removes, bonds or sets aside, or causes to be paid, removed, bonded or set aside,

REF. #11970, portion of

adequate reserves, with respect to any such Liens being contested in good faith prior to being enforced against the Property. Any damage caused by Owner to any Remediation Systems or other equipment related to the Environmental Actions shall become a Lien against the Property and Grantee shall be entitled to record any and all documents against the Property necessary to perfect such Lien.

3.7.2. This Agreement is, and shall at all times hereafter be, superior to: (a) the Lien of any mortgage or mortgages which may now or hereafter affect the Property, and to all advances made or hereafter to be made upon the security thereof and to the interest thereon, and to any agreements at any time made modifying, supplementing, extending or replacing any such mortgages; (b) any ground or underlying lease which may now or hereafter affect the replacements and extension thereof; and (c) any other Liens which may hereafter affect the Property, to the extent permitted by Law.

3.8     Settlement Agreement Limitations. Any Environmental Actions shall be subject to the terms of this Agreement, any RRCP, force majeure events and the Settlement Agreement (including, without limitation, the funding limitations of the Funding Accounts (as defined in the Settlement Agreement) for the Environmental Actions). Grantee shall use commercially reasonable efforts to complete any Environmental Actions related to the Property, as required by the Settlement Agreement. The terms of this Agreement and the Easement Rights, to the extent they relate to Grantee's Environmental Actions, shall, in all respects, be subject to the terms of the Settlement Agreement. Grantor, for itself and any future Owners, hereby waives and releases Grantee and Grantee Representatives from and against any and all liabilities for any additional Environmental Actions or other remediation or other work by Grantee, whether required or recommended for the Property by any Governmental Authority, to the extent it is not allowed for, or cannot be funded, under the Settlement Agreement. In the event of any conflict between the terms hereof and the terms of the Settlement Agreement, the terms of the Settlement Agreement shall control. Grantor hereby acknowledges that it has been provided with a copy of or access to, and has had an opportunity to review, the Settlement Agreement (available as of the Effective Date at http://www.racertrust.org/About_RACER/Settlement_Agreement).

3.9.    Surrender and Restoration. Except to the extent precluded by the Environmental Actions or required by any Governmental Authority or by Environmental Laws, within ninety (90) days after the delivery by Owner of a Termination Amendment, Grantee shall surrender and vacate the Property, and use all commercially reasonable efforts to restore the Property to a reasonable condition, all Environmental Actions, Owner's activities, casualty, condemnation, and ordinary wear and tear excepted. In connection therewith, Grantee shall remove, at its sole cost (to the extent funding is available under the Settlement Agreement), all Remediation Systems which are not required by any Governmental Authority to remain on the Property within such ninety (90) day period; and restore any damage to the Property resulting therefrom.

3.10.   Waiver and Release. EXCEPT TO THE EXTENT OTHERWISE EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, GRANTOR, FOR ITSELF AND FUTURE OWNERS, FOREVER WAIVES, RELEASES, RELINQUISHES, ACQUITS AND FOREVER DISCHARGES GRANTEE, RACER PROPERTIES LLC, THEIR AFFILIATES AND THEIR RESPECTIVE MEMBERS, PARTNERS, VENTURERS, STOCKHOLDERS, DIRECTORS, MANAGERS, OFFICERS, SPOUSES, LEGAL REPRESENTATIVES, AGENTS, AND SUCCESSORS AND ASSIGNS (COLLECTIVELY "RACER") FROM ANY AND ALL CLAIMS, DEMANDS, FINES, EXPENSES, DUTIES, OBLIGATIONS AND LIABILITIES WHATSOEVER (COLLECTIVELY, "CLAIMS") ARISING FROM, RELATED TO AND/OR OTHERWISE IN CONNECTION WITH, ALL ENVIRONMENTAL CONDITIONS AFFECTING, OR WHICH MAY AFFECT, THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, CLAIMS ARISING

FROM OR RELATED TO ALL PRE-EXISTING ENVIRONMENTAL CONDITIONS, THAT GRANTOR AND ANY FUTURE OWNERS MAY NOW HAVE, EVER HAD OR WILL EVER HAVE AGAINST RACER IN CONNECTION THEREWITH.

3.11.   Insurance.  Prior to entering the Property pursuant to this Agreement, Grantee or Grantee's Representatives, as the case may be, shall deliver to Grantor a certificate of insurance evidencing that Grantee or Grantee's Representatives, as appropriate, have in effect the following underlying and umbrella policies: a general liability and property damage insurance policy with a combined single limit of at least One Million Dollars ($1,000,000) worth of coverage for any one occurrence, an automobile public liability and property damage insurance policy including owned, hired, rented or non-owned automotive equipment with a combined single limit of at least One Million Dollars ($1,000,000), as well as employer's liability insurance of at least One Million Dollars ($1,000,000) in the aggregate covering the activities of Grantee and Grantee's Representatives, as appropriate, on or about the Property and contractor's pollution and professional liability (if applicable) of at least One Million Dollars ($1,000,000) per occurrence, and Two Million Dollars  ($2,000,000) in the aggregate; and that Grantor and Grantee (and for policies owned by Grantee's Representatives) have been named as additional insureds on all such insurance policies to the extent of Grantee's and Grantee's Representatives' obligations hereunder.   All such policies shall provide that Grantee will endeavor to deliver to Grantor a minimum of thirty (30) days' advanced notice of cancellation, to the extent commercially obtainable and practicable, and endorsed to provide a waiver of subrogation as to Grantor and Grantor's Representatives.  The insurance shall be considered primary insurance and Grantor's insurance, if any, shall be secondary.  Any deductibles will be paid by the primary named insured.  Grantee shall obtain and deliver to Grantor, upon request, certificates of insurance from each of its contractors evidencing the coverage required by this Section 3.11 in advance of any access to, or work at, the Property.

3.12.   Waiver of Jury Trial.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY CLAIM ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT.   THIS PROVISION IS A MATERIAL INDUCEMENT TO GRANTEE ACCEPTING THIS AGREEMENT.

## SECTION 4. **GENERAL TERMS.**

4.1.   Governing Law.  The laws of the State in which the Property is located shall govern the validity, construction, enforcement, and interpretation of this Agreement. Each Party hereby consents to the jurisdiction and venue of the Federal District Court and State Courts located in the county in which the Property is located, waives personal service of any and all process upon it, consents to service of process by registered mail directed to each Party

D-9

at the address for notices herein, and acknowledges that service so made shall be deemed to be completed upon actual delivery thereof (whether accepted or refused).

4.2.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties concerning its subject matter, and supersedes and replaces all prior agreements and understandings between Grantor and Grantee with respect to Grantee's access to the Property.

4.3.    <u>Paragraph Headings</u>.  The paragraph headings appearing herein are for the convenience of the Parties and are not to be used or construed so as to modify the terms and conditions of this Agreement in any fashion.

4.4.    <u>Successors, Assigns, etc.</u>  This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Parties and their successors and assigns.

4.5.    <u>No Beneficiaries</u>.  Except as otherwise specifically provided herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person, firm, or corporation other than Grantee and Grantor/Owner, any rights or remedies under or by reason of this Agreement.    Notwithstanding the foregoing or anything to the contrary set forth elsewhere in this Agreement, both USEPA and MDEQ are intended to be third party beneficiaries of this Agreement, and be entitled to enforce those terms of this Agreement which the Grantee is entitled to enforce.

4.6.    <u>Notice</u>.  Any notice, demand, or other communication required to be given or to be served upon any Party hereunder shall be in writing and delivered to the person to whom the notice is directed, either: (a) delivered by delivery service (including any express mail or overnight delivery service); or (b) sent by electronic mail or by facsimile.  Any notice given by overnight delivery service for next Business Day delivery shall be deemed given on the date of deposit with the overnight carrier for next Business Day delivery.  Any notice, demand, or other communication given other than by overnight carrier shall be deemed to have been given and received when delivered (if by facsimile or electronic mail, as evidenced by a facsimile receipt or date of electronic mail) to the address of the Party to whom it is addressed as stated below.

**If to the Grantee**:
Revitalizing Auto Communities
Environmental Response Trust
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226
Attn:  Bruce Rasher, Redevelopment Manager
Facsimile:  734.879.9537
Email:  brasher@racertrust.org

**With a Copy to**:
Revitalizing Auto Communities
Environmental Response Trust
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226
Attn:  Carl P. Garvey, General Counsel
Facsimile:  734.879.9537
Email: cgarvey@racertrust.org

**And a Copy to**:
Revitalizing Auto Communities
Environmental Response Trust
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226
Attn:  Grant Trigger, Cleanup Manager
Facsimile:  734.879.9537
Email:  gtrigger@racertrust.org

**And a Copy to**:
RACER Trust
P.O. Box 43859
Detroit, MI 48243

**And a Copy to**:
Dawda, Mann, Mulcahy & Sadler, PLC

39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
Attn:  Edward C. Dawda
Facsimile:  248.642.7791
Email:  edawda@dmms.com

**If to Grantor**:                                   **And a Copy to**:
ECALP Corp.                                         Goldberg Weprin Finkel Goldstein LLP
123 Grove Avenue, Suite 222                         1501 Broadway, 22nd Floor
Cedarhurst, New York 11516                          New York, New York 10036
Attn:  Andrew Spodek                                Attn:  Andrew W. Albstein, Esq.
Facsimile:  516.295.2004                            Facsimile:  212.730.4518
Email: aspodek@nationwidepostal.com                 Email:  aalbstein@gwflaw.com

    4.7    <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a fully executed agreement, with the same effect and validity as a single, original agreement signed by all of the Parties.  Signatures transmitted via facsimile or electronic mail transmission shall have the same validity and effect as original signatures.

## SECTION 5.  DEFINITIONS.

    The following defined terms shall have the meaning ascribed thereto below:

    (a)    "**Affiliate**" means, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents and employees.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract or otherwise.

    (b)    "**Bankruptcy Code**" means Title 11 of the United States Code, as amended and/or supplemented from time to time, together with any similar Law relating to bankruptcy, insolvency, reorganization, restructuring, winding up or composition or adjustment of a Person's debts.

    (c)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

    (d)    "**Bankruptcy Documents**" means, collectively, the Confirmation Order and the "Plan" described therein, the Settlement Agreement, the Trust Agreement and any other documents relating to the Trust or the Property filed with the Bankruptcy Court in connection with the Case, or delivered pursuant thereto.

    (e)    "**Baseline Environmental Assessment**" or "**BEA**" means a written report prepared in accordance with Parts 201 and/or 213 of Michigan's NREPA (as defined below), and the regulations promulgated thereunder, that confirms that, among other things, the Property is a "facility" and/or a "site" as those terms are defined in those Acts.

    (f)    "**Business Day**" means any day other than: (i) a Saturday, Sunday or federal holiday; or (ii) a day on which commercial banks in the State are authorized or required to be closed for all or any portion of the normal business hours of the day.

(g)    "**Case**" means that certain Chapter 11 case filed by Motors Liquidation Company (f/k/a General Motors Corporation) and jointly administered with the Chapter 11 cases of its affiliated debtors under Case No. 09-50026 (REG).

(h)    "**Confirmation Order**" means that certain Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan, dated March 29, 2011, issued by the Bankruptcy Court and filed as Docket No. 9941 in the Case approving, among other things the "Plan" described therein and the Settlement Agreement.

(i)    Intentionally omitted.

(j)    "**Due Care Plan**" or "**DCP**" means a written report documenting Grantor's or Owner's due care requirements of MCL 324.20107a and/or continuing obligations set forth in 42 U.S.C. Section 9601(40) related to its Intended Use of the Property.

(k)    "**Emergency**" means any event, condition, or circumstance which poses, or without immediate action will pose, a threat of: (i) imminent danger to the safety of Persons at the Property; (ii) significant or structural damage to, the Easement Area, the remaining Property, or the Remediation Systems; (iii) a Release, Environmental Condition or Environmental Compliance Liability; or (iv) violation of a Restriction.

(l)    "**Environmental Action**" means, subject to the terms of the Settlement Agreement, any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and Operation, Maintenance and Monitoring activities authorized or required under the Settlement Agreement or under any Law with respect to the Property.

(m)    "**Environmental Claims**" means, with respect to the Property, any and all Claims or Demands brought or instigated by any Governmental Authority under any Environmental Law or with respect to Environmental Condition, and/or any and all third party Claims or demands (including without limitation those based on negligence, trespass, strict liability, nuisance, toxic tort or detriment to human health or welfare) due to any actual or threatened Release and whether or not seeking any Liabilities.

(n)    "**Environmental Compliance Liability**" means any Liability arising from, or related to, an Environmental Claim, any Environmental Condition or any other violation of any Environmental Law.

(o)    "**Environmental Condition**" means any Release or other event, circumstance and/or condition existing at, on, in, under or about the Property, or the ambient air around the Property.

(p)    "**Environmental Laws**" means any and all Laws relating to pollution, noise and/or odor control, wetlands pollution, the protection or restoration of health, safety or the environment, natural resources, and/or the use, transportation, presence, storage, handling, disposal, discharge, recycling, treatment, generation, processing, labeling, production, release, contamination or disposal of threatened Release of Hazardous Substance, including, without limitation, the following:  (i) the Clean Air Act, 42 U.S.C. Section 7401 *et seq.*; (ii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*; (iii) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 *et seq.*; (iv) the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 *et seq.*;

REF. #11970, portion of

(v) the Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; (vi) the Safe Drinking Water Act, 42 U.S.C. Section 300f *et seq.*; (vii) OSHA, 29 U.S.C. 651 *et seq.*; (viii) the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001 *et seq.*; and (ix) the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 *et seq.*; as in effect on the Effective Date, and including the analogous Laws of the State including but not limited to applicable provisions of Michigan's Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.* ("**NREPA**") and applicable tribal or local Law counterparts, as any of the foregoing has been, and may be, reauthorized, amended, supplemented, and/or replaced from time to time.

(q)     "**Hazardous Substances**" means all materials, substances, and wastes, defined, designated, regulated or classified as hazardous, toxic or radioactive under Environmental Laws, whether by type or by quantity, and shall include but not be limited to petroleum or any derivative or by-product thereof and asbestos-containing materials.

(r)     "**OMM**" means the operation, monitoring and maintenance activities required as a form of Environmental Action under the Settlement Agreement.

(s)     "**Party**" refers to either Grantor or Grantee, as appropriate, and as a party to this Agreement.

(t)     "**Person**" refers to an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization or other entity.

(u)     "**Pre-Existing Environmental Condition**" means any Environmental Condition existing as of the Effective Date for which the Trust has actual knowledge and is obligated to perform Environmental Actions under the PSA, the Settlement Agreement, or any other Bankruptcy Document.

(v)     "**Release**" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, transporting or dumping of Hazardous Substances, or as otherwise defined under any Environmental Law, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

(w)     "**Remediation Systems**" means that or those certain machinery, equipment and fixtures used in connection with the Environmental Action, including without limitation, treatment sheds, monitoring wells, monitoring devices, vapor extraction systems, pump and treat systems, air sparge and compressor systems, bioremediation systems, oil and water separators and associated personal property and fixtures.

(x)     "**Restrictions**" means those restrictions, covenants, conditions, reservations, controls (engineering, land use, institutional and otherwise), easements or rights-of-way, affecting the future use of, access to, or activities on the Property, relating to the ongoing Environmental Actions at, on, in, under or about the Property, and otherwise limiting the use and/or development of the Property to the Intended Use or to implement the Settlement Agreement, whether agreed to by the Parties or required by any Governmental Authority.

(y)     "**Restrictive Covenant**" means a recorded document that sets forth the Restrictions on the Property and is based upon the form required by the applicable Governmental Authority, i.e., MDEQ's model Restrictive Covenant applicable to Part 201, Part 111, and or Part 213 of NREPA, whichever is applicable.

(z) "**Settlement Agreement**" means that certain Environmental Response Trust Consent Decree and Settlement Agreement among Motors Liquidation Corporation (f/k/a General Motors Corporation) and its affiliated debtors, the States, and EPLET, LLC (not individually but solely in its representative capacity as Administrative Trustee of the "Environmental Response Trust" established thereby) that established the Trust, notice of which was published in the 75 Fed. Reg. 66390 (Oct. 28, 2010) and a copy of which is available as of the Effective Date at http://racertrust.org/About_RACER/Settlement_Agreement.

(aa) "**States**" means collectively, the United States of America (on behalf of the Environmental Protection Agency and the Saint Regis Mohawk Tribe), the States of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Virginia and Wisconsin, and the Louisiana Department of Environmental Protection and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

(bb) "**Surface Materials**" means any and all discarded materials located on or at the surface of the Property, including, but not limited to: building materials from demolition activities; domestic and industrial trash; tires; automotive parts; used containers which held materials such as paint, antifreeze, gasoline, and other household substances; materials painted with lead-based paints or otherwise; wood, and other materials which may have been painted with lead-based paints; and roof shingles and other building materials which may contain asbestos-containing materials.

(cc) "**Trust Agreement**" means that certain "Environmental Response Trust Agreement" described in the Settlement Agreement, pursuant to which the Trust was formed.

(dd) "**Utilities**" means any and all water, gas, electric, septic and sanitary and storm water utilities and related infrastructure, that service the Property or any portion thereof.

This Instrument is exempt from State and County Transfer Tax pursuant to Michigan Compiled Laws §§ 207.526(a) and 207.505(a).

[SIGNATURES ON FOLLOWING PAGES]

*Signature Page to Environmental Easement Agreement*

        IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date and year first written above.

**GRANTOR:**               **ECALP CORP.**
a New York corporation

Dated as of _____, 201__

By: _____
Name:  Andrew Spodek
Title:

_____

STATE OF _____)
                      ) SS:
COUNTY OF _____)

On the _____ day of _____, 201__, before me a Notary Public for the State and County aforesaid, personally appeared _____, who acknowledged himself or herself to be the _____ of _____ a _____ and that he, being authorized to do so, executed the foregoing Environmental Easement Agreement for the purposes therein contained by signing the name of said entity by himself or herself as such officer.

WITNESS my hand and seal the day and year aforesaid.

_____
Print Name:_____
Notary Public, State of _____
County of_____
Acting in the County of_____
My commission expires:_____

D-15

*Signature Page to Environmental Easement Agreement*

   IN WITNESS WHEREOF, the Parties have executed this Agreement on the date and year first written above.

| | |
|---|---|
| **GRANTEE:** | **REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST,** a trust formed under the laws of the State of New York |
| Dated as of _____, 201___ | |

By:  EPLET, LLC, acting solely in its capacity as Administrative Trustee of Revitalizing Auto Communities Environmental Response Trust

By:  _____
   ELLIOTT P. LAWS, not individually,
   but acting solely in his capacity
   as Managing Member

_____

DISTRICT/STATE OF _____)
                ) SS:
CITY/COUNTY OF _____)

   On the _____ day of _____, 201___ before me a Notary Public for the District/State and City/County aforesaid, personally appeared Elliott P. Laws who acknowledged himself to be the Managing Member of EPLET, LLC, as Administrative Trustee of the REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST (the "Trust"), Sole Member of RACER Properties LLC, a Delaware limited liability company,  and that he, being authorized to do so, executed the foregoing Environmental Easement Agreement on behalf of RACER PROPERTIES LLC, not individually, but solely in his capacity as Managing Member of EPLET, LLC, Administrative Trustee of the Trust, its Sole Member, for the purposes therein contained by signing his name.

   WITNESS my hand and seal the day and year aforesaid.

        _____
        Print Name:_____
        Notary Public, District/State of _____
        City/County of_____
        Acting in the City/County of_____
        My commission expires:_____

**TAX PARCEL IDENTIFICATION NUMBER:** 63-64-14-21-101-007

REF. #11970, portion of

**DRAFTED BY AND WHEN RECORDED MAIL TO:**

Carl P. Garvey
General Counsel
Revitalizing Auto Communities Environmental Response Trust
500 Woodward Avenue, Suite 2650
Detroit, Michigan 48226

REF. #11970, portion of

## EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

All those tracts or parcels of land lying and being in the City of Pontiac, Oakland County, State of Michigan, and being more particularly described on as follows:

Part of lot 500, including vacated streets and alleys lying adjacent to said lots of the "Plat of Modem Housing Corporation Addition", as recorded in Liber 20 of Plats on Page 22, Oakland County Records, all or part of Lots 1 through 23, inclusive, Block 1, including vacated streets and alleys lying adjacent to said lots of "Modern Housing Corporation's Oakland Park", a subdivision of part of the North ½ of Section 21, Township 3 North, Range 10 East as recorded in Liber 46 of Plats on Page 21, Oakland County Records; including part of Sections 20 and 21, Township 3 North, Range 10 East, all being located in the City of Pontiac, Oakland County, State of Michigan and being more particularly described as follows:

Commencing at the East ¼ corner of Section 20, Township 3 North, Range 10 East, as recorded in Liber 20101, Page 712, Oakland County Records, said point also being the West ¼ of Section 21, Township 3 North, Range 10 East, thence along the East Section line of said Section 20, North 6 degrees 58 minutes 26 seconds West, 147.20 feet to the Point of Beginning and the North right-of-way line of East Montcalm Street (variable width), thence along said North right-of-way line, South 84 degrees 26 minutes 26 seconds West, 1,280.69 feet; thence North 07 degrees 33 minutes 31 seconds West, 614.02 feet; thence North 02 degrees 09 minutes 35 seconds West, 66.80 feet; thence North 84 degrees 05 minutes 48 seconds East, 244.44 feet; thence North 05 degrees 54 minutes 12 seconds West, 741.12 feet; thence North 84 degrees 05 minutes 48 seconds East, 1,788.80 feet; thence South 05 degrees 54 minutes 12 seconds East, 153.03 feet; thence North 84 degrees 05 minutes 48 seconds East, 91.20 feet; thence South 05 degrees 54 minutes 12 seconds East, 116.97 feet; thence North 84 degrees 05 minutes 48 seconds East, 385.00 feet to the Westerly right-of-way line of North Glenwood Avenue; thence along said right-of-way the following courses: South 05 degrees 54 minutes 12 seconds East, 300.00 feet to a curve to the right; thence along said curve an arc distance of 144.17 feet, radius 300.00 feet, central angle 27 degrees 32 minutes 04 seconds, and chord bearing of South 07 degrees 51 minutes 50 seconds West, 142.79 feet; thence South 21 degrees 37 minutes 52 seconds West, 489.35 feet to a curve to the left; thence along said curve an arc distance of 192.56 feet, radius 400.00 feet, central angle of 27 degrees 34 minutes 56 seconds, and chord bearing of South 07 degrees 50 minutes 24 seconds West, 190.71 feet; thence South 05 degrees 57 minutes 05 seconds East, 100.25 feet to the North right-of-way line of East Montcalm Street (variable width); thence along the said right-of-way line, South 83 degrees 49 minutes 03 seconds West, 606.04 feet to a deflection point; thence South 84 degrees 26 minutes 26 seconds West, 303.94 feet to the Point of Beginning. Containing 71.858 acres, more or less.

Subject to all recorded easements and rights-of-way.

**Tax Parcel ID Number**: 63-64-14-21-101-007

**Commonly known as:** 711 North Glenwood Avenue, Pontiac, Michigan 48340

**<u>EXHIBIT E</u>**

**<u>DECLARATION OF RESTRICTIVE COVENANT</u>**
**<u>OR ENVIRONMENTAL RESTRICTIVE COVENANT</u>**

**<u>[To Be Provided]</u>**

REF. #11970, portion of

**EXHIBIT F**

**SITE PLAN**



REF #11970, portion of

EXHIBIT 5

# FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement (this "**First Amendment**") is effective as of the date provided below (the "**Effective Date**") and is entered into by and between **RACER PROPERTIES LLC**, a Delaware limited liability company ("**Seller**"), and **ECALP CORP.**, a New York corporation ("**Buyer**"). Seller and Buyer may be referred to below individually as "**Party**" and collectively as "**Parties**."

## RECITALS

Buyer and Seller entered into a Purchase and Sale Agreement dated as of January 7, 2019 ("**Agreement**"), for the purchase and sale of certain real property situated at 711 North Glenwood Avenue, City of Pontiac, County of Oakland, State of Michigan ("**Property**"), and as more particularly described in the Agreement.

Buyer and Seller desire to amend the Agreement in certain respects, subject to and in accordance with, the terms of this First Amendment.

In consideration of the foregoing, the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller do hereby agree as follows:

1.     First Amendment.  As of the Effective Date of this First Amendment, and provided that within two (2) business days following the Effective Date of this First Amendment, Buyer will deliver to Title Company the sum of $500.00 in consideration for such extensions (the "**Inspection Period Extension Fee**") in accordance with Section 2.2.4(c) and 3.3(c) of the Agreement, (i) each of the Physical Inspection Period and the Title Inspection Period (collectively referred to herein as the "Inspection Period") shall be extended to a date that is thirty (30) days from the Effective Date (or the next business day thereafter, if such 30th day is not a business day); and (ii) Purchaser shall have the right to exercise one (1) additional thirty (30) day extension of the Inspection Period, upon delivery of an additional $500.00 to Title Company, which amount shall be added to and referred as the Inspection Period Extension Fee.

All references to the "Inspection Period" in the Agreement and in this First Amendment shall mean and refer to the Inspection Period as same are extended by this First Amendment.  All time periods in the Agreement which run from or are tied to the Inspection Period, shall automatically be extended to run from or be tied to (as the case may be) the Inspection Period as same are extended by this First Amendment.

The Title Company, per PSA Basic Terms of the Agreement, is as follows:

First American Title Insurance Company
Patricia A. Cadena, National Escrow Officer
National Commercial Services
900 Wilshire Drive, Suite 260

Troy, Michigan 48084
Tel: 248.458.7207
Fax: 866.714.8131
Email: pcadena@firstam.com

2. <u>Ordering Title Commitment</u>. Section 3.1.1 of the Agreement provides that "[p]romptly after the Effective Date, Buyer may obtain at its own expense, and deliver, or cause to be delivered, to Seller, a title insurance commitment (the "Title Commitment") from the Title Company.

Buyer acknowledges that Seller has informed Buyer that Title Company has informed Seller that the Title Commitment will take approximately thirty (30) days to complete once ordered and cost approximately $5,500, given the complex ownership history of the Property.

The parties also agree and acknowledge that Buyer has requested that Seller consent to a modification of the EEA (as such term is defined in the Agreement).

Buyer agrees that it will, by not later than such date which is three (3) Business Days following the earlier of (i) the parties' execution of a further amendment to the Agreement to ratify the amended EEA, and (ii) written notice from either party that it is no longer willing to negotiate an EEA Amendment prior to completion thereof to the mutual satisfaction of the parties, either: (a) accept the Property's title "as is" and inform Seller in writing of such acceptance, or (b) order the Title Commitment from the Title Company and comply with the applicable provisions of Article 3 (Title and Survey) of the Agreement, as amended by this First Amendment.

3. <u>Miscellaneous</u>.

(a)    Except as specifically modified hereby, the Agreement shall continue in full force and effect and is hereby ratified and confirmed as amended by this First Amendment.

(b)    This First Amendment shall be construed, interpreted, and enforced under the laws of the State of Michigan.

(c)    This First Amendment is binding upon and shall inure to the benefit of the parties and their respective permitted successors and assigns under the Agreement.

(d)    All capitalized terms not defined in this First Amendment shall have the same meaning ascribed to those terms in the Agreement.

(e)    In the event of any conflict between the terms of this First Amendment and the terms of the Agreement, the terms of this First Amendment shall govern and control.

(f)    This First Amendment may be executed in counterparts, each of which may be deemed an original, and both of such counterparts together shall

constitute one and the same instrument.  Signatures delivered by telephone facsimile or email shall be fully effective to bind the signatory or signatories, although hard copies will be provided promptly upon request.

(g)     The Recitals are by this reference incorporated herein and made a part of this First Amendment.

(h)     The Effective Date of this First Amendment shall be the date on which both Parties have executed this First Amendment.  If the Parties do not execute this First Amendment on the same date, the Effective Date shall be the date the last Party signs this First Amendment.

**[Remainder of the page left blank intentionally; Signature page follows]**

3

The Parties have executed this First Amendment as of the dates set forth below their respective signatures.

**BUYER:**

**ECALP CORP.,**
a New York corporation

By: _____

Its: Authorized Signatory

Date: May 10, 2019

**SELLER:**

**RACER PROPERTIES LLC,**
a Delaware limited liability company

By: Revitalizing Auto Communities
    Environmental Response Trust,
    Sole Member of RACER Properties LLC

By: EPLET, LLC, acting solely in its capacity
    as Administrative Trustee of Revitalizing
    Auto Communities Environmental
    Response Trust

By: _____
    ELLIOTT P. LAWS, not individually,
    but acting solely in his capacity as
    Managing Member

Date: _____May 10_____, 2019

4

EXHIBIT 6

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Second Amendment to Purchase and Sale Agreement (this "**Second Amendment**") is effective as of the date provided below (the "**Second Amendment Effective Date"**) and is entered into by and between **RACER PROPERTIES LLC**, a Delaware limited liability company ("**Seller**"), and **ECALP CORP.**, a New York corporation ("**Buyer**").  Seller and Buyer may be referred to below individually as "**Party**" and collectively as "**Parties.**"

### RECITALS

Buyer and Seller entered into a Purchase and Sale Agreement dated as of January 7, 2019 ("**Agreement"**), for the purchase and sale of certain real property situated at 711 North Glenwood Avenue, City of Pontiac, County of Oakland, State of Michigan ("**Property**"), and as more particularly described in the Agreement.

Thereafter Buyer and Seller entered into an Amendment to Purchase and Sale Agreement (the "**First Amendment**") on or about May 10, 2019.

Buyer and Seller desire to further amend the Agreement in certain respects, subject to and in accordance with, the terms of this Second Amendment.

In consideration of the foregoing, the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller do hereby agree as follows:

1. <u>Basic Terms</u>. The Basic Terms are hereby modified as follows:

   a. "Deposit: N/A" is deleted in its entirety and replaced with the following language: "New Diligence Deposit: $50,000".

   b. The language after "Outside Closing Date" is deleted in its entirety and replaced with the following: "August 31, 2020".

2. <u>The Physical Inspection Period.</u>  Seller and Buyer acknowledge that the Physical Inspection Period has expired and that Purchaser may not terminate this Agreement in accordance with Section 2.2.2 of the Agreement, except as otherwise expressly provided pursuant to this Second Amendment.

3. <u>Buyer's New Diligence.</u>  For purposes of this Agreement, the "**New Diligence Completion Date**" shall be such date that is the later of (a) (I) Buyer's completion of its Baseline Environmental Assessment and (II) Buyer's receipt of each of those Environmental Comfort Letters (as such term is defined below) sought by Buyer or (provided that Buyer shall not be permitted to continue to pursue an Environmental Comfort Letter following Buyer's receipt of a final, non-appealable written notice from the applicable governmental or quasi-governmental body that such body will not issue the applicable Environmental Comfort Letter that Buyer is seeking); and (b) the date that the Title Company indicates that it is prepared to issue an owner's policy of title insurance for the Property subject only

to the Permitted Encumbrances and in form otherwise acceptable to Buyer at normal rates for such policy.  Notwithstanding the foregoing, unless otherwise provided by the Parties in writing, in no event shall the New Diligence Completion Date be later than the date that is three-hundred sixty-five (365) days from the Second Amendment Effective Date.

4.     Buyer's Phase I.  In consideration for Buyer depositing with the Escrow Agent the New Diligence Deposit in the manner set forth herein, Buyer shall have access to the Property from the Second Amendment Effective Date until the New Diligence Completion Date in accordance with the terms and conditions of the Access Agreement to perform a Phase I environmental assessment, Phase II environmental assessment and any further environmental testing of the Property as reasonably required by Buyer's environmental consultants in order to permit Buyer to complete a Baseline Environmental Assessment and obtain any comfort letters or a Prospective Purchaser Agreement ("**PPA**") from State or Federal authorities as Buyer requires in its sole discretion (collectively the "**Environmental Comfort Letters**").  Within five (5) Business Days after the Second Amendment Effective Date, Buyer shall deliver the New Diligence Deposit to the Title Company, by certified check or wire transfer of immediately available funds, which New Diligence Deposit will be held by the Title Company in escrow in accordance with a written escrow agreement in the form annexed hereto as **Exhibit A**.  At the Closing, the New Diligence Deposit (together with any accrued interest thereupon) will be refunded to Buyer, except as otherwise provided herein.  If the Closing fails to occur on or prior to the Outside Closing Date by reason of: (a) Buyer's default under the Agreement; or (b) Buyer's failure to close for any reason other than (i) Seller's failure to obtain the release of the Treasury Lien by the New Diligence Completion Date or (ii) Seller's inability to deliver title to the Property to Purchaser in accordance with the terms of the Agreement (including but not limited to delivery of title to the Property subject only to the Permitted Exceptions), then the New Diligence Deposit (together with any accrued interest thereupon) will automatically, and without further act, be paid to Seller (along with all other Deposit funds then held in escrow by the Title Company).

5.     The Title Inspection Period.  Buyer agrees that within five (5) Business Days following Second Amendment Effective Date, Buyer will order (i) the Title Commitment from the Title Company, and (ii) the Survey.  Buyer shall instruct the Title Company to deliver a copy of the Title Commitment to Seller concurrent with the delivery thereof to Buyer.  Within fifteen (15) days following Buyer's receipt of the Title Commitment, Buyer will deliver an Objection Notice to Seller (if at all). Prior to the expiration of Seller's Response Period, Seller will deliver Seller's Response Notice to Buyer setting forth which Objection Items, if any, Seller will cause to be insured over or removed, in its sole and absolute discretion, without regard to reasonableness, on or before the Closing Date.  Seller's failure to deliver a Seller's Response Notice in accordance with this Section 5 will be treated as if Seller had elected to not take any action with respect to any Objection Items, thereby rendering them Permitted Exceptions (defined below), unless Buyer elects to terminate this Agreement in accordance with this Section 3.1.2(b) of the Agreement.

2

6.      Closing Date.   Section 6.1.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

> "Except as otherwise provided herein or subsequently modified in writing by the Parties, the Sale shall close (the "**Closing**") at 11:00 am (Detroit time) on or before August 31, 2020 (the "**Closing Date**")."

7.      Assignment.   Section 14.10 of the Agreement is hereby modified by deleting the following language from the second sentence:

> "provided, however, Buyer may assign this Agreement to Affiliate or an entity owned or controlled by Andrew Spodek, without Seller's consent"

and replacing such language with:

> "provided, however, Buyer may assign this Agreement to Affiliate or an entity owned or controlled by (x) Andrew Spodek, or (y) members of Andrew Spodek's family or (y) trusts for the benefit of members of Andrew Spodek's family, without Seller's consent and without release of Buyer's obligations under this Agreement"

8.      Miscellaneous.

(a)      Except as specifically modified hereby, the Agreement shall continue in full force and effect and is hereby ratified and confirmed as amended by this Second Amendment.

(b)      This Second Amendment shall be construed, interpreted, and enforced under the laws of the State of Michigan.

(c)      This Second Amendment is binding upon and shall inure to the benefit of the parties and their respective permitted successors and assigns under the Agreement.

(d)      All capitalized terms not defined in this Second Amendment shall have the same meaning ascribed to those terms in the Agreement.

(e)      In the event of any conflict between the terms of this Second Amendment and the terms of the Agreement or the First Amendment, the terms of this Second Amendment shall govern and control.

(f)      This Second Amendment may be executed in counterparts, each of which may be deemed an original, and both of such counterparts together shall constitute one and the same instrument.   Signatures delivered by telephone facsimile or email shall be fully effective to bind the signatory or signatories, although hard copies will be provided promptly upon request.

(g)      The Recitals are by this reference incorporated herein and made a part of this Second Amendment.

       (h)    The Effective Date of this Second Amendment shall be the date on which both Parties have executed this Second Amendment.  If the Parties do not execute this Second Amendment on the same date, the Effective Date shall be the date the last Party signs this Second Amendment.

       The Parties have executed this First Amendment as of the dates set forth below their respective signatures.

**BUYER:**

**ECALP CORP.,**
a New York corporation

By: _____

     Andrew Spodek
Its:   Authorized Signatory

Date: July 26 2019

**SELLER:**

**RACER PROPERTIES LLC,**
a Delaware limited liability company

By: Revitalizing Auto Communities
     Environmental Response Trust,
     Sole Member of RACER Properties LLC

By: EPLET, LLC, acting solely in its capacity
     as Administrative Trustee of Revitalizing
     Auto Communities Environmental
     Response Trust

By: _____
     ELLIOTT P. LAWS, not individually,
     but acting solely in his capacity as
     Managing Member

Date:  July __, 2019

4

(h)    The Effective Date of this Second Amendment shall be the date on which both Parties have executed this Second Amendment.  If the Parties do not execute this Second Amendment on the same date, the Effective Date shall be the date the last Party signs this Second Amendment.

The Parties have executed this First Amendment as of the dates set forth below their respective signatures.

**BUYER:**

**ECALP CORP.,**
a New York corporation

By: _____
         Andrew Spodek
Its:    Authorized Signatory

Date: July _, 2019

**SELLER:**

**RACER PROPERTIES LLC**,
a Delaware limited liability company

By: Revitalizing Auto Communities
       Environmental Response Trust,
       Sole Member of RACER Properties LLC

By: EPLET, LLC, acting solely in its capacity
       as Administrative Trustee of Revitalizing
       Auto Communities Environmental
       Response Trust

By: _____
       ELLIOTT P. LAWS, not individually,
       but acting solely in his capacity as
       Managing Member

Date:  July 25, 2019

4

## **EXHIBIT A**

**Escrow Agreement**

**[To be attached]**



# *First American Title Insurance Company*

### ESCROW AGREEMENT

This Agreement is entered into this _____day of July, 2019, between:

**SELLER: RACER PROPERTIES LLC**
    **And**
**BUYER: ECALP CORP.**

**PROPERTY ADDRESS:** 711 North Glenwood Avenue, City of Pontiac, County of Oakland, State of Michigan (the "Property")

**TITLE INSURANCE FILE NUMBER OR LEGAL DESCRIPTION: NCS-944677-MICH (pc)**

Buyer and Seller request that the *National Commercial Service Division of First American Title Insurance Company* at its Office located at 900 Wilshire Dr., Ste. 260, Troy, MI 48084 ("Escrow Agent") act as their Escrow Agent to hold the sum of $50,000.00 ("Deposit"), which Deposit is being delivered to Escrow Agent herewith. Upon written acceptance by Escrow Agent of these instructions and the delivery of the Deposit to Escrow Agent, Escrow Agent shall hold and deliver the Deposit to, or at the direction of, the parties in accordance with these instructions. It is agreed that joint written instructions from BOTH SELLER AND BUYER must be provided to Escrow Agent to authorize the release of the Deposit. The term of this escrow agreement shall be in accordance with the Purchase and Sale Agreement between Buyer and Seller dated as of January 7, 2019 for the purchase and sale of the Property (as amended, the "Purchase and Sale Agreement"; a copy of which has been furnished to Escrow Agent) and may be extended by joint written instructions from BUYER AND SELLER.

In the event that (i) a dispute arises between Buyer and Seller as to the disposition of the Deposit, or (ii) Escrow Agent does not receive JOINT written instructions from Buyer and Seller during the term of this escrow (as that term may be extended by joint written instructions from Buyer and Seller), or (iii) Escrow Agent does not receive a final, non-appealable order from a court of competent jurisdiction instructing Escrow Agent as to how to deliver the Deposit, Escrow Agent may at its discretion, continue holding the Deposit.

Escrow Agent shall hold the deposit in accordance with the Purchase and Sale Agreement.

The Escrow Agent shall not be paid any fee or other compensation for this service.

If Escrow Agent receives conflicting instructions or claims to the funds held in escrow, then it may take any one or more of the following actions:

    1.   It may hold all or any portion of the funds, securities or documents affected by the conflicting instructions or claims in Escrow and take no further action until otherwise directed, either by mutual written instructions from all interested Parties or final order of a court of competent jurisdiction; or

    2.   It may initiate an interpleader action in any court in the State of Michigan having jurisdiction, naming all interested Parties and depositing all or any portion of the funds affected by the adverse claims with the clerk of the court in full compliance of its responsibilities under these instructions.

Upon delivering or applying all funds deposited with it hereunder in accordance with these instructions, Escrow Agent shall be released from any further liability under these instructions (except for damages to the parties, if any, caused by Escrow Agent's gross negligence or intentional actions or omissions), it being expressly understood that liability is limited by the terms and provisions set forth in these instructions. By acceptance of these instructions, Escrow Agent acknowledges that it is acting in the capacity of a depository only. Escrow Agent shall not be responsible for the

6

**RACER PROPERTIES LLC, a Delaware limited liability company**

By:    Revitalizing Auto Communities
           Environmental Response Trust,
           Sole Member of RACER Properties LLC

By:    EPLET, LLC, acting solely in its capacity
           as Administrative Trustee of Revitalizing
           Auto Communities Environmental
           Response Trust

By:_____
           Elliott P. Laws, not individually, but acting
           Solely in his capacity as Managing Member

**ECALP CORP., a New York corporation**

By:_____
        Andrew Spodek
Its:     Authorized Signatory

**ACCEPTED BY:**

_____

***National Commercial Services Division***
***First American Title Insurance Company***
900 Wilshire Dr., Ste. 260
Troy, MI 48084

Telephone: (248) 458-7200
Facsimile:  (866) 714-8131

failure of any bank used as a depository for funds received pursuant to this Agreement. Escrow Agent's liability hereunder shall in all events be limited to return to the party or parties entitled thereto, the funds retained in escrow less any reasonable expenses which Escrow Agent may incur in the administration of the funds, including, without limitation, attorneys' fees and litigation expenses paid in connection with the defense, negotiation or analysis of claims against it, by reason of litigation or otherwise, arising out of the administration of the escrow, all of which costs Escrow Agent shall ,without notice, be entitled to deduct from amounts on deposit hereunder.

**SELLER (or its Agent)**

**RACER PROPERTIES LLC, a Delaware limited liability company**

By:    Revitalizing Auto Communities
        Environmental Response Trust,
        Sole Member of RACER Properties LLC

By:    EPLET, LLC, acting solely in its capacity
        as Administrative Trustee of Revitalizing
        Auto Communities Environmental
        Response Trust

By: _____
Elliott P. Laws, not individually, but acting
Solely in his capacity as Managing Member

**BUYER (or its Agent)**

**ECALP CORP.,** a New York corporation

By:_____
        Andrew Spodek
Its:     Authorized Signatory

**ACCEPTED BY:**

_____
National Commercial Services Division

***First American Title Insurance Company***
900 Wilshire Dr., Ste. 260
Troy, MI 48084

Telephone: (248) 458-7200
Facsimile: (866) 714-8131

7

# EXHIBIT 7

FACILITIES, ASSET MANAGEMENT

 *UNITED STATES POSTAL SERVICE*

May 2, 2020

**VIA:   USPS Priority <u>Express Mail</u> and First Class Mail (Signature Required)**

Racer Properties LLC
Attn: Carl Garvey, General Counsel
500 Woodward Ave. Suite 2650
Detroit, MI 48226-3416

RE:   Option to Purchase-Notice of Exercise of Option to Purchase Northeast Metro Michigan
      Metoplex, 711 N. Glenwood Ave., Pontiac, MI 48340-9997 (the 'Property')

Dear Mr. Garvey:

This letter is in reference to the United States Postal Service Ground Lease Agreement ("Lease"),
dated November 29th, 2004, made by and between GENERAL MOTORS CORPORATION, a
Delaware corporation, as the "Landlord," and the UNITED STATES POSTAL SERVICE, an
independent establishment of the executive branch of the government of the United States, as the
tenant under the Lease ("Postal Service").  Racer Properties LLC, a Delaware limited liability
company, became the successor in interest to the Landlord by that Quitclaim Deed dated March
31, 2011 and recorded on July 11, 2014 in the public records of Oakland County Michigan in Book
47205 Page 77.

In accordance with  Article 21 Option to Purchase in the Lease, this letter hereby constitutes notice
pursuant to Section 21.1, Grant of Option in the Lease, that the  Postal Service, hereby elects to
purchase the fee simple title to the Premises described in Paragraph 2.1 of the Lease as the "real
property consisting of approximately 72.5 acres located at 711 North Glenwood
Avenue, Pontiac, Michigan 48340-9000, described in <u>Exhibit A </u>and all appurtenances
thereto (the "Land"), together with all buildings ('Buildings"), structures, pavement,
lighting fixtures and other improvements now or later installed or constructed upon the
Land (the Buildings and all structures, pavement, lighting fixtures  and other
improvements being herein collectively referred to as the "Improvements", for the
purchase price of $10.00 ("Purchase Price").  Such conveyance shall be free of liens per the
requirements of Section 21.3(a) of the Lease.  The Purchase Date for this purchase, if reasonably
acceptable to Landlord shall be September 9, 2020. On the Purchase Date, the Postal Service
shall pay the Purchase Price and the Landlord shall provide in a Deed substantially in the form
attached to the Lease as Exhibit D as provided for in Section 21.3(b) of the Lease.

Prior to the Purchase date, the Postal Service will contact you to let you know the closing agent's
contact information so that you can properly deliver the deed and other required closing
documents, and make arrangements to receive the Purchase Price.

If you have any questions, please do not hesitate to contact Philip Doyle at (336) 544-3830.
<u>Philip.g.doyle@usps.gov</u>

Sincerely,

Joseph Lowe
Contracting Officer

# EXHIBIT 8



**Revitalizing Auto Communities**
**Environmental Response Trust**

August 21, 2020

<u>VIA FEDERAL EXPRESS</u>

Andrew Spodek
ECALP Corp.
123 Grove Avenue, Suite 222
Cedarhurst, NY 11516

> **Re:    Purchase and Sale Agreement ("PSA") dated December 27, 2018,**
> **between RACER Properties LLC ("RACER") and ECALP Corp. ("Buyer")**
> **re 711 North Glenwood Avenue, Pontiac, Michigan (the "Property")**

Dear Mr. Spodek:

This letter is RACER's notice that it is terminating the above-referenced PSA.

As explained in RACER's discussions with your legal counsel, the United States Postal Service ("USPS") has exercised its option to purchase the Property in accordance with its Ground Lease dated November 29, 2004, which was identified in Section 6.2.1 of the PSA. A copy of the USPS's formal "Notice of Exercise of Option to Purchase Northeast Metro Michigan Metroplex" was provided to your counsel on May 11, 2020.

USPS has met the Ground Lease terms and conditions under which it may exercise its option to purchase the Property, and therefore RACER must terminate the PSA.

Patricia Cadena of First American Title Insurance Company is copied on this letter as confirmation for her to disburse to Buyer the $51,000 in escrowed funds First American is holding on behalf of Buyer.

RACER appreciates the working relationship it has had with Buyer.  If the USPS transaction is terminated for some reason, RACER will contact you to determine Buyer's interest in purchasing the Property.

Sincerely,

Bruce Rasher
Redevelopment Manager

cc:    Stewart Wolf, Esq. and Andrew W. Albstein, Esq (via Federal Express)
       Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, NY
       10036, Tel: 212-301-6940

       Patricia Cadena, First American Title Insurance Company (via email only)

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

RACER PROPERTIES,

     Plaintiff,                       Case No. 20-184360-CB

v                                    Hon. Martha D. Anderson

ECALP CORP., a foreign corporation,

     Defendant.

---

| | |
|---|---|
| Frances Belzer Wilson (P68650) | Glenn L. Smith (P43156) |
| Brian Considine (P53783) | WHEELER UPHAM, P.C. |
| DAWDA, MANN, MULCAHY & SADLER | Attorneys for Defendant |
| Attorneys for Plaintiff | 250 Monroe Ave NW, Ste 100 |
| 39533 Woodward Ave., Suite 200 | Grand Rapids, MI 49503 |
| Bloomfield Hills, MI 48304 | (616) 459-7100 |
| (248) 642-3700 | Smith@wuattorneys.com |
| fwilson@dmms.com | |
| bconsidine@dmms.com | |

---

## DEFENDANT'S ANSWER TO COMPLAINT

     NOW COMES Defendant ECALP CORP., by and through its attorneys, Wheeler Upham,

P.C., and answers Plaintiff's Complaint as follows:

     1.     Defendant denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph "1" of the Complaint.

     2.     Defendant denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph "2" of the Complaint.

     3.     Defendant denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph "3" of the Complaint.

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

4.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "4" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning, except admits that, upon information and belief, Plaintiff is the owner of the real property commonly known as 711 North Glenwood Avenue, Pontiac, Michigan.

5.      Defendant admits the allegations set forth in paragraph "5" of the Complaint.

## JURISDICTION AND VENUE

6.      Paragraph "6" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6" of the Complaint and respectfully refers all questions of law to the Court.

7.      Paragraph "7" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "7" of the Complaint and respectfully refers all questions of law to the Court.

8.      Paragraph "8" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "8" of the Complaint and respectfully refers all questions of law to the Court.

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

9.      Paragraph "9" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "9" of the Complaint and respectfully refers all questions of law to the Court.

10.     Paragraph "10" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "10" of the Complaint and respectfully refers all questions of law to the Court.

11.     Paragraph "11" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "11" of the Complaint and respectfully refers all questions of law to the Court.

## BACKGROUND

12.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "12" of the Complaint.

13.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "13" of the Complaint.

14.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "14" of the Complaint.

3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

15.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "15" of the Complaint.

16.     Paragraph "16" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "16" of the Complaint and respectfully refers all questions of law to the Court.

## **GROUND LEASE BETWEEN RACER AND USPS**

17.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "17" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

18.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "18" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

19.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "19" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "20" of the Complaint and respectfully refers this

4

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

21.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "21" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

22.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "22" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

23.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "23" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

## RACER MARKETS THE PROPERTY FOR SALE
## AND ENTERS INTO PSA

24.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "24" of the Complaint.

25.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "25" of the Complaint.

26.     Defendant admits the allegations set forth in paragraph "26" of the Complaint.

27.     Defendant denies the allegations set forth in paragraph "27" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

5

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

28.     Defendant denies the allegations set forth in paragraph "28" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

29.     Paragraph "29" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "29" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning

30.     Paragraph "30" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "30" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

31.     Paragraph "31" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "31" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

32.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Complaint.

33.     Paragraph "33" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "33" of the Complaint and respectfully

6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

34. Paragraph "34" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "34" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

35. Paragraph "35" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "35" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

36. Paragraph "36" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "36" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

37. Paragraph "37" of the Complaint purports to paraphrase the PSA and therefore does not set forth an allegation to which a response is required. To the extent a response is required, Defendant denies the allegations set forth in paragraph "37" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

7

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

38.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "38" of the Complaint.

39.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "39" of the Complaint.

40.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "40" of the Complaint.

41.     Defendant denies the allegations set forth in paragraph "41" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

## USPS EXERCISES OPTION TO PURCHASE

42.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "42" of the Complaint.

43.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "43" of the Complaint.

44.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "44" of the Complaint.

## RACER NOTIFIES PURCHASER OF EXERCISED OPTION, ECALPS DEFAULT, AND TERMINATION AND EXPIRATION OF PSA

45.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "45" of the Complaint.

46.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "46" of the Complaint except admits that Defendant "wanted to close on the sale of the Property."

8

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

47. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "47" of the Complaint.

48. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "48" of the Complaint except admits that Defendant received the Termination Notice and otherwise respectfully refers this Court to the documents referenced in paragraph "48" of the Complaint for their true and accurate terms, content, context, and meaning.

49. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "49" of the Complaint except avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of "August 31, 2020, the "Outside Closing Date" pursuant to the Second Amendment of the PSA (hereinafter the "Law Day").

50. Defendant denies the truth of the allegations set forth in paragraph "50" of the Complaint.

51. Paragraph "51" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "51" of the Complaint and respectfully refers all questions of law to the Court.

52. Defendant denies the allegations in paragraph "52" of the Complaint.

53. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "53" of the Complaint except avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject

9

to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

54. Paragraph "54" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "54" of the Complaint and respectfully refers all questions of law to the Court and avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

55. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "55" of the Complaint.

56. Paragraph "56" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "56" of the Complaint and respectfully refers all questions of law to the Court and refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

57. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "57" of the Complaint and avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

58. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "58" of the Complaint.

10

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

59.     Defendant admits the allegations set forth in paragraph "59" of the Complaint.

60.     Paragraph "60" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "60" of the Complaint and respectfully refers all questions of law to the Court.

61.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "61" of the Complaint except avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

## COUNT I
## DECLARATORY JUDGMENT

62.     In response to the allegations set forth in paragraph "62" of the Complaint, Defendant restates and reiterates each and every response set forth above as though fully set forth at length herein.

63.     Defendant admits the allegations set forth in paragraph "63" of the Complaint.

64.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "64" of the Complaint.

65.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "65" of the Complaint.

66.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "66" of the Complaint and respectfully refers this Court to the documents referenced therein for their true and accurate terms, content, context, and meaning.

11

67. Paragraph "67" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "67" of the Complaint and respectfully refers all questions of law to the Court and avers that despite Defendant being ready, willing, and able to close on August 31, 2020 (and to accept title subject to the alleged Option), Plaintiff refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

68. Paragraph "68" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "68" of the Complaint and respectfully refers all questions of law to the Court.

69. Paragraph "69" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "69" of the Complaint and respectfully refers all questions of law to the Court.

70. Paragraph "70" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "70" of the Complaint and respectfully refers all questions of law to the Court.

71. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "71" of the Complaint except Defendant admits that "[Defendant] has demanded that RACER complete the sale."

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

72. Paragraph "72" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "72" of the Complaint and respectfully refers all questions of law to the Court.

## COUNT II
## BREACH OF CONTRACT

73. In response to the allegations set forth in paragraph "73" of the Complaint, Defendant restates and reiterates each and every response set forth above as though fully set forth at length herein.

74. Defendant admits the allegations set forth in paragraph "74" of the Complaint.

75. Paragraph "75" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "75" of the Complaint and respectfully refers all questions of law to the Court.

76. Paragraph "76" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the truth of the allegations set forth in paragraph "76" of the Complaint, respectfully refers all questions of law to the Court, and avers that having repudiated the PSA, Plaintiff loses the benefit of any limitation of remedies included in Section 11.3.

77. Paragraph "77" of the Complaint does not make any allegations against the Defendant, but instead states a legal conclusion to which no response is required. To the extent a

13

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

response is required, Defendant denies the truth of the allegations set forth in paragraph "77" of

the Complaint and respectfully refers all questions of law to the Court.

Any allegation of the complaint not specifically responded to above is hereby denied.

Respectfully submitted,

Dated: January 8, 2021          By:   /s/ Glenn L. Smith
                                      Glenn L. Smith (P43156)
                                      Wheeler Upham, P.C.
                                      Attorneys for Defendant

14

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

RACER PROPERTIES,

     Plaintiff,                        Case No. 20-184360-CB

v                                      Hon. Martha D. Anderson

ECALP CORP., a foreign corporation,

     Defendant.

---

Frances Belzer Wilson (P68650)
Brian Considine (P53783)
DAWDA, MANN, MULCAHY & SADLER
Attorneys for Plaintiff
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
bconsidine@dmms.com

Glenn L. Smith (P43156)
WHEELER UPHAM, P.C.
Attorneys for Defendant
250 Monroe Ave NW, Ste 100
Grand Rapids, MI 49503
(616) 459-7100
Smith@wuattorneys.com

---

## DEFENDANT'S AFFIRMATIVE AND/OR SPECIAL DEFENSES

NOW COMES Defendant ECALP CORP., by and through its attorneys, Wheeler Upham,

P.C., and for its Special and/or Affirmative Defenses states as follows:

1.     The First Count, Second Count, and the relief sought in the *ad damnum* clauses

each fail to state a cause action upon which relief can be granted.

2.     The United States Postal Service ("USPS") has a vital interest in the subject matter

of this action based on its purported Option to purchase the Property.

3.     The presence of the USPS in this action is, therefore, essential particularly since

there is no indication that the Option was ever consummated and the time to do so potentially

expired on September 12, 2020.

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

4.      As such, Plaintiff's failure to include the USPS as a necessary party to this action warrants dismissal pursuant to MCR 2.205.

5.      The First Count, Second, and the relief sought in the *ad damnum* clauses are each barred by the doctrine(s) of waiver, estoppel, laches and unclean hands.

6.      This action is barred in whole or in part by Plaintiff's repudiation of the PSA and breach of the covenant of good faith and fair dealing in refusing to proceed with the closing on or before August 31, 2020 even though (i) the Option was not a condition to the PSA; and (ii) Defendant was ready, willing, and able to close under the PSA subject to all potential rights asserted by USPS.

7.      Defendant expressly reserves the right to assert additional defenses and/or affirmative defenses.

Respectfully submitted,

Dated: January 8, 2021          By:     /s/ Glenn L. Smith
                                        Glenn L. Smith (P43156)
                                        Wheeler Upham, P.C.
                                        Attorneys for Defendant

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

RACER PROPERTIES,

     Plaintiff,

Case No. 20-184360-CB

v

Hon. Martha D. Anderson

ECALP CORP., a foreign corporation,

     Defendant,

and

ECALP CORP., a foreign corporation,

     Counter-Plaintiff,

v

RACER PROPERTIES,

     Counter-Defendant.

---

| | |
|---|---|
| Frances Belzer Wilson (P68650) | Glenn L. Smith (P43156) |
| Brian Considine (P53783) | WHEELER UPHAM, P.C. |
| DAWDA, MANN, MULCAHY & SADLER | Attorneys for Defendant/Counter-Plaintiff |
| Attorneys for Plaintiff/Counter-Defendant | 250 Monroe Ave NW, Ste 100 |
| 39533 Woodward Ave., Suite 200 | Grand Rapids, MI 49503 |
| Bloomfield Hills, MI 48304 | (616) 459-7100 |
| (248) 642-3700 | Smith@wuattorneys.com |
| fwilson@dmms.com | |
| bconsidine@dmms.com | |

---

## DEFENDANT'S COUNTERCLAIM

NOW COMES Defendant ECALP CORP., by and through its attorneys, Wheeler Upham,

P.C., and for its Counterclaim states as follows:

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## PRELIMINARY STATEMENT

These counterclaims arise out of Plaintiff's repudiation of the Purchase and Sale Agreement ("PSA") (**Complaint Exhibit 4**) and its improper decision to abdicate any responsibility to close under the parties' contract to sell certain property at 711 North Glenwood Avenue, Pontiac, Michigan (the "Property"). Instead, Plaintiff refused to proceed with a closing under the false premise that USPS's exercise of a purchase option (the "Option") automatically excused Plaintiff from closing with Defendant, even though (i) the Option was not a condition to the PSA; (ii) the closing for the Option was set by USPS <u>after</u> the Law Date to close with Defendant; and (iii) Defendant was and remains ready, willing, and able to close and purchase the Property subject to all potential rights asserted by USPS.

## COUNTERCLAIMS

1.     Defendant repeats and realleges the allegations set forth in paragraphs "1" through "89" of its contemporaneously filed Answer to the Complaint as though set forth at length herein.

2.     Defendant entered into the PSA with Plaintiff for the purchase of the Property on or about December 27, 2019.  **Complaint Exhibit 4.**

3.     The PSA does not make any reference to the Option.

4.     The PSA does not make any representation about the Option.

5.     Among other provisions, Article 4 of the PSA, entitled "Seller's Representations, Warranties, and Covenants" provides:

> a.     Seller has full capacity, right, power and authority to execute, deliver, and perform this Agreement and the Transaction Documents. This Agreement, the Transaction Documents and the transactions contemplated herein have been duly authorized by Seller and are binding and enforceable against Seller in accordance with their respective terms (except as enforceability may be limited by Law). (Sec. 4.1.2)

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

b. Except as disclosed herein, no consents of any kind are required for Seller to execute, deliver and perform its obligations under this Agreement and consummate the Sale. (Sec. 4.1.3)

c. The Lease Agreement (as hereinafter defined) is still in full force and effect. To Seller's knowledge, Seller in its capacity as landlord has performed all work to date under the Lease Agreement, and Seller has not received any written notice from the tenant thereunder of any default by landlord or any state of facts which could ripen into a default thereunder. (Sec. 4.1.6)

d. Seller has no knowledge of any pending or contemplated eminent domain actions, condemnations or other such takings affecting the Property or any portion thereof. (Sec. 4.1.7)

6. Further, Section 4.2 of the PSA, entitled "Additional Covenants," expressly

provides that:

> From and after the Effective Date until the Closing Date, without Buyer's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed), Seller will refrain from: (a) entering into any contract or Agreement of any kind to sell or dispose of the entire Property, or otherwise solicit or accept from any individual(s) or entity or other Person any offers to purchase the entire Property, except as contemplated by this Agreement; (b) encumbering title to the Property with any liens or encumbrances (except to the extent that any required property taxes may continue to accrue with respect to the Property prior to the Closing, which items will be prorated as of the Closing Date in accordance with this Agreement), other than with Permitted Exceptions; and (c) entering into any other new contract affecting the Property, which will survive the Closing for more than sixty (60) days after the Closing or is otherwise terminable on not more than 60 days' notice.

7. Similarly devoid of any mention of the Option is Section 6.2 of the PSA, entitled

"Closing Conditions," which references the Lease as follows:

3

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

> The obligations of Seller to consummate the sale are condition upon the satisfaction of the following Closing Conditions: … (e) assignment by Seller to and assumption by Buyer of the Ground Lease Agreement dated November 29, 2004 between General Motors Corporation and USPS, as assumed by the Trust pursuant to the Settlement Agreement. (Sec. 6.2.1)

8.      Further, Section 6.2.2 of the PSA provides that:

> The obligations of Buyer are conditioned upon the satisfaction of following Closing Conditions: (a) the unconditional delivery of Seller's Closing Deliveries; and (b) the delivery of fee simple title to the Property, subject to no liens other than the Permitted Exceptions, and those items which Seller has elected to cause to be omitted or insured over at or prior to Closing in accordance with this Agreement.

9.      In turn, the Option is not a Permitted Exception under the PSA.

10.     On or about May 10, 2019, the parties entered into the First Amendment to Purchase and Sale Agreement (the "First Amendment") to extend the Inspection Period (as defined in the PSA).

11.     On or about July 26, 2019, the parties entered into the Second Amendment to Purchase and Sale Agreement (the "Second Amendment" and together with the First Amendment, the "Amendments"), which granted Plaintiff access to the Property in order to perform a "Phase I environmental assessment, Phase II environmental assessment and any further environmental assessment …." **Complaint Exhibit 5.**

12.     The Second Amendment set the "Outside Closing Date" to August 31, 2020 (hereinafter the "Law Day"). **Complaint Exhibit 6.**

13.     Neither of the Amendments make any reference to the Option.

14.     Neither of the Amendments make any representation about the Option.

4

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

15.     On August 21, 2020, a mere 10 days before Law Day, Plaintiff sent Defendant a letter stating, "it is terminating the [PSA] … [because USPS] exercised its option to purchase the property."

16.     However, according to the Complaint, USPS allegedly exercised the Option on May 8, 2020 and set a closing for September 12, 2020 which was after the Law Day on August 31, 2020.

17.     At any rate, Plaintiff's delay of more than three (3) months in issuing a notice of termination constitutes a waiver of any potential rights.

18.     Defendant was ready, willing, and able to close on August 31, 2020 (and even before that time) and advised Plaintiff that it would accept title subject to the alleged Option.

19.     The Plaintiff, however, refused to proceed with a closing and repudiated the PSA in advance of the Law Day.

20.     To date, there is no indication that the Property was sold or that the Option is still effective, and USPS is curiously not a party to this action.

21.     Plaintiff's decision to unilaterally recognize the exercise of the Option to the detriment of Defendant was done in bad faith and violates not only the PSA, but all the precepts of good faith and fair dealing inherent in all contract for the sale of real property.

22.     As the party repudiating the PSA, Plaintiff cannot seek to selectively enforce any provisions of the PSA.

23.     In view of the foregoing, the provisions of the PSA relating to limitation of remedies (Section 11.3) are not effective in this case based upon Plaintiff's prior repudiation and refusal to proceed with a closing. Any effort by Plaintiff to first disavow the PSA and then limit Defendant's recourse and remedies is against relevant equitable principle.

5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

24.     By reason of the foregoing, and notwithstanding Section 11.3 which is not effective under the circumstances, Defendant is entitled to a judgment declaring and adjudging that the Plaintiff breached and repudiated the PSA, entitling Defendant to a judgment of specific performance directing Plaintiff to deliver title to the Property in accordance with the PSA.

**25.**     The PSA relates to an interest in real property that is special and unique and there is no adequate remedy at law.

## SECOND COUNTERCLAIM

26.     Defendant repeats and realleges the allegations set forth in paragraphs "1" through "114" of its contemporaneously filed Answer to the Complaint above as though set forth at length herein.

27.     Defendant pleads, in the alternative, that to the extent specific performance for the Property is not available, Defendant is entitled to an award of damages by reason of Plaintiff's repudiation of the PSA and failure to proceed in good faith to a closing.

28.     The damages incurred by the Defendant by reason of Plaintiff's repudiation of the PSA include, but are not limited to, all amounts expended by Defendant for due diligence, attorneys' fees, environmental review, lost opportunity costs, as well as the costs and legal expense of defending this action.

29.     In view of the foregoing, Defendant is entitled to a judgment for its compensatory and consequential damages in an amount to be determined at trial.

## THIRD COUNTERCLAIM

30.     Defendant repeats and realleges the allegations set forth in paragraphs "1" through "118" of its contemporaneously filed Answer to the Complaint as though set forth at length herein.

31.     MCR 2.605(a) states that:

6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

> In a case of actual controversy within its jurisdiction, a Michigan Court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

32.     Here, a justiciable controversy exists between Plaintiff and Defendant regarding whether the terms of Section 11.3 regarding the limitation of Defendant's remedies under the PSA are operative or enforceable.

33.     Specifically, a controversy exists between Plaintiff and Defendant regarding whether Defendant may seek specific performance of the PSA under the circumstances herein.

34.     Section 11.3 does not exonerate Plaintiff from specific performance and damages under all circumstances, and may be deemed unenforceable when, as here, the PSA is repudiated. Having repudiated the PSA plaintiff loses the benefit of any limitation of remedies.

35.     Here, Plaintiff cannot rely on Section 11.3 after repudiating the PSA and otherwise engaging in bad faith conduct evincing Plaintiff's wholesale disregard of Defendant's rights and legitimate expectations.

36.     Implicit in every contract is the covenant of good faith and fair dealing.

37.     Here, despite making other representations, Plaintiff specifically omitted any representation about the Option in the PSA.

38.     Plaintiff's failure to make any representations as to the Option and then attempt to use the Option as a reason to repudiate or terminate the PSA in advance of the Law Day preludes reliance on the provisions of Section 11.3 which should be declared inoperative or unenforceable under the circumstances.

7

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## FOURTH COUNTERCLAIM

39.     Defendant repeats and realleges the allegations set forth in paragraphs "1" through

"127" of its contemporaneously filed Answer to the Complaint  as though set forth at length herein.

40.     Section 4.1 of the PSA provides that, *inter alia*, Plaintiff:

> will refrain from (a) entering into any contract or Agreement
> of any kind to sell or dispose of the entire Property… (b)
> encumbering title … and (c) entering into any new contract
> affecting the Property …. [Plaintiff] agree[s] to defend,
> indemnify, and hold [Defendant] harmless with respect to
> any obligation, liability, cause of action, claim, damage,
> harm, cost, expense (including reasonable attorney's fees
> actually incurred) by [Defendant] as a result of … any
> related or ancillary action relating to actual or alleged claims
> which accrued (if at all) during [Plaintiff's] period of
> ownership of the property. [Plaintiff's] obligations pursuant
> to the preceding sentence shall survive the Closing.

41.     Plaintiff's recognition of the Option expressly violates Section 4.2 of the PSA.

42.     Accordingly, Plaintiff is obligated to reimburse and indemnify Defendant for all

the damages, harm, cost, and expenses incurred by the Defendant as a result of Plaintiff's refusal

to proceed including the amounts expended and incurred for due diligence, attorneys' fees,

environmental review, and lost opportunity costs, as well as the costs and legal fees of defending

this action.

43.     In view of the foregoing, Defendant is entitled to a judgment for indemnity against

Plaintiff in an amount to be determined at trial.

**WHEREFORE**, Defendant respectfully requests judgment as follows:

a.      Dismissing Plaintiff's Complaint in its entirety, with prejudice;

b.      On Defendant's First Counterclaim, a judgment against Plaintiff declaring
that Plaintiff breached and repudiated the PSA, and directing Plaintiff to
specifically perform under the PSA and deliver title to the Property to
Defendant in accordance with the PSA;

8

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

c.     On Defendant's Second Counterclaim, a judgment against Plaintiff for all compensatory and consequential damages in an amount to be determined at trial;

d.     On Defendant's Third Counterclaim, a judgment declaring that Section 11.3 of the PSA unenforceable;

e.     On Defendant's Fourth Counterclaim, a judgment against Plaintiff for indemnity directing Plaintiff to indemnify Defendant for all damages, harm, cost, and expenses incurred by Defendant in an amount to be determined at trial; and,

f.     Awarding Defendant such further and different relief as the Court may deem just and proper in these circumstances.

Respectfully submitted,

Dated:  January 8, 2021          By:     /s/ Glenn L. Smith
                                         Glenn L. Smith (P43156)
                                         Wheeler Upham, P.C.
                                         Attorneys for Defendant/Counter-Plaintiff

9

ocument Submitted for Filing to MI Oakland County 6th Circuit Court.

FILED   Received for Filing   Oakland County Clerk   1/28/2021 3:30 PM

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

RACER PROPERTIES LLC,
a foreign limited liability company,

      Plaintiff/Counter-Defendant,                Case No. 20-184360-CB
                                                        Hon. Martha D. Anderson

v.

ECALP CORP., a foreign corporation,

      Defendant/Counter-Plaintiff.

| | |
|---|---|
| Frances Belzer Wilson (P68650) | Glenn L. Smith (P43156) |
| Brian Considine (P53783) | Wheeler Upham, P.C. |
| Dawda, Mann, Mulcahy & Sadler, PLC | 250 Monroe Ave NW, Ste 100 |
| 39533 Woodward Ave., Suite 200 | Grand Rapids, MI 49503 |
| Bloomfield Hills, MI 48304 | (616) 459-7100 |
| (248) 642-3700 | Smith@wuattorneys.com |
| fwilson@dmms.com | Attorneys for Defendant/Counter-Plaintiff |
| bconsidine@dmms.com | |
| Attorneys for Plaintiff/Counter-Defendant | |

**RACER PROPERTIES LLC'S ANSWER TO ECALP CORP.'S COUNTERCLAIM**

NOW COMES Plaintiff/Counter-Defendant RACER Properties LLC ("RACER"), by its attorneys, Dawda, Mann, Mulcahy & Sadler, PLC, and for its Answer to Defendant/Counter-Plaintiff ECALP Corp.'s Counterclaim, RACER incorporates herein the allegations set forth in its Complaint and states in like number paragraphs to the Counterclaim as follows:

**PRELIMINARY STATEMENT**

Defendant/Counter-Plaintiff ECALP Corp. ("ECALP") has mischaracterized the facts and the issues in this matter.  Under the law, once an option to purchase has been exercised, the party exercising that option becomes the equitable owner of the real property.  This is settled as a matter of law for cases addressing leases where the United States Postal Service ("USPS") is tenant (including cases where ECALP's affiliated entities were USPS's landlord).

ECALP had full knowledge and access to the USPS Lease (as that term is defined in the Complaint) and knew of its terms – including the option to purchase.  Moreover, upon USPS exercising its option to purchase, in May of 2020, RACER notified ECALP of USPS's election during a conference call between RACER and ECALP's counsel on May 11, 2020 and immediately thereafter forwarded to ECALP's counsel the USPS notification letter.

Given USPS's election to purchase, USPS has an equitable ownership interest in the Property.  Therefore, RACER was faced with a Hobson's choice to ignore the exercise of option letter from its tenant, USPS, and proceed to close the RACER-ECALP Purchase and Sale Agreement ("PSA") — or consider the USPS exercise of the option to purchase as valid and binding, thus requiring RACER to proceed with a sale to USPS.  RACER thereafter forwarded a Termination Agreement to ECALP on June 25, 2020, which ECALP's counsel rejected during a subsequent conference call and correspondence.  Further complicating the matter, RACER was not able to discuss details of the ECALP sale with USPS because of ECALP's insistence that RACER not disclose its identity to USPS.  RACER again tried to resolve the issue on or about August 21, 2020, by notifying ECALP that it was terminating the RACER-ECALP PSA because of USPS having exercised its option; however, this notice only resulted in more discussions between RACER and ECALP.

During a call with ECALP's counsel on September 14, 2020, RACER explained the practical difficulties that had arisen as a result of USPS having exercised its option and thereafter served another letter on ECALP on or about October 2, 2020 regarding the PSA termination.  One of the issues confronting RACER was that as part of a closing the PSA with ECALP, the Title Company required that RACER execute an Owner's Affidavit affirmatively stating that RACER had clear title to the Property and that no tenants exerted any claims to the Property. Yet RACER could not and cannot make these statements in light of USPS's equitable interest resulting from it

exercising the option to purchase.  Moreover, statements made by ECALP's counsel during the discussions leading up to the letter of October 2, 2020, (a) evidenced an intent by ECALP to not honor USPS's interest in the Property, and (b) constituted a breach of representations and warranties, as more fully set forth in the Complaint.  It is in this context that RACER filed its Complaint.

### ANSWER TO COUNTERCLAIMS

1.     No response is required as the paragraph attempts to incorporate ECALP's Answer to the Complaint, which is inconsistent with the provisions of MCR 2.111 and should be stricken.

2.     Denied as untrue. By way of further response, RACER states that the PSA was signed December 27, 2018 but the parties, by an exchange of correspondence, agreed that the Effective Date would be January 7, 2019.

3.     Denied as untrue.  By way of further response, the referenced option for USPS to purchase the real property at issue is contained in the USPS Lease and the PSA makes reference to the USPS Lease in several provisions.

4.     Denied as stated as untrue.  By way of further response, the referenced option for USPS to purchase the real property at issue is contained in the USPS Lease and the PSA references the USPS Lease in several provisions.  Moreover, ECALP was aware of the option in the USPS Lease and it was provided a copy in advance of the execution of the PSA.

5.     RACER neither admits nor denies the allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

6.      RACER neither admits nor denies the allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

7.      Denied as untrue.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

8.      RACER neither admits nor denies the allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

9.      This is a mere legal conclusion and no response is required.  RACER denies any factual allegation contained therein as untrue.

10.     RACER admits the parties entered into the First Amendment to Purchase and Sale Agreement, attached to the Complaint as Exhibit 5, and that the document is dated May 10, 2019. RACER neither admits nor denies any remaining allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

11.     RACER admits that the parties entered into the Second Amendment to Purchase and Sale Agreement, attached to the Complaint as Exhibit 6, and that the document is dated July

4

26, 2019.  RACER neither admits nor denies any remaining allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations. By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

12.     RACER admits that the Second Amendment to the PSA set an Outside Closing Date of August 31, 2020.  RACER neither admits nor denies any remaining allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations.  By way of further response, the document referenced is the best evidence of its content.  To the extent the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

13.     Denied as stated as untrue.  By way of further response, the documents referenced are the best evidence of its content.

14.     Denied as stated as untrue.  By way of further response, the documents referenced are the best evidence of its content.

15.     RACER admits that it notified ECALP in writing, via letter dated August 21, 2020, that the PSA was terminated.  The August 21, 2020 letter is the best evidence of its content and any remaining allegations that allege or imply that the content of the document is contrary to its actual content are denied as untrue.  By way of further response, RACER notified ECALP of USPS's exercise of the option under the USPS Lease as early as May 11, 2020.

16.     RACER admits that USPS exercised its option under the USPS Lease on or about May 8, 2020 via the document attached to the Complaint as Exhibit 7, which is the best evidence of its content. Any remaining allegations that allege or imply that the content of the document is contrary to its actual content are denied as untrue.   RACER thereafter notified ECALP on or about

May 11, 2020 that USPS had exercised its option.  Further, the August 31, 2020 Outside Closing Date has no relevance to the September 12, 2020 date that USPS suggested for closing on its Option and there was no closing on that date between RACER and USPS because of the issues raised in the Complaint.

17.     This is a mere legal conclusion and no response is required.  RACER denies any factual allegation contained therein as untrue.  Moreover, RACER notified ECALP of USPS exercising the option in the USPS Lease promptly and in writing as early as May 11, 2020.

18.     Denied as stated as untrue.  ECALP was not ready, willing, or able to close on August 31, 2020 as it was still trying to negotiate a Prospective Purchaser Agreement with the United States Environmental Protection Agency.  Further, ECALP had the opportunity to object to USPS's option rights in its Title Objection Notice letter dated September 10, 2019, but failed to do so, thereby accepting the possibility that USPS would exercise its rights during ECALP's performance of due diligence and thereby acquire an equitable ownership interest in the Property prior to closing of the RACER-ECALP transaction.

19.     Denied as stated as untrue.  In further response, as of September 14, 2020, the parties were still discussing how USPS's exercise of its option affected the transaction and it was not until RACER's letter of October 2, 2020 (after August 31, 2020) that RACER outlined the reasons it could not proceed with closing the RACER-ECALP transaction.  ECALP made no attempt to seek  an extension of the Outside Closing Date.

20.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

21.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

22.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

23.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

24.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

25.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

## SECOND COUNTERCLAIM

26.     RACER realleges its responses contained in preceding paragraphs as though fully set forth herein.

27.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

28.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

29.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

## THIRD COUNTERCLAIM

30.     RACER realleges its responses contained in preceding paragraphs as though fully set forth herein.

31.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

32.     To the extent this allegation contains legal conclusions no response is required. RACER's Complaint also seeks declaratory relief related to Section 11 of the PSA.  However, the

PSA specifically provides that specific performance is not an available remedy to ECALP, and that the sole and exclusive remedy for any seller's default shall be the return of extension fees. See PSA, Section 11.3.

33.    To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue. ECALP expressly and unambiguously agreed that specific performance is not an available remedy under the PSA.

34.    To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

35.    To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

36.    To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

37.    RACER denies any factual allegation contained therein as untrue. By way of further response, the USPS Lease contains the option at issue and it is expressly referenced in the PSA; moreover, ECALP was otherwise fully informed of its existence and provisions.

38.    To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

## FOURTH COUNTERCLAIM

39.    RACER realleges its responses contained in preceding paragraphs as though fully set forth herein.

40.    RACER neither admits nor denies the allegations contained therein as RACER lacks knowledge or information sufficient to form a belief as to the truth of the allegations. By way of further response, the document referenced is the best evidence of its content. To the extent

the allegation alleges or implies the content of the document is contrary to its content, the allegation is denied as untrue.

41.     RACER denies any factual allegation contained therein as untrue.

42.     RACER denies any factual allegation contained therein as untrue.

43.     To the extent this allegation contains legal conclusions no response is required. RACER denies any factual allegation contained therein as untrue.

WHEREFORE, Plaintiff/Counter-Defendant RACER Properties LLC, respectfully requests that this Honorable Court dismiss Defendant/Counter-Plaintiff's Counterclaim, and award it such other and further relief which this Court may deem proper, including costs and attorney fees for having to defend this Counterclaim.

Respectfully submitted,

DAWDA, MANN, MULCAHY & SADLER, PLC


By:  */s/ Frances Belzer Wilson*
Frances Belzer Wilson (P68650)
Brian Considine (P53783)
Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
bconsidine@dmms.com
Attorneys for Plaintiff/Counter-Defendant

Dated:  January 28, 2021
02565193.DOCX

---

**CERTIFICATE OF SERVICE**

I certify that I served a copy of the foregoing document on all attorneys of record via the Court's electronic filing system on January 28, 2021.

*/s/ Kristen Landman*

---

9

FILED    Received for Filing    Oakland County Clerk    1/28/2021 3:30 PM

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

RACER PROPERTIES LLC,
a foreign limited liability company,

       Plaintiff/Counter-Defendant

v.

ECALP CORP., a foreign corporation,

       Defendant/Counter-Plaintiff

Case No. 20-184360-CB
Hon. Martha D. Anderson

---

| | |
|---|---|
| Frances Belzer Wilson (P68650) | Glenn L. Smith (P43156) |
| Brian Considine (P53783) | Wheeler Upham, P.C. |
| Dawda, Mann, Mulcahy & Sadler, PLC | 250 Monroe Ave NW, Ste 100 |
| 39533 Woodward Ave., Suite 200 | Grand Rapids, MI 49503 |
| Bloomfield Hills, MI 48304 | (616) 459-7100 |
| (248) 642-3700 | Smith@wuattorneys.com |
| fwilson@dmms.com | Attorneys for Defendant/Counter-Plaintiff |
| bconsidine@dmms.com | |
| Attorneys for Plaintiff/Counter-Defendant | |

---

## AFFIRMATIVE AND/OR SPECIAL DEFENSES TO COUNTERCLAIM

NOW COMES Plaintiff/Counter-Defendant RACER Properties LLC ("RACER"), by its attorneys, Dawda, Mann, Mulcahy & Sadler, PLC, and for its Affirmative and/or Special Defenses to Defendant/Counter-Plaintiff ECALP Corp.'s Counterclaim, RACER incorporates herein the allegations set forth in its Complaint and states as follows:

1.      ECALP Corp. ("ECALP") fails to state a claim upon which relief may be granted pursuant to MCR 2.116(C)(8) and (C)(10).

2.      In the event the United States Postal Service ("USPS") is deemed a necessary party, ECALP's failure to add such party warrants dismissal of the Counterclaim.

3.      ECALP's claims are precluded, in whole or in part, for its failure to mitigate damages, as ECALP failed to object to the USPS purchase option during its title review period,

engaged in lengthy due diligence when it knew USPS could exercise its option at any time, allowed the Purchase and Sale Agreement ("PSA") to expire, and failed to promptly seek declaratory relief from the Court, among other actions as more fully set forth in its Complaint.

4.      ECALP's claims may be barred, in whole or in part, where the damages suffered by it, if any, are the result of its own actions and/or conduct as set forth in the Complaint in this matter, including but not limited to failing to object to the USPS purchase option during its title review period, engaging in lengthy due diligence when it knew USPS could exercise its option at any time, allowing the PSA to expire, and failing to promptly seek declaratory relief from the Court.

5.      ECALP's damages, if any, are the direct and proximate result of its own actions, omission, malfeasance, and/or by the acts or omissions of parties over whom RACER has/had no control, including but not limited to, USPS's claim of an equitable ownership interest in the property, statements by ECALP and/or its agents/attorneys that indicated an intent not to honor the USPS option to purchase in breach of the warranties and representations in the PSA, and allowing the PSA to expire, as more fully set forth in its Complaint.

6.      The underlying contract at issue terminated and/or expired.

7.      The relief sought is expressly precluded under the PSA, for the reasons more fully set forth in its Complaint.

8.      ECALP's claims may be barred, in whole or in part, by the doctrine of waiver, latches, estoppel and/or unclean hands, for the reasons set forth more fully in the Complaint.

9.      ECALP's claims may be barred, in whole or in part, as it was the first party to materially breach the contract at issue, for the reasons set forth more fully in the Complaint.

10.     ECALP's claims may be barred, in whole or in part, by release and/or fraud, for the reasons set forth more fully in the Complaint.

11.     ECALP's claims may be barred, in whole or in part, because no duty to Defendant/Counter-Plaintiff was owed and/or breached, for the reasons set forth more fully in the Complaint.

12.     ECALP's claims may be barred, in whole or in part, as a result of failure of condition precedent or subsequent, for the reasons set forth more fully in the Complaint.

13.     To the extent ECALP is entitled to damages, if any, RACER is entitled to an offset for the reasons set forth more fully in the Complaint.

14.     RACER reserves the right to add any other special or affirmative defenses as they may become known throughout the course of discovery.

WHEREFORE, Plaintiff/Counter-Defendant RACER Properties LLC, respectfully requests that this Honorable Court dismiss Defendant/Counter-Plaintiff's Counterclaim, and award it such other and further relief which this Court may deem proper, including costs and attorney fees for having to defend this Counterclaim.

<table>
<tr><td>

**CERTIFICATE OF SERVICE**
I certify that I served a copy of the foregoing document on all attorneys of record via the Court's electronic filing system on January 28, 2021.

*/s/ Kristen Landman*

</td><td>

Respectfully submitted,

DAWDA, MANN, MULCAHY & SADLER, PLC


By: */s/ Frances Belzer Wilson*
Frances Belzer Wilson (P68650)
Brian Considine (P53783)
Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Ave., Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
fwilson@dmms.com
bconsidine@dmms.com
Attorneys for Plaintiff/Counter-Defendant

</td></tr>
</table>

Dated:  January 28, 2021

02565192.DOCX

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

BUSINESS COURT

RACER PROPERTIES                                    HON. MARTHA D. ANDERSON
Plaintiff,
                                                    Case No. 2020-184360-CB
vs.


ECALP CORP
Defendant.

_____/

### NOTICE AND ORDER TO APPEAR

TO:  ALL COUNSEL OF RECORD

    You are notified to appear in the chambers of the HON. MARTHA D. ANDERSON of the Oakland County Circuit Court, 1200 N. Telegraph, Pontiac, Michigan 48341 for a Case Management Conference on 03/08/2021 at 8:30 a.m.

    **At least one week prior to the Case Management Conference, the parties must submit a Joint Case Management Plan.**

    Counsel for Plaintiff must initiate a conference with all counsel of record for the purpose of preparing the Joint Plan.  All counsel must cooperate in the preparation of the Joint Plan. Counsel for Plaintiff must file the Joint Plan.  The Joint Plan[1]  must address the following:

1.  A **brief** description of the Plaintiff's claim(s) and a **brief** description of the Defendant's defenses. Additional paragraphs may be added to address any counterclaims, third-party claims or other additional claims in the case.

2.  The parties must disclose the relief and good faith estimate of the damages sought for all claims and counterclaims.  Depending upon the relief and damages amount sought and the nature of the case, the Court may place the case on an expedited docket.

3.  The basis for jurisdiction in the Business Court and whether jurisdiction is contested.

4.  Whether or not venue is proper in Oakland County.

5.  Whether the pleadings are complete or whether any amendments or additional pleadings/parties are required.

[1]The Joint Plan is to assist the Court in establishing an appropriate case managment plan for the case.  The statements made by a party in the Joint Plan shall not be admissible in evidence for any purpose.

6. Be prepared to discuss the timing and/or status of initial disclosures as well as any issues that the parties are having with regard to initial disclosures. **A party may seek discovery only after the party serves its initial disclosures under MCR 2.302(A).**

7. The possibility of obtaining admissions of fact and of documents to avoid unnecessary proof.

8. Any discovery issues that the parties anticipate may require Court intervention, including any issues regarding the discovery of ESI.

9. Whether there is the possibility of settlement and whether to refer the case to an alternate dispute resolution procedure under MCR 2.410.

10. A proposal for a Scheduling Order to issue in the case, addressing at a minimum the following:

    a. The date by which any additional parties will be joined and the pleadings completed.

    b. Timing of initial disclosures in accordance with MCR 2.302(A)

    c. The date by which all discovery will be completed.  The parties will be expected to discuss what type of discovery will be sought in the case.

    d. Limitation of expert witnesses, if applicable; dates for disclosure of testimonial expert witness lists and expert reports.

    e. The date by which witness lists will be exchanged.

    f. The date by which the parties desire to mediate / facilitate the case.  The parties shall have discussed a mutually-agreeable facilitor prior to the Case Management Conference.

    g. Whether and when the parties desire to have the case submitted to case evaluation under MCR 2.403.

    h. The date by which all dispositive motions will be filed.

    i. The date by which the parties will be ready for trial.

    j. Whether the case is jury or non-jury.

    k. Estimated length of trial.

    l. Whether the parties stipulate to the entry of the Model Protective Order as attached.

11. **The Business Court Case Management Protocol, as attached, shall be adopted as a Court Order by the Court for the governance of all cases assigned to the business court docket unless specific objections are filed by either party prior to the Case Managment Conference.**

12. Any other issues that counsel desire to bring to the attention of the Court.

    Counsel must be prepared to discuss the above issues at the Case Management Conference, during which a Scheduling Order will be prepared and issued.

13. The parties may consider and discuss stipulating in the Scheduling Order to a 9-day filing requirement for what are otherwise 7-day motions.

**Lead counsel for all parties shall appear at the Case Management Conference.  Failure of lead counsel to attend may result in sanctions.  Failure to timely file the Joint Case Management Plan may result in sanctions.  Attorneys of Record must also provide an email address on all future pleadings.**

**SO ORDERED.**

Dated: 01/22/2021

/s/ Martha Anderson
_____

Judge Martha D. Anderson
Oakland County Circuit Court Judge
Business Court

## CASE MANAGEMENT PROTOCOL
## OAKLAND COUNTY CIRCUIT COURT
## BUSINESS COURT CASES

1)     Governance

    a.   As provided in the Notice and Order to Appear, the Business Court Case Management Protocol shall be adopted as a Court Order by the Court for the governance of all cases assigned to the business court docket unless specific objections are filed by either party prior to the early scheduling conference (i.e., Case Management Conference).

    b.   The Case Management Protocol shall be discussed by the parties and the Court at the initial Case Management Conference. If objections have been raised, the objecting party must show good cause as to why a particular case should be exempted, in whole or in part, from the Case Management Protocol or why the Case Management Protocol should be modified in relation to that particular case. Any deviation from the Case Management Protocol shall be specifically described by the objecting party and alternative procedures suggested.

    c.   The Case Management Protocol, including any alternative procedures acceptable to both the parties and the Court, shall be incorporated into the Scheduling Order.

2)     Standing Protocols

    a.   <u>Electronic Service</u>. All counsel of record agree to accept service of all filings and other communication via email at the address identified by the State Bar of Michigan or a single email address as otherwise directed. Service is accomplished upon transmission absent knowledge by the sender that the email was not received (e.g., it is returned as undeliverable). Delivery of materials by the Court's e-filing system also constitutes service effective as of the time stamp on the document.

    b.   <u>Case Management Conference</u>. Pursuant to MCR 2.401(B)(1), the Court may direct that an early scheduling conference be held. In Oakland County, the Court will conduct an early scheduling conference, known in Business Court as the Case Management Conference, at the onset of the case. Lead trial counsel shall attend and be prepared to discuss the case.

    Prior to the conference, all counsel are expected to confer regarding the following matters (as outlined in 2(b)(i)-(xviii) of the Protocol). Plaintiff's counsel shall then file a Joint Case Management Plan, identifying areas of agreement and disagreement (and as to such matters outlined below, briefly setting forth the parties' positions), at least one week prior to the scheduled conference

1

During the conference, the Court should consider any matters that will facilitate the fair and expeditious disposition of the action. To assist the Court, the parties shall address:

    i.   whether jurisdiction and venue are proper or whether the case is frivolous;

    ii.  whether to refer the case to an alternative dispute resolution procedure under MCR 2.410;

         1.  The timing of early ADR processes and the selection of a mutually acceptable neutral.

             a.  The parties shall have discussed a mutually-acceptable neutral prior to the conference.

    iii. the complexity of a particular case and dates when future actions should begin or be completed in the case;

    iv. disclosure, discovery, preservation, and claims of privilege of ESI;

         1.  Whether an ESI Conference will be necessary; if so, the ESI discovery plan shall be filed 14 days following the conference

    v.  the simplification of the issues;

    vi. the amount of time necessary for discovery, staging of discovery, and any modification to the extent of discovery;

         1.  The parties shall attempt in good faith to agree on a proposed discovery plan. The parties shall then incorporate their proposed discovery plan into the Joint Case Management Plan for the Court's review.

    vii. the necessity or desirability of amendments to the pleadings;

    viii. the possibility of obtaining admissions of fact and of documents to avoid unnecessary proof;

    ix. the timing of disclosures under MCR 2.302(A);

    x.  the limitation of the number of expert witnesses, whether to have a separate discovery period for experts, whether to require preparation and disclosure of testifying expert reports, and whether to specify expert disclosure deadlines;

    xi. the consolidation of actions for trial, the separation of issues, and the order of trial when some issues are to be tried by a jury and some by the court;

    xii. the possibility of settlement;

    xiii. whether mediation, case evaluation, or some other form of alternative dispute resolution would be appropriate for the case, and what mechanisms are available to provide such services;

    xiv. the identity of the witnesses to testify at trial;

    xv. the estimated length of trial;

    xvi. whether all claims arising out of the transaction or occurrence that is the subject matter of the action have been joined as required by MCR 2.203(A); and

    xvii. other matters that may aid in the disposition of the action such as:

         1.  Requested relief, including a good faith estimate of the amount of damages, sought in the Complaint and any Counterclaim.

         2.  Need for a protective order and consent to the Court's Model Protective Order

(https://www.oakgov.com/courts/businesscourt/Documents/mod-bc-pro_ord.pdf).

The parties will be expected to discuss the adoption of the Case Management Protocol, subject to any objections and/or mutually agreeable alternative procedures, as a Court Order.

The parties and the Court will discuss the need and timing for any additional conferences.

   c.  <u>Scheduling Order</u>. At the Case Management Conference, the Court shall establish times for events and adopt other provisions deemed appropriate, including:

      i. What, if any, changes should be made in the timing, form, or requirement for disclosures under MCR 2.302(A);

      ii. What, if any, changes should be made to the limitations on discovery imposed under the court rules and whether other presumptive limitations should be established;

      iii. The completion of discovery;

      iv. The exchange of witness lists; and

      v. The scheduling of a pretrial conference, a settlement conference, or trial.

The Scheduling Order may also include provisions concerning initial disclosures, discovery of ESI, any agreements the parties reach for asserting claims of privilege or for protection as trial-preparation material after production, preserving discoverable information, and the form in which ESI shall be produced. MCR 2.401(B)(2).

   d.  <u>Standard Discovery Protocols</u>

**NOTICE:**    **A party may seek discovery only after the party serves its initial disclosures under MCR 2.302(A). See MCR 2.301(A)(1).**

**NOTICE:**    **Discovery shall be proportional to the complexity of the case and amount of damages sought. See MCR 2.302(B)(1). The Court may control the scope, order, and amount of discovery consistent with the court rules. MCR 2.301(C).**

**NOTICE:**    **The parties shall preserve all documents, including all electronically stored information relevant or potentially relevant to the case. Any logistical, cost or other issues presented by this requirement shall be addressed at the Case Management Conference.**

   i. The following provisions are suggested to the parties as a starting point in order to streamline discovery, reduce costs, and engage in meaningful ADR processes as early in the litigation as practicable. The parties may agree to additional or different protocols as long as otherwise permitted by the Michigan Court Rules or upon Court Order. The Court will consider principles of proportionality with regard to all discovery disputes.

   ii. Initial Disclosures.

(1) *Time for Initial Disclosures. MCR 2.302(A)(5).*

Unless a stipulation or order sets a different time, the following deadlines apply:

(a)  A party that files a complaint, counterclaim, cross-claim, or third-party complaint must serve its initial disclosures within 14 days after any opposing party files an answer to that pleading.

(b) A party answering a complaint, counterclaim, cross-claim, or third-party complaint must serve its initial disclosures within the later of 14 days after the opposing party's disclosures are due or 28 days after the party files its answer.

(c)  A party serving disclosures need only serve parties that have appeared. The party must serve later-appearing parties within 14 days of the appearance.

(2) *In General. MCR 2.302(A)(1).*

Except as exempted by the court rules, stipulation, or court order, a party must, without awaiting a discovery request, provide to the other parties:

(a)  The factual basis of the party's claims and defenses;

(b)     The legal theories on which the party's claims and defenses are based, including, if necessary for a reasonable understanding of the claim or defense, citations to relevant legal authorities;

(c)  The name and, if known, address and telephone number of each individual likely to have discoverable information - along with the subjects of that information - that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(d)     A copy - or a description by category and location - of all documents, ESI, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

(e)  A description by category and location of all documents, ESI, and tangible things that are not in the disclosing party's possession, custody, or control that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment. The description must include the name and, if known, the address and telephone number of the person who has possession, custody, or control of the material;

(f)  A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under MCR 2.310 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered;

(g)     A copy (or an opportunity to inspect a copy) of pertinent portions of any insurance, indemnity, or suretyship agreement under which another person may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment including self-insured retention and limitations on coverage,

indemnity, or reimbursement for amounts available to satisfy a judgment; and

    (h)   The anticipated subject areas of expert testimony.

(3)    *Form.* Initial disclosures must be in writing, signed, and served, and a proof of service must be promptly filed.

(4)    *Basis for Initial Disclosure; Unacceptable Excuses.* A party must serve initial disclosures based on the information then reasonably available to the party. A party is not excused from making disclosures because the party has not fully investigated the case or because the party challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

(5)    *Supplementing Initial Disclosures.* A party must supplement or correct an initial disclosure or response as ordered by the Court or in a timely manner if the party learns that the disclosure is materially incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties. Failure to supplement disclosures or responses could lead to sanctions under MCR 2.313(B)(2)(b).

(6)    *Changes to Procedure.* A court order or a written and filed stipulation of the parties may change the initial disclosure requirements as long as the change is not inconsistent with a court order. MCR 2.302(F).

iii. *Written Discovery.*

1. *Scope.* Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information. Information within the scope of discovery need not be admissible in evidence to be discoverable. MCR 2.302(B)(1).

2. Each separately represented party may serve no more than **twenty** interrogatories upon each party. A discrete subpart of an interrogatory counts as a separate interrogatory. MCR 2.309(A)(2).

   A court order or a written and filed stipulation of the parties may change the limits on interrogatories as long as the change is not inconsistent with a court order. MCR 2.302(F).

3. For any type of written discovery under 2.310 or 2.312, the parties are encouraged to agree upon any limitation on written discovery, including the timing and sequencing of written discovery that will best serve the speedy, just and efficient resolution of the matter.

4. Objections shall be clear and concise. Boilerplate or "general" objections are discouraged. Responses with objections shall clearly indicate the scope of the withholding of any information or document on the basis of an asserted objection.

5. Documents identified consistent with MCR 2.309(E) shall be identified by bates number or otherwise such that it is clearwhich produced documents correspond to each interrogatory.

6. Any document withheld on the basis of a claimed privilege, and generated before the initiation of litigation, shall be logged to allow the opposing party and the Court to assess the prima facie assertion of privilege. The log shall be produced at the same time as the document production. The document production shall be made at the same time as the written responses. The log shall (1) state the document number (e.g. Bates number) of the document, (2) describe the nature and general subject matter of the document not produced,(3) state the date and type of document (e.g., e-mail, notes, memo, etc.), (4) state the name(s) of the author/sender, recipient, and any third parties recipients copied, or, if known, who later received copies; and (5) state the privilege(s) asserted as to the withheld document. A log for post-litigation communications may be agreed to by the parties or requested by motion.

7. When filing a motion pursuant to MCR 2.309(C) or 2.310(C)(3), a party must state that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action.

8. The Court will entertain motions to expand or increase discovery upon good cause shown, either initially in the case or later in the discoveryprocess once a defined need is established.

9. Unless otherwise ordered, a date for completion of discovery means the serving party shall initiate the discovery by a time that provides for a response or appearance, per the court rules, before the completion date. MCR 2.301(B)(4).

   That is, discovery must be served sufficiently in advance of the discovery cutoff date so as to allow the opposing party sufficient time to respond prior to the discovery cutoff. As a practical matter, a party shall initiate written discovery at least 28 days before the deadline for the completion of discovery.

10. Discovery motions may be brought after the date for completion of discovery as may be reasonable under the circumstances or by leave of the Court.

11. The parties may stipulate or the Court may order the mediation of discovery

6

disputes. MCR 2.411(H). The Court may specify that discovery disputes must first be submitted to the mediator before being filed as a motion unless there is a need for expediency. MCR 2.411(H)(3).

iv. *Depositions.*

1. A deposition may not exceed **one day of seven hours**. MCR 2.306(A)(3).

2. Subject to MCR 2.306(A)(3), the parties are encouraged to agree upon a limitation on the number and length of any depositions, including the timing, location and sequencing of those depositions that will best serve the speedy, just and efficient resolution of the matter.

3. Presumptively, depositions of Plaintiff's representatives shall take place in Oakland County at Plaintiff's counsel's office or other local location designated by Plaintiff's counsel, and Defendant's depositions shall take place in the location of the deponent's customary place of work (whether in or out of state) at Defendant's counsel's office or other local location designated by Defendant'scounsel.

4. Inordinate breaks during depositions, gamesmanship, objections violative of MCR 2.306(C)(4) or uncivil behavior are inappropriate and will be subject to the imposition of sanctions by the Court.

5. Notice of a deposition must be served on a party's corporate representative at least 14 days prior to the scheduled deposition. No later than 10 days after being served with the notice, the noticed entity may serve objections or file a motion for protective order, upon which the party seeking discovery may either proceed on topics as to which there was no objection or motion, or move to enforce the notice. MCR 2.306(B)(3).

v. *Electronic Discovery; ESI (Electronically Stored Information).*

1. *Form.* ESI means electronically stored information, regardless of format, system, or properties.

2. A party has the same obligation to preserve ESI as it does for all other types of information. MCR 2.302(B)(5). Failure to preserve ESI in the anticipation or conduct of litigation could lead to sanctions under MCR 2.313(D) upon a finding of prejudice to another party from the loss of information or upon a finding that the party acted with the intent to deprive another party of the information's use in litigation.

3. A party need not provide discovery of ESI from sources that the party identifies as not reasonably accessible because of undue burden or cost. MCR 2.302(B)(6).

4. ESI Conference. Where a case is reasonably likely to include the discovery of ESI, parties may agree to an ESI Conference, the judge may order the parties to hold an ESI Conference, or a party may file a motion requesting an ESI Conference, at which time certain matters shall be discussed. MCR 2.401(J)(1) sets forth the matters to be considered during the ESI Conference. Within 14 days of the ESI Conference, the parties shall file with the Court an ESI discovery plan and a statement concerning any issues upon which the parties cannot agree. MCR 2.401(J)(2). The Court may enter an order governing the discovery of ESI pursuant to the parties' ESI discovery plan, upon motion of a party, by stipulation o the parties, or on its own. MCR 2401(J)(4).

5. In cases involving complex issues of ESI, the Court may appoint an expert under MRE 706. By stipulation of the parties, the Court may also designate the expert as a discovery mediator of ESI issues. MCR 2.411(H)(4).

6. Parties should be prepared to discuss e-discovery protocols and related issues in an educated manner at the Case Management Status Conference. Parties are free to agree to additional protocols governing e-discovery (e.g., the Model Order utilized by the U.S. District Court, E.D. Mich). (https://www.mied.uscourts.gov/pdffiles/ParkerEsiOrderChecklist.pdf).

Presumptively, all documents produced electronically shall be produced in native format and with the load files preserving all metadata.

**Failure to comply with the Business Court Case Management Protocol may subject the parties to sanctions.**

# PROPOSED

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

,

**Plaintiff,**

**v.**                                                    Case No. _____
                                                         Hon. _____

,

**Defendant.**

_____
/

*Attorney for Plaintiff*                              *Attorney for Defendant*

_____ /

## STIPULATED PROTECTIVE ORDER

At a session of Court held in the City of Pontiac,
County of Oakland, State of Michigan, on _____

PRESENT: HONORABLE_____
                                        Circuit Judge

Pursuant to MCR 2.302(C), the Court's authority, and on stipulation of the parties,

**IT IS HEREBY ORDERED** that any party or non-party (the "producing party") may

designate information, documents, or things as "Confidential" under the following terms and

conditions:

**1.** Any document, information, or thing may be designated "Confidential" if the producing

party determines in good faith that it contains confidential or proprietary information.

**2.** A producing party may designate any document or other tangible information or thing

as "Confidential" by conspicuously stamping or appending the appropriate designation. In the case of a paper document, a producing party may so mark the first page of a multipage document or each applicable page. In the case of an electronic document, a producing party may append to that document the appropriate designation that does not alter the metadata associated with the document, or may place the appropriate designation mark "CONFIDENTIAL" on the outside of the medium (whether disc, hard drive, etc.) containing the document.

3.    A non-producing party may also designate any document, information, or things produced during the course of this proceeding, not already designated "Confidential" as "Confidential" as if it were a producing party. The non-producing party shall accomplish such designation by notifying all parties in writing of the specific item so designated.

4.    A producing party may designate documents, information, or things disclosed at a deposition as "Confidential" on the record during the deposition or, within 30 days of receiving the deposition transcript, by notifying all parties in writing of the specific item so designated or the lines and pages of the transcript that are "Confidential." All deposition transcripts and exhibits will be deemed Confidential for a period of 30 days after the receipt of the deposition transcript.

a.    If a producing party designates such materials as "Confidential" on the record, the court reporter shall indicate that fact on the cover page of the transcript that the transcript includes "Confidential" information, and shall list the pages and line numbers and/or exhibits of the transcript on or in which such information is contained, and shall bind the transcript in separate portions containing "Confidential," and non-Confidential material. Further, during the period   in which such "Confidential" information is discussed during the deposition, any

person present during the deposition who is not authorized to receive such information under Paragraph 10 below shall be excluded from that portion of the deposition.

    **b.** A non-producing party may designate documents, information, or things disclosed at a deposition as "Confidential" in the same manner as a producing party.

5. If a party producing documents inadvertently fails to mark a document as "Confidential" for which it desires such treatment, it shall so inform the party receiving the documents forthwith, but in no event later than thirty (30) days following discovery of the inadvertent disclosure. The receiving party thereupon shall return the unmarked documents to the producing party and the producing party shall substitute properly marked documents.

6. The inadvertent or unintentional disclosure by a producing party supplying confidential discovery material, regardless of whether such discovery material was designated as "Confidential," shall not be deemed a waiver in whole or in part of the producing party's claim of confidentiality with respect to the discovery material disclosed, provided that the producing party making such inadvertent or unintentional disclosure notifies the receiving parties forthwith, but in no event later than thirty (30) days after it learns of such inadvertent or unintentional disclosure. If discovery material has been disclosed and is subsequently designated as "Confidential," the disclosing party shall make good faith efforts to preserve the "Confidential" nature of such discovery material and to obtain compliance with this Order from any person to whom such discovery material was disclosed.

7. If a producing party, at the time of disclosure, inadvertently fails to identify as "Confidential" any discovery material (including, without limitation, documents, oral, visual, or

3

recorded information) for which it desires such treatment, and another party files the material with the Court prior to receiving notice that such material was inadvertently disclosed without the desired designation, the producing party who made the inadvertent disclosure shall be responsible for seeking appropriate relief from the Court.

8.  Should any party object to a designation of any information, documents, or things as "Confidential," the parties or the producing party shall, on an expedited basis, meet and confer in a good-faith attempt to reach an agreement regarding the status of the information, documents, or things. The parties are strongly encouraged to resolve all such objections and, if appropriate, utilize the services of a neutral to assist the parties in the resolution of the dispute. If an objection is not thereby resolved, a party may bring the dispute before the Court on an expedited basis for a determination. The party claiming the "Confidential" designation shall have the burden of proving good cause for the entry of an order maintaining the designation of the information, documents, or testimony under the terms of this Stipulated Protective Order. Until the Court makes such determination, all material designated as "Confidential" shall be treated as such.

9. All information, documents, or things produced, exchanged, or inspected in the course of this proceeding shall be used solely for the purposes of this proceeding or any other proceeding including substantially similar parties or substantially similar issues.

10. All documents, information, or things designated as "Confidential" shall be made available only to the Court's staff and to counsel for the parties (including the paralegal, clerical, and secretarial staff employed by such counsel in connection with this case) and the following persons:

a.  The parties and those agents and employees that are directly involved

in the prosecution or defense of this matter;

    **b.** experts or consultants (together with their clerical staff) retained by the respective parties to assist in this case;

    **c.** any court reporter employed in this case;

    **d.** a witness at any deposition or other proceeding in this case;

    **e.** a potential witness; and

    **f.** any other person with the written consent of the parties (and any affected non-party producing party) or upon order of the Court.

**11.** Materials designated as "Confidential" shall not be made available to persons other than those authorized in paragraphs 9 and 10 above - even if attached to or contained within otherwise non-Confidential materials, such as transcripts, memoranda, discovery responses, or affidavits. The "Confidential" information must be removed before the remaining materials may be made available to those other persons.

**12.** Materials designated as "Confidential" shall not be disclosed by opposing counsel to a former employee of Plaintiff or Defendant, respectively, or to a testifying or non-testifying expert or consultant under paragraphs 9 and 10 unless and until such representative, expert, or consultant has first been supplied with and has read a copy of this Order and has executed a copy of the Confidentiality Agreement attached as <u>Exhibit A</u>. Current employees of Plaintiff and Defendant are not required to execute a copy of the Confidentiality Agreement, but must be advised regarding the provisions of this Protective Order.

**13.** Counsel shall maintain files containing materials designated as "Confidential" in a secure location. This provision shall not prevent use of an ESI vendor or host who restricts access to those persons permitted to review Confidential materials as set forth in this Order.

**14.** No documents, information, or things designated as "Confidential," including that contained in pleadings, motions, briefs, declarations, or exhibits (except in sealed envelopes) shall be filed with the Court. Such sealed envelopes shall bear the case caption and shall recite a concise, non-disclosing inventory of their contents for docketing purposes. Additionally, in the case of materials or information designated "Confidential," such sealed envelopes shall prominently bear the notice:

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT**

**TO PROTECTIVE ORDER.  TO BE OPENED ONLY BY OR**

**AS DIRECTED BY THE COURT.**

To the extent practical, only those portions of a filing with the Court that contain material designated as "Confidential" shall be filed under seal (as provided in paragraph 18) or provided to the Court for *in camera* inspection. The Court and its staff shall maintain all filings so designated pending further order or direction from the Court. Provided that no "Confidential" information is disclosed, the parties may generally refer to documents designated as "Confidential" in pleadings, motions, briefs, affidavits, or exhibits filed with the Court, without filing such pleadings, motions, briefs, affidavits, or exhibits under seal.

**15.** Nothing in this Order shall preclude any party or their attorneys from:

**a.** Showing materials designated as "Confidential" to an individual who either prepared or reviewed the document, or is shown by the document to have received the document.

**b.** Disclosing or using, in any manner or for any purpose, any information, documents, or things from the party's own files that the party itself designated as "Confidential."

**c.** Disclosing or using, in any manner or for any purpose, any information, document, or thing at the trial of this matter. But if a party intends to use or offer into evidence at such trial any materials designated as "Confidential," that party must, unless otherwise ordered by the Court, so inform the producing party in a reasonable time in advance to allow the producing party to take such steps that it deems reasonably necessary to preserve the confidentiality of such information or documents.

**d.** Redacting information from documents produced in accordance with the discovery process, including information is irrelevant to this action and would provide the opposing party with a business advantage over the producing party if it is produced. Nothing in this sub-section limits the opposing party from challenging such redactions before this Court.

**16.** If either party is served with a subpoena or similar process, from any person or entity whatsoever, directing that party to produce any materials designated as "Confidential" by another party, counsel for that party shall immediately give counsel for the designating party written notice of such service so that the designating party may seek a protective order or otherwise act to protect the confidentiality of the designated materials.

**17.** Within sixty (60) days of the conclusion of this action, including any appeals, all originals and reproductions of any materials designated as "Confidential" shall be destroyed at the request of the opposing party; provided however, counsel for the parties may retain one complete set (including exhibits) of pleadings and motion papers filed with the Court, and one complete copy of deposition testimony given in this action, in addition to materials designated as "Confidential" in a secure location - subject to any applicable Statute of Limitations. Upon

7

request, counsel for the receiving party shall provide written verification to the producing party that all copies of such materials produced to the receiving party have been destroyed, other than as indicated in this paragraph. Materials designated as "Confidential" that are in the custody of the Court are excepted from the terms of this paragraph.

18.  This Order does not authorize or permit the filing of any documents under seal.

Pursuant to MCR 8.119, as amended, the parties are not to file documents under seal without prior Court approval. The party seeking to file any paper under seal must file and serve a motion under MCR 8.119(I) that (1) describes each item proposed for sealing; (2) states the reason sealing each item is necessary and identifies the specific interest to be protected; (3) explains  why there is no less restrictive means to adequately and effectively protect the specific interest; and (4) includes a memorandum of legal authority supporting the motion. The movant may not file or otherwise tender to the Clerk any item proposed for sealing unless the Court has granted a motion brought under MCR 8.119(I).

19.  If information or materials are inadvertently produced that are subject to a claim of attorney-client privilege, attorney work product or any other ground on which production of such information or materials should not be made to a party, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege, work product or other ground for withholding production to which the producing party would otherwise be entitled. Any and all facially privileged or work product materials inadvertently produced shall be returned promptly, when discovered, in accordance with ABA Rules of Professional Conduct Formal Opinion 92-368 (1992). Any other inadvertently produced privileged materials shall be promptly returned upon the request of the producing party.

**20.** The terms of this Order shall remain in effect after the action and any related appeals are concluded, except that there shall no longer be any restriction on use of materials designated as "Confidential" that are used as exhibits at trial (unless such exhibits were used under seal or protective order at trial).


_____          _____
Date                                 Judge _____
                                     Oakland County Circuit Court Judge
                                     Business Court


Approved as to form and content:


_____          _____

*Attorneys for Plaintiff*             *Attorneys for Defendant*

**EXHIBIT A**

**CONFIDENTIALITY AGREEMENT**

STATE OF _____ )

                                         ) ss.

COUNTY OF _____ )

I, _____ , being first duly sworn, state that:

1. My address is:

_____

_____

2. My present employer is _____ and the address of my employer is

_____

_____

3. My present occupation is

_____

_____

4. I have received a copy of the Stipulated Protective Order in the case of

_____, Case No. _____ in the Oakland County

Circuit Court of Michigan.

5. I submit to the jurisdiction of the Oakland County Circuit Court for purposes of enforcement of the Stipulated Protective Order.

6. I have carefully read and understand the provisions of the Stipulated Protective Order, and I will comply with all of its provisions.

_____

Subscribed and sworn to me before this day _____ of _____ 20____ .

_____
Notary Public
My commission expires: _____